UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
                                                    :
                                                    :
MARVEL WORLDWIDE, INC.,                             :
MARVEL CHARACTERS, INC. and                         :
MVL RIGHTS, LLC,                                    :
                                                    :
                    Plaintiffs,                     :
                                                    :
     - against-                                     :
                                                    :
LISA R. KIRBY, BARBARA J. KIRBY,                    :
NEAL L. KIRBY and SUSAN N. KIRBY,                   :
                                                    :
                    Defendants.                     :
---------------------------------------------------x     Civil Action No. 10 Civ. 141 (CM) (KNF)
                                                    :
LISA R. KIRBY, BARBARA J. KIRBY,                    :
NEAL L. KIRBY and SUSAN N. KIRBY,                   :
                                                    :
                Counterclaim-Plaintiffs,            :
                                                    :
     - against-                                     :
                                                    :
MARVEL ENTERTAINMENT, INC.,                         :
MARVEL WORLDWIDE, INC.,                             :
MARVEL CHARACTERS, INC., MVL                        :
RIGHTS, LLC, THE WALT DISNEY                        :
COMPANY and DOES 1 through 10,                      :
                                                    :
                Counterclaim-Defendants.            :
---------------------------------------------------x


# PLAINTIFFS' AND COUNTERCLAIM-DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

UNDISPUTED MATERIAL FACTS ...................................................................... 3

    Goodman, Marvel's Publisher And Owner, Had The Right And Authority To
    Control Marvel's Creations And Bore The Financial Risk Associated With Its
    Comic Book Business ...................................................................................... 3

    Lee, Marvel's Editor, Oversaw All Aspects Of, And Had The Right And
    Authority To Control, Marvel's Comic Book Creations ................................... 4

    Payment To Freelance Artists For Work Contributed To Marvel's Comic Books .......... 6

    Kirby's Work Was Subject To Marvel's Authority And Control..................... 7

    Kirby And Other Marvel Freelancers Have Acknowledged Their Work Is Work
    Made For Hire ................................................................................................ 8

    The Termination Notices And Copyright Ownership In The Works ............... 9

ARGUMENT ......................................................................................................... 9

I.      LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT ..................... 9

II.     THE UNDISPUTED RECORD EVIDENCE DEMONSTRATES THAT THE
       WORKS AT ISSUE WERE WORKS MADE FOR HIRE UNDER THE 1909
       COPYRIGHT ACT.......................................................................................... 10

       A.    There Is No Termination Right For Works Made For Hire Under The 1909
            Copyright Act....................................................................................... 10

       B.    Marvel Is Entitled To The Almost Irrebuttable Presumption That The
            Works Are Works Made For Hire ....................................................... 11

       C.    The Undisputed Record Evidence Establishes That The Works Were
            Created At Marvel's Instance ............................................................. 12

            1.    Marvel Induced The Creation Of The Works And Maintained The
                 Authority To Direct And Supervise Their Creation ................................ 12

            2.    Artistic Freedom Is Irrelevant To Whether The Works Were
                 Created At Marvel's Instance ................................................................ 14

i

**TABLE OF CONTENTS**
**(continued)**

Page

D.   The Undisputed Record Facts Establish That The Works Were Created At Marvel's Expense ................................................................................ 17

1.   Kirby's Flat-Rate Payment Is Indicative Of A Work-For-Hire Relationship ........................................................................... 17

2.   Marvel Bore All The Financial Risk Associated With The Works ........ 17

III.   THE RECORD IS UTTERLY DEVOID OF ANY FACTS FROM WHICH DEFENDANTS COULD CARRY THEIR BURDEN TO REBUT THE PRESUMPTION THAT THE WORKS ARE WORKS MADE FOR HIRE ................. 18

A.   Defendants Have Not Produced A Single Witness With Personal Knowledge Or Any Admissible Evidence .......................................... 19

B.   Defendants' So-Called Experts Fail To Raise Any Genuine Issue Of Material Fact .................................................................... 20

C.   Kirby Acknowledged Marvel's Direction And Control ..................... 22

CONCLUSION ........................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................9

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435 (2d Cir. 1999) ..........................................10

*Dolman v. Agee*, 157 F.3d 708 (9th Cir. 1998) ...........................................................11

*Easter Seal Soc'y for Crippled Children & Adults of La., Inc. v. Playboy Enters.*, 815 F.2d 323 (5th Cir. 1987) ...........................................................................................11

*Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.*, No. 08 CIV. 6143 (DLC), 2010 WL 3564258 (S.D.N.Y. Sept. 10, 2010) ..............................................*passim*

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, No. 00 Civ. 9569 (DLC), 2002 WL 398696 (S.D.N.Y. Mar. 15, 2002) ...................................................................*passim*

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149 (2d Cir. 2003) .....................2, 11

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624 (2d Cir. 2004) ......................................................11, 12

*In re Marvel Entm't Group, Inc.*, 254 B.R. 817 (D. Del. 2000) .............................*passim*

*Murray v. Gelderman*, 566 F.2d 1307 (5th Cir. 1978) .............................................12, 15

*Ocean Group LLC v. Marcal Mfg., LLC*, No. 09 Civ. 7679 (CM), 2010 WL 4963155 (S.D.N.Y. Dec. 2, 2010) .............................................................................................9

*Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213 (2d Cir. 1972) .............................13

*Playboy Enters., Inc. v. Dumas*, 53 F.3d 549 (2d Cir. 1995) .................................*passim*

*Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710 (S.D.N.Y. 1997) ...........................14

*Scherr v. Universal Match Corp.*, 417 F.2d 497 (2d Cir. 1969) ...................................12

*Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909 (2d Cir. 1974) ...........................11, 16

*Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111 (C.D. Cal. 2007) ...........................18

*Siegel v. Warner Brothers Entm't Inc.*, 658 F. Supp. 2d 1036 (C.D. Cal. 2009) .................*passim*

iii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
429 F.3d 869 (9th Cir. 2005) ...................................................................12, 17, 19, 20

*Weinstock v. Columbia Univ.*, 224 F.3d 33 (2d Cir. 2000)............................................9

*Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2d Cir. 1939).....................................13

**FEDERAL STATUTES**

17 U.S.C. § 26.........................................................................................................10

17 U.S.C. § 304(c) ...................................................................................................10

17 U.S.C. § 410(c) ...................................................................................................22

Fed. R. Civ. P. 56(c) ..................................................................................................9

Fed. R. Evid. 702 .....................................................................................................20

Plaintiffs Marvel Worldwide, Inc., Marvel Characters, Inc. and MVL Rights, LLC (collectively, "Plaintiffs") and Counterclaim-Defendants Marvel Entertainment, LLC (successor by merger to Marvel Entertainment, Inc. and together with Plaintiffs, "Marvel") and The Walt Disney Company ("Disney") respectfully submit this Memorandum of Law in Support of Their Motion for Summary Judgment.

## PRELIMINARY STATEMENT

The undisputed facts show that each of the characters, stories and other copyrightable elements in the Marvel comic books at issue in this case (collectively, the "Works") was created at Marvel's direction, subject to Marvel's editorial control, and at Marvel's expense. Second Circuit precedent thus mandates that Marvel is, and always has been, the owner of the Works as works made for hire. The notices sent by Defendants – the children and legal heirs of comic book artist Jack Kirby – purporting to terminate an alleged assignment by Kirby of the copyrights in such comic books as *The Fantastic Four*, *The Incredible Hulk*, *The X-Men*, and *The Avengers*, among others (the "Termination Notices") are therefore invalid, and Marvel and Disney are entitled to judgment as a matter of law.

A work is made for hire under the Copyright Act of 1909 (the "1909 Act") when it meets the "instance and expense" test. That test is satisfied when the hiring party induces and pays for the creation of a work, and the hired party cannot prove that the parties explicitly agreed the works would be treated as anything other than works made for hire. *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 554-55 (2d Cir. 1998). As the hiring party, Marvel need only show "some credible evidence" that the Works were created at its instance and expense to be entitled to the "*almost irrebuttable* presumption" that they are works made for hire and Marvel is the author.

1

*See Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 158 (2d Cir. 2003) (emphasis added); *In re Marvel Entm't Group, Inc.*, 254 B.R. 817, 828 (D. Del. 2000).

Marvel has more than met its threshold burden to establish the work-for-hire presumption. Indeed, following exhaustive discovery, the record is all one way. Stan Lee, the protagonist of and percipient witness to the creation of the Works, has given precisely detailed testimony making clear that the Works were created at Marvel's instance and expense:

- Marvel, through its publisher Martin Goodman and editor Lee, at all times maintained and exercised authority to direct and control the Works' creation. No work ever was published without Lee's and/or Goodman's prior approval.

- Marvel assigned, and when necessary reassigned, artists and writers, including Kirby, to work on particular stories and characters.

- To the extent artists, including Kirby, proposed new characters or story elements for the comics to which they were assigned, they did so as part of their overall relationship with Marvel, in carrying out assignments given by Lee.

- Lee had the authority to, and frequently did, require edits and revisions to Kirby's artwork submitted to Marvel for publication.

- Marvel, not Kirby, bore the financial risk of the success of the Works.

- Freelance artists for Marvel, including Kirby, were paid an agreed per-page rate for all assigned work that they submitted to Marvel, including work that was not used, and acknowledged on numerous occasions that their work was "work made for hire."

Against the foregoing, Defendants have entirely failed to overcome the work-for-hire presumption. To do so, Defendants must prove by a preponderance of the credible evidence that there was an explicit agreement between Marvel and Kirby that the Works were <u>not</u> intended to be works made for hire. *Playboy Enters.*, 53 F.3d at 554-55. There indisputably was no such agreement. To the contrary, the testimony of those with firsthand knowledge conclusively

establishes that all of Kirby's contributions to the Works were done at Marvel's behest and expense.  Indeed, while generally uninformed on any specifics, Kirby's own son Neal Kirby – a Defendant in this action – testified unequivocally that "[his] father didn't do work on spec."

Lacking any other relevant admissible evidence, Defendants fall back on the testimony of so-called comic book "historians," who, without reviewing any of the testimony, make a vain effort to transform multiple layers of hearsay into admissible evidence.  But in the end, even they concede the core elements of Marvel's case – they admitted that Kirby *never* put pencil to paper for a work published by Marvel without an express assignment to do so, that Marvel paid Kirby a flat per-page rate, and that Marvel bore the financial risk associated with its comic books during the relevant time period.

This is an easy case for summary judgment.  The proof is undisputed and the law is settled.  The Works were made for hire and are therefore expressly exempt from the termination provisions of section 304(c) of the Copyright Act of 1976.  Defendants' attempt to invoke that provision to "recapture" Kirby's alleged rights to the Works falls flat, as section 304(c) has no application here.  There are simply no rights for Defendants to recapture, and the Termination Notices are invalid.  Hence, Marvel and Disney are entitled to judgment as a matter of law on both Marvel's own claim for declaratory judgment and Defendants' sole remaining counterclaim.

## <u>UNDISPUTED MATERIAL FACTS</u>

### <u>Goodman, Marvel's Publisher And Owner, Had The Right And Authority To Control Marvel's Creations And Bore The Financial Risk Associated With Its Comic Book Business</u>

Marvel owner and publisher Martin Goodman and editor Stan Lee oversaw and controlled the creation of Marvel's comic books from conception through publication throughout the period 1958 through 1963 (the "Time Period").  *See* Marvel's Local Rule 56.1 Statement

("56.1 Stmt.") ¶¶ 14-15, 22-27, 30-32, 34.  As publisher, Goodman was the "ultimate boss" and no Marvel comic book story, character or series was published without his approval.  *See id.* ¶¶ 15-16.  He often directed that comic books with a specific idea or theme be created.  *See id.* ¶¶ 80, 97, 105; *see also id.* ¶ 15.  For example, *The Fantastic Four* was created because Goodman instructed Lee to create a team of superheroes to compete with National Comics's popular *Justice League of America* series, *id.* ¶ 80, and Lee created *The Rawhide Kid* specifically because "Goodman loved westerns."  *Id.* ¶ 105.

As the owner, Goodman had his money on the line when it came to Marvel's comic business, and he bore all the financial risk associated with each comic book Marvel published.  *See id.* ¶ 19.  If a comic book did not sell well, Goodman bore the loss, *id.*, and it was up to him to decide whether to discontinue comic books that were not profitable.  *Id.* ¶ 21.  Still, Marvel paid its artists and writers for all their assigned work when they submitted it – long before the book went on sale – so artists were paid regardless of whether the comic book to which they had contributed was a financial success.  *Id.* ¶ 20.

### Lee, Marvel's Editor, Oversaw All Aspects Of, And Had The Right And Authority To Control, Marvel's Comic Book Creations

While Goodman oversaw the business at a high level, Lee supervised the day-to-day comic book business.  Lee was responsible, among other things, for overseeing the creative direction and all other aspects of Marvel's comic books, characters and stories.  *Id.* ¶¶ 22-23, 27, 30-32, 34-35.  One of Lee's main responsibilities during the Time Period was to execute Goodman's ideas for comic books and to originate concepts himself.  *See id.* ¶ 22.  After conceiving the characters and storyline to be featured in a particular comic book, he decided which writer and artist to assign to write and draw it.  *See id.* ¶¶ 24, 27.  Prior to the Time Period, writers composed a detailed script, complete with page breakdowns and panel-by-panel

descriptions of the action and visuals, as well as full dialogue and captions. *Id.* ¶ 36. Lee wrote most Marvel scripts; if he was not writing the book himself, Lee gave the assigned writer an outline or synopsis of the plot. *See id.* The full script was provided to an artist, who created pencil drawings based on the scenes and directions in the script. *Id.*

Marvel paid its freelance artists for each page that they submitted for publication, so without an assignment from Lee, they had no work and received no pay. *Id.* ¶¶ 38, 45. As Lee's workload increased during the Time Period, he had less time to devote to writing full scripts. *See id.* ¶ 38. As artists depended on assignments from Marvel to support themselves, Lee had to find a way to keep the artists busy. To that end, he devised a new system for writing comic books: instead of giving the artist a detailed panel-by-panel script, he gave the assigned artist a written or oral plot synopsis directly in a "plotting conference." *Id.* ¶ 37. Artists did not put pencil to paper before they obtained the synopsis from Lee; it was only after the plotting conference that the artist drew a complete comic book story based on Lee's plot and instructions. *Id.* ¶ 39. Once the artist's pencil drawings were submitted, Lee wrote the captions and dialogue for the story. *See id.* ¶¶ 37, 40. This process came to be known as the "Marvel Method." *Id.* ¶ 37.

Once the writing and artwork were finalized in pencil, a letterer lettered the captions and dialogue and an inker went over the pencil drawings in ink. *Id.* ¶¶ 27-28. These pages were then sent to an engraver, who reduced them to the proper size, and then a colorist colored the pages and sent them to the printer. *See id.* ¶ 29. The printer set the printing schedule each month and Marvel reserved time on the press in advance. *Id.* ¶ 26. Lee hired, supervised and coordinated all of the people who contributed to the final published comic book and established deadlines for each component to be sure that each book went out on schedule each month. *Id.* ¶¶ 26, 30. He

sometimes reassigned artists and writers onto different projects when he felt it was necessary or appropriate. *Id.* ¶ 25; *see also id.* ¶ 90. If deadlines were not met and a comic book was not ready to be printed at the time reserved, Marvel bore the entire loss. *Id.* ¶ 26.

While the Marvel Method gave artists significant freedom to flesh out Lee's plots, for all of the work – including the addition of any new characters or storylines – Marvel maintained control. *See id.* ¶¶ 40-43. Thus, Lee reviewed all artwork, including covers, during the Time Period. *Id.* ¶¶ 27, 30, 32-35, 40, 43. He decided what artwork would be published, what artwork would be revised, and what artwork would be reassigned to a different artist. *Id.* ¶¶ 25, 30, 32-33, 35, 40, 43; *see also id.* ¶¶ 83, 87. Likewise, Lee also had the final say on plot and dialogue and he sometimes changed those elements as well. *Id.* ¶¶ 31, 37, 40; *see also id.* ¶ 66. He routinely ignored the dialogue that artists, including Kirby, suggested. *Id.* ¶¶ 31, 63. New material that an artist introduced was understood to be part of the assignment, and Lee and Goodman determined whether it would find its way into a published Marvel comic book. *Id.* ¶¶ 40-42, 57; *see also id.* ¶ 107.

If any disagreement arose between Kirby (or any other artist) and Lee, Lee always had the last word. *Id.* ¶¶ 56, 66; *see also id.* ¶ 23. Marvel never published any material unless Lee approved it. *Id.* ¶ 30.

**Payment To Freelance Artists For Work Contributed To Marvel's Comic Books**

Marvel did not pay artists royalties, and did not purchase artwork on spec. *Id.* ¶¶ 46, 49. Rather, Marvel paid artists, including Kirby, an agreed-upon flat rate per page for the assigned work that they submitted, regardless of whether Lee required changes to the artwork prior to publication, and even if Marvel did not ultimately publish it. *Id.* ¶¶ 45, 47-48, 61-62. While no payroll checks from the Time Period have survived, Marvel's witnesses uniformly testified that,

based in part on legends on the backs of paychecks, they understood that Marvel owned all of the rights in work they submitted to Marvel during the 1950s and 1960s.  *See id.* ¶ 50-53.

**Kirby's Work Was Subject To Marvel's Authority And Control**

Artist Jack Kirby contributed to Marvel's comic books at various times from around 1940 until his death in 1994.  *See id.* ¶¶ 2-4.  Lee assigned Kirby to draw original artwork for various of the Works, including the now iconic Thor, The Fantastic Four, The Incredible Hulk, The X-Men, and The Avengers.  *Id.* ¶¶ 3, 82, 85, 88, 97, 99, 101, 103, 105.  Marvel paid Kirby an agreed per-page rate for the work he submitted for publication, like Marvel's other freelance artists.  *Id.* ¶ 62.  As his son Neal conceded, Kirby did not work on any artwork for a Marvel comic book during the Time Period before getting the assignment from Lee; Kirby simply "didn't do work on spec."  Deposition of Neal Kirby ("N. Kirby Dep.") at 127:25-128:5; 56.1 Stmt. ¶¶ 64, 115.

Before Kirby put pencil to paper, Lee provided him with either a written or oral plot synopsis during a plotting conference, or a detailed panel-by-panel script.  *E.g.*, 56.1 Stmt. ¶¶ 54-55, 64, 115.  For example, Kirby drew the first issue of *The Fantastic Four* based on Lee's written synopsis, and Kirby drew the first stories to feature Thor and Ant-Man based on a detailed script written by Larry Lieber based on Lee's plot synopsis.  *Id.* ¶¶ 82, 88, 101.  During the Time Period, Lee often directed that changes be made to Kirby's artwork, and he asked Kirby himself to make changes to other artists' pages on occasion.  *See id*. ¶¶ 58-60.  Kirby never refused to make the requested changes.  *Id.* ¶ 59.

In some cases, Lee determined that Kirby was not the right artist for the job.  For instance, although Lee initially assigned Kirby to draw the first Spider-Man story, when Kirby's sketches did not fit Lee's vision for the hero and his alter-ego, Lee replaced Kirby with artist

Steve Ditko, whose artwork was used for the first Spider-Man story. *Id.* ¶¶ 90-91. Kirby was, nonetheless, paid his customary per-page rate for the pages he had submitted, as was Marvel's policy during the Time Period. *Id.* ¶¶ 47, 61, 90. For the first comic book to feature Iron Man, Lee decided from the outset to assign another artist, Don Heck, to draw the story from a script written by Lieber based on a plot provided by Lee. *See id.* ¶¶ 94-95. Lee did, however, assign Kirby to draw the cover of the first Iron Man story. *Id.* ¶ 95.

### Kirby And Other Marvel Freelancers Have Acknowledged Their Work Is Work Made For Hire

Marvel artists and writers, including Kirby, expressly acknowledged that their contributions to Marvel comic books were works made for hire. *See id.* ¶¶ 50-53, 68-75; *see also id.* ¶¶ 66-67. For example, Lee, who was paid as a freelancer for the writing he did over and above his editorial duties, has signed numerous agreements and sworn statements stating that his work for Marvel – including the Works – was all work made for hire. *See id.* ¶¶ 17-18, 50, 53, 79. Likewise, artists John Romita and Gene Colan and writers Larry Lieber and Roy Thomas all acknowledged that they retained no rights in the works they created for Marvel during the 1950s and 1960s, as they were works made for hire owned by Marvel. *See id.* ¶¶ 51-53.

Kirby himself signed numerous agreements and sworn statements acknowledging that he understood his contributions to Marvel publications were works made for hire. *Id.* ¶¶ 68-75. Among these was an agreement dated May 30, 1972 (the "1972 Agreement"), in which "Kirby acknowledges and agrees that all his work on the [Works], and all his work which created or related to the RIGHTS, was done as an employee for hire" of Marvel. *Id.* ¶¶ 10, 71. There is no record evidence that Kirby ever sought to register the copyright in any of the Works in his own name, *id.* ¶ 12, and in the late 1960s, he even signed copyright renewal applications for certain *Captain America* comic books (not at issue here but to which he also was a contributor) in which

Marvel claimed a renewal copyright as a "[p]roprietor of copyright in a work made for hire." *Id.* ¶ 70.  Indeed, on a number of occasions, Kirby and those acting on his behalf acknowledged that his belief that he was not given proper credit for his contributions "ha[d] nothing to do with copyright ownership." *Id.* ¶ 76; *see also id.* ¶¶ 77-78.

### The Termination Notices And Copyright Ownership In The Works

Marvel registered the copyrights in the Works for both the initial and renewal periods in its own name.  *See id.* ¶ 12.  In 2009, just two weeks after Disney announced its plan to purchase Marvel (but before the transaction closed), Defendants served the Termination Notices on Marvel, Disney and various other entities.  *Id.* ¶¶ 6-7.  The Termination Notices claim to exercise a right under section 304(c) of the Copyright Act of 1976 to terminate an alleged assignment from Kirby to Marvel of the copyright in the Works.  *Id.* ¶¶ 7-9, 11.  They purport to take effect automatically to divest Marvel of certain rights beginning in 2014.  *Id.* ¶ 11.

## ARGUMENT

## I.   LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT

At summary judgment, "[t]he time has come . . . to put up or shut up."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotations and citation omitted).  After nine months of discovery, Defendants have failed to "put up"; they have not identified a single relevant fact, let alone the preponderance of the evidence required, that might rebut the "almost irrebuttable presumption" that Marvel was the sole copyright owner in the Works.  A party is entitled to summary judgment when the pleadings and admissible evidence show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A party opposing summary judgment must show sufficient evidence upon which a reasonable

factfinder could return a verdict in its favor. *E.g.*, *Ocean Group LLC v. Marcal Mfg., LLC*, No. 09 Civ. 7679 (CM), 2010 WL 4963155, at *10 (S.D.N.Y. Dec. 2, 2010) (McMahon, J.). "Statements that are devoid of specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

## II.  THE UNDISPUTED RECORD EVIDENCE DEMONSTRATES THAT THE WORKS AT ISSUE WERE WORKS MADE FOR HIRE UNDER THE 1909 COPYRIGHT ACT

### A.  There Is No Termination Right For Works Made For Hire Under The 1909 Copyright Act.

The Copyright Act of 1909 and case law construing it govern whether the Works were made for hire because the Works were published prior to the January 1, 1978 effective date of the Copyright Act of 1976 (the "1976 Act"). *See, e.g.*, *Playboy Enters.*, 53 F.3d at 553. Defendants rely on a provision of the 1976 Act that entitles the author of a work governed by the 1909 Act (or after his death, prescribed other family members or legal representatives) to terminate a prior copyright assignment or license after a certain time period. Critically, this provision is expressly *inapplicable* to works made for hire under the 1909 Act: "In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, *other than a copyright in a work made for hire*, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it . . . is subject to termination." 17 U.S.C. § 304(c) (emphasis added). The 1909 Act did not itself define the term "work made for hire"; it merely stated that "[t]he word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (repealed).

Works made for hire are not subject to the section 304(c) termination provisions because the copyright in such works "never belonged to the artist in the first instance to grant; instead, it

belonged at the outset to the party that commissioned the work."  *Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1056 (C.D. Cal. 2009).  Thus, a creator's purported grant of the copyright in a work made for hire is "merely a superfluous act that did not alter the pre-existing ownership rights to that copyright."  *Id.*

### B. Marvel Is Entitled To The Almost Irrebuttable Presumption That The Works Are Works Made For Hire.

Courts in the Second Circuit use the "instance and expense" test to determine if a work governed by the 1909 Act is a work made for hire, and it is well established that the test applies equally to independent contractors and to traditional employees.  *See, e.g.*, *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 634-35 (2d Cir. 2004); *Hogarth*, 342 F.3d at 159-63; *Playboy Enters.*, 53 F.3d at 554.  The test is met "when the motivating factor in producing the work was the employer who induced the creation."  *Playboy Enters.*, 53 F.3d at 554 (quoting *Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909, 914 (2d Cir. 1974)); *see also Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.*, No. 08 CIV. 6143 (DLC), 2010 WL 3564258, at *8 (S.D.N.Y. Sept. 10, 2010) (instance and expense test met when "the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out").

The hiring party – here, Marvel – must proffer "some credible evidence" that the works at issue were created at its instance and expense to be entitled to the "almost irrebuttable presumption" that those works were created as works made for hire.  *See Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998); *In re Marvel*, 254 B.R. at 828; *see also Hogarth*, 342 F.3d at 158; *Fifty-Six Hope Road Music Ltd.*, 2010 WL 3564258 at *8; *cf. Easter Seal Soc'y for Crippled Children & Adults of La., Inc. v. Playboy Enters.*, 815 F.2d 323, 327-28 (5th Cir. 1987).  To overcome this presumption, Defendants must prove by the preponderance of the credible

evidence the existence of an express written or oral agreement between Marvel and Kirby

evidencing their mutual intent that the Works would <u>not</u> be works made for hire.  *See Playboy*

*Enters.*, 53 F.3d at 554-55; *Fifty-Six Hope Road Music Ltd.*, 2010 WL 3564258 at \*8; *see also*

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 881 (9th Cir. 2005) ("The

presumption may be rebutted only by evidence that the parties did not intend to create a work-

for-hire."); *Murray v. Gelderman*, 566 F.2d 1307, 1309 (5th Cir. 1978).  Here, the undisputed

facts establish that Marvel has more than discharged its evidentiary burden; Defendants have

adduced no admissible evidence – let alone a preponderance of such evidence – to rebut the

work-for-hire presumption.

    C.  <u>The Undisputed Record Evidence Establishes That The Works Were Created At
Marvel's Instance.</u>

        *1.*    *Marvel Induced The Creation Of The Works And Maintained The Authority To
Direct And Supervise Their Creation*

The undisputed record necessitates the conclusion that all of the Works were created at

Marvel's instance.  Under controlling Second Circuit precedent, the essential element in

determining whether a work was created at the hiring party's instance under the 1909 Act is that

party's right to direct and supervise the manner in which the work is performed.  *E.g.*, *Playboy*

*Enters.*, 53 F.3d at 554; *see also Martha Graham Sch. & Dance Found., Inc.*, 380 F.3d at 635.

The hiring party need not actually exercise this right; rather, the core consideration is whether the

hiring party had the authority to do so.  *See, e.g.*, *Martha Graham Sch. & Dance Found., Inc.*,

380 F.3d at 635 (citing *Scherr v. Universal Match Corp.*, 417 F.2d 497, 500-01 (2d Cir. 1969));

*Playboy Enters.*, 53 F.3d at 554 ("[T]he hallmark of an 'employment for hire' is whether the

employer *could have* exercised the requisite power to control or supervise the creator's work.")

(emphasis added; citation omitted); *Murray*, 566 F.2d at 1310 ("Actual exercise of that right is

not controlling, and copyright is vested in the employer who has no intention of overseeing the detailed activity of any employee hired for the very purpose of producing the material.") (citing *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2d Cir. 1939)).  At bottom, where a hiring party "took the initiative in engaging" the artist and "had the power to accept, reject, or modify [his] work," then the work is created at its instance.  *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 00 Civ. 9569 (DLC), 2002 WL 398696, at *18 (S.D.N.Y. Mar. 15, 2002) (quoting *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972)), *aff'd*, 342 F.3d 149 (2d Cir. 2003).

Here, it is beyond dispute that Marvel, through Goodman and Lee, took the initiative to engage the artists needed to create all of the Works, and retained the authority to supervise and control all aspects of their contributions and the ultimate publication.  56.1 Stmt. ¶¶ 15-16, 22-24, 26-27, 30-31, 34-35, 56.  Marvel repeatedly exercised this authority by directing changes, reassigning artists and even canceling certain comic books.  *Id.* ¶¶ 15-16, 21, 25, 32-35, 58-60; *see also id.* ¶¶ 83, 87, 90.  Lee testified that he assigned an artist – in many cases, Kirby – to draw the Works after he had either described the premise in a plot outline or plotting conference or provided them with a detailed script.  *See id.* ¶¶ 36-37, 39, 54, 82, 85, 88, 94-95, 97, 99, 101. Lee's testimony is corroborated both by contemporaneous accounts and documentary evidence like his two-page synopsis of the first issue of *The Fantastic Four*.  *See* Declaration of Randi W. Singer, dated February 18, 2011 ("Singer Decl.") Exhibits 11, 27, and 30.  Lee's testimony also is consistent with that of others who worked for Marvel during the late 1950s and 1960s, including writer Larry Lieber, artist John Romita and writer-turned-editor Roy Thomas, *see* 56.1 Stmt. ¶¶ 37, 39, 54, 88, 94-95, 101.

Marvel's assignment process alone is sufficient support for a finding that the Works were created at its instance.  *See In re Marvel*, 254 B.R. at 830 (finding where hiring party "gives an

artist specific assignments or asks the artist to create particular works, the artist works at the employer's instance") (citing *Playboy Enters.*, 53 F.3d at 556).  Yet, the evidence that the Works were made at Marvel's behest goes even further.  Lee supervised the creation of Marvel's comic books generally, and the Works in particular, from conception to publication.  He engaged and supervised all contributors to the comic books – including pencil artists like Kirby as well as writers, letterers, inkers and colorists – and ensured that all the components of the books were completed by specific deadlines.  *See* 56.1 Stmt. ¶¶ 24, 26-27, 30.  Lee also reviewed all artwork that was submitted and no artwork was published unless it met with his approval.  *See id.* ¶¶ 27, 30, 32-35, 40, 43.  Even after he gave an assignment to an artist, Lee had the authority to, and occasionally did, reassign the artist to a different project.  *Id.* ¶ 25.  No clearer example exists than the origin of Spider-Man.  There, Lee was displeased with Kirby's initial drawings of Spider-Man, so he paid Kirby for his work and reassigned it to artist Steve Ditko, who then drew the entire issue based on Lee's vision for the character.  *Id.* ¶ 90.

Finally, the undisputed evidence shows that Kirby was paid for assigned artwork that he submitted to Marvel, regardless of whether it was edited and even if it was not published.  *See id.* ¶¶ 61, 90; *see also id.* ¶¶ 47-48.  This factor not only satisfies the expense test, below, but also weighs heavily in favor of a finding that Marvel was the motivating factor in the creation of the Works to which Kirby contributed.  *See Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 715 (S.D.N.Y. 1997).

### 2. *Artistic Freedom Is Irrelevant To Whether The Works Were Created At Marvel's Instance*

The Court need not assess of the degree of Kirby's creative contribution to a Work, or the leeway he may have been afforded in carrying out his assignments in determining whether it was created as a work for hire.  The undisputed record is clear that Kirby did not work on an

assignment from Marvel until after he received Lee's instructions and guidance, and that Lee, Goodman and Marvel had control over whether and in what form to use Kirby's work product. *See* 56.1 Stmt ¶¶ 55, 58-60, 63-64, 90; *see also id*. ¶ 42.  Ultimately, as one of the Defendants himself has conceded, Kirby never did any artwork for Marvel without Marvel's prior approval and an assignment from Lee because he "didn't do work on spec." N. Kirby Dep. 127:25-128:5; *see also* 56.1 Stmt. ¶¶ 64, 115; *see also id*. ¶ 46.  As has been judicially recognized, "[w]here an independent contractor would not have created the work but for the hiring party's assignment to do so, then the work is made at the hiring party's 'instance.'"  *Hogarth*, 2002 WL 398696 at *18.

Indeed, to permit an artist to defeat a finding that a work is made for hire because she had artistic license over its creation "would permit an employee to circumvent the works for hire doctrine simply by demanding creative freedom as a condition of employment."  *Murray*, 566 F.2d at 1311.  Thus, when an employer gives an assignment, it "need not control or mandate the content of an artist's creation."  *In re Marvel*, 254 B.R. at 830 (finding characters and works were created at Marvel's instance where "Marvel asked [writer] to produce scripts and ideas for specific comic book titles") (citing *Playboy Enters.*, 53 F.3d at 556).  Since Marvel at all times maintained the right to accept, reject or modify the Works, the degree of Kirby's artistic freedom is "legally irrelevant" to the work-for-hire analysis.  *See Fifty-Six Hope Road Music Ltd.*, 2010 WL 3564258 at *10 ("[T]hat Marley may have exercised artistic control over the recording process, however, is legally irrelevant; what is dispositive is that Island [Records] had the contractual *right* to accept, reject, modify and otherwise control the creation of the Sound Recordings.") (emphasis in original); *Siegel*, 658 F. Supp. 2d at 1068; *Hogarth*, 2002 WL 398696 at *19 ("[T]hat Hogarth, a master illustrator with extensive prior experience . . . was

treated with deference and respect in the execution of the art is not sufficient to undercut the strong evidence that the Books were made at ERB's instance."), *id.* at *22.

The cases make clear that the considerable artistic freedom Marvel granted Kirby does not undercut the conclusion that the Works were created at Marvel's instance.  It is undisputed that Kirby submitted all of his artwork pursuant to assignments and based on plots that he discussed with Stan Lee before Kirby began to draw.  56.1 Stmt. ¶¶ 39-41, 54-55, 57, 64, 82, 85, 88, 90-91, 97, 99, 101, 103, 105.  That Kirby may have, from time to time, created additional characters or fleshed out plotlines in the course of executing an assignment makes no difference here.  These tasks were understood to be part of his assignment, and in all events were done to further the story that Lee had assigned him.  *See id.* ¶¶ 57, 107; *see also id.* ¶¶ 40-42; *cf. In re Marvel*, 254 B.R. at 830 (finding work made for hire where, *inter alia*, Marvel expected writer to produce fresh stories that would include new plots and characters).  It is also undisputed that Lee had the final word on the plot and dialogue of every Marvel comic book and he routinely ignored any suggestions Kirby or other artists may have made.  56.1 Stmt. ¶¶ 31, 37, 40, 63, 66.

This case is readily distinguishable from several cases on which Defendants likely will rely.  In *Siegel*, for example, writer and artist Jerry Siegel and Joseph Shuster created the original incarnation of the Superman character in the form of a comic strip "on spec" long before they offered it to Detective Comics.  It was also undisputed that Detective Comics had no involvement whatsoever in the concept or creation of Superman and that the character "had been spawned by the plaintiffs four years before the relationship between his authors and the defendants existed."  *Siegel*, 508 F.2d at 914.  In contrast, certain later Superman works were found to be works made for hire, where, among other things, the works were not done on spec

but rather pursuant to an engagement by the company, which maintained a level of control and direction over their creation.  *See Siegel*, 658 F. Supp. 2d at 1065-70, 1077-80.

    **D.**   **The Undisputed Record Facts Establish That The Works Were Created At Marvel's Expense.**

        *1.*      *Kirby's Flat-Rate Payment Is Indicative Of A Work-For-Hire Relationship*

There can be no dispute that Kirby, like all of Marvel's freelance artists and writers during the Time Period, was paid a fixed per-page rate for assigned artwork that he submitted for publication.  *See* 56.1 Stmt. ¶¶ 45, 62; *see also id.* ¶¶ 18, 38, 49.  This fact alone is sufficient to satisfy the second prong of the Second Circuit's instance and expense test.  *Playboy Enters.*, 53 F.3d at 555 ("The simple fact that Playboy paid Nagel a fixed [per-page] sum for each of the works published in *Playboy* magazine is sufficient to meet the requirement that the works be made at Playboy's expense."); *Twentieth Century*, 429 F.3d at 881 (expense prong satisfied where, among other things, author was paid a lump sum instead of royalty); *In re Marvel*, 254 B.R. at 830 (finding comic book characters were created at Marvel's expense where Marvel paid writer flat fee per page of copy that writer provided).  It is also undisputed that Marvel engaged additional staff to work as inkers, letterers and colorists to complete comic books to which Kirby contributed.  *See* 56.1 Stmt. ¶¶ 24, 26-30.  Thus, the Works were created at Marvel's expense. *See Twentieth Century*, 429 F.3d at 881 (finding book was created at publisher's expense where, *inter alia*, publisher "shouldered the expense for the entire staff who assisted" in its creation).

        *2.*      *Marvel Bore All The Financial Risk Associated With The Works*

Defendants cannot dispute that Marvel and its publisher Martin Goodman bore the entire financial risk associated with the creation of the Works.  *See, e.g.*, *id.* (book made at publisher's expense where, among other things, publisher "took on all the financial risk of the book's success"); *Hogarth*, 2002 WL 398696 at *20 (expense prong met where employer took "full

assumption of the risk of loss on the project"). As even Defendants' purported expert has conceded, Goodman's money was on the line at every step of the process. *See* 56.1 Stmt. ¶¶ 19-21; *see* December 6, 2010 Deposition of Mark Evanier ("Evanier Dep. (12/6/10)"), attached as Exhibit 9 of the Singer Decl., at 40:7-18; 148:12-149:16. Marvel scheduled press time in advance, and if the book could not go to press on time, Marvel bore the costs of the delay. *See* 56.1 Stmt. ¶ 26. Moreover, if a book or series was not successful, Goodman and Marvel lost money, but it still paid the artists and writers who contributed to it in full. *See id.* ¶¶ 19-20.

That Kirby worked from his home or bought his own art supplies is irrelevant and cannot serve to create a genuine issue of material fact. The case law applying the work-for-hire doctrine under the 1909 Act is clear that such factors are relevant only to the question of whether the commissioned party was an independent contractor and not a formal employee, and "have no bearing on whether the work was made at the hiring party's expense." *Playboy Enters.*, 53 F.3d at 555; *Hogarth*, 2002 WL 398696, at *20; *see also Siegel*, 658 F. Supp. 2d at 1058; *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1138 (C.D. Cal. 2007).

## III.   THE RECORD IS UTTERLY DEVOID OF ANY FACTS FROM WHICH DEFENDANTS COULD CARRY THEIR BURDEN TO REBUT THE PRESUMPTION THAT THE WORKS ARE WORKS MADE FOR HIRE

In light of the overwhelming and undisputed evidence that the Works were created at Marvel's instance and expense, the burden shifts to Defendants to rebut the almost irrebuttable presumption that they are works made for hire. Defendants must come forward and prove by a preponderance of the credible evidence that Marvel and Kirby both intended that the Works would <u>not</u> be works made for hire and that there was an explicit agreement that the copyrights were to vest with Kirby. *See Playboy Enters.*, 53 F.3d at 554-55; *Fifty-Six Hope Road Music*

*Ltd.*, 2010 WL 3564258 at *8.  No such evidence exists because no such agreement was ever made.

### A. **Defendants Have Not Produced A Single Witness With Personal Knowledge Or Any Admissible Evidence.**

All of Defendants' witnesses have admitted that they lack any personal knowledge regarding the specific circumstances under which the Works were created.  *See* 56.1 Stmt. ¶¶ 118-133.  Thus, none of the Defendants was present during any meeting between Kirby and Lee and none has personal knowledge of Lee's assignments and guidance to Kirby for particular comic books.  *See id.* ¶¶ 113-115; *see also id.* ¶¶ 119-112.  Neal Kirby, who was between ten and fifteen years old during the Time Period, further conceded that he has no basis to dispute the fact that Lee had the right to, and routinely did, disregard any margin notes that Kirby submitted with his artwork.  *Id.* ¶¶ 110, 116.

Additionally, there is no credible evidence – let alone a preponderance of the evidence – of an explicit agreement that the copyrights to the Works would vest with Kirby.  Defendants' reference to the alleged assignment language in the 1972 Agreement is legally insufficient, especially in the face of Marvel's overwhelming evidence that the Works were created at its instance and expense.  Such purported language of assignment, by itself, cannot rebut the work-for-hire presumption.  *See Fifty-Six Hope Road Music Ltd.*, 2010 WL 3564258, at *11 (finding, in granting summary judgment for hiring party, that language that "assigns" or "licenses" rights to hiring company was not dispositive of work-for-hire issue; noting that "the Second Circuit has held that a work was 'made for hire' under the 1909 Act despite the absence of such magic words in the contract"); *see also, e.g.*, *Twentieth Century*, 429 F.3d at 881 (contract with assignment language was insufficient to rebut work-for-hire presumption "without any evidence

as to the circumstances or intendment of its execution"); *Playboy Enters.*, 53 F.3d at 557;

*Hogarth*, 2002 WL 398696 at *23.

Further, despite exhaustive discovery, Defendants failed to muster even a single fact to

show the "circumstances or intendment of [the] execution" of the 1972 Agreement, let alone the

parties' supposed mutual intent to vest Kirby with the copyright in the Works.  *See Twentieth*

*Century*, 429 F.3d at 881.  Indeed, the language of the 1972 Agreement itself belies Defendants'

argument, as it reflects Kirby's clear "acknowledge[ment] and agree[ment] that all his works on

the MATERIALS, and all his work which was created or related to the RIGHTS" that were

subject to the Agreement "was done as an employee for hire of" Marvel and his agreement not to

contest the validity of Marvel's rights in any of the subject works.  56.1 Stmt. ¶¶ 10, 71.

**B.  Defendants' So-Called Experts Fail To Raise Any Genuine Issue Of Material Fact.**

As detailed in Marvel's accompanying Motions to Exclude, the so-called "expert"

opinions of self-styled comic book historians Mark Evanier and John Morrow seek only to

introduce inadmissible hearsay and epitomize the type of unreliable and inadmissible testimony

that the Federal Rules of Evidence mandate be excluded.  *See, e.g.*, Fed. R. Evid. 702.  Evanier

and Morrow each admitted a lack of any personal knowledge of the facts surrounding the

creation of the Works.  *See* Evanier Dep. (12/6/10) at 231:10-12; January 10, 2011 Deposition of

John Morrow ("Morrow Dep."), attached as Exhibit 10 of the Singer Decl., at 13:20-21.  More

importantly, however, both Evanier and Morrow *agree with Marvel* on all of the material facts.

Evanier explicitly admitted that:

- As publisher, Goodman had the final say as to what Marvel published and bore the financial risk of the success of Marvel's comic books (Evanier Dep. (12/6/10) at 40:7-41:3, 41:6-42:13, 100:4-21, 104:20-105:5, 148:12-23, 149:10-24);

- Lee decided which artist would work on a particular comic book, had the authority to accept, reject or require revisions to artwork, and Kirby did not begin to draw until after he discussed the idea and plot with Lee (*id.* at 105:6-14, 105:18-23, 106:5-7, 155:15-20, 225:5-8; November 9, 2010 Deposition of Mark Evanier ("Evanier Dep. (11/9/10)"), attached as Exhibit 8 of the Singer Decl., at 59:22-60:4, 60:23-61:8, 61:20-23, 91:15-18, 92:22-93:4);

- Kirby was paid for all artwork that he submitted to Marvel for publication that Marvel accepted, even if that artwork was never actually published (Evanier Dep. (12/6/10) at 138:19-22; Evanier Dep. (11/9/10) at 61:24-62:1, 62:10-24);

- During the Time Period, freelance artists for major comic book publishers did not receive royalties for their works and were paid a fixed per-page rate (Evanier Dep. (11/9/10) at 164:18-165:18, 165:21-166:11);

- *The Fantastic Four* was created because of Goodman's instruction to create a team of superheroes (*id.* at 87:21-88:4); and

- Lee reassigned the first Spider-Man comic book from Kirby to Steve Ditko when he was not satisfied with Kirby's work (*see id.* at 133:13-20; *see also id.* at 132:22-133:7).

Similarly, Morrow acknowledged that:

- As publisher, Goodman decided the type of stories Marvel would publish and "handled all the money" related to Marvel's comic business (Morrow Dep. at 149:4-18);

- Lee had the authority to reassign artists to different projects (*see id.* at 57:14-58:6);

- During the Time Period, some of Marvel's comic books were created using the conventional process of assigning an artist to draw based on a detailed script, while others were created using the "Marvel Method," under which the assigned artist would draw the artwork based on a discussion with the writer regarding the basic plot (*id.* at 59:2-23, 60:5-61:20); and

- Lee maintained the authority to – and frequently did – make changes to Kirby's artwork and altered scripts and concepts as part of the normal editorial process; Kirby never

21

refused to make any such changes and "generally did what the editor told him" (*id.* at 205:13-19, 206:5-207:10, 264:11-18).

Accordingly, even if the Court were to accept the improper testimony of Evanier and/or Morrow, there is no genuine issue of fact as to any element relevant to the work-for-hire inquiry.

### C.  Kirby Acknowledged Marvel's Direction And Control.

The evidence in this case that the Works were created at Marvel's instance and expense is further corroborated in statements Kirby himself made acknowledging Marvel's authority to direct and control his work.  *See* 56.1 Stmt. ¶¶ 66-75.  In interviews, Kirby expressly acknowledged that Lee, as editor, "always ha[d] the last word" on the creative direction of Marvel's comic books.  *Id.* ¶ 66; *see also id.* ¶ 67.  Kirby and those acting on his behalf also stated on numerous occasions that his grievance with Marvel over whether he was afforded sufficient credit for his involvement in the Works had "nothing to do with copyright ownership." *Id.* ¶¶ 76-78.  Indeed, in both sworn statements and multiple agreements with Marvel over the course of some 25 years, Kirby acknowledged that all of Marvel's works to which he contributed were created as works made for hire.  *Id.* ¶¶ 68-75; *cf. id.* ¶¶ 17, 50-53, 79.

Finally, a determination that the Works were made for hire is consistent with the fact that Marvel filed both the initial and renewal copyright registrations for the Works in its name, and that no record evidence shows that Kirby ever sought to register the copyrights in the Works in his own name.  *See id.* ¶ 12.  Kirby even signed copyright renewal applications for certain *Captain America* comic books (not at issue in this case) in which Marvel claimed a renewal copyright as a "[p]roprietor of copyright in a work made for hire."  *See id.* ¶ 70.  These certificates of registration "constitute[] prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c); *see also Fifty-Six Hope Road Music*

*Ltd.*, 2010 WL 3564258 at *9 & n.13 (finding copyright registrations in company's name were consistent with circumstances showing songs were created as works made for hire).

## CONCLUSION

Defendants have not (and cannot) come forward with *any* evidence – let alone a preponderance of the evidence – to attempt to rebut the presumption that the Works were created at Marvel's instance and expense as works made for hire.  Consequently, Marvel is entitled to judgment as a matter of law that the Termination Notices are invalid and of no force or effect. For all the foregoing reasons, summary judgment should be entered in favor of Marvel on its sole cause of action of its Complaint, and in favor of Marvel and Disney on Defendants' sole remaining counterclaim.

Dated: February 25, 2011   By:   /s/  James W. Quinn

          WEIL, GOTSHAL & MANGES LLP
          James W. Quinn
          R. Bruce Rich
          Randi W. Singer
          Sabrina A. Perelman
          767 Fifth Avenue
          New York, NY 10153
          Tel:  (212) 310-8000
          Fax: (212) 310-8007

          PAUL, HASTINGS, JANOFSKY & WALKER LLP
          Jodi A. Kleinick
          75 East 55th Street
          New York, NY 10022
          Tel: (212) 318-6000

          HAYNES AND BOONE, LLP
          David Fleischer
          30 Rockefeller Plaza, 26th floor
          New York, NY 10112
          Tel: (212) 659-7300

          *Attorneys for Plaintiffs/Counterclaim-Defendants*