# EXHIBIT 5

In Re:
Marvel Enterainment Group, Inc.

Δ π EXHIBIT
Deponent Evanier Expert
Date 12-6-10  Rptr. C
WWW.DEPOBOOK.COM

Mark Evanier
October 12, 1999

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
IN RE:
MARVEL ENTERTAINMENT GROUP, INC.;)
THE ASHER CANDY COMPANY; FLEER CORP.;)
FRANK H. FLEER CORP.; HEROES WORLD)
DISTRIBUTION, INC.; MALIBU COMICS ) Case No. 97-638-RRM
ENTERTAINMENT, INC.; MARVEL )
CHARACTERS, INC.; MARVEL DIRECT )
MARKETING INC.; and SKYBOX)
INTERNATIONAL, INC.,          )
          Debtors.            )

DEPOSITION OF MARK EVANIER
Tuesday, October 12, 1999
NEWLANDER & NEWLANDER
1138 WILSHIRE BOULEVARD, SUITE 200
LOS ANGELES, CALIFORNIA 90017
TELEPHONE: (213) 482-1522

**Page 2**

Deposition of MARK EVANIER, taken by Marvel Enterprises, Inc. at 2049 Century Park East, Suite 2350, Los Angeles, California, commencing at 11:35 a.m., Tuesday, October 12, 1999, before Laura L. Gray, C.S.R. No. 4194, and Gerrilynn Strosnider, C.S.R. No. 4128.

**Page 3**

APPEARANCES OF COUNSEL:
ON BEHALF OF MARVEL ENTERPRISES, INC.:
    BATTLE FOWLER LLP
    BY: DAVID FLEISCHER, ESQ.
    75 East 55th Street
    New York, New York 10022
ON BEHALF OF MARVIN A. WOLFMAN:
    THE LAW FIRM OF KLEINBERG & LERNER, LLP
    BY: MICHAEL R. DILIBERTO, ESQ.
        ADRIAN R. ASKARIEH, ESQ. (As Noted)
    Suite 1060
    2049 Century Park East
    Los Angeles, California 90067-3112

**Page 4**

APPEARANCES OF COUNSEL: (Cont'd)
ON BEHALF OF NEW LINE CINEMA:
    LEOPOLD, PETRICH & SMITH
    BY: LOUIS P. PETRICH, ESQ. (As Noted)
    Suite 3110
    2049 Century Park East
    Los Angeles, California 90067-3274
ALSO PRESENT:
    MARVIN A. WOLFMAN (As Noted)

**Page 5**

INDEX
WITNESS    EXAMINATION            PAGE
MARK EVANIER
    (A.M. Session)
        By Mr. Fleischer    8
    (P.M. Session)
        By Mr. Fleischer    99
UNANSWERED QUESTIONS
    PAGE   LINE
     74     2
EXHIBITS
EVANIER
EXHIBIT NO.  DESCRIPTION            PAGE
  1  Deposition notice (10 pages)    9
  2  Marvel Comics Group voucher    10
     (1 page)

**Page 6**

EXHIBIT NO.  DESCRIPTION            PAGE
  3  Letter from Mark S. Evanier to   13
     Western Publishing Company, Inc.
     (1 page)
  4  Document titled "Artwork Release"   13
     dated 6/14/79 (1 page)
  5  Document titled "Assignment"    15
     (10 pages)
  6  February 20, 1987 letter on Marvel   16
     Entertainment Group letterhead from
     Joseph A. Calamari to Mr. Jack Kirby,
     with attachment (11 pages)
  7  Document titled "Acknowledgement Of   17
     Copyright Ownership" (2 pages)
  8  Complaint and second amended    19
     complaint in Simon vs. Goodman,
     et al. (14 pages)

**Page 7**

EXHIBIT NO.  DESCRIPTION
  9  Document titled "Expert Report of   21
     Mark Evanier" (9 pages)
 10  Copy of a portion of "The Art of   200
     the Comic Book, an Aesthetic
     History" (12 pages)
 11  Copy of a portion of "The Comics   213
     Journal" (41 pages)
 12  Copy of a portion of "The Comics   259
     Journal" (9 pages)

**Page 8**

[1] MARK EVANIER,
[2] having been duly sworn, [3] was examined and testified as follows:
[5] EXAMINATION
[6] BY MR. FLEISCHER:
[7] Q: Mr. Evanier, would you state your address [8] for the record, please.
[9] A: 6282 Drexel Avenue, D-r-e-x-e-l, Avenue, [10] L.A., 90048.
[11] Q: How old are you, sir?
[12] A: 47.
[13] MR. FLEISCHER: Let me ask the reporter to [14] mark for identification as Evanier Exhibit 1 a photocopy [15] of a deposition notice dated September 24, 1999.
[16] (Evanier Exhibit No. 1 [17] was mrk'd for identification.)
[18] BY MR. FLEISCHER:
[19] Q: Mr. Evanier, have you ever seen a copy of [20] what we've marked as Exhibit 1?
[21] A: I believe this is a copy of a document [22] that I was given, yes.
[23] Q: Directing your attention to page 8 of the [24] document, there are a series of numbered paragraphs [25] requesting documents. Did you review your files for the

**Page 9**

[1] purpose of ascertaining whether you had any documents [2] responsive to the numbered paragraphs in the document [3] request?
[4] A: Could I have that one more time?
[5] Q: Did you review your records, wherever you [6] keep them, to determine whether you had in your [7] possession or control any documents that fell into the [8] categories requested in paragraphs 1 through 17 of the [9] document request?
[10] A: Yes, I did.
[11] Q: And did you bring them with you today?
[12] A: I brought the material I understood was [13] covered, yes.
[14] Q: Okay. May I see it, please.
[15] MR. DILIBERTO: This is an original we'd [16] like to have back, but I have made a copy for you, which [17] is in here.
[18] MR. FLEISCHER: Okay. [19] Off the record a second.

[20] (Off-the-record discussion.)
[21] MR. FLEISCHER: Let me mark for [22] identification as Evanier Exhibit 2 a photocopy of a [23] document that has a voucher number of 125733 at the [24] upper right-hand corner and the document control number [25] WOLF 239 in the lower right-hand corner.

**Page 10**

[1] (Evanier Exhibit No. 2 [2] was mrk'd for identification.)
[3] BY MR. FLEISCHER:
[4] Q: Mr. Evanier, how did you come into [5] possession of Exhibit 2?
[6] A: When I was working for Marvel in the [7] Eighties, I was sent a pile of these, of which this is [8] one copy of many duplicates.
[9] Q: I notice that the document has a control [10] number in the lower right-hand corner. Was the control [11] number placed on the document after you furnished it to [12] Mr. Wolfman's counsel?
[13] A: Yes, it was. When you asked me how did I [14] come into possession of this, I was referring to the [15] document that was xeroxed, not the document that you [16] handed me.
[17] Q: Right. You were referring to the [18] original.
[19] A: Correct.
[20] Q: And are you able to tell us when for the [21] first time you received a document in the form of [22] Exhibit 2 from Marvel?
[23] MR. DILIBERTO: Objection. Vague and [24] ambiguous.

**Page 11**

[1] BY MR. FLEISCHER:
[2] Q: Do you understand the question?
[3] A: What do I do now?
[4] Q: You can answer.
[5] A: All right.
[6] Q: Throughout the deposition, you will hear [7] objections.
[8] A: All right. Ask me again, please.
[9] MR. FLEISCHER: Would you read it back, [10] please.
[11] (The record was read as follows:
[12] "Q. And are you able to tell us [13] when for the first time you received a [14] document in the form of Exhibit 2 from [15] Marvel?")
[16] BY THE WITNESS:
[17] A: I received it at some point in the early [18] to mid Eighties.
[19] BY MR. FLEISCHER:
[20] Q: Do you remember in connection with what [21] work, if any, you received the first document of this [22] type?
[23] A: No.

CONFIDENTIAL                                                                MARVEL0016627

In Re:  
Marvel Enterainment Group, Inc.

Mark Evanier  
October 12, 1999

[14] profit-sharing plan – I take that back. It would be a [15] royalty provision, which was similar to the [16] profit-sharing plan that Western Publishing had in the [17] Sixties and into the Seventies, but DC had not similarly [18] had that across-the-board plan for anyone who created [19] new property for them or who was doing a comic that sold [20] over a certain level.

[21] Q: Any other changes between those two [22] periods that you are aware of?

[23] A: There were many changes, as there continue [24] to be changes in the business constantly as different [25] deals are made and as different contracts are made. I'm

Page 180

[1] not sure – If you could ask me a more specific [2] question, I'll try to give you a more specific answer.

[3] Q: I'm not referring to specific transactions [4] between a specific writer and a specific company. I'm [5] trying to ascertain whether it is your understanding [6] that on an industrywide basis there were material [7] changes in the way the rights to comic book materials [8] were handled by comic book publishers before 1978 and [9] after 1978.

[10] A: Okay. Yes. I understand now. Thank you. [11] In the latter period – not necessarily [12] immediately after 1978, but in the period that you're [13] describing, there was much more reliance on written [14] contracts, deal memos in advance of doing the work, [15] allowing lawyers to consult on comic book company [16] contracts, agents. There actually were agents that – [17] I never heard prior to '78 of anyone having an agent [18] represent them in a negotiation with a comic book [19] company, but that happened later on.

[20] There were new contracts and new language [21] we had never seen before, some of which I believe was [22] retroactively trying to acquire rights to materials [23] created prior to 1978.

[24] Q: Anything else?

[25] A: They started printing on different paper

Page 181

[1] stocks a lot during the Eighties. Comic books were more [2] distributed by a method called direct distribution, [3] which sold the comics on a non-returnable basis to comic [4] book shops as opposed to selling them through what were [5] called ID distributors which put them on newsstands on a [6] returnable basis.

[7] There was more emphasis on credits, on [8] artists and writers having their names prominently [9] displayed on their works in the Eighties. There were [10] more cases of artists retaining creative control over [11] their work. There were more cases of people making [12] deals where they held the copyrights to their [13] characters.

[14] There were more cases where people were [15] working in even a wider variety of methods for [16] individual companies. That is to say that there was [17] less reliance on any given company on one way of doing [18] comics. I think the business matured in that they were [19] willing to tolerate even more creative variance. People [20] got to write about more adult-subject material [21] sometimes, they got to be more experimental in the [22] artwork, they began experimenting with computer [23] lettering and computer coloring that had not existed [24] before '78.

[25] It's a very different – The industry

Page 182

[1] every year or so is different from, you know, the years [2] before.

[3] (Mr. Askarieh left the room.)

[4] BY MR. FLEISCHER:

[5] Q: Specifically with respect to the ownership [6] of copyright, were there any changes in the industry of [7] which you were aware that occurred after January 1 of [8] 1978?

[9] A: Some of the companies became more willing [10] to make deals in which the artist or writer or some [11] combination thereof held the copyright to material than [12] they had been before.

[13] Q: Focusing on the mainstream publishers that [14] you identified earlier, what was the position of DC on [15] the ownership of copyright prior to 1978?

[16] A: I don't know.

[17] Q: What was the position of Marvel?

[18] A: I don't know that there ever was a clearly [19] stated position.

[20] Q: What was the position of Western?

[21] A: I don't know what their position was.

[22] Q: What was the position of Archie?

[23] A: I don't know what their position was.

[24] Q: What was the position of Harvey?

[25] A: I don't know what their position was.

Page 183

[1] Q: What was the position of Charlton?

[2] A: I don't know what their position was.

[3] Q: What was the position of Print Mint?

[4] A: Print Mint, generally I believe the [5] artists usually held the copyrights on their work.

[6] Q: And how did you come to that [7] understanding?

[8] A: Looking at Print Mint comics and seeing [9] the copyright notices.

[10] Q: And in your view, Print Mint was a [11] mainstream publisher prior to 1978?

[12] A: Well, by my definition, it would be. They [13] certainly sold an awful lot of comics. I'm basing [14] "mainstream" on sales figures.

[15] (Mr. Askarieh returned to the room.)

[16] BY MR. FLEISCHER:

[17] Q: By order of magnitude, what would you say [18] that Print Mint's total comic book sales in 1977 were as [19] compared with those of either DC or Marvel?

[20] A: I don't know. The sales figures in the [21] comic book industry at that time were generally [22] considered to fall into two categories: secrets and [23] lies.

[24] Q: I thought you numbered Print Mint among [25] the mainstream publishers because of your understanding

Page 184

[1] of their sales.

[2] A: Yes.

[3] Q: So what was your understanding of their [4] sales?

[5] A: My understanding of their sales was that [6] they sold an awful lot of comic books that were around [7] on an awful lot of racks.

[8] Q: What do you mean by "awful lot of comic [9] books"?

[10] A: They published a substantial number of [11] comics. I can't quote you accurate sales figures here [12] because the sales figures in the business have long been [13] kept very secretive or, when they were published, [14] rumored to have been completely inaccurate. But we [15] heard stories of individual Print Mint titles selling [16] 200, 300,000 copies.

[17] Q: Which titles were those?

[18] A: I can't give you the names offhand. I [19] believe they published Zap Comix for a while. I believe [20] they published a couple of ghost, monster-type comics. [21] I don't really know.

[22] Q: What was the name of the comic that you [23] saw the copyright notice on that led you to believe that [24] the practice of Print Mint was to leave the copyright [25] with the writer?

Page 185

[1] A: I can't cite a specific one. I just [2] always saw copyright notices in Print Mint comics.

[3] Q: And what did the copyright notices in [4] Print Mint comics say that you recall?

CONFIDENTIAL

MARVEL0016657