# EXHIBIT B

JOHN MORROW                          1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

MARVEL WORLDWIDE, INC.,

MARVEL CHARACTERS, INC.,

and MLV RIGHTS, LLC,

                Plaintiffs,

        v.                        Case No. 10-141-CMKF

LISA R. KIRBY, BARBARA J.

KIRBY, NEAL L. KIRBY and

SUSAN N. KIRBY,

                Defendants.

------------------------------x


            Video Deposition of JOHN MORROW

                 (Taken by Plaintiffs)

               Raleigh, North Carolina

                  January 10, 2011




Reported by:    Marisa Munoz-Vourakis -

                RMR, CRR and Notary Public


TSG JOB NO. 35702

JOHN MORROW                              10

the case for the magazine.

So I called him and asked him if he would be interested in doing an interview.  He said, you know, possibly somewhere down the line, you know, we could do something like that.  That was our first contact.

And then I guess I assume he called me -- you might remember better than I do -- but like about a year ago, and asked if I would do the report.

Q.    And what did you understand the subject matter of the report or the content of the report was going to be?

A.    Oh, well, see, there were a few things that were going to be covered.  A lot of the history of Marvel Comics going back to like the 1940s.  Jack Kirby's history working for the company, and gosh, sort of, you know, that it should contain, you know, my personal observations from my years of doing, you know, comic scholarship work, about, you know, industry practices and things like that.

Q.    Was any engagement letter signed between Mr. Toberoff's office and yourself?

A.    What is an engagement letter?

Q.    A letter setting out the terms and

JOHN MORROW                                13

Q.    And that continues today?

A.    It does.  I think we actually told them we would be dropping it to just about 800 an issue now because of the economy and all sales have kind of declined.

Q.    Do you have any understanding with Mr. Toberoff with regard to any arrangement to publish anything about this case in consideration of your providing a report?

A.    No.  No.  I hope after it's all said and done that I can interview various parties involved, if they're allowed to talk about it.  But, no, we don't have an arrangement or anything like that.

Q.    Have you ever had any business dealings with Mr. Toberoff prior to being contacted in connection with this case?

A.    No, other than my initial request to get an interview from him, which never resulted in anything.

Q.    How old are you?

A.    About 48.

Q.    And would you summarize your educational background, beginning with high school?

A.    Sure.  Twelve years of high school diploma, four-year college degree with a bachelor in fine arts.

JOHN MORROW                        16

programs.  A wide range of things.  A lot of commercial real estate work, things like that.

Q.      Do you have any legal training?

A.      No.  No.

Q.      Do you have any training in the art or science of determining whether people are telling the truth or lying?

A.      No, no professional training.  I guess just intuition, such as it is.

Q.      What, if anything, did you do to prepare for today's deposition?

A.      I pulled out a few issues of our publications and a few other publications, just to reread some things.

What else?  I read back my report, met with Mr. Toberoff yesterday for an hour or two, and having never done this before, he kind of talked me through what the, you know, the whole experience was going to be like, and he told me not to get nervous and kind of went over my report page by page and just talked about specifics of what I put in there.

Other than that, pretty much nothing.

Q.      Where did the meeting between yourself and Mr. Toberoff take place?

JOHN MORROW                          17

A.    Oh, over at the, what is it, the Sheraton Hotel, where he's staying.

Q.    And was anyone other than the two of you present at that meeting?

A.    No.

Q.    And during the course of that meeting, did you look at any documents other than your expert report?

A.    No.

Q.    Have you ever seen any other expert report issued in connection with this case?

A.    No.

Q.    Have you ever been told what the contents of any other expert report issued in this case are?

A.    No.

Q.    Have you reviewed any deposition testimony given in this case?

A.    No.

Q.    So you've never reviewed the deposition testimony of Mark Evanier, for example?

A.    No.  I work with Roy Thomas, and Roy in a phone conversation mentioned to me that he had been deposed, and it took like, he said it took like three days or something like that, but we didn't actually

Page 18

JOHN MORROW                                    18

talk about specifics of what he said or anything that went on.

Q.    And I'm correct based on your answer, I assume that you have not seen any testimony of Stan Lee or any of the Kirbys?

A.    No.

Q.    Or John Romita?

A.    No.

Q.    Were you told of any testimony given by Larry Lieber in the case?

A.    No.

Q.    On this one, I've -- check your acquaintanceship, if any, with some people, first of whom is Martin Goodman.  Did you ever meet Martin Goodman?

A.    Oh, no, that was well before my time.

Q.    Did you ever meet Saul Brodsky?

A.    No.

Q.    Did you ever meet Stan Lee?

A.    I met him on a few occasions.  I'm not sure that he would recall them.

        The first time would have been 1978, just standing in line at a comic convention to get his autograph.

Page 37

JOHN MORROW                                37

Lisa or Neal told you was pertinent to the opinions

that you've set forth in your expert report?

    A.    Well, I can't really recall specifics right

now.  Of course, I've done a lot of interviews over the

years and read probably ten times as many as I've

actually conducted, and they all kind of, you know, go

in there and help form the opinions on things.

          So I'm sure if I had the interviews in

front of me, I could read through them and say oh,

yeah, that probably helped form my opinions on my

report as well, so.

    Q.    Did you refer to any Neal or Lisa Kirby

interviews?

    A.    I didn't specifically refer to those

interviews, no, not when I was doing the report.

    Q.    Have you ever interviewed Susan Kirby?

    A.    No, I've not.

    Q.    Or Barbara Kirby?

    A.    No, have not.

    Q.    Did you ever attend a meeting at Marvel

attended by Jack Kirby?

    A.    No, I've never been in the Marvel offices.

    Q.    Have you ever been told about any story or

plotting conferences at Marvel?

Page 40

JOHN MORROW                                    40

later on.

    A.    Okay.

    Q.    According to your report, I think you became involved in the comic book industry in 1989?

    A.    No, 1994.

    Q.    Did you have any connection to the comic book industry prior to 1994?

    A.    Well, my only connection was that I was a comics fan, a comics collector, devoured fan magazines and the Comics Journal, publications like that, really enjoyed learning about comics history and reading about it, that dates back all the way to probably 1969, 1970 when I got my first comic book.

    So, but no, I didn't have any professional connection to comics at all before 1994.

    Q.    And would it be fair to say that you have been a lifelong fan of Jack Kirby?

    A.    Lifelong?

    Q.    Well, at least once you started reading comics?

    A.    Well, no, not since I started.  I actually hated his work when I started reading comics.  I was about age 14 where I first developed an appreciation of his work.  Before that, I couldn't stand his art style.

Page 53

JOHN MORROW                                        53

Q.      And I know we covered this a little bit generally, but I'd like to cover it more specifically, what you were asked to cover specifically in your report?

A.      Well, the history of Timely and Marvel and kind of the history work practices at the time.  Jack Kirby's history with the company dating all the way back to what his first work for them with Joe Simon in, what was it, 1939, 1940.

His -- Jack Kirby's career, how he left Marvel, went to work for DC in the '40s, his work in the '50s, how he ended up back at Marvel in the late '50s and then the working relationship between he and Stan Lee, as I understood it, in the '60s.

But, you know, a lot of the history of the company and, you know, what I knew about Jack Kirby's personal work habits, you know, where he worked, how he worked, I guess that's pretty much --

Q.      Now, what you know about Jack Kirby and his work habits was not derived from personal observation of Jack Kirby working, is that correct?

A.      Correct.  Well, I've seen his studio in California, but that was after he had been deceased, and that's not where he was working when he was doing

Page 54

JOHN MORROW                            54

the work in general.

Q.    And so your knowledge of Jack Kirby's working habits and how he worked during the period from '58 to '63, which is the period relevant to this case, is based on what you've read about Mr. Kirby?

MR. TOBEROFF:  Misstates testimony.

A.    A lot of it is based on what I've read throughout the years.  A lot of it is, I believe, I'm sure I talked to Roz Kirby about that, about what it was like living in New York and working in New York.

I know I've read -- Mark Evanier has written several times about visiting Jack's studio and what that was like.

I believe in the Neal Kirby interview, we talked about that they called their dad's work space the dungeon, I believe, because it was in the basement of their New York home.

I do recall he painted a very graphic picture of what it was like down there.  I got a very good sense of what it looked like.  It was this room with this one little basement window for light, which is why they called it the dungeon.

But also I read a lot over the years about how Kirby worked when he was working with Joe Simon as

JOHN MORROW                                55

well.  How they had shared their across-the-street attic studios right after the war.  They got, you know, veteran housing and built houses and worked across the street from each other, to the point Joe Simon even told me they lived in different cities, because the state was the dividing line, or different counties, I guess, between the two houses.  Just picked up a lot over the years from various things I've read and talking to different people.

Q.    Did you ever talk to Joe Simon about Jack Kirby and his work?

A.    Yes, we have.  I actually interviewed Joe Simon for the Jack Kirby Collector.

Q.    And did Mr. Simon describe the nature of the working relationship between Jack Kirby and Marvel during the 1958 to '63 period?

A.    I don't believe so, because I don't believe Simon and Kirby were particularly close at that point.  Their company had dissolved shortly before that, which was the big reason Kirby ended up back in Marvel, and that seems to be kind of a dead area in the relationship.  There's not been much written or said about it.

Q.    Did Neal Kirby ever tell you that he had

Page 64

JOHN MORROW                              64

does kind of show that Kirby was doing things differently from everybody else.

Q.    Have you ever heard that Fantastic Four number one was the first issue that employed the more Marvel method?

A.    I've not heard that that was the first issue, no.

Q.    Am I correct though, you cannot testify with any degree of certainty as to whether or not Mr. Kirby was working from scripts at any time between '58 and '63?

MR. TOBEROFF:    Asked and answered.

It's okay, you can answer it.

A.    I can't say definitively, but there's anecdotal evidence that he was working Marvel method during that period.

Q.    Exclusively?

A.    Exclusively?  I had never heard him say that he was working from Larry Lieber's scripts, but Mr. Lieber says he was providing scripts, so I guess it's possible Mr. Lieber provided scripts and Mr. Kirby just went on and did what he wanted anyway.

Q.    Apart from that being possible, do you have any direct knowledge to suggest that it didn't happen

JOHN MORROW                              71

A.      Oh, I probably spent seven, eight hours, something like that, probably total.

Q.      And do you recall approximately when you began to actually write the report?

A.      I don't recall the date.  I think it was about -- Mr. Toberoff told me we needed to have something done in a couple of weeks, and so I didn't do like, you know, eight hours altogether.  There were a couple of revisions on it, so, but, I mean, I think I started about two weeks before we submitted it, something like that.

Q.      And did you input a draft on your own computer?

A.      No, the initial draft actually came from Mr. Toberoff's office.  We spoke over the phone.  The problem is I've not done one of these before, so I had no idea like the format.  I've never even seen one before.  So I asked for their assistance with that.  We kind of just sort of did an informal interview over the phone.  They'd ask me questions about things, and I would give them my sense, and then they send over -- they typed up kind of an initial draft of it and sent it over to me with the understanding that, you know, this is just our run through on it, make any changes

Page 72

JOHN MORROW                                72

you want.

Once I had the basic, you know, format there in a Word document, it was very easy to go in and alter things, and I changed a considerable amount of what they sent over.

Q.    Do you recall over how long a period of time it was between your receipt of that initial draft, to the completion of the final report?

A.    No, I remember I was very busy at the time, and I think -- I'm going by memory here, but it seems like it was about a two-week process.  It may have been a little more, a little less than that.  But once I got the draft, I think it was -- I spent about two days or three days before I sent it back to them as my like final version.

At that point, they looked it over, found a couple of typos, things like that.  Somebody from his office called me up and said I think we got, you know, couple of typos.  You might want to consider fixing. They told me I would go in, and they were, I'd change them and send them back, you know, the final, final draft.

Q.    And how long prior to the delivery of that initial draft that was prepared by Mr. Toberoff's

JOHN MORROW                                    74

was covered by Mark Evanier's report?

        A.      No, they didn't.  I have absolutely -- I've

not seen Mark's report.  I have had no knowledge of it

whatsoever.  I did know that he and I were listed as

the two expert witnesses or expert reports or whatever,

but that's the extent of my knowledge of it.

        Q.      Did you use any reference materials in

preparing your report?

        A.      I did.  I mean, I pulled out some books and

looked things up to try and get dates correct and

things like that.

        Q.      Do you recall what books you pulled out and

used?

        A.      I think several issues of Alter Ego

Magazine, issues of the Jack Kirby Collector,

particularly issue 41.  We actually published a couple

of Mr. Kirby's contracts with Marvel and so I referred

back to those.

                I know there was an article in Alter Ego

number 49 that Tom Lammers wrote about the history of

Timely and Atlas Comics and their whole problems with

their distributor.

                Books, I believe I pulled out, Stan Lee's

Excelsior, his biography, and I referred to some of the

JOHN MORROW                                    75

materials that we've gotten from Stan Lee's archives

for a book we're doing on Stan.

Q.    The we being TwoMorrows?

A.    Yes.

Q.    Your company?

A.    Yes, Roy Thomas and Danny Fingeroth, who

did Write Now Magazine for us.  They are coauthoring

that book.

Q.    But you will be publishing?

A.    Right, yes.

Q.    You are not writing the book?

A.    No, I'm not writing.

Q.    And do you recall what materials from those

archives you looked at?

A.    There were some interviews, transcripts of

radio interviews that Stan did in the '60s, some

newspaper clippings.  One in particular I remember,

Stan was talking about the different way he works with

different artists, and he talked about he has a story

conference with Gene Colan over the phone.  He would

put the phone up to his reel-to-reel tape recorder and

just let Stan talk.  And then Gene would have the

recording of that to refer to after the fact.

So they didn't actually have a lot of give

Page 76

JOHN MORROW                                    76

and take.  When they worked, it was just Stan talking.

Whereas, he said, with Jack Kirby, it was an entirely

different thing.  It might be by phone, it might be in

person, it might just be let's use Dr. Doom in the next

issue Jack, okay, and that might be the whole story

conference.

So let's see what else was in that batch?

I sent -- you should have a list of all the

research materials and stuff we have.  I think there's

a pretty good list of material we got together for that

Stan Lee book.

Q.    Right.  But I'm trying to focus on what

materials you referred to in connection with the

preparation of the expert report from that list.  I

assume you didn't look at all of it?

A.    No.  I looked at main issues of the Jack

Kirby Collector, if I got my facts straight, Alter Ego,

and then that Stan Lee interview.  That was probably

most of it.

Q.    Did you listen to the radio interview in

connection with the preparation of your report?

A.    I don't actually have a copy of the audio

of that.  All I've got is the written transcripts.

Mr. Fingeroth has copies of the audio.

JOHN MORROW                          80

BY MR. FLEISCHER:

Q.    I've placed before you what we've marked for identification as Exhibit 4.  It bears production numbers JM131 through 144?

(The document referred to was marked Plaintiff's Morrow Exhibit Number 4 for identification.)

Q.    Is the first page of the exhibit the e-mail forwarding to you the first written draft of the report that you are aware of and the other pages of the exhibit, the attachment to that e-mail?

A.    This looks like it, yes.

Q.    Did you provide the substance of everything set forth in this draft, which is part of Exhibit 4?

A.    Everything?

Q.    Yes.

A.    No, did not.  After our initial discussions, they prepared this and sent this to me.  I was quite impressed actually with how well they did with it.  Then at that point, I took this and modified it.

Q.    Is there anything in this draft that you did not provide to them in verbal terms prior to receiving the draft?

JOHN MORROW                                  81

A.      Well, we -- let's see, obviously the bio, that was sent by e-mail.  The introduction, let's see, the introduction was just their summation of what they told me this would be about.  The qualifications are based on the bio that I sent in.

The historical background, A, historical background, most of that was provided by them.  We had some brief discussions on that.

Let's see, Jack Kirby and Marvel -- again, most of that was provided by them.  We had some brief discussion on that, but most of that is from them.

Q.      You are talking about the material on page 135?

A.      Well, yeah, page four.

Q.      Page four of the draft?

A.      Yeah, the Jack Kirby Marvel background.

Q.      Okay.  And on page five, there's another numbered section headed Kirby's working relationship with Marvel.  How much of that did you provide and how much was there?

A.      Well, we had a pretty good conversation about this.  You know, I'm not sure how much of it they took verbatim from me, but, again, this is the draft they sent me.  So it was based on our conversation.  I

Page 82

JOHN MORROW                                    82

feel a lot more of this is what we talked about on the

phone, because most of the early historical stuff is

just a matter of record.  This seems to have more of my

opinions in it at this stage.

So that section two would be, I'd say,

largely from our phone conversations, and section

three, right, they asked about if I knew anything on

the Hulk, and I didn't really have too much information

on that.  So not much came forth on that.

Q.    Is the material -- let's just take it

paragraph by paragraph, if you don't mind.

A.    Okay.

Q.    Under the heading Jack Kirby's creations

and co-creations, how much of that paragraph was

provided -- was based on information you provided and

how much was provided in their initial draft to you?

A.    Well, the first sentence sounds like it was

probably taken verbatim from something I said; as is

the second.  Actually, it all sounds like it could have

been taken verbatim from me.

The second one under Fantastic Four, if

that's not all taken verbatim from me, it's

definitely -- that goes (sic) exactly my thoughts.  So

it may well have all been taken from me.

JOHN MORROW                              83

The incredible Hulk, they were just asking for that.

Thor should have been basically from me.

Spider-man should be from me.

Sgt. Fury, I added quite a bit on that after they sent this.

Number four --

Q.    I think we can skip over four, because that's part of the -- when they sent you the report, did they indicate to you what they expected to be added under the conclusion heading?

A.    No, they just, as it says there, just to recap everything.

Q.    What did you understand your function to be in completing the conclusion section here or recap?

A.    Just to recap the main points, you know, as far as just recap the main points of the history and Kirby's working relationship, you know, what I understood of work-for-hire.  That's pretty much it, or what I understood work-for-hire, how I felt it related to this.

Q.    And after receiving Exhibit 4, what did you do with respect to the report then by way of completing it?

JOHN MORROW                                88

e-mail, just to make sure he knew it had been sent to his assistant.

Q.   Did Mr. Toberoff respond to this e-mail?

A.   I don't believe so.  Again, it's possible there was an e-mail saying thanks, I got it or whatever.  But I don't believe I got a response back from him.

Q.   Do you recall any discussion about any substantive changes to the report, other than the correction of typos?

A.   I don't recall right now, no.

Q.   Let me direct your attention to page four of the draft, that's part of Exhibit 5, which is your signed version, and specifically the first sentence, full sentence at the top of page four that begins: Marvel required me to sign a work-for-hire agreement for the various work I produced for them, and in the course of this project, Marvel finally paid Jack Kirby's estate $325 for the use of that unused Kirby story Kirby drew in 1970.  Actually, it doesn't just begin, that's the whole sentence.

Did you have any discussion with someone from Mr. Toberoff's office about that sentence?

A.   You know, I took that out of the final one,

Page 89

JOHN MORROW                                89

because I thought it kind of wasn't pertinent, and then you guys would think I'm some kind of expert on work-for-hire, which I'm not.  So that's why I took that out.

Q.    Did something prompt you to take it out?

A.    No, just rereading back over it.

Q.    So in a subsequent draft, this sentence was modified or deleted?

A.    I believe so.  I don't have the -- I thought this was the final version, but I guess it's not.

Q.    The last phrase of that sentence that I just read, where it says Marvel finally paid Jack Kirby's estate $325, what did you mean by finally there?

A.    Because he had not been paid for it when it was originally drawn.

Q.    And you know that how?

A.    Because rejected work, all the historical data shows rejected and redrawn work or rejected work wasn't paid for, and that redrawn work wasn't like, you know, paid again for.

Q.    And what historical data are you referring to to support that statement?

JOHN MORROW                                91

Marvel paid for them, Jack wouldn't have had the opportunity to throw them in the garbage.  Marvel would have done something with them.

Q.    Am I correct that you don't have any firsthand knowledge about whether or not Jack was paid for the pages you're referring to in this sentence?

A.    Well, by firsthand knowledge, was I there, for instance?  No, of course not.  I was much too young to be there.  You know, I'm not privy to Marvel's books, so, no, I can't say definitively that it was on the books that he was paid.

I know when we did -- Marvel wanted to do a book called Fantastic Four Lost, which was -- I assembled an unused Fantastic Four story from various collector's collections.  They had scattered pieces of this story that Marvel -- Jack had drawn in, I guess, 1969 but Marvel never published.

Marvel read my article in the Kirby Collector and said oh, we should get that together and finish it and publish it.

So when they contacted me about doing all of that, I told them that, you know, unless there's some reason to believe that they paid for that originally that, you know, no, they're not going to get

JOHN MORROW                    98

copyright to terminate because Marvel was -- its work product Marvel was the author.  Kirby is not the author.  Stan Lee is not the author.  So, and that seemed to be key to the case.

Q.    Did you ever have discussion about the issues in the case with anyone from Mr. Toberoff's office?

A.    I think I talked to Mr. Toberoff about the intricacies of work-for-hire.  I think he kind of sort of explained those to me.  I don't remember when that discussion was.  It was over the course of between our first correspondence and this, but I couldn't tell you exactly when.

Q.    And prior to that discussion, did you ever have an independent understanding of the legalities associated with work-for-hire under the copyright laws?

A.    In my layman's understanding, yeah.  I remember in the late '70s, it suddenly became a big issue.  I remember, you know, who Neal Adams is.  There was an issue about are the companies going to return our original art to us or not.  And our issue at the time is well, if they don't return it, then they own it, so they have to pay sales tax on it, and Neal Adams was trumpeting that as a major reason why the companies

JOHN MORROW                          100

contracts to kind of protect yourself in cases like that.

So, yeah, I had at least a rudimentary knowledge of what work-for-hire was about.  I don't think I know every detail by any means, but I got the basics.

Q.     What is your understanding of what work-for-hire is, as you sit here today?

A.     Well, in terms of just in general, or in terms of this case?

Q.     I mean, well, in general.

A.     In general.  Well, for it to be work-for-hire, my understanding is that, like the people you're dealing with, they have to have an obligation to pay you, first of all, for the work you're doing.  It's not like -- I'm like -- I mean, there has to be like a guarantee of payment for the work you are going to do for them.  It has to be kind of agreed in advance.  I know in a lot of instances, there actually has to be a written document before work begins saying this is work-for-hire agreement, both parties understand that.

You know, for instance, I know work-for-hire is a whole lot more clear and easy to

JOHN MORROW                                129

were asked to provide are set forth in the second paragraph of the introduction, preceded by the letters A, B and C?

A.    Yes.

Q.    Were those the specific opinions that you had in mind when you were talking with Mr. Williamson and making the revisions to the draft report?

A.    Yes.

Q.    And with respect to your opinions concerning Marvel's history before, during and after the 1958 through 1963 time period, apart from what you've described as reading interviews and materials over the years and perhaps conducting some interviews, is there any other basis that you had for offering opinions concerning that history?

A.    Well, what you mention encompasses a lot. Just the sheer number of pages we published on comics history since we started in 1994 is pretty extensive.

So I don't want to discount the value of that, in my opinion for him. And just the number of books I've read in that time period as well.

And before, I mean, the four-page list of research materials I sent you is not all of the books I've ever read on comics history. There's any number

JOHN MORROW                                    130

that I, you know, also sold or traded or donated or whatever.

So, I mean, this has, you know, comics history has been kind of in my life since I was 12-years old, so, I mean, I think that's sufficient to form opinions, frankly.

Q.    And with respect to your opinions concerning the B element described here, which is the business relationship between Jack Kirby and other freelancers with Marvel during this period, is there anything, other than what you just described and described earlier, that you used as a basis for forming opinions with regard to that relationship?

A.    All my research materials, you know, conversations I've had, convention panels I've attended, where these creators were actually speaking firsthand about it, but, yeah, I mean, I think we've outlined where my research comes from.

Q.    And with respect to the last of the three described opinions, which is Jack Kirby's creation or co-creation of many of Marvel's most famous characters during the period, did you do anything other than, again, what you've described previously?

A.    I think that's pretty much the same.  A lot

JOHN MORROW                                131

of firsthand accounts by creators, a lot of interviews.

Q.    Any firsthand accounts by creators concerning people who were at story conferences between Jack and Stan Lee?

A.    Certainly.  I think, wow, let's see, I believe Flo Steinberg is mentioned, of course, she wasn't actually in the conference, she was outside, as the secretary, but could overhear things.

I believe Marie Severin has commented on story conferences.

John Romita, of course, I think I elaborated earlier the example where Stan was driving him home, that's a good example.

Who else?  Of course Mark Evanier hearing the phone, one side of the phone conference from Mr. Kirby's studio.  I'm sure there's more.  Those were the ones that immediately come to mind.

Q.    What information did you get from Flo Steinberg about this subject?

A.    Oh, I just recall, I can't give you a specific right off the top of my head, but I remember her speak or read of her speaking about -- you know, Stan Lee was infamous for very enthsiastic story conferences in his office.  He would stand on the desk

JOHN MORROW                          133

break.

THE VIDEOGRAPHER:  The time is 11:55 a.m.  This is the end of tape number three.  We are off record.

(Recess.)

THE VIDEOGRAPHER:  The time is 12:02 p.m.  This is the beginning of tape number four.  We're back on the record.

BY MR. FLEISCHER:

Q.    Am I correct in looking at your report that the report contains both statements of fact and statements of opinion?

A.    To my knowledge, yes.

Q.    And is there a way that I can distinguish or the reader can distinguish what you are stating as a matter of fact, from what you are stating as a matter of opinion?

A.    I'm not sure how to answer that.  I'm stating the facts, as I understand them.  And I -- I mean, it's, I understand my job with this report is to give my opinions.  But my opinions are based on the facts, as I understand them.

So I don't know that the two are so intertwined.  I'm not quite sure how you would like a

JOHN MORROW                              134

formula for saying okay, this is fact, this is opinion.
I don't really understand.

Q.      In some places in your report, you say it
is my opinion that, or words to that effect, I assume?

A.      Oh, right, if I say I believe that, that
would obviously be an opinion.

Q.      I can assume -- let me just finish the
question.

A.      Oh, I'm sorry.

Q.      Am I safe in assuming that when you say it
is my opinion that, or words to that effect, that that
is an opinion, not a fact?

A.      Yes, my opinion based on the facts that I
understand.

Q.      And if you don't preface a conclusionary
statement with it is my opinion that, or words to that
effect, is there any way to know whether you are
stating something you believe is a matter of opinion or
is a matter of fact?

A.      Well, I guess we'd have to take it line by
line, and you could say is that a fact or is that an
opinion?  And if it's a fact, I can tell you what it's
based on.  That we could do.  But in terms of just
something so the casual reader can go oh, that's a fact

JOHN MORROW                              135

or that's an opinion, I don't know that there's some kind of system in place for someone to do that.

Q.    So the reader, other than with respect to statements prefaced by it is my opinion that, or similar words, would have to ask you -- follow up and ask you whether it's a statement of fact or opinion?

A.    As with any document, certainly, yes.

Q.    And am I correct that the statements that appear in the report that purport to relate facts are facts that you have derived from research as opposed to personal observation, something you saw, something you heard directly or something like that?

MR. TOBEROFF:  Asked and answered.

A.    Yes.  I mean, my report is based on research and the opinions I've formed based on the research.

Q.    Is there any method by which the reader of your report could test reliability of the conclusions in your report?

A.    I guess they could read the same research materials I've read, and if they've read our -- the publications we've put out over the last 17 years, I think they could do a pretty decent job of going through and seeing where I got my information and

JOHN MORROW                           136

giving it validity, yes.

Q.    So the only way you could test validity is by reviewing, theoretically, everything you've reviewed, and in your view, the reader of that material would always come to the same conclusion that you came to?

A.    Well, I can't say always, because I can't speak for other people and how their thought processes work.  I was asked to do an expert report based on my knowledge that I gained over the years, so that's what I did.

Q.    Just in terms of methodology, if I wanted to test reliability of a statement in your report, the only way I could do that is by immersing myself in all of the material you reviewed over the years and making judgment?

MR. TOBEROFF:  Misstates testimony.

A.    You asked a way that you could validate what I put in my report.  That is one way.  There are probably other ways.  Probably other people who have read other research materials and read other interviews could probably evaluate what I said as well.  There may be other ways.  I don't really know how to answer that question.

JOHN MORROW                              137

Q.      What I'm getting to is this, if you had written a scientific paper, where you set forth, take a wild example, the proof of Fermat's last theorem.

A.      Whatever that is.

Q.      Which is A to the end, plus B to the end equals C to the end, has no whole number solution greater than two, and you published that paper, the scientific mathematical community would be in a position to test that by looking at your calculations. And I'm trying to get to is there any way the reader of your report could apply some methodology to testing the reliability of your conclusions?

A.      A methodology to test reliability?  By, I assume, by reading the rest of the testimony in this case, other people's depositions, that could, you know, support or reject some of the things I say in my opinions.  But, again, I'm not -- I don't really know how to answer that question.

Q.      Let me direct your attention to page three of your report, not the final report, that's the one -- Exhibit 9, and specifically to the sentence appears to be the third sentence in the second full paragraph, which I'll read for the record, "Prior to my 1996 article, the unused Fantastic Four story was unknown to

JOHN MORROW                    153

for DC at the same time and summarily told them to leave, and they went to work for DC comics.  Then they went to war.

Then Simon and Kirby worked for Harvey Comics, Enterprise Comics and a lot of other companies but not for Marvel.

Q.      What was the relationship between Timely and Kirby and Simon at the time Captain America was being published?

A.      I believe I put that in here.  I don't know where that is.  Kirby was working for, I believe, Fox Features at the time when he met Joe Simon.  Simon took an editor's job at Timely and worked on agreement with Martin Goodman for Timely publishing Captain America, and Simon and Kirby, I believe, would get 20 percent of the profits, Simon would get 15 percent and Kirby would get ten percent.  Simon got the extra percentage because he brokered the deal with Goodman.  They produced ten issues of Captain America there at Timely before difficulties arose and they parted ways.

Q.      Did Timely pay Jack Kirby for work he did on Captain America, or did Joe Simon pay Jack Kirby, or did someone else pay Jack Kirby?

A.      I wasn't there and can't say for certainty.

Page 168

JOHN MORROW                               168

was just accumulating.

Q.     Was that an assumption on your part or based on specific information?

A.     It's based on reading research in that time period.

Q.     Yet you use the phrase a closet full of unused artwork.  Doesn't that refer to just pencils?

A.     Not in this case.  I believe in this case, it would refer to stories that were not published.

Q.     To be more accurate, your report should have said a closet full of finished stories?

A.     Certainly, yes, that's fine.

Q.     And you indicate in your report that Mr. Goodman gave Stan Lee the job of firing the employees, the staff of the company at that time?

A.     Yes.

Q.     What is the basis for that?

A.     Mr. Lee's own biography, various historical articles written, interviews in Alter Ego.  I remember Alan Bellman particularly talking about that, that they had like a little PA system, and you would be called into the office and you would go oh, he's getting laid off, he's getting laid off, and one day he heard his name over the PA system and realized it was his turn.

JOHN MORROW                            173

A.      Well, you could say that it's possible any number of their early successes were on spec.  If Joe Simon brought in Captain America and said let's make a deal with this, does that follow your definition of on spec.?

Q.      Is it your understanding that Joe Simon brought Captain America to Martin Goodman or that he was working at the request of Martin Goodman on a superhero character?

A.      My understanding is that Joe Simon brought it to Martin Goodman.

Q.      How did you get that understanding?

A.      From Joe Simon's biography and from Jack Kirby confirming that in interviews.

Q.      So let's put Captain America aside.

Any other instance in which you can think of, any work published by Marvel up to 1963 was created on spec.?

A.      I'd have to do further research.  Bill Everett created the Submariner.  I'm not, off the top of my head, sure of the instances of how that ended up at Timely.  That was around the same time period as Captain America.

The Human Torch, Carl Burgos is another

JOHN MORROW                                199

drew some sample pages, brought them in and Stan said

no.  He rejected probably because it was too close to

Archie Comics' Fly, and that's when Stan had Steve

Ditko come in.

Q.    Are you saying that Jack brought the pages

without being given an assignment by Stan with respect

to Spider-Man?

A.    No, I think Jack brought in the concept,

the idea to Stan as one that they had kind of kicked

around at Mainline for doing, and Stan said sure, let's

give it a try, and I don't know what level of input

Stan gave Jack at that point.

Q.    Do you have an opinion with regard to

whether or not Jack Kirby was the sole creator of Sgt.

Fury and the Howling Commandos?

A.    Well, I put in my report -- a quote that

really caught my attention when we interviewed John

Severin for the Jack Kirby Collector.  On page 12 and

13 of my report, he talked about met over coffee with

Jack Kirby, and Jack at that point was trying to get

syndicated newspaper strips purchased to syndicates and

he had this idea that he pitched to John Severin to get

John to draw it, because John was very good at drawing

war comics, and -- well, the quote is in the report.

JOHN MORROW                              200

You can read it.  But that one was very interesting to me.  That's not an interview I actually conducted.  Jim Amash conducted that actually.

Q.    So returning to my question, do you have an opinion as to whether or not Jack Kirby was the sole creator of Sgt. Fury and the Howling Commandos?

A.    Well, you have to define sole creator.  Do I think Jack Kirby initiated the concept?  Yes.  That right there makes me think that Jack Kirby initiated the concept.

Did Stan Lee have input into the concept? I would think as editor, certainly.  It could have been as simple as this is hypothetical.  It could have been as simple as Stan saying Jack, we need a war book, and Jack said oh, I got this great idea I was kicking around, and then he presented it, and maybe Stan added some stuff, something like that.

It could have been that Jack walked in and said Stan, here's an idea.  If you want to use it, we can do it.  I, of course, wasn't there, so I don't know.  But this leads me to believe that Jack initiated the concept outside of Marvel and through whatever process it was brought in.  I'm sure Stan had some input into it.  The question is how much?

JOHN MORROW                                    201

Q.      Do you have any information to the effect that Stan -- that Jack Kirby began drawing Sgt. Fury and the Howling Commandos before getting an assignment from Stan to do so?

A.      No, not that he began drawing it, no.

Q.      Had Stan Lee ever done war comics for Marvel before Nick Fury?

A.      Yes, he had.

Q.      Was there something unique about Sgt. Fury and this Howling Commandos and the war of comic genre?

A.      Yes, there was.

Q.      What was unique about it?

A.      Sgt. Fury was, for me, the first war comic I actually could read.  I never enjoyed war comics. There was something about the feel and the tone of it and the level of action in it that I really enjoyed. At that point, I had never discovered Kirby's earlier war comics.  But when I first saw Sgt. Fury, it was like, okay, this is almost like superhero comics, which I like, but done as a war comic.  It had a lot of the same trademarks that the superhero comics had.

Q.      It was unique in the sense that you liked it?

A.      It was unique in the sense that it was

JOHN MORROW                                    203

lessen that Stan didn't add to it, but it's -- Jack --

Q.      When you say it's a Jack Kirby creation --

MR. TOBEROFF:  He was still talking, he said but Jack.

BY MR. FLEISCHER:

Q.      I thought you had finished your answer.

A.      Well, just that it just screams that was a Jack Kirby creation.

Q.      Screams that to you?

A.      To me, yes.

Q.      That is your opinion?

A.      That is my opinion, yes.

Q.      Now, do you know whether Jack Kirby put pencil to paper before discussing the Thor character or the concept of a Thor book with Stan Lee?

A.      No, do not.

Q.      So when you say it's your conclusion that it's the sole creation of Jack Kirby, you are saying it was his idea?

A.      That is my opinion, yes.  The idea to take Thor and use him as an ongoing superhero and cloak him into Norse mythology would have been Jack's idea.

Q.      But he wouldn't have drawn anything until getting the go ahead of from Stan and having a story

JOHN MORROW                          204

conference of some kind with Stan, is that correct?

          MR. TOBEROFF:  Assumes facts, lacks

     foundation.

     A.     Again, I wasn't there in 1961 and '62 when

these books were being produced.  I can give you my

opinion, if that's what you'd like.

          My opinion is that Jack came to Stan Lee

and said hey, I got this idea for a superhero based on

Thor.  And Stan would say something along the lines of

okay, we've got a dead magazine and a mystery with

nothing going on.  Our superheros are starting to take

off.  Let's do it.  At that point, they would kick

around details of it.  That's my opinion.

     Q.     Do you have an opinion with regard to who

is the creator of Ant Man?

     A.     He is such a lesser known character, I

don't think I actually included anything about Ant Man

in there.  I have not heard or read much historical

data on Ant Man.  What I do know about Ant Man is

that --

     Q.     Just try to restrict yourself to my

questions.

     A.     I'll say no, I have no opinion.

     Q.     I don't mean to cut you off, but we are

JOHN MORROW                                    207

Q.      I think you indicated earlier, I just want to make sure I'm clear for the record, is it your understanding that Marvel had the right to make changes in the work submitted by Kirby?

A.      Well, that's generally the job of an editor in any publishing house.  The editor accepts the work and they edit it.

Q.      So the answer would be --

A.      Would be yes.  Yes.

Q.      Do you know whether Jack Kirby ever received any vacation pay from Marvel?

A.      No, none that I'm aware of.

Q.      Well, are you aware that he didn't receive vacation pay?

A.      My understanding is that he did not, and that's why he produced so many pages at such a faster rate than most of the other artists, so that he could keep up with his family finances and be able to take a little time off once in a while.

Q.      Am I correct that you cannot testify from firsthand knowledge that throughout Mr. Kirby's career with Marvel, he never received any form of vacation pay?

A.      From firsthand knowledge, no, I cannot.

JOHN MORROW                           226

So a lot of these were unpublished pages that appeared in there.

So he had possession of those, Marvel didn't, which leads me to believe he was not paid for them or Marvel would have kept possession of them.

Q.    So there is some relevance about who retains the pages?

A.    I think so, but, again, there's, you know, a certain amount of fluidity to the working relationship there, particularly in the early days of Marvel, when everybody is trying to please everybody else.

Q.    Would I be correct again in saying that you have no firsthand knowledge as to whether or not Jack Kirby was paid for these pages?

A.    No, I do not.

Q.    The next one, the last one I'll ask you about is the X-Men.  Do you have any information about this?

A.    The X-Men one is interesting, because it was actually inked by Chick Stone.  So that leads me to believe that that one may have been paid for, because it got to the inking stage.  It was actually inked and lettered and had a logo put on it, and apparently at

JOHN MORROW                          228

with the company for a while, who to this day is not

regarded as a particularly compelling artist.

Well, I correct that, Steve Ditko also

would be a very influential creator there, except that

his influence was largely on one or two strips.

Whereas Jack Kirby's influence was across the board.

But certainly Ditko, you can't discount his work on

Spider-Man, and to some extent, on Doctor Strange.

Q.    What about John Romita?

A.    Well, Romita didn't come in until Ditko

left Spider-Man, so we're talking what year was that?

Probably around '64, somewhere in there.  He became

influential, but not at first.

At first, actually, the fans tended to

really dislike him, because he wasn't Ditko.  It took

him a while to get the feel for the Marvel style, which

is why Stan had Jack do layouts for him.

Q.    In your report on page 11, under the

heading of Fantastic Four, you describe some history,

as you understand it with regard to the publication by

Marvel of Fantastic Four number one, correct?

A.    Correct.

Q.    There's nothing here that talks about the

actual circumstances, as you understand them, of the

Page 229

JOHN MORROW                                    229

creation of Fantastic Four, is there?  That is to say,

the interaction between Stan Lee and Jack Kirby?

A.    Well, that in Origins of Marvel Comics, Lee

admits that he discussed Fantastic Four with Jack Kirby

before writing anything.  I think that goes to that.

Q.    Do you have any other information with

regard to the circumstances of the interaction between

Stan Lee and Jack Kirby, other than what was in Stan's

Marvel comic book?

A.    Again, I'm sure there is more.  This is off

the top of my head.  I don't have anything now.  You

know, if I put more time and think about it,

particularly into researching old interviews, I could

probably find something.

Q.    Can you tell me what --

MR. TOBEROFF:  What is this?

MR. FLEISCHER:  Let me identify it for

the record.

BY MR. FLEISCHER:

Q.    I've placed before you as Exhibit 14 a

two-page document.  It has production numbers Marvel

14587 and 88.

(The document referred to was marked

Plaintiff's Morrow Exhibit Number 14 for

JOHN MORROW                          237

referred to a minute ago, comparing Kirby's Spider-Man with Ditko's Spider-Man?

A.   Yes.

Q.   And do you agree that Kirby's Spider-Man looks like the Simon Kirby Captain America character?

A.   There are similarities certainly, but there are similarities among most superhero costumes.  It's kind of that's just the way superheros are drawn.  I think the finished Spider-Man is obviously very different from either of the other two.

Q.   And in this document, there is a depiction of The Fly, particularly on the second page on a couple of covers, do you see those?

A.   Yes.

Q.   And would you agree that the look of The Fly is substantially different than the look of Spider-Man?

A.   Yes, I would.

Q.   I'd like to direct your attention again to your report in Exhibit 9, the final version, and the first sentence of your conclusion says, and I'm going to quote it:  "To recap, I believe that Kirby's work for Marvel from 1958 to 1963 was not 'work for hire'".

I had understood you earlier to have

Page 238

JOHN MORROW                               238

eliminated a conclusion with regard to work-for-hire

because you didn't feel you were competent to opine

with respect to work-for-hire.  Is there a reason --

    A.    Not in a legal.  Not in a legal.

        MR. TOBEROFF:  Let him finish the

    question and give me room to object.

        BY MR. FLEISCHER:

    Q.    Is there a reason that you feel competent

to make the statement in the first sentence here?

        MR. TOBEROFF:  Objection, misstates

    his prior testimony.  You can answer.

    A.    Yes, from what my understanding, my

layman's understanding of work-for-hire, I feel

confident to make that statement.

    Q.    Is that an expert opinion?

    A.    Yes, that's my expert opinion.

    Q.    A minute ago you said it was a layman's

opinion.

    A.    My expert layman's opinion.  Not my expert

legal opinion, but my expert layman's opinion.  I, of

course, am not an attorney.

    Q.    Do you know whether there were any changes

in the concept of work-for-hire that occurred in the

mid-'70s applicable to works created after 1978?

JOHN MORROW                          239

A.      I've got a basic understanding of how the copyright law changed, yes.

Q.      And what's your understanding of how the concept of work-for-hire under the copyright law changed as a result of statutes that became effective on January 1 of 1978?

MR. TOBEROFF:  Objection, lacks foundation, misstates the law.  Go ahead.

A.      Well, my understanding of the copyright law change, I guess it was written in 1976 and enacted in 1978, defined work-for-hire is you have to have a preexisting agreement between the person commissioning the work, the person doing the work, usually in writing.

That you had to -- it's not work-for-hire if you are doing it at your own expense.  That there's not some financial guarantee of payment, it's not work-for-hire.

You have to believe that -- both parties have to believe that from the second of inception of that work, that the employer owns that work, which I don't believe was the case with this.  And I'm sorry, I'm blanking out on the others.  But that's -- that in a lot of cases freelance work is not work-for-hire, but

Page 240

JOHN MORROW                                    240

there are cases where it is.

Q.    I think the question was, what changed as a result of the '78 -- the statute that became effective on January 1, '78?  I'm a little confused about your answer.

Were you describing the elements of work-for-hire in your answer, as you understood them that changed in 1978, or were you talking more generally?

A.    I was talking more generally in terms of why I made this statement, so.

Q.    Well, do you know what changes occurred as a result of the Copyright Act of 1976 that became effective in 1978?

A.    Right.  I believe that you had to have an actual signed contract for it to be considered a work-for-hire.  I'm sorry, I'm blanking out on that one, so.

Q.    Do you know what the elements of a work-for-hire were under the preceding statute, which was the Copyright Act of 1909 as amended?

A.    No, I do not.

Q.    Do you know which statute would have applied to work created between 1958 and 1963?

JOHN MORROW                           241

A.      I would assume the one that was enacted prior to the 1976 change.

Q.      Do you know one way or the other?

A.      Well, it makes sense, but, well, yes, it would have to be the one that was before the 1976 change.

MR. TOBEROFF:  Just word of caution with regard to the word assume.  Since you are not supposed to speculate when you say assume, I don't believe you are speculating, but I would be careful with that word.

THE WITNESS:  Okay.

BY MR. FLEISCHER:

Q.      Is it your understanding that the concept of work-for-hire is a legal concept?

A.      Yes.

Q.      And you, I think agree, you are not qualified to offer a legal opinion, is that correct?

A.      A legal opinion, correct.

Q.      And in your conclusion on page 14 at the bottom, you continue:  Nor do I believe that Marvel itself in this period viewed or understood such freelance work to be made-for-hire, since there is no evidence of Marvel having documentation to support it.

JOHN MORROW                               245

work-for-hire.  I don't think they had ever even heard
the term.  If they had heard it, I don't think they
would have known what it meant.

Q.    Did you ever see a copyright application
signed by Jack Kirby for Marvel for work published by
Marvel?

A.    I don't believe so.  Why would Kirby have
filed a copyright application if Marvel was filing the
copyright applications?

Q.    Do you know if the copyright applications,
for example, for Captain America were filed by someone
in the legal department of Marvel or just some
editorial employee or other employee of Marvel at the
time?

A.    Are you talking in 1939?

Q.    1940 or whenever Captain America was
started.

A.    I have no idea.  I've never seen those
papers.

Q.    Do you think it would have been prudent for
you to review some copyright applications before
rendering the opinion you've offered here in your
report?

A.    In retrospect, yeah, certainly.  I didn't

Page 246

JOHN MORROW                                246

have access to those.  But if I had, I certainly would have reviewed them.

Q.    Couldn't you have gotten copies of copyright registrations from the copyright office?

A.    I guess I could have gone through and gotten copyright applications on every character Marvel ever produced for this report, but that didn't seem to be really in the scope of it.

Q.    And in fact, you didn't attempt to obtain any copyright applications?

A.    No, I did not.

Q.    For any character or publication, right?

A.    No, I did not.

Q.    In your understanding of the concept of work-for-hire, can a work made-for-hire be a work created by a freelancer?

A.    Yes, there are instances where a freelancer can work under work-for-hire, yes.

Q.    Mr. Morrow, I placed before you what we've marked for identification as Exhibit 17.  It bears production numbers JM225 through 227.

(The document referred to was marked Plaintiff's Morrow Exhibit Number 17 for identification.)

Page 281

JOHN MORROW                                        281

After you had described something to that effect, you were then asked, which I believe you were intending to describe the 1909 Act, you were asked, do you know the test of the 1909 Act?  And I believe your answer was no?

A.     Yeah.  What I just described would have been the test under the 1909 Act.

So the 1976 Act added some requirements, like getting a contract signed before work begins, like if somebody wants to do a -- somebody is hired to do a screenplay ahead of time, we'll pay you $10,000 for this, we'll pay you 5,000 when you sign and 5,000 when you deliver it.  Even though he is a freelancer under the 1978 version, that would be work-for-hire.

So that's a good instance of where a freelancer could be work-for-hire under the '78 law.

So, yeah, I got confused with the questioning on do I know the difference between the '78 and 1909?  I think I have a decent understanding of the difference.

MR. TOBEROFF:  Okay.

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. FLEISCHER:

Q.     Just some follow-up questions.

Page 282

JOHN MORROW                                            282

Did Mr. Toberoff help you in -- at a break in triggering the testimony that you just gave?

A.    During the break, he pointed out to me that you got that wrong, and I knew I did, because he had helped me understand the differences in copyright law way back before I did my report over the phone, because I had a lot of questions about what was work-for-hire and what was not.

Q.    So is your understanding of the content of the copyright law and in particular the elements of work-for-hire under that law, derived from your discussions with Mr. Toberoff?

A.    Well, partially, yeah, but also, I mean, we had had freelance illustrators and designers that worked for our ad agency sign work-for-hire contracts for us, long before I was ever doing the Jack Kirby Collector.

Before that I had a grasp of work-for-hire. You know, Mr. Toberoff helped me understand really the distinction with the new law versus the old.

Q.    And did you ever read the work-for-hire provisions of the new law and whatever provisions of the old law --

A.    Yeah, I actually went on line to the