EXHIBIT A

Marc Toberoff (MT 4862)
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: 310-246-3333

Attorneys for Defendants Lisa R. Kirby, Barbara J.
Kirby, Neal L. Kirby and Susan M. Kirby

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARVEL WORLDWIDE, INC.,
MARVEL CHARACTERS, INC. and
MVL RIGHTS, LLC,

|  |  |
|---|---|
| Plaintiffs, | Civil Action No.  10-141 (CM) (KF) |
| -against- | [Hon. Colleen McMahon] |
| LISA R. KIRBY, BARBARA J. KIRBY,<br>NEAL L. KIRBY and SUSAN M. KIRBY, | [ECF Case] |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## DEFENDANTS' INITIAL DESIGNATION OF EXPERT WITNESS
## JOHN MORROW

Pursuant to Rule 26 of the Federal Rules of Civil Procedure and the Court's April 19, 2010 Order, defendants and counterclaimants Lisa R. Kirby, Barbara J. Kirby, Neal L. Kirby and Susan M. Kirby (collectively "Defendants") hereby designate John Morrow as an expert witness whose testimony Defendants intend to introduce at the trial of these matters. A copy of Mr. Morrow's expert report is attached hereto as Exhibit A.

Defendants' foregoing initial designation does not include any expert whose testimony may be offered solely for purposes of impeachment or rebuttal. Defendants reserve the right to amend and/or modify its expert witness designation in accordance with the Federal Rules of Civil Procedure and the Local Rules of this Court.

Dated: New York, New York          TOBEROFF & ASSOCIATES, P.C.
       November 4, 2010

                                   By: _____
                                         Marc Toberoff (MT 4862)

                                   2049 Century Park East, Suite 2720
                                   Los Angeles, CA 90067
                                   Tel: 310-246-3333

                                   Attorneys for defendants Lisa R. Kirby, Barbara J.
                                   Kirby, Neal L. Kirby and Susan M. Kirby

# EXHIBIT A

## EXPERT REPORT OF JOHN MORROW

### INTRODUCTION

I understand that Jack Kirby's ("Kirby") children, Lisa R. Kirby, Barbara J. Kirby, Neal L. Kirby and Susan M. Kirby ("the Kirby Family") exercised their rights under the Copyright Act to recapture Jack Kirby's copyright interests in his work by filing notices of termination. I further understand that these notices concern Kirby works published by Marvel between 1958 and 1963. I am further informed that Marvel filed a lawsuit against the Kirby family in the Southern District of New York that challenges the termination notices by claiming all of Jack Kirby's work published by Marvel during this period, and otherwise, was "work-made-for-hire."

I have been asked to give my opinions regarding these subjects as they relate to this "work for hire" claim: (a) Marvel's history before, during and after the 1958-1963 time period; (b) the business relationship between Jack Kirby and other freelancers with Marvel during this period and (c) Jack Kirby's creation or co-creation of many of Marvel's most famous characters during this period.

### QUALIFICATIONS

I have been involved in the comic book industry for nearly twenty years as a writer, archivist and publisher. In 1989, my wife Pamela and I started TwoMorrows Advertising in Raleigh, North Carolina, providing advertising and graphic design services to local and national accounts. In early 1994, after hearing of Jack Kirby's death, I, being a lifelong Kirby fan, dug out my Kirby comics and, after spending that spring re-experiencing what had drawn me to Kirby's work originally, decided to produce a newsletter about his life and achievements. The result was *The Jack Kirby Collector* #1 in September 1994,

mailed free to 125 other Kirby fans. The magazine became popular and I have now published 55 issues of the magazine through Fall 2010. At first I was releasing issues approximately every two months. More recently, I have been putting out approximately three issues a year, in a larger, tabloid-size format. Periodically I collate these issues and release *The Collected Jack Kirby Collector*. To date we have issued seven of these books, collecting issues up through #30 along with new material. In the process of putting these issues together I have done extensive research into Jack Kirby's life and amassed a wealth of archival material relating to his entire career. I have also spoken to and formally interviewed dozens of the leading lights in the comic book business from the 1950s onward as well as members of Jack Kirby's family. I am also a Trustee of the non-profit (501c3) online Jack Kirby Museum.

In 1998, I teamed with editor Jon Cooke to produce the Eisner Award-winning magazine *Comic Book Artist*, followed by the revival in 1999 of comic writer Roy Thomas' 1960s fanzine *Alter Ego,* which focuses on the Golden and Silver Age of comics (1940s to 1960s) and their creators. TwoMorrows also publishes comic book illustrator Mike Manley's *Draw!,* the professional how-to magazine about comics, cartooning, and animation, and formerly published comic book writer/editor Danny Fingeroth's *Write Now!,* which offers tips and lessons on writing for comics. In 2004, TwoMorrows launched *Back Issue!* magazine (edited by comic book writer/editor Michael Eury), covering the history of comics of the 1970s, 1980s, up to today, and in 2006, we spun the "Rough Stuff" section of *Back Issue!* into its own magazine, edited by comic book illustrator Bob McLeod, which celebrates the art of creating comics. In 2008, TwoMorrows also launched *BrickJournal*, a magazine for LEGO® enthusiasts.

Today, TwoMorrows is widely recognized as the premier publisher of books and magazines about the history of the comic book medium. Our

publications have been nominated for and won numerous Eisner Awards, recognizing excellence in historical and journalistic presentation, and I have been commissioned by both industry heavyweights Marvel and DC Comics to write introductions to several of their books reprinting classic comic book series by Jack Kirby, including collections reprinting DC's *Challengers of the Unknown* and *Sandman,* and Marvel's *Fantastic Four, Thor, Nick Fury,* and *Captain America.*

In addition, both DC Comics and Marvel Comics have contacted me for assistance in tracking down both missing art, and alternate or unused/rejected art, for many of their reprint projects, including art for DC's *Kamandi, OMAC, Demon, Jimmy Olsen,* and *New Gods* series, and Marvel's *Thor, Spider-Man, X-Men,* and *Fantastic Four* series.

In 2006, Marvel Comics requested my assistance in re-assembling an entire unpublished *Fantastic Four* story by Jack Kirby. The genesis of this project was an article I wrote about this unused story in my publication, *The Jack Kirby Collector,* in 1996. Prior to my 1996 article, the unused *Fantastic Four* story was unknown to the public at large, and to the then-current Marvel Comics editorial department. The story was originally drawn and plotted by Kirby as his next-to-last issue of *Fantastic Four,* but it was rejected and went unused and unpaid. Sections of the story were eventually cut up, rearranged, and used as part of a later issue of *Fantastic Four* after Kirby was no longer working with the company, and much of the remaining art was lost over time until I was able to track it down in private collections, for use in my 1996 article. Marvel paid me to update my *Jack Kirby Collector* article, which was used as both as an Afterword in a *Fantastic Four* reprint collection in 2006, and an introduction to the stand-alone *Fantastic Four: The Lost Adventure* #1 comic book in 2008, wherein Marvel commissioned Stan Lee to finally add dialogue to Kirby's plotted/penciled pages, over 35 years after Kirby drew them. In the course of this project, Marvel paid

Jack Kirby's estate $325 per page for the use of that unused story Kirby drew in 1970.

I have had the privilege of serving as a panelist or moderator at numerous comic book industry events, including Comic-Con International in San Diego, the New York Comicon, and others. I also appeared on camera in the documentary *Jack Kirby: Storyteller,* which was one of the special features on 20th Century Fox's DVD release of the 2005 *Fantastic Four* theatrical film. I also provided research materials and audio and video footage of Jack Kirby to the documentary's producer at his request.

## ANALYSIS

**A.    Historical Background of Marvel**

Martin Goodman was primarily in the business of publishing men's magazines. In 1939 he founded Marvel's predecessor, Timely Comics, to also publish comics. Goodman would use a number of additional corporate entities to engage in the comic book business as well. The "comic book industry" grew out of the Great Depression and was hardly an industry at all. It originally served as just a conduit to republish newspaper strips. When publishers such as Goodman could not acquire enough newspaper product to reprint, they acquired new product for publication from eager young artists at cut-rate prices. Comic books were considered the lowliest form of publishing in both cultural and business terms.

Goodman's relative Stanley Lieber (a.k.a. "Stan Lee") started in 1939 as an office assistant at Timely Comics. In 1941, Goodman had Stan Lee, then 18, run his fledgling comic book business. They published comic books in all sorts of genres from Westerns and crime to romance books, always imitating whatever trend was popular at a given moment.

In the mid-1940s, Timely moved to large offices on the 14th floor of the Empire State Building. Here, Timely had an in-house "Bullpen" of staff artists, who created comic book stories on salary for the company. In late 1949, Goodman discovered a closet full of unused artwork, and due to a combination of this huge, already paid-for surplus of art, along with changes in the New York employment tax laws, decided it was financially beneficial to fire the entire Bullpen of artists and use up the surplus art, before later using some of the previous staff artists in a freelance capacity to create more stories. Goodman gave the unpleasant job of firing the salaried artists to Stan Lee, and only retained production assistants and editors as employees. Artists such as art supervisor Syd Shores, Mike Sekowsky, Joe Maneely, Dan DeCarlo, and Carl Burgos were now forced to fend for themselves as freelance artists, preparing stories at their own expense, working in their own home studios.

In 1954 Fredric Wertham's book *Seduction of the Innocent* accused comic books of poisoning the minds of America's youth. This lead to Senate hearings on the subject, and the resulting public backlash brought the comic book business to the brink of ruin. Most comic book companies shuttered, and those that remained, like Timely, fired nearly all their employees and were barely afloat. The comic book business had always been small, informal and unstructured, but in this time of desperation, it was even more haphazard. Goodman's comic book business was reduced to a tiny space in New York on Madison Avenue with two small offices, Stan Lee and an assistant. Due to the bankruptcy of its newsstand distributor, Timely was suddenly limited to releasing only 8 comics per month with its new distributor (it was previously producing roughly 60 comics per month). This left another surplus of completed and in-progress stories with few places to publish them, so to stay in business, Stan Lee was forced by Goodman to tell his artists (now all freelancers) that, once again, he would not be able to

buy any work from them in the immediate future. John Romita, one of Timely's main artists at the time, later recalled of that period, *"I thought I would never be in comics again. When Stan pulled a western book out from under me in the middle of a story, I figured that's it. I never got paid for it…"*

Roughly six months later, once the surplus art was again used up, Timely resumed buying the material it wanted to publish from freelancers at a per page rate. However, it had no financial obligation to purchase such freelance material and no ongoing financial commitment to such freelancers. The freelancers worked out of their own homes on their own time, without any medical or other benefits whatsoever, and invested in their own overhead and materials to create the product Timely was free to accept and purchase for publication or reject. Accordingly, the freelancers, not Mr. Goodman, took on the financial risk of their creations.

**B.    Jack Kirby and Marvel**

**1.    Background**

From 1935 to 1940, Jack Kirby worked at the Max Fleischer studio, Universal Phoenix Syndicate, the Lincoln Features Syndicate and Fox Comics, Inc. At Fox Comics, Kirby partnered with Joe Simon, and to earn additional income they created on a freelance basis and sold comic book stories to other publishers. Simon and Kirby were lured away from Fox with an offer of $5 more per page by Martin Goodman, and there they famously created *Captain America*, which was published by Marvel. Simon brokered a deal with Goodman for 25% of the profits on *Captain America* for he and Kirby, and Goodman in turn hired Simon and Kirby as employees to run Timely, while they continued to sell material on a freelance basis to other publishers. Stan Lee was assigned as their assistant, and his first published comics work was a single-page all-text story

featuring Simon and Kirby's creation in *Captain America Comics* #3. In 1941, Simon and Kirby's employment by Marvel ended due to a dispute with Goodman over their share of profits from *Captain America*, and their resulting agreement to supply material to Marvel's competitor, DC Comics.

Their agreement with DC ended with the United States' entry into World War II, when Kirby joined the U.S. Army. When the war ended, Simon and Kirby partnered again, and created adventure, romance, crime and superhero comics which were sold to a variety of publishers including Headline, Hillman, Harvey and Prize. They later formed their own publishing company, Mainline Comics, which was short-lived due to the comic book witch-hunt resulting from Wertham's book and the Senate hearings. Simon and Kirby disbanded and Simon went into the advertising business.

Kirby then co-created a newspaper strip called *Sky Masters of the Space Force* that was syndicated. Kirby also created the *Challengers of the Unknown*, which DC Comics agreed to publish. It was a superhero team that many believe was the predecessor of *The Fantastic Four* superhero team.

### 2.  Kirby's Working Relationship with Marvel

In 1958, Timely Comics, which by then was also going by the name Marvel Comics (and briefly Atlas Comics), published a very small number of titles and started to seek freelance artwork from Kirby as well as other artists, but did not employ them. Although Lee had started out plotting and dialoguing most of the comics himself, along with his younger brother, Larry Lieber, Lee soon developed a method for working with freelance artists that became known as "the Marvel method." The Marvel method originally grew from expediency and the fact that Lee had little or no support staff. Unlike DC Comics, which furnished artists with scripts to be illustrated, at Marvel, Lee would just confer with the artists

regarding basic stories and ideas. The artist was expected to plot the story as well as illustrate the story in panels.

For Kirby, who was bursting with talent and ideas and drew extremely quickly, Lee relied on the "Marvel method" even more. With Kirby, Lee would often provide only a bare-bones concept, or just the name of a character, and sometimes not even that. Kirby would plot and illustrate a story, usually with his specific notes and dialogue suggestions in the margins of the pages. Lee would then dialogue the balloons and write the captions based on Kirby's plotting, artwork, dialogue and story notes.

Kirby worked from his home in Long Island late into the night, not at Marvel's offices. He was extremely independent; he did not work from any written material supplied by Marvel, nor did he create under Marvel's direction or supervision. He simply went to Marvel's offices two or three times a month to drop off his material. Kirby paid for all his own expenses in connection with this material and was not reimbursed for such expenses by Marvel. He periodically bought his own paper, pencils, pens, brushes, ink and other materials. Kirby was only paid by the page for those pages that were purchased by Marvel after they had been created and was not paid any sort of salary by Marvel. If pages were rejected for publication (though uncommon due to Kirby's talent), the pages were not purchased and Kirby was not paid for them.

Notably, if Kirby was asked to redraw pages, Kirby was not paid double (once for the original page and once for the redraw); he was paid for only the redrawn page once it was accepted for publication. Marvel did not provide Kirby with any health benefits or insurance, vacation or sick pay. The transaction was a straightforward purchase of finished material. Once Kirby's material was completed and accepted by Marvel for publication, the material was purchased at an agreed-upon per page rate. Kirby was paid not for his time, but for the

material he created that Marvel wanted to purchase and publish. This is also consistent with Goodman's desire during the 1958-1963 period to severely limit Marvel's overhead and financial commitments. It does not appear that Kirby had a written agreement with Marvel regarding his creation of material from 1958-1963. The first agreement I am aware of was entered into between Marvel and Kirby in 1972, after he was no longer producing work for Marvel.

Marvel engaged in a practice of putting a legal acknowledgement or legend on the back of its checks, forcing freelancers to sign under the legend when they went to cash the check. Some freelancers would routinely cross out the legend before signing and depositing the checks. It is uncertain when Marvel started placing such legends on its checks. Up until the 1980s, the legends stated in effect that by signing the check the freelancer acknowledges that he was assigning all right, title and interest in the freelancer's material. I believe the intent of the transaction was that Marvel was purchasing the rights to the material for publication. In the 1980s, after Marvel had been acquired by a much larger corporation (Perfect Film and Chemical/Cadence Industries), its management felt threatened by the "work for hire" provisions of the new Copyright Act pertaining to independent contractors, and Marvel changed its legends for the first time to an acknowledgement that the check was in payment for "work made for hire."

I do not believe that Goodman, Lee, Marvel or the freelance artists, like Jack Kirby, who worked out of their own houses on their own dime, thought that the material they created was "work made for hire," owned by Marvel from the moment it was created on their drawing tables in their home studios. Freelancers like Kirby were free to take unused concepts they created while working on a Marvel project, or ones that were rejected, and reuse them for other freelance work for other companies. In fact, Kirby amassed a sizeable stack of self-rejected pages while working on Marvel projects at home in the 1960s; he knew he would

not be paid for these pages, so he kept them on hand for possible future use. In 1969, an independent company licensed the rights from Marvel to produce merchandise featuring Marvel's characters, and under the name "Marvelmania International," paid Kirby separately for the use of several of his rejected pages from Marvel projects, plus some personal artwork, and published it in their *Jack Kirby Portfolio* for sale to comic book fans. One of those rejected drawings was reworked later and used as the cover of Kirby's self-published *GODS* portfolio.

Freelancers were provided no financial security and solely bore the financial risk of creation. They were only paid by the page for the material they created once it was accepted for publication. Such transactions in the late 1950s and 1960s have always appeared to be a straightforward purchase of material by Marvel after creation.

### 3.    Jack Kirby's Creations and Co-Creations

With all due respect to Stan Lee and his contributions to Marvel Comics, Jack Kirby was unquestionably the dynamic creative force behind Marvel's resurgence in the early 1960s and its most iconic superheroes to this day. Prior to the debut of *The Fantastic Four*, Marvel produced derivative comics of little note (with the exception of *Captain America*, created by Simon and Kirby and published in 1941). *The Fantastic Four, The Incredible Hulk, The Mighty Thor, X-Men, Ant-Man, Sgt. Fury and His Howling Commandos* and *The Avengers* were all created by Kirby or jointly created by Kirby and Lee. Prior to 1958, Stan Lee had no significant original creations in comics, while Kirby had a continuous string of creative and financial successes including *Captain America, Boy Commandos, Sandman, the Newsboy Legion,* and the *Fly*. He and Joe Simon also pioneered the genre of Romance comics, which in the late 1940s and 1950s were selling in the millions of copies, and sparking imitators throughout the

comics field, including Timely. Likewise, Lee can boast no notable original comics creations after Kirby left Marvel in 1970, while Kirby went on to create numerous new concepts and characters which are major players at DC Comics today, such as the *New Gods, Darkseid, Mister Miracle, Kamandi, OMAC, the Demon,* and many others.

### *The Fantastic Four*

Martin Goodman and Marvel were well known for imitating successful comics at other companies. In this case Goodman wanted Lee to publish a superhero team book to compete with DC Comics' *Justice League of America.* Lee and Kirby then met and bounced ideas off each other. Kirby thereafter drew the first issue of *The Fantastic Four*, and Lee dialogued the story. Many view *The Fantastic Four* as a descendent of Kirby's *Challengers of the Unknown* due to parallels between the works, particularly in a story that first appeared in *Challengers of the Unknown* #2 (Aug./Sept. 1958), several years before the debut of the Fantastic Four in November 1961. (In this story, following a failed space flight like the one much later in *Fantastic Four* #1, one of the Challengers acquires powers that would be mimicked by the Fantastic Four: the ability to control and shoot flames, superhuman strength, and the power to turn invisible.) In his 1974 book *Origins of Marvel Comics*, Lee admits discussing *The Fantastic Four* with Jack Kirby before writing anything.

### *The Mighty Thor*

It is well known that Kirby was very keen on and drew inspiration from mythology, particularly Norse mythology. In 1942, Kirby created a Thor-like character in a story he did with Joe Simon—"Villain from Valhalla," published in May 1942 in DC Comics' *Adventure Comics* #75. Kirby thereafter included Thor in DC's *Tales of the Unexpected* #16, published in August 1957, where Thor sported a horned helmet and wielded a magic hammer.

In contrast, at no time before or after the appearance in 1962 of Marvel's *Thor* in *Journey into Mystery* #83 (August 1962) did Lee, or his brother Larry Lieber, the credited "writer," express any interest in Norse mythology, or in using mythological gods as comic book characters. Kirby on the other hand was fascinated throughout his life with mythology, and in particular, Norse mythology.

In a 1998 interview by one of my company's competitors, Stan Lee was asked about the mythology-based "Tales of Asgard" *Thor* stories, and he replied, "...most of those were dreamed up by Jack because he did a lot of research on Norse gods... more than I did."

I have no doubt that *The Mighty Thor* was a Jack Kirby creation.

### *Spider-Man*

It is also well known that Kirby was involved in the original creation of *Spider-Man*, based upon a character called *The Fly* that Simon and Kirby had created in the late 1950s based on an earlier character called *The Silver Spider*. Kirby originally drew the first five pages of the initial Spider-Man story, which like *The Fly* was about a young orphan who with the aid of a magic ring transformed himself into a superhero. Lee rejected Kirby's story, and then asked Steve Ditko to draw the first Spider-Man story instead of Kirby. Interestingly, Lee did not use Ditko's cover and went back to Kirby for the cover of the first Spider-Man story published in *Amazing Fantasy* #15 (August 1962). Whereas Kirby was paid for this cover, he was not paid for the five Spider-Man pages that Marvel rejected.

### *Sgt. Fury and His Howling Commandos*

In an interview conducted for my magazine, *Jack Kirby Collector* #25 (August 1999), artist John Severin, who had worked with Stan Lee both at Timely's Empire State Building location and the later Madison Avenue address, recalled a meeting with Jack Kirby in the late 1950s. Severin related the following, which perfectly describes the concept of Sgt. Fury:

*"Jack wanted to know if I'd be interested in syndication [of a newspaper comic strip]. He said we could be partners on a script idea he had. The story would be set in Europe during WWII; the hero would be a tough, cigar-smoking Sergeant with a squad of oddball G.I.s—sort of an adult Boy Commandos.*

*"Like so many other grand decisions I have made in comics, I peered through the cigar smoke and told him I really wasn't interested in newspaper strips. We finished cigars and coffee and Jack left, heading towards Marvel and Stan Lee."*

### 4.    The Original Artwork Fiasco in the 1980s

From the 1940s through 1970s, Marvel paid little heed to freelance artists' original artwork once their sole focus, the published comic book product, was on the stands. Artwork was left unattended in Marvel's offices; those pieces that were not thrown out, misplaced, given as gifts or stolen were placed in storage, and even from storage much of this artwork mysteriously "disappeared."

As such artwork began to fetch considerable sums in the 1970s, artists began demanding their artwork back. DC Comics capitulated, publicly stating that it had no legal claim to the artwork. Initially Marvel refused to return artwork but changed course in the mid-1970s and began returning then-current artwork. By the late 1970s Marvel began returning older artwork from the 1960s provided the recipients signed releases drafted by Marvel re-characterizing the artwork it had purchased as "work made for hire." I believe that Marvel did this for two reasons. First, Marvel management was concerned that if they kept the artwork, they could wind up owing New York a tremendous amount for years of sales tax on the purchase of this artwork. Second, Marvel's management and attorneys at the time were obsessed with the implications of the new Copyright Act's "work for hire" provisions.

They thus embarked on a campaign to retroactively force their original purchase of rights to that older freelance material, into the new "work for hire" mould. To do this, they agreed to return income-producing artwork to freelancers provided that they sign "work for hire" acknowledgements or "releases" drafted by Marvel's attorneys.

Due to Marvel's heightened insecurity with respect to their ownership of Jack Kirby's numerous, and now famous, creations, they insisted that Kirby sign a special four-page release, given only to him, before he could get his artwork back. The release Marvel insisted that Kirby sign was filled with especially onerous terms not present in the one-page release Marvel demanded from other freelancers. Kirby refused, and this debacle dragged on for years. Finally, in 1987, after years of negative publicity and outcry within the comic book industry, Marvel reduced Kirby's "work for hire" release to a single page, and Kirby, who had become increasingly concerned about providing his family with some future financial security, succumbed and signed the paper.

## CONCLUSIONS

To recap, I believe that Kirby's work for Marvel from 1958-1963 was not "work for hire." Freelancers from that era assumed they were assigning to Marvel the material they created after cashing their checks for the purchase of such material, which was industry practice at the time. No freelancer in the industry during that period, to my knowledge, felt that what they were submitting for purchase and publication was already owned by the publisher as "work for hire" from the moment it was created on their drawing tables in their home studios. Nor do I believe that Marvel, itself, in this period, viewed or understood such freelance work to be "work made for hire," since there is no evidence of Marvel

having documentation to support it. It stands to reason that if Marvel had, they would have required freelancers to sign some kind of written document or agreement at the time, or otherwise would have substantial evidence of such an understanding.

Kirby, as a freelancer, produced work at his own expense from his home studio, and provided his own materials and supplies. He took the sole financial risk for the material he was producing, because he was only being paid if it was accepted for publication. He never had a written contract from Marvel during that time period, and he was not afforded any financial security.

I further believe that, based on the historical record, Jack Kirby deserves credit for the creation or co-creation of characters from that time period, including *The Fantastic Four, The Incredible Hulk, The Mighty Thor, X-Men, Ant-Man, Sgt. Fury and His Howling Commandos* and *The Avengers*.

Finally, I believe that Marvel began returning original artwork to creators in the 1980s because they were concerned about the sales tax implications of purchasing all of this freelance artwork over the years, and anxious about the new Copyright Act's "work for hire" provisions. In doing so, they set about having artists sign releases re-characterizing all this original artwork as "work for hire," even though this was long after the fact, and was a not-so-subtle attempt to rewrite history to conform with the new law. Not surprisingly, in light of Jack Kirby's prodigious talent, the tremendous value of the work he had created, and Marvel's heightened insecurity as to the status of that work, Jack Kirby was singled out to sign a particularly onerous release.

## COMPENSATION

I am not being paid for my services as an expert witness in this case.

## PRIOR CASES

I have not previously served as an expert witness in a legal matter.

## PUBLICATIONS

Over the past ten years I have authored the following publications:

*The Jack Kirby Collector,* Issues 1-55.

*The Collected Jack Kirby Collector,* Vols. 1-7.

*Jack Kirby Checklist*

*Jack Kirby Checklist, Gold Edition*

*Kirby Five-Oh!*

*Kirby Unleashed*

*Captain Victory: Graphite Edition*

*Silver Star: Graphite Edition*

*Streetwise*


Respectfully submitted,

John Morrow

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2010, I caused a true and correct copy of the

foregoing Defendants' Initial Designation of Expert Witness John Morrow to be served

by first class mail on the following counsel of record:

Randi Singer
WEIL GOTSHAL & MANGES LLP
767 5th Avenue
New York, NY 10153

David Fleischer
HAYNES BOONE LLP
1221 Avenue of the Americas, 26th Floor
New York, NY 10020

Attorneys for Plaintiffs


_____
Nicholas C. Williamson