TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 3630
Los Angeles, CA 90067
Tel:     310-246-3333
Fax:    310-246-3101
MToberoff@ipwla.com

Attorneys for Defendants Lisa R. Kirby, Barbara J.
Kirby, Neal L. Kirby and Susan M. Kirby

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------

MARVEL WORLDWIDE, INC.,
MARVEL CHARACTERS, INC. and
MVL RIGHTS, LLC,

                    Plaintiffs,

    -against-

LISA R. KIRBY, BARBARA J. KIRBY,
NEAL L. KIRBY and SUSAN M. KIRBY,

                   Defendants.

--------------------------------------------------------------

LISA R. KIRBY, BARBARA J. KIRBY,
NEAL L. KIRBY and SUSAN M. KIRBY,

                 Counterclaimants,

    -against-

MARVEL ENTERTAINMENT, INC.,
MARVEL WORLDWIDE, INC.,
MARVEL CHARACTERS, INC., MVL
RIGHTS, LLC, THE WALT DISNEY
COMPANY and DOES 1 through 10,

              Counterclaim-Defendants.

--------------------------------------------------------------

Civil Action No.  10-141 (CM) (KF)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

[Hon. Colleen McMahon]

[ECF Case]

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

HISTORICAL BACKGROUND...........................................................................3

I.     THE COMIC BOOK "INDUSTRY"..............................................................3

II.    MARVEL COMICS ...................................................................................4

III.   JACK KIRBY ...........................................................................................5

LEGAL STANDARD...........................................................................................8

ARGUMENT ......................................................................................................8

I.     THE RECAPTURE RIGHT UNDER THE U.S. COPYRIGHT ACT................8

       A.     The Recapture Right Under the 1909 Copyright Act ...............................9

       B.     The Termination Rights Under the 1976 Copyright Act ..........................9

II.    MARVEL CANNOT PROVE THE EXPENSE PRONG OF ITS "WORK
       FOR HIRE" DEFENSE AS A MATTER OF LAW ..........................................11

       A.     "Work For Hire" Under the 1909 Copyright Act ...................................11

             1.     Derivation of the "Work For Hire" Doctrine..............................11

             2.     The Instance and Expense Test...................................................13

             3.     "Work For Hire" Turns on the Mutual Intent of the Parties
                 and Their Actual Relationship ....................................................14

       B.     As Kirby Bore the Financial Risks of His Creations, Marvel
             Cannot Meet Its Burden of Proving Its "Work for Hire" Defense ..........16

       C.     It is Clear That Marvel *Purchased* the Kirby Material It Accepted ........22

CONCLUSION.................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*Aldon Accessories, Ltd. v. Spiegel, Inc.,*
738 F.2d 548 (2d Cir. 1984)..............................................................................15

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).........................................................................................8

*Brattleboro Publishing Co., v. Winmill Publishing Corp.,*
369 F.2d 565 (2d Cir. 1966)................................................................. *passim*

*Brattleboro Publishing Co., v. Winmill Publishing Corp.,*
250 F. Supp. 215 (D. Vt. 1966).........................................................................14

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).........................................................................................8

*Community for Creative Non-Violence v. Reid,*
490 U.S. 730 (1989)................................................................................ 14-16

*Consarc v. Marine Mid. Bank,*
996 F.2d 568 (2d Cir. 1993)................................................................................8

*Donaldson Publishing Co. v. Bregman, Vocco, & Conn, Inc.*
375 F.2d 639 (2nd Cir. 1967)................................................................ 12, 14-15

*Easter Seal Soc. v. Playboy Enterprises, Inc.,*
815 F.2d 323 (5th Cir. 1987) ...........................................................................15

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
342 F.3d 149 (2d Cir. 2003)................................................................... *passim*

*Florabelle Flowers, Inc. v. Joseph Markovits, Inc.,*
296 F. Supp. 304 (S.D.N.Y. 1968)....................................................................13

*Fred Fisher Music Co., v. M. Witmark & Sons,*
318 U.S. 643, 657 (1943) ............................................................................ 9-10

*Gaste v. Kaiserman,*
863 F.2d 1061 (2d Cir. 1988)...........................................................................15

*Greenberg v. Nat'l Geographic Soc'y,*
533 F.3d 1244 (11th Cir. 2008) .......................................................................10

*Martha Graham School & Dance Found., Inc. v. Martha Graham Center of Contemporary Dance, Inc.*,
380 F.3d 624 (2d Cir. 2004)......................................................................... 13-15

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002)..................................................................... 10, 15-16

*Mazer v. Stein*,
347 U.S. 201 (1954)...............................................................................................9

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985)......................................................................................1, 9, 16

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001).....................................................................................1, 10, 16

*Nat'l Ctr. for Jewish Film v. Goldman*,
943 F. Supp. 113 (D. Mass. 1996) .......................................................................12

*Olympia Press v. Lancer Books*,
267 F. Supp. 920 (S.D.N.Y. 1967)......................................................................13

*Picture Music, Inc. v. Bourne, Inc.*,
314 F. Supp. 640 (S.D.N.Y. 1970).......................................................................11

*Picture Music, Inc. v. Bourne, Inc.*,
457 F.2d 213 (2d Cir. 1972)...........................................................................13, 16

*Playboy Enterprises, Inc. v. Dumas*,
53 F.3d 549 (2d Cir. 1995)....................................................................... *passim*

*Playboy Enterprises, Inc. v. Dumas*,
960 F. Supp. 710 (S.D.N.Y. 1997).......................................................................14

*Scott v. Almenas*,
143 F.3d 105 (2d Cir. 1998).................................................................................8

*Shapiro Bernstein & Co., v. Jerry Music Co.*,
221 F.2d 569 (2d Cir. 1995).................................................................................13

*Siegel v. National Periodical Publications, Inc.*,
508 F.2d 909 (2d Cir. 1974)................................................................................13

*Stewart v. Abend*,
495 U.S. 207 (1990).......................................................................................... 9-10

*Twentieth Century Fox Film Corp v. Entertainment Distrib.,*
429 F. 3d 869 (9th Cir. 2005) ...............................................................................14, 17, 22

*Uproar Co. v. Nat'l Broad. Co.,*
81 F.2d 373 (1st Cir. 1937)...................................................................................12

*Woods v. Bourne Co.,*
60 F.3d 978 (2d Cir. 1995)....................................................................................16

*Wright v. Goord,*
554 F.3d 255 (2d Cir. 2009)....................................................................................8

*Yardley v. Houghton Mifflin Co.,*
108 F.2d 28 (2d Cir. 1939)............................................................................... 12-13

## State Cases

*Eliscu v. T.B. Harms Co.,*
151 U.S.P.Q. 603 (N.Y. Sup. Ct. 1966)...................................................................15

## Federal Statutes, Rules and Regulations

17 U.S.C. § 24 (1909) .............................................................................................9

17 U.S.C. § 24 (1909) ...........................................................................................11

17 U.S.C. § 101 ...........................................................................................7, 9-10, 15

17 U.S.C. § 203 ................................................................................................. 9-10

17 U.S.C. § 304.................................................................................... *passim*

37 C.F.R. § 201.10....................................................................................................2

F.R.C.P. 56................................................................................................................8

## Other Authorities

H.R. Rep. No. 2222, 60th Congress, 2d Sess. (1909).........................................9

H..R. Rep. No. 94-1476 (1976)................................................................... *passim*

Pub. L. 94-553, 90 Stat. 2541 (1976)...............................................................11

S. Rep. No. 104-315, at 22-23 (1996)...............................................................10

M. Nimmer & D. Nimmer, *Nimmer on Copyright*
1 *Nimmer* § 5.03[B][1][a][i] ...........................................................................................15

1 *Nimmer* § 5.03[B][2][d] .......................................................................................14, 17

1 *Nimmer* § 5.03[B][2][e] ...........................................................................................24

3 *Nimmer* § 9.11[B][1]...............................................................................................10

3 *Nimmer* § 11.02[A][2] .............................................................................................15

W. Patry, *Patry on Copyright*
2 *Patry* § 5:44.............................................................................................................15

2 *Patry* § 5:45.............................................................................................................24

2 *Patry* § 5:61.............................................................................................................14

Barbara A. Ringer, Copyright Law Revision Study No. 31 "Renewal of
Copyright," prepared for the Senate Subcommittee on Patents, Trademarks
and Copyrights of the Committee on the Judiciary (June 1960) .......................................11

B. Varmer, Copyright Law Revision Study No. 13, "Works Made for Hire
and on Commission," Studies Prepared for the Copyright Office, Reprinted
by the Subcommittee on Patents, Trademarks and Copyrights of the Senate
Committee on the Judiciary, 86th Cong., 2d Sess. 127, 130 (Comm. Print
1960) ............................................................................................................................12

## <u>INTRODUCTION</u>

Defendants/counterclaimants Lisa R. Kirby, Barbara J. Kirby, Neal L. Kirby and Susan M. Kirby ("Kirbys"), the children of legendary comic book artist Jack Kirby ("Kirby"), hereby move this Court for summary judgment against plaintiffs/ counterclaim-defendants Marvel Worldwide, Inc., Marvel Characters, Inc. and MVL Rights LLC, together with counterclaim-defendants The Walt Disney Company and Marvel Entertainment, Inc. (collectively, and including predecessors, "Marvel").  The Kirbys so move on the grounds that Marvel will not be able, as a matter of law, to carry its burden of proving that the material created by Jack Kirby in 1958-1963 for the subject comic books listed in the Kirbys' 17 U.S.C. § 304(c) Notices of Termination ("Termination") were "works made for hire."

The Kirbys properly availed themselves of their statutory termination right under section 304(c) to recapture their father's original copyrights to his material.[1]  In devising section 304(c), Congress recognized that authors commonly agree to one-sided bargains dictated by publishers with far greater bargaining power.  H.R. Rep. No. 94-1476 ("H.R. Rep."), at 124 (1976).  The results are often supremely unfair, as when a work proves very successful, but enriches only the publisher, but not the author or his family. "[T]he termination right was expressly intended to relieve authors of the consequences of [such] ill-advised and unremunerative grants."  *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-173 (1985) *citing* H.R. Rep. at 124.  The Supreme Court recently confirmed that the guiding objective of the termination provisions is to readjust the "author/publisher balance" by "enhanc[ing] the author's position vis-à-vis the patron."  *N.Y. Times v. Tasini,* 533 U.S. 483, 496, n.1 (2001).

The Kirby Termination complied with all requirements of 17 U.S.C. § 304(c) and 37

---

[1] As Jack Kirby is the co-author of most of the comic book properties in question, the Termination would entitle the Kirbys to a share of profits in their father's co-creations, but would not deprive Marvel of the properties.

C.F.R. § 201.10.  Marvel nonetheless sued the Kirbys, predictably claiming that all the Kirby material published by Marvel was "work for hire" – the lone exception to the termination right. However, Marvel has the burden of demonstrating by credible evidence that it satisfies both prongs of the "work for hire" test under the 1909 Copyright Act, namely that the material was created by Jack Kirby at Marvel's "instance" and at its "expense."

This motion focuses on Marvel's fatal inability to meet the "expense" prong of this analysis.  In essence, a work is created at a party's "expense" if that party takes on "the financial risk" of its creation, and payment is _not_ contingent.  The putative employer must be "on the hook" prior to the work's creation to pay the author.  The key difference between "work for hire," owned upon creation, and the antithetical *purchase* of work upon acceptance, is that the alleged employer must be legally obligated to pay for a "work for hire" from the outset.

This is where Marvel's attempt at revisionist history breaks down.  Marvel's business in the 1950's to mid-1960's was a small, patchwork operation.  In 1957, Marvel fired all of its staff writers and artists, forcing them to work out of their homes on a piecemeal freelance basis with no financial security.  By this, it obviously sought to avoid financial obligations and to keep its options open.  Try as they now may to re-label such freelance material "work for hire," the simple reality was that Marvel purchased and paid for only that material it wished to publish.

The uncontroverted evidence shows that Marvel had no legal obligation to purchase Kirby's artwork and that Kirby, who worked out of his basement and paid for his own supplies, bore the financial risk of creation, not Marvel.  Marvel was free to reject Kirby's submissions without financial liability.  As Marvel cannot proffer evidence sufficient to raise a triable issue of material fact as to the "expense" prong of its "work for hire" defense, it fails as a matter of law.

## HISTORICAL BACKGROUND

### I.    THE COMIC BOOK "INDUSTRY"

From its beginnings in the Great Depression to the 1960s, the comic book business was considered "very much a fly-by-night industry."  *See* Declaration of Mark Evanier ("Ev. Dec."), Ex. A at 4; Declaration of John Morrow ("Mor. Dec."), Ex. A at 4; Declaration of Marc Toberoff ("Tob. Dec."), Ex. C at 31:1-33:17; Ex. D at 143:24-145:7.  There was a sense that the business was "always a year from ending," as publishers came and went at an alarming rate.  Ev. Dec., Ex. A at 5; Tob. Dec., Ex. C at 31:17-32:12.  Comic books were viewed at the time as "disposable" "low brow" entertainment.  Ev. Dec., Ex. A at 5; Mor. Dec., Ex. A at 4; Tob. Dec., Ex. D at 145:13-146:7.  Comic book publishers did not see any value in their product beyond monthly sales figures.  Ev. Dec., Ex. A at 5; Mor. Dec., Ex. A at 4; Tob. Dec., Ex. D at 144:14-145:7.  There was zero expectation these books would be reprinted or that the characters would be exploited in other media.  Ev. Dec., Ex. A at 5; Tob. Dec., Ex. C at 35:16-36:20.  Little attention was paid to copyright ownership of new material by the publishers or artists.  Ev. Dec., Ex. A at 5; Mor. Dec., Ex. A at 9-10; Tob. Dec., Ex. C at 35:16-36:20; Ex. D at 145:24-146:7.

In the 1930s-40s, at some publishers, artists worked as employees to write and draw stories, usually at long rows of desks, resembling a "sweat shop."  Ev. Dec., Ex. A at 5.  At other publishers, the work was all freelance:  writers and artists worked out of their homes, set their own hours and paid for their supplies.  Ev. Dec., Ex. A at 5, 11; Mor. Dec., Ex. A at 8; Tob. Dec., Ex. E  at 72:22-73:8; 76:4-24; Ex. F  at 194:11-21; 199:8-200:2; 204:6-207:11; 210:3-8; Ex. V at 407.  The freelancers submitted completed work to publishers, which purchased those pages accepted for publication.  Ev. Dec., Ex. A at 12; Mor. Dec., Ex. A at 8-9; Tob. Dec., Ex. B at 61:20-62:9; Ex. C at 136:7-137:18; Ex. D  at 89:13-92:5; Ex. E at 71:17-72:7; 76:25-79:4; Ex.

F at 123:18-125:9; Ex. G at 57:18-58:21; 62:19-63:6; 234:12-236:1; Ex. H at 37:6-19; Ex. V at 396. If pages were rejected or redone, then the artists were not paid for it. *Id.*

## II. MARVEL COMICS

In 1939, Martin Goodman founded Marvel's predecessor, Timely Comics. Mor. Dec., Ex. A at 4, Ev. Dec., Ex. A at 5. Timely first published cheaply-printed "pulp" comics. *Id.* Goodman's relative Stanley Lieber (a.k.a. "Stan Lee") started at Timely in 1939 as an office boy. Mor. Dec., Ex. A at 4, Ev. Dec., Ex. A at 6; Tob. Dec., Ex. I at 10:14-11:4. In 1941, Goodman promoted Lee, then 18, to run his fledgling comic business. Mor. Dec., Ex. A at 4; Ev. Dec., Ex. A at 6; Tob. Dec., Ex. J at 254:22-255:12. Goodman was known in the industry as "a man who imitated what was selling for other publishers and one who often flooded the stands with knockoffs." Ev. Dec., Ex. A at 7. Some books lasted a few years; others were cancelled immediately. Ev. Dec., Ex. A at 7; Tob. Dec., Ex. C at 174:1-177:11; Ex. D at 145:24-146:7. Almost none of these titles were merchandized or adapted in other media. *Id.*

In the mid-1940s, Timely had an in-house "bullpen" of staff artists, who created comic books on salary. Mor. Dec., Ex. A at 5. However, in 1949, Goodman discovered a closet full of surplus artwork, and "decided it was financially beneficial to fire the entire Bullpen of artists and use up the surplus art." Mor. Dec., Ex. A at 4; Tob. Dec., Ex. D at 169:4-18. In 1954, Fredric Wertham's book *Seduction of the Innocent* accused comic books of "poisoning the minds" of America's youth. Mor. Dec., Ex. A at 4; Ev. Dec., Ex. A at 7; Tob. Dec., Ex. F at 200:4-201:20. The resulting public backlash led to Senate hearings on the corrupting influence of comics, and nearly bankrupted the industry, as most comic book companies went out of business. *Id.*

In 1957, Timely again fired nearly all of its employees and was reduced to two small offices for Lee and an assistant. Ev. Dec., Ex. A at 8; Tob. Dec., Ex. F at 200:4-201:20; Ex. U at

80.  Timely went from publishing 60 comics a month to 8, using surplus artwork.  *Id*.  In or about 1958, Timely resumed buying freelance material at a per page rate.  Mor. Dec., Ex. A at 6-8; Ev. Dec., Ex. A at 8-9; Tob. Dec., Ex. E at 29:4-8.  But it had no written contracts with freelancers and no financial obligation to purchase their material.  Mor. Dec., Ex. A at 8-10; Ev. Dec., Ex. A at 11-12; Tob. Dec., Ex. E at 71:17-72:7; 72:22-73:8; 73:11- 74:5; 76:25-77:6; Ex. F at 194:11-21; 204:6-19; 204:24-205:15; Ex. J at 256:25-257:25; Ex. L at ¶ 1, 3.

### III.    JACK KIRBY

Jack Kirby (born in 1917) began his career in the Great Depression, "hauling his art portfolio to various publishers, newspaper syndicates, and animation companies in and around New York."  Ev. Dec., Ex. A at 6.  From 1935-1940, he worked as a staff artist at the Max Fleischer animation studio, the Lincoln Features Syndicate, Universal Phoenix Syndicate, and Fox Comics, Inc.  *Id.*; Mor. Dec., Ex. A at 6.  When so employed, he would supplement his income by selling freelance artwork to other companies.  *Id*.  While at Fox, Kirby formed his famous partnership with Joe Simon.  *Id.*  Together, they created *Captain America*, and many other super-hero, adventure, crime and romance comics, which they sold to many different publishers, including Timely.  Ev. Dec., Ex. A at 7.  After the "scare" resulting from Wertham's book, Simon and Kirby disbanded in 1955.  Mor. Dec., Ex. A at 6-7; Ev. Dec., Ex. A at 6-8.

In 1956, Kirby began to submit as much freelance work as he could to Timely, which eventually became Marvel.  Ev. Dec., Ex. A at 9; Mor. Dec., Ex. A at 7.  The company split its output among Westerns, "teen," romance, and sci-fi/monster comics.  *Id.*  During the 1958-1963 period in question, and until 1970, Kirby produced and sold artwork to Marvel on a freelance basis, and was not employed by Marvel.  Ev. Dec., Ex. A at 9, 11-12; Mor. Dec., Ex. A at 7-10; Tob. Dec., Ex. C  at 23:4-24:4; Ex. E at 71:17-72:7; 72:22-73:8; Ex. F  at 194:11-21; 200:4-

201:13; Ex. J  at 256:25-257:25; 391:1-14; Ex. L, ¶¶ 1, 3.  Like other freelancers who sold their

work to Marvel, Kirby was not paid a fixed salary or wage, and Marvel was not legally obligated

to purchase his artwork.  *Id*.; *see also* Tob. Dec., Ex. C at 105:15-17; Ex. E at 71:17-72:7; 73:11-

74:5; 76:25-79:4; Ex. F at 204:6-19; 204:24-205:15.  Marvel did not have any written agreement

with Kirby during the 1958-1963 period.  Mor. Dec., Ex. A at 9; Ev. Dec., Ex. A at 11; Tob.

Dec., Ex. E at 71:17-72:7; 72:22-73:8; 73:11- 74:5; 76:25-77:6; Ex. F at 194:11-21; 204:6-19;

204:24-205:15; Ex. J at 256:25-257:25; Ex. L, ¶¶ 1, 3.[2]  The first written agreement with Kirby

produced by Marvel was executed on June 5, 1972.  Tob. Dec., Ex. M.  Kirby was paid on a per-

page basis for those pages of artwork ultimately accepted and purchased by Marvel.  Ev. Dec.,

Ex. A at 12; Mor. Dec., Ex. A at 8-10; Tob. Dec., Ex. D at 89:13-92:5; 180:4-182:12; Ex. E at

103:7-105:17; Ex. F at 123:18-125:9; Ex. V at 396.

     If a page(s) or story was rejected by Marvel, Kirby was not compensated, and personally

took the financial loss.  *Id*.  Kirby was also not paid for work Marvel asked him to redraw.  Ev.

Dec., Ex. A at 12; Mor. Dec., Ex. A at 8-9; Tob. Dec., Ex. B at 61:20-62:9; Ex. C at 136:7-38:15;

Ex. D at 89:13-92:5; Ex. E at 77:20-79:4; Ex. G at 57:18-58:21, 234:12-236:1; Ex. H at 37:6-19.

Like other freelancers, Kirby was free to sell, and sold, work to other publishers while selling

work to Marvel.  Ev. Dec., ¶ 18; Tob. Dec., Ex. D at 177:11-15; Ex. W at 5-6, 18, 19, 21, 25, 55,

80-81, 84-85; Ex. X at 18462-18466; Ex. Y at 129.  Kirby was also free to use and repurpose

rejected concepts and characters he created for a Marvel project in other work, sold to other

companies.  Mor. Dec., Ex. A at 10; Ev. Dec., ¶¶ 17, 19-20; Ex. B at K355-356; Ex. C.

     Like other freelancers, Kirby worked out of his own home, set his own hours, paid his

own overhead and insurance, and paid all expenses associated with his creations, including for

---

[2] Marvel also admitted that it "does not possess copies of any written agreement between any
freelance artist and Marvel from January 1, 1957 - January 1, 1964."  Tob. Dec., Ex. L  at ¶ 3.

his own paper, pens, pencils and other materials, and such expenses were not reimbursed by
Marvel.  Ev. Dec., Ex. A at 11; Mor. Dec., Ex. A at 8; Tob. Dec., Ex. E at 76:4-24; Ex. F at
194:11-21; 199:8-200:2; 205:19-207:11; 210:3-22; Ex. G at 90:12-91:15; 92:24-93:11; Ex. H at
9:15-10:9.; Ex. CC at K860-61.  Marvel did not withhold any taxes from any payments to Kirby
for the purchase of his artwork.  Ev. Dec., Ex. A at 12; Tob. Dec., Ex. E at 79:5-14; Ex. F at
15:24-16:24; Ex. L at ¶ 13.  Nor did Marvel provide to Kirby any health benefits, insurance, or
any other benefits, such as vacation or sick pay.  Ev. Dec., Ex. A at 12, Mor. Dec., Ex. A at 8;
Tob. Dec., Ex. E at 79:18-25; Ex. F at 204:6-19; 204:24-205:15; Ex. L at ¶¶ 10-11; Ex. V at 428.

   In 1968 Marvel was purchased by Perfect Film and Chemical Corp., re-named Cadence
Industries in 1973.  Ev. Dec., Ex. A at 13.  Due to Marvel's haphazard business practices in the
late 1950's and early 1960's as it tried to survive, and the increased value of comic book
characters, Cadence sought to shore up Marvel's assets.  Ev. Dec., Ex. A at 13; Tob. Dec., Ex. J
at 256:25-257:25.  The "work for hire" doctrine became the focus of attention when the 1976
Copyright Act established an explicit "work for hire" regime in 17 U.S.C. § 101, under which
freelance material is not "work for hire," unless "the parties expressly [so] agree in a written
instrument."  Starting in the late 1970's, Cadence/Marvel required freelancers to sign "releases,"
re-characterizing all of their material that Marvel had purchased/published as "work for hire,"
decades after its creation, as a pre-condition to returning their original artwork.  Ev. Dec., Ex. A
at 13-14; Mor. Dec., Ex. A at 13-14. Tob. Dec., Ex. C at 215:14-216:23; Exs. DD-EE.

   On September 16, 2009, Kirby's children served Marvel with Notices of Termination
under 17 U.S.C. § 304(c) to recapture their father's copyrights by statutory termination of any
prior grants to Marvel, including the 1972 Assignment.  Tob. Dec., ¶ 4; Ex. A.  On January 8,
2010, Marvel sued the Kirbys, seeking a declaratory judgment that their Termination is invalid

on the revisionist theory that the subject 1958-63 works were purportedly "works for hire."

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-50 (1986). The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact for trial. *Id.* at 256; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to establish "specific facts showing a genuine issue for trial," and not "rely merely on allegations or denials." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). A fact is "material" only if it affects the outcome of the suit under the governing substantive law. *Consarc v. Marine Mid. Bank,* 996 F.2d 568, 572 (2d Cir. 1993) (citing *Liberty*, 477 U.S. at 248). A court shall grant summary judgment "against a party who fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear burden of proof at trial … since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celote*x, 477 U.S. at 322-323. However, the movant is not required to affirmatively disprove unsupported assertions made by the non-movant, *see Celotex*, 477 U.S. at 323; and if the non-movant's evidence is "merely colorable and not significantly probative, summary judgment may be granted." *Scott v. Almenas*, 143 F.3d 105 (2d Cir. 1998) (citing *Liberty Lobby*, *supra*).

## ARGUMENT

### I.    THE RECAPTURE RIGHT UNDER THE U.S. COPYRIGHT ACT

The economic philosophy behind the [Copyright] clause … is the conviction that encouragement of individual effort by personal gain is the best way to advance the public

welfare through the talents of authors [] in '[] useful Arts.'" *Mazer v. Stein*, 347 U.S. 201, 219

(1954). Commencing with the Copyright Act of 1831, Congress has thus consistently provided

authors and their families with the right to recover transferred copyright interests. Over time,

Congress strengthened and enhanced such "recapture" rights to enable authors and their heirs to

realize the enhanced value of an author's work. *See Stewart v. Abend*, 495 U.S. 207, 219 (1990).

These protections culminated in the current Copyright Act's termination provisions. 17 U.S.C.

§§ 203(a), 304(c) and 304(d).

### A.    The Recapture Right Under the 1909 Copyright Act

Under the Copyright Act of 1909 ("1909 Act"), copyright protection was divided into

two separate, consecutive terms of 28 years: the "initial" term and the "renewal" term. 17

U.S.C. § 24; *see* H.R. Rep. No. 2222, 60th Congress, 2d Sess., at 14 (1909). The renewal term

was intended to be a new grant reverting to the author at the end of the initial term, not merely a

term extension, in order to protect authors who struck imprudent deals by allowing them to

realize a portion of the increased economic value of their work. *See Abend,* 495 U.S. at 217-220.

This legislative purpose was eviscerated by the Supreme Court's decision in *Fred Fisher*

*Music Co., v. M. Witmark & Sons*, 318 U.S. 643, 657-59 (1943), which held that authors could

assign their renewal interest during the initial term. Thereafter, publishers routinely insisted that

authors assign *both* copyright terms, effectively eliminating the reversion to the author under the

1909 Act, and thus, the author's ability to share in his work's success. *Stewart*, 495 U.S. at 219;

*see also Mills Music, Inc.,* 469 U.S. at 185 (White, J., dissenting).

### B.    The Termination Rights Under the 1976 Copyright Act

On January 1, 1978, the Copyright Act of 1976 (the "1976 Act") went into effect, and

with it major changes to U.S. copyright law that significantly enhanced authors' rights. 17

U.S.C. § 101 *et seq.* (1978). *See Greenberg v. Nat'l Geographic Soc'y*, 533 F.3d 1244, 1259 n.1 (11th Cir. 2008) ("The 1976 Copyright Act was supposed to reverse two hundred years of publishers' exploitation of authors under the [] Copyright Act."). When Congress extended the renewal term from 28 to 47 years in § 304(a) of the 1976 Act, it intended to benefit authors rather than grantees, for whom the automatic grant of the extended term would be an unjustified windfall. *See* H.R. Rep. at 140. To that end, Congress coupled the term extension with a *new* right of authors and their heirs to terminate transfers of rights in a copyright's renewal term executed before January 1, 1978. 17 U.S.C. § 304(c).[3]

In recognizing the intent of the 1976 Act to "enhance the author's position," by adjusting "the author/publisher balance," the Supreme Court has emphasized the "inalienable authorial right to revoke a copyright transfer." *N.Y. Times,* 533 U.S. at 496. *See also Abend,* 495 U.S. at 230 ("[1976 Act] provides an inalienable termination right"); *Marvel Characters, Inc. v. Simon* ("*Marvel*"), 310 F.3d 280 (2d Cir. 2002) (Marvel cannot bar termination rights under the Copyright Act by re-characterizing works as "made for hire," after the fact).

The termination right lies in stark contrast to ordinary contract principles, as it empowers authors and their statutory heirs to terminate grants of copyright *without cause*, regardless of the contracting parties' promises, intent or expectations when the grant was made. 17 U.S.C. § 304(c)(5). In creating the vital termination right, Congress directly addressed the inequities caused by *Fred Fisher*, and sought to prevent the further erosion of the right of authors and their families to profit from their creations. Thus, in further abrogation of "freedom of contract"

---

[3] 17 U.S.C. § 203(a) allows an author or her statutory heirs to terminate any post- January 1,1978 grant by an author 35 years after such grant. Thus, for both existing and future grants, Congress granted a termination right. The Sonny Bono Copyright Term Extension Act of 1998 ("CTEA"), again extended the renewal term, and Congress again coupled the term extension with an inalienable termination right. 17 U.S.C. § 304(b), (d); S. Rep. No. 104-315, at 22-23 (1996); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 9.11[B][1] at 9-152.

principles, the termination right cannot be waived or circumvented:  that "[t]ermination of the

grant may be effected notwithstanding any agreement to the contrary;" and that "[a] further

grant…of any right covered by a terminated grant is valid only if it is made after the effective

date of termination … [or as to] the original grantee or such grantee's successor in title, after the

notice of termination has been served…."  17 U.S.C. §§ 304(c)(5)-(6)(B).

## II.     MARVEL CANNOT PROVE THE EXPENSE PRONG OF ITS "WORK FOR HIRE" DEFENSE AS A MATTER OF LAW

### A.     "Work For Hire" Under the 1909 Copyright Act

#### 1.     Derivation of the "Work For Hire" Doctrine

As the Kirby works at issue were created prior to 1978, the Copyright Act of 1909 (the

"1909 Act") generally governs.  *See Estate of Hogarth v. Edgar Rice Burroughs, Inc.*

("*Hogarth*"), 342 F.3d 149 (2d Cir. 2003).  The 1909 Act did not define "work for hire," but

simply stated that "in the interpretation and construction of this title…the word 'author' shall

include an employer in the case of works made for hire.").  17 U.S.C. § 26, repealed by Pub. L.

94-553, 90 Stat. 2541 (1976).  This section was intended to have a narrow application:

> [T]he provision was included in the draft bills at the behest of two groups:  the publishers of encyclopedias, directories and other composite works and the publishers of prints and similar works of graphic arts.  These publishers wished to insure their right to secure copyrights in material composed by their staffs without having to obtain their employees' assignments.

*Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 651-52 (S.D.N.Y. 1970).[4]  Thus, for the

first five and a half decades of the 1909 Act, courts applied the "work for hire" doctrine to

traditional hierarchical employment.  *See Hogarth*, 342 F.3d at 161 n.15 ("'[U]ntil the mid-

---

[4] *See* Barbara A. Ringer, Copyright Law Revision Study No. 31 "Renewal of Copyright" at 138-39, prepared for the Senate Subcommittee on Patents, Trademarks and Copyrights of the Committee on the Judiciary (June 1960) ("The committee reports on this bill [the 1909 Copyright Act] indicate a likelihood that the legislators regarded a 'work made for hire' as a species of 'composite or cyclopedic work.'").

1960's, federal courts applied the work-for-hire doctrine only to cases in which a traditional

employer/employee relationship existed ….") (citations omitted); *Nat'l Ctr. for Jewish Film v.*

*Goldman*, 943 F. Supp. 113, 117-119 (D. Mass. 1996) ("[C]ourts generally adhered to the

interpretation that the 1909 Act's work for hire doctrine referred to works made by employees,"

while "[c]ommissioned works … were treated as if the commissioned party impliedly agreed to

convey the copyright along with the work itself to the hiring party.").[5]  It was understood that:

> The statutory concept of employment for hire is based on the specific contractual
> relationship between employer and employee.  The courts have not given a definition of
> that relationship which will cover all situations that may come up, but all the cases have
> involved salaried employees who received either a fixed salary or a minimum salary plus
> commission….  Hence, it may be concluded that section 26 [of the 1909 Act] refers only
> to works made by salaried employees in the regular course of their employment.[6]

*Brattleboro Publishing Co., v. Winmill Publishing Corp*. ("*Brattleboro*"), 369 F.2d 565,

567-68 (2d Cir. 1966) used an "instance and expense" test to find an implied *assignment* of an

independent author's copyright to a publisher, holding that "there is a presumption in the absence

of an express contractual reservation to the contrary, that the copyright shall be in the person at

whose instance and expense the work is done."  *See Hogarth*, 342 F.3d at 160, n.14.  However,

*Donaldson Publishing Co. v. Bregman, Vocco, & Conn, Inc.* 375 F.2d 639, 643 (2nd Cir. 1967)

held that an author's "freedom to engage in profitable outside activities without sharing the

proceeds with [its publisher]," and the publisher's contingent payment of royalties to the author,

---

[5] Commissioned works were owned by the hiring party through *assignment*.  *See Yardley v. Houghton Mifflin Co.*, 108 F.2d 28, 30 (2d Cir. 1939) ("When an artist accepts a commission to paint a picture for another for pay, he ***sells*** not only the picture but also the right to reproduce copies ….") (emphasis added); *Uproar Co. v. Nat'l Broad. Co.*, 81 F.2d 373 (1st Cir. 1937) (hiring party obtained rights only through assignment from the commissioned party).

[6] B. Varmer, Copyright Law Revision Study No. 13, "Works Made for Hire and on Commission," Studies Prepared for the Copyright Office, Reprinted by the Subcommittee on Patents, Trademarks and Copyrights of the Senate Committee on the Judiciary, 86th Cong., 2d Sess. 127, 130 (Comm. Print 1960) ("Varmer Study").  The Varmer Study based its findings, in part, on the legislative history of the 1909 Act, noting that in a draft bill of the Act, dated March 2, 1906, a "work made for hire" was "defined in terms of salaried employment."  *Id.* at 128.

weighed against "work-for-hire."[7]  *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 213 (2d Cir.

1972), then extended the "work for hire" doctrine to independent contractors, using the "instance

and expense" test, based on erroneous interpretations of *Brattleboro* and other *implied*

*assignment* cases.  *See Hogarth*, 342 F.3d at 160.[8]  *Playboy Enterprises, Inc. v. Dumas*

(*"Playboy"*), 53 F.3d 549, 563 (2d Cir. 1995), in turn, relied on *Picture Music* to find that an

independent contractor's work was "made for hire," under the "instance and expense" test.

## 2.    The Instance and Expense Test

In applying the "instance" component of the test, courts look to whether the "'motivating

factor in producing the work was the employer who induced the creation.'"  *Siegel v. National*

*Periodical Publications, Inc.*, 508 F.2d 909, 914 (2d Cir. 1974) (citation omitted).  The inquiry

focuses not on generalities, but on specific historical facts.  For example, a work created by a

traditional employee "as a special job assignment, outside the line of the employee's regular

duties" is not work for hire.  *See Shapiro Bernstein & Co., v. Jerry Music Co.*, 221 F.2d 569, 570

(2d Cir. 1995); *Martha Graham School & Dance Found., Inc. v. Martha Graham Center of*

*Contemporary Dance, Inc.* ("*Martha Graham*"), 380 F.3d 624, 635 (2d Cir. 2004).

---

[7] *See also Olympia Press v. Lancer Books*, 267 F. Supp. 920, 924 (S.D.N.Y. 1967) (refusing to
find "work for hire" where publisher "engaged [a freelance author] and commissioned the work
for hire in return for a set fee"); *Florabelle Flowers, Inc. v. Joseph Markovits, Inc.*, 296 F. Supp.
304, 306 (S.D.N.Y. 1968) (holding, where "plaintiff paid [commissioned contractor] nothing
except an invoiced price," that "[t]here is nothing whatever to indicate that [contractor's] creative
efforts were expended 'at the Plaintiff's expense'").

[8] "[*Picture Music*] characterized *Brattleboro* as having 'expressly applied the statutory work for
hire doctrine to the case of an independent contractor'" when in fact "what *Brattleboro* had done
was [to] apply the 'instance and expense' test to determine that a party commissioned to create a
work should be deemed to have assigned its copyright … to the commissioning party."  *Hogarth*,
342 F.3d at 160 n.14.  Similarly, "[*Picture Music*] stated that *Yardley* 'held that one who
commissions an artist to paint a mural owns all rights to its reproduction,'" when in fact "*Yardley*
had recognized that the executor of the deceased artist, not the commissioning party, held the
renewal right."  *Id.  Picture Music* thus misinterpreted the two Second Circuit cases it relied
upon to expand the "instance and expense" test to independent contractors under the 1909 Act.

A work is created at a party's "expense" if that party takes on "all the financial risk" of the work's creation. *Twentieth Century Fox Film Corp v. Entertainment Distrib.,* 429 F. 3d 869, 881 (9th Cir. 2005). *See also Community for Creative Non-Violence v. Reid* ("*CCNV*"), 490 U.S. 730, 741 (1989). "Plainly, it is the expense of creation, rather than publication, that is relevant" to the expense test. 1 *Nimmer* § 5.03[B][2][d] at 5-56.9 n.171c. The putative employer must be "on the hook" to pay a "sum certain" to the creator prior to the creation of the work, regardless of whether the work is accepted or published. *Brattleboro,* 369 F.2d at 568 (finding "instance and expense" because hiring party obliged to bear expense of creating the ad regardless of whether ad was accepted and used, *see Brattleboro*, 250 F. Supp. 215, 218 (D. Vt. 1966)); *Playboy*, 53 F.3d at 563 (the fact that hiring party "had no commitment to purchase any of [the author's] work" supports a finding that such works were not "for-hire"). Notably, where the putative employer is at least obligated to pay a "'turn-down'" fee for "unused work," this weighs in favor of "work for hire." *Playboy*, 960 F. Supp. 710, 715 (S.D.N.Y. 1997).

In contrast, where an author's payment is contingent, for instance, where an author is to receive contingent royalties, this weighs heavily against finding a "work for hire" relationship. *See Donaldson,* 375 F.2d at 642; *Twentieth Century*, 429 F. 3d at 881; 2 W. Patry, *Patry on Copyright* § 5:61 ("Where payment is solely by royalties, this fact weighs against [work for hire].");  1 *Nimmer* § 5.03[B][2][d] at 5-56.8 (same).

Finally, satisfaction of the "instance and expense" test gives rise to a "presumption" of "work for hire" which "may be rebutted by sufficient proof." *Martha Graham*, 380 F.3d at 641.

### 3.     "Work For Hire" Turns on the Mutual Intent of the Parties and Their Actual Relationship

Whether a work is "made for hire" under the 1909 Act is a mixed question of law and fact that turns on the mutual "intent of the parties." *Playboy*, 53 F.3d at 556-57. The analysis

requires an evaluation of "the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work." *Marvel*, 310 F.3d 280, 291 (2d Cir. 2002) (citing *Donaldson*, 375 F.2d at 640-642). *See* 3 *Nimmer* § 11.02[A][2] at 11-13 ("[I]t is the relationship that in fact exists between the parties … that is determinative."); *Eliscu v. T.B. Harms Co.*, 151 U.S.P.Q. 603 (N.Y. Sup. Ct. 1966) (holding that an agreement with "the phrase 'we engage and employ you' does not necessarily create a for-hire relationship").

In addressing the status of works created prior to 1978, Courts can seek guidance from the 1976 Copyright Act. *See* 2 *Patry* § 5:44 (criticizing the vague post-1965 expansion of "work for hire" to freelancers and praising *Martha Graham*, 380 F.3d at 624, for "mov[ing] the 1909 Act very close to that of the 1976 Act and eliminat[ing] the worst features of [the] presumptive 'instance and expense' approach."); 1 *Nimmer* § 5.03[B][1][a][i] at 5-14.1 ("[I]t is necessary to consult cases decided under the current act to round out one's understanding of the work for hire doctrine under the 1909 Act."); *Gaste v. Kaiserman*, 863 F.2d 1061, 1065 (2d Cir. 1988).

Under the 1976 Act, an explicit contractual statement that the subject work is "made for hire" is *required* for independent contractors. 17 U.S.C. § 101 ("A 'work made for hire' is – (2) a work specially ordered or commissioned … if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."). This avoids self-serving claims, made after-the-fact, under the malleable "instance and expense" test which frequently "worked an injustice." *Aldon Accessories, Ltd. v. Spiegel, Inc.*, 738 F.2d 548, 552 (2d Cir. 1984) (citations omitted). *See Easter Seal Soc. v. Playboy Enterprises, Inc.*, 815 F.2d 323, 331 (5th Cir. 1987) ("[W]e cannot avoid the impression that Congress meant [] to tighten up the 'work for hire' doctrine under the 1976 Act….").[9]

---

[9] The Supreme Court has looked to "the general law of agency" in deciding whether a work is "made for hire" under the 1976 Act. *CCNV*, 490 U.S. at 751-52. Relevant factors from "the

Notably, *Brattleboro*, *Picture Music, Playboy* and its progeny focused on copyright *ownership*; hence, whether it was by assignment or the "work for hire" doctrine was of less import. Here it makes all the difference. The terminated party's ownership is presumed by 17 U.S.C. § 304(c), but solely "works for hire" are excluded from termination. The concerted legislative objective of the termination provisions to enhance "the rewards for the creativity of authors," *Mills Music*, 469 U.S. at 172-173, and "to protect authors from [their] unequal bargaining positions," *Marvel*, 310 F.3d at 290 (citing H.R. Rep. at 124), calls for cautious application of the "instance and expense" test. Ironically, the forward thinking termination right under sections 304(c) and (d) entail only pre-1978 works under the 1909 Act. Thus, if the amorphous "instance and expense" test is too loosely applied, the "work for hire" exception will swallow the rule, and gut this "inalienable authorial right." *N.Y. Times,* 533 U.S. at 496.

### B. As Kirby Bore the Financial Risks of His Creations, Marvel Cannot Meet Its Burden of Proving Its "Work for Hire" Defense

Marvel bears the significant burden of proving by "credible evidence" that the terminated works were created at the "instance and expense" of its predecessors because "work for hire" is a statutory exception to the termination statute. *See* 17 U.S.C. § 304(c); *Woods v. Bourne Co*., 60 F.3d 978, 993 (2d Cir. 1995) (burden of proving exception to Section 304(c) falls on the assignee, under the rule that the burden falls on a party claiming a statutory exception).

Marvel cannot satisfy the "expense" prong of its "work for hire" defense. There is no evidence that Marvel was legally obligated to buy the artwork submitted by Kirby or by any other freelancer during the operative 1958-1963 period. The evidence reflects what one would

---

general law of agency" include "the skill required; the source of instrumentality and tools; the location of the work…the extent of the hired party's discretion over when and how long to work; the method of payment; … the provision of employee benefits and the tax treatment of the hired party." *CCNV*, 490 U.S. at 751-52. "[The Second Circuit] has [likewise] looked to agency law to determine whether a work is created 'for hire' under the 1909 Act." *Marvel*, 310 F.3d at 291.

expect – payment was *contingent* on Marvel's acceptance of completed artwork.  Kirby bore all expenses of creating his artwork, and thus the financial risks of creation.  That is not "work for hire."  *See* 1 *Nimmer* § 5.03[B][2][d] at 5-56.9 n.171c; *Twentieth Century*, 429 F. 3d at 881.

In the late 1950's, Marvel, then a small informal business, was on the verge of bankruptcy in a depressed chaotic industry.  Mor. Dec., Ex. A at 5; Ev. Dec., Ex. A at 8; Tob. Dec., Ex. F at 200:4-201:20.  When Marvel fired near all of its staff artists and writers in or about 1957 and converted to a freelance model, it obviously did so to drastically limit its financial obligations and to keep its options open.  Ev. Dec., Ex. A at 7-8; Mor. Dec., Ex. A at 5, 8-9; Tob. Dec., Ex. F at 123:18-125:9; 200:4-202:13.  The multi-billion dollar Marvel of today, built largely on Kirby's creativity, now seeks "to have its cake and eat it too" by revising history.

Kirby worked as a freelancer for Marvel during the operative 1958-1963 period.  Ev. Dec., Ex. A at 9, 11-12; Mor. Dec., Ex. A at 7-10; Tob. Dec., Ex. C at 23:4-24:4; Ex. E at 71:17-72:7; 72:22-73:8; Ex. F at 200:4-201:13; Ex. L, ¶¶ 1, 3.  Kirby had no financial security, no employment contract, nor any other contract with Marvel during this period.[10]  Mor. Dec., Ex. A at 9; Ev. Dec., Ex. A at 11; Tob. Dec., Ex. C at 23:4-24:4; Ex. E at 71:17-72:7; 72:22-73:8; Ex. F at 194:11-13; 199:8-200:3; Ex. L, ¶¶ 1, 3.  It is undisputed that Kirby, like the other freelancers, paid for his own overhead and other expenses, worked out of his own house, and procured and paid for his own supplies.  Ev. Dec., Ex. A at 11-12; Mor. Dec., Ex. A at 8; Tob. Dec., Ex. E at 76:4-24; Ex. F  at 194:11-21; 199:8-200:3; 205:19-207:11; Ex. G at 86:2-11; 90:12-91:5; 92:24-93:11; Ex. H at 9:15-10:09; Ex. CC at K860-61.  Kirby was not paid a salary, hourly wage or fee for his services, but was paid a "page rate" only for those completed pages of artwork submitted by Kirby and accepted by Marvel for publication.  Mor. Dec., Ex. A at 8-10; Ev. Dec., Ex. A at

---

[10] The earliest Kirby agreement produced by Marvel is dated June 5, 1972.  Tob. Dec., Ex. M.

12; Tob. Dec., Ex. C at 105:15-17; Ex. D at 89:13-92:5; 180:4-182:12; Ex. E at 29:4-8; Ex. F at 123:18-125:9;  Ex. I at 17:17-25.  It is clear that Marvel was not obligated to purchase the artwork submitted by Kirby or other freelancers.  *See Brattleboro,* 369 F.2d at 568 (hiring party obliged to pay regardless of whether it accepted the work); *Playboy,* 53 F.3d at 563 (same).

For instance, Marvel called Stan Lee's brother, Larry Lieber (*Iron Man*, *Thor*) as a witness.  Lieber, who consistently sold freelance scripts and artwork to Marvel during the 1958-1963 period at issue, testified that Marvel had no obligation to purchase his freelance material:

> Q: Now, when you submitted your freelance work to Marvel, whether it's a script or artwork, was it -- was it your understanding that Marvel was obligated to purchase that material from you?
> ***
> A: My understanding [was that] they were not obligated.
> Q: And was it your understanding that when they did buy your work, they owned all rights to it?
> ***
> A: Yes.
> Q: And that's because they had purchased it from you?
> ***
> A: Yes.

Tob. Dec., Ex. E at 73:11-74:5; *see also* 71:17-72:7, 76:25-77:6; Ex. D at 178:5-13.

Marvel was not obligated or "on the hook" to pay for freelance work that it chose, in its sole discretion, to reject.  Ev. Dec., Ex. A at 12; Mor. Dec., Ex. A at 8-10.  Marvel witness John Romita confirmed that Marvel did not pay for freelance work it chose not to accept.  *See* Tob. Dec., Ex. F at 123:18-125:9; Ex. V at 396.  Discovery revealed further revealed examples in the 1958-1963 period, where Kirby submitted artwork to Marvel that it rejected and did not purchase.  A well-known example is Kirby's rejected pages of *The Incredible Hulk* that he tore up after storming out of Stan Lee's office. Tob. Dec., Ex. N; Ex. O at 71-74.  The old *Hulk* pages were salvaged and scotch-taped by Larry Lieber, who produced them in this action.  *See* Tob. Dec., Ex. N; Ex. E at 103:7-105:17.

Defendants' expert John Morrow confirmed on cross-examination by Marvel:

> A: …[A]ll the historical data shows rejected and redrawn work or rejected work wasn't paid for, and that redrawn work wasn't like, you know, paid again for.
> Q: And what historical data are you referring to support that statement?
> A:…There's a lot of rejected pages over the years that Kirby had in his collection. If they were – you know, if they were paid for, Marvel would have kept the physical pages there at the office to use for, you know, inking sample, inking tryouts and things like that. In addition to that, there was a lot of instance where Kirby had rejected pages he might have repurposed for a different project, for a different company even, and, of course, if Marvel had paid for that, that doesn't seem like that would have happened…

Tob. Dec., Ex. D at 89:20- 91:4.

The record evidence shows that Marvel did not pay Kirby or other freelancers for work that it wanted re-drawn.  Ev. Dec., Ex. A at 12; Mor. Dec., Ex. A at 8-9; Tob. Dec., Ex. B at 61:24-62:9; Ex. C at 136:7-138:15; Ex. E at 76:25-77:6; 77:20-79:4; Ex. G at 57:18-58:21; 62:19-63:6; 234:12-235:5; 235:6-236:1; Ex. H at 37:6-19; Ex. Z.  For example, "if Marvel rejected seven pages of Kirby's work, and he redid the seven pages which were then accepted, Kirby would not be paid for fourteen pages, but simply for the seven pages approved for purchase."  Ev. Dec., Ex. A at 12.  Lieber testified to Marvel's practice:

> Q: Now as a freelancer, if your work was rejected, you wouldn't be paid for that, would you?
> A: I felt that they didn't have to pay me for it…
> ***
> Q: So you got paid for the script but you weren't paid for redoing the plot a number of times?
> A: No. Because if I had been, I might not have been so concerned about my expenses.

Tob. Dec., Ex. E at 76:25-79:4. ("I was worried about paying my rent, and I wondered …. how often do I have to keep redoing this plot …. Finally, you know, he did like it and …. I got paid for the script.").  Jack Kirby's children also testified to how their father was not paid by Marvel for rejected work.  Susan Kirby remembered her parents arguing:

> Q: Did you have an understanding when you were living in East Williston [late 50's/ early 60's] about the economic terms of your father's relationship with any publisher?

19

> A: Well, I knew that Marvel paid him by the page, and that he and mom used to argue about it, because he would be up all night doing pages, and Marvel would say, "Well, we don't want to buy this." Then they would go ahead and make him do the whole thing over again, and he would just get paid for the artwork that he did over again. So he was doing things twice and getting half the money.

*Id.*, Ex. H at 37:6-19. Neal Kirby also distinctly remembers these conversations between his parents in the early 1960's, as well as specific *Thor* artwork for which his father was not paid.

*Id.*, Ex. G, at 57:19-58:21; 62:19-63:6; 234:12-235:5 ( "[My father] had to redo them and …he would get upset because, from what I understand, he didn't get paid for those pages." Neal also recalled a specific incident involving *Fantastic Four* pages that had been rejected by Marvel.

*Id.*, Ex. G at 235:6-236:1 ("[My father] had those pages that he had brought in but he needed to redo…[H]e was upset that he would have to take the time to do it…and not be paid for it.")

Defendants' expert Mark Evanier, who also worked for Kirby in 1969-1970, witnessed Kirby and his wife Rosalind's distress over this problem. Ev. Dec., Ex. A at 1-4; Tob. Dec., Ex. B at 61:24-62:9. On cross, Evanier testified to seeing rejected unpaid Kirby work:

> Q:…Would you tell the record precisely what materials were that you claim were submitted and rejected?
> A: Well, there were several categories of these. Jack had drawn up a number of ideas for new characters. He had done these beautiful little presentation pieces and he had shown them to Marvel and not received the kind of offer that he felt was appropriate for them. He had also prepared sketches of a revamp of the character Thor, which he was working on, he was doing stories of Thor for them at the time, a lot for Thor….He had sent them to Marvel, and Marvel has said 'Well, we want to do this approach, but we want to just pay you the same rate we're paying you all along.'… He also had pages for comic books that he had recently drawn that Marvel had purchased from him where they had rejected certain pages and sent them back to him, and they had not paid him for them, he said. And he had a pile of approximately a hundred of those pages, which I thought were, you know, beautiful, wonderful work, and I asked him, 'Oh, could I have one of those?'…and he said, 'Well, no, I might find a way to sell them to him later.'

Tob. Dec., Ex. B at 50:20-51:25; Ev. Dec., Ex. A at 1-2. Evanier further testified that Jack Kirby "was not paid" for the first Spider-Man pages he drew in 1962 that were rejected by Marvel. *See* Tob. Dec., Ex. C at 140:19-142:21.

20

Defendants' expert John Morrow testified:

"In 2006, Marvel Comics requested my assistance in re-assembling an entire unpublished *Fantastic Four* story by Jack Kirby…The story was originally drawn and plotted by Kirby as his next-to-last issue of *Fantastic Four*, but it was rejected and went unused and unpaid…Marvel paid me to update my *Jack Kirby Collector* article, which was used as both as an Afterword in a *Fantastic Four* reprint collection in 2006, and an introduction to the stand-alone *Fantastic Four: The Lost Adventure* #1 comic book in 2008, wherein Marvel commissioned Stan Lee to finally add dialogue to Kirby's plotted/penciled pages, over 35 years after Kirby drew them. In the course of this project,  Marvel paid Jack Kirby's estate $325 per page for the use of that unused story Kirby drew in 1970.

Tob. Dec., Ex. D at 91:13-92:5; 138:11-139:4; Ex. P; Ex. S; Mor. Dec., Ex. A at 3; Ex. B.

Marvel implicitly acknowledged that it did not own this unpublished story when it licensed this material from the Kirbys in 2008.  Tob. Dec., Ex. P.  Marvel also approached the Kirbys in 2008 to license at a per-page rate other unpublished Kirby artwork, including rejected covers their father did for *Thor*, *X-Men* and *The Fantastic Four* (*id.*, Ex. Q at 1509-1512) and rejected interior *Thor* artwork.  *Id.*, Ex. R at 1492.

If Kirby's *Fantastic Four*, *Thor* and *X-Men* had been "work for hire," Marvel would have owned such material at inception.  *Hogarth*, 342 F.3d at 162 ("[W]ith a true work for hire, copyright ownership … [is] with the employer automatically upon the employee's creation of the work").  There would have been no need for Marvel to convince the Kirbys to license it.

The "expense" prong thus necessarily entails a legal obligation of the putative employer to pay for work it commissions.  If the "expense" prong hinged on whether the employer ultimately accepts/pays for such work, the "work for hire" doctrine would collapse.  Under such a scenario, if the "employer" chose to reject and/or not pay for "work for hire," its "authorship" and ownership would disappear.  This turns "work for hire" on its head, as the doctrine focuses on the circumstances of creation.  *Id.*  It is far more consistent with the doctrine that the employer is legally obligated at the outset to pay a "sum certain," and that if it fails to pay, the work

remains "for hire," but the artist has a breach of contract claim for the sum.

### C.    It is Clear That Marvel *Purchased* the Kirby Material It Accepted

When a company like Marvel keeps its options open, so that it pays only for that freelance material it deems acceptable, that is a *purchase* of speculative work, not "work for hire," as a matter of law.  Marvel's revisionism is unpersuasive given this simple explanation.

From the 1930's through the mid-1960's the comic book "industry" was a small exploitive business.  Ev. Dec., Ex. A at 4-5; Mor. Dec., Ex. A at 4-5; Tob. Dec., Ex. C at 31:1-33:17; Ex. D at 143:24-145:7; Ex. F at 200:4-201:20.  By 1957, when Kirby began submitting material to Marvel, it was particularly haphazard, chaotic, and on the verge of bankruptcy.  *Id.*.  Marvel had fired all but a couple of its employees and chose instead to *buy* material from freelancers to drastically reduce its financial obligations.  Ev. Dec., Ex. A at 8; Mor. Dec., Ex. A at 5; Tob. Dec., Ex. F at 123:18-125:9, 200:4-202:13; Ex. U at 80.  It is simply not credible that during these difficult times Marvel did not condition payment on its acceptance of completed material.  This shifted, and was intended to shift, the "financial risk" of creation to freelancers like Kirby.  *See Twentieth Century*, 429 F. 3d at 881.

Marvel engaged in the dubious practice of putting a legal acknowledgement on the back of its checks, forcing freelancers to sign under the legend in order to cash Marvel's checks.  It is uncertain when Marvel started doing this.  Mor. Dec., Ex. A at 9; Ev. Dec., Ex. A at 12-13.  Marvel claims that it has no copies of any freelancer checks with such legends prior to 1974 and no such checks to Jack Kirby prior to 1986.  Tob. Dec., Ex. L at ¶¶ 2, 4; Ex. AA.  The earliest such check produced by Marvel is a 1974 check to the freelance artist Dick Ayers (*Sgt. Fury*).  *Id.*  Tellingly, even by 1974, Marvel's legend does not mention "work made for hire" but uses inapposite language consistent with the purchase and assignment of freelance material:

> By endorsement of this check, I, the payee, acknowledge full payment for my employment by Magazine Management Company, Inc. and ***for my <u>assignment</u> to it of any copyright, trademark and any other rights in or related to the material, and including my <u>assignment</u> of any rights to renewal copyright***.

Tob. Dec., Ex. AA at 14603 (emphasis added); Ex. L at ¶ 15.[11]  In fact, the earliest produced

Marvel check (Tob. Dec., Ex. BB) containing a legend mentioning "work for hire" is from 1986,

seems to apply to traditional employment, and states the following:

> By acceptance and endorsement of this check, payee acknowledges, a) full payment for payee's employment by Marvel Entertainment Group, Inc., b) that all payee's work has been within the scope of that employment, and c) that all payee's works are and shall be considered as works made for hire, the property of Marvel Comics Group, Inc.

The 1974-1975 freelance checks Marvel produced, and the fact it could produce no

checks with a "work for hire" legend prior to 1986, raises a strong inference that over a decade

after the 1958-1963 period, Marvel still viewed its ownership as predicated on the purchase and

assignment of completed material, not the "work for hire" doctrine. *Id*., Ex. AA.[12]

Several artists and writers testified that this comported with their understanding at the

time as well, including Marvel's "star witness," Stan Lee:

> Q: And how were you paid for your work as a writer on comics?
> A: I was paid on a freelance basis, like any freelance writer.
> Q: And does that mean you were paid by the page?
> A: Yes.
> Q: And was it your belief that because Marvel had bought that work from you, that they owned all right, title and interest in the work?
> A: Yes, I did believe that.

Tob. Dec., Ex. J at 396:1-14.  This was confirmed by Lee's brother, Larry Lieber:

---

[11] Kirby's daughter testified on cross that she had seen the "writing on the back [of Marvel's checks]…where they said they bought and owned Dad's work."  Tob. Dec., Ex. H at 44:22-46:6.

[12] Western Printing and Litho. Co. (a.k.a. Dell Comics, Gold Key Comics), a Marvel competitor, also owned freelance artwork based on a "transfer and assignment," as evidenced by Western's form freelance voucher signed by Don Heck in 1965.  Tob. Dec., Ex. T ("I hereby release, transfer and assign to Western…").  Like Kirby, Heck (*Iron Man*) worked as a freelance artist with Marvel and others, from 1958 through the 1960's. *Id*., Ex. U at 78, 99, 108.

> Q: And was it your understanding that the import of the writing on the back of these checks was that by signing the check and accepting payment for your work, you were transferring over to Marvel all rights in your work?
> A: Yes, it was my understanding.
> Q: On the checks you received for your freelance work, did they have language stating that your work was work made for hire?
> A: No. No.

*Id.*, Ex. E at 100:21-101:9.  Marvel's witness Roy Thomas similarly confirmed:

> Q: Was it your understanding that by signing the checks, you were acknowledging that you were assigning to Marvel all right, title and interest in your work?
> ***
> A: Yes.

*Id.*, Ex. K at 232:5-10.  It is well accepted that whether freelance material is a "work for hire" under the 1909 Act "always turn[s] on the intention of the parties."  1 Nimmer § 5.03[B][2][e] at 5-56.1.  Yet during the 1958-63 period, prior to the extension of "work for hire" to independent contractors in 1965-1972, "the work-for-hire doctrine [applied] only to … traditional employer/ employee relationship(s)."  *Hogarth*, 342 F.3d at 161, n.15.  It is therefore impossible that Marvel and Kirby *intended* his freelance material be owned as "work for hire," rather than by assignment, when the doctrine only applied at that time to employees.  *See Patry* § 5:45; *Geisel v. Poynter Prods., Inc.*, 295 F. Supp. 331, 341 (S.D.N.Y. 1968) (publisher owned rights to pre-1965 materials not under "work for hire" doctrine but due to an "implied in fact … provision whereby all rights or complete rights were assigned").

Consistent with Marvel's *purchase* of Kirby's freelance material, and inconsistent with Marvel's retroactive "work for hire" theory, Kirby was permitted to use elsewhere rejected artwork he had originally submitted for a Marvel comic.  Mor. Dec., Ex. A at 9-10.[13]

---

[13] Such works included a new version of *Captain America* in 1968 that Kirby later used as the cover of *Captain Glory*, No. 1 by the Topps Company in April 1993, without objection from Marvel.  Ev. Dec., ¶¶ 17-20; Ex. B at K355-56.  Similarly, a re-imagined version of Marvel's *Thor* was rejected by Marvel without pay, and Kirby thereafter openly packaged and sold copies of this artwork on a mail order basis and at conventions, also without objection from Marvel.

The reality of the Kirby-Marvel relationship was thus quite different from Marvel's revisionist rendition, designed to circumvent the statutory termination rights of Kirby's family. The evidence shows that Kirby had no legal obligation to provide freelance artwork to Marvel, and Marvel had no legal obligation to purchase the freelance material he submitted. Naturally, Marvel paid Kirby and other freelancers by the page for those pages it approved and accepted for publication. This is no surprise given the vicissitudes of the penny-wise comic book business in those early days. To underscore this point, if Marvel asked Kirby to redraw material as a condition to its acceptance, Kirby was not paid for all the pages he had done, just the accepted, redrawn pages. In short, Marvel purchased that Kirby material it accepted for publication – the antithesis of "work for hire." Even Marvel's key witnesses, including Stan Lee, admitted that their understanding at the time was that Marvel was simply purchasing their work. Marvel's own conduct, then and now, contradicts its retroactive "work for hire" claim, which fails as a matter of law due to Marvel's inability to satisfy the "expense" prong of the "work for hire" test.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants/Counterclaim-Plaintiffs respectfully request that their motion for summary judgment be granted in its entirety.

Dated: February 25, 2011               Respectfully submitted,
                                       TOBEROFF & ASSOCIATES, P.C.

                                       /s/ Marc Toberoff
                                       Marc Toberoff (MT 4862)

                                       Attorneys for defendants
                                       Lisa R. Kirby, Barbara J. Kirby, Neal L.
                                       Kirby and Susan M. Kirby

---

Ev. Dec., ¶ 17; Ex. C at 956. Kirby also drew new characters for Marvel's *Thor/Tales of Asgard* mythos in 1968-69. When Marvel rejected this material, Kirby pitched the characters elsewhere, and later used them in comics published by DC in 1971, without objection from Marvel. Ev. Dec., ¶ 20, Ex. D; Tob. Dec., Ex. B at 56:2-57:19; 58:15-23.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically by e-mail

and by first class mail on those parties not registered for ECF pursuant to the rules of this court.

Dated: February 25, 2011                    TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
Marc Toberoff (MT 4862)

Attorneys for defendants
Lisa R. Kirby, Barbara J. Kirby, Neal L.
Kirby and Susan M. Kirby

26