# EXHIBIT D

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.    CV 04-08400-SGL (RZx)                                    Date:  July 8, 2009

Title:    JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -*v*-
WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a
corporation; DC COMICS INC., a corporation; and DOES 1-10
============================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Cindy Sasse                                         None Present
Courtroom Deputy                                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:

None present                                        None present

PROCEEDINGS:    **IN CHAMBERS (NO PROCEEDINGS HELD)**
                **FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL**

In March, 2008, this Court held that plaintiffs, the widow, and the daughter of Jerome Siegel, the co-creator of the iconic comic book superhero Superman, had successfully terminated the 1938 grant Jerome Siegel and his creative partner Joseph Shuster had conveyed to DC Comics' predecessor-in-interest, Detective Comics, to the copyright in the Superman material published in the comic book <u>Action Comics No.1</u>.  Left unanswered for trial was, <u>inter alia</u>, the question of "whether the license fees paid" by Warner Bros Entertainment Inc. ("Warner Bros") to its corporate sibling, DC Comics, for the audiovisual rights to the Superman copyright pursuant to various licensing agreements entered into during the 1999 to 2002 period "represents the fair market value therefor, or whether the license for the works between the related entities was a 'sweetheart deal.'"

To answer that question, the Court conducted a ten-day bench trial.  In resolving this portion of the case, the Court must, based on the evidence at trial, ascribe a value for the audiovisual rights to the Superman copyright in the marketplace during the relevant time period, circa 1999 to 2002, and then discern whether the audiovisual licensing arrangements DC Comics entered into with Warner Bros. during that same time reflect, despite their closely-affiliated  corporate nature,

MINUTES FORM 90                                      Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          1

option payment(s) were made applicable.  The agreement also provided for a contingent compensation package for DC Comics should Warner Bros. produce the television series on a "per episode basis" for an amount equal to 3% of the first dollar distributor gross from the first $1.5 million garnered, and then 5% thereafter.

The Smallville television agreement also provided that, should Warner Bros. fail to begin filming a television production within two years of exercising its option under the agreement, the rights granted thereunder would automatically revert to DC Comics without any possibility for Warner Bros. to cure or to extend the period.  Insofar as creative controls was concerned, DC Comics was accorded a right of consultation "concerning all treatments and teleplays to be used," but the decision on whether to integrate such comments was left to Warner Bros.' sole discretion. Regarding money generated from the merchandising "based upon the pilot or [television] series," the agreement provided that the "net proceeds" from the same would be split 50/50 between Warner Bros. and DC Comics, again subject to a 20% deduction in favor of DC Comics for costs and expenses if the merchandising activity in question was done "primarily" by DC Comics.

The Smallville television agreement was thereafter amended by the parties by written instrument on September 5, 2002, with the basic terms outlined above remaining unaltered from the prior agreement (See Defs Ex. 1043).

### *The Evidence Presented*

#### *The Witnesses*

In assessing the testimony at trial, the Court found some witnesses very credible and others not very credible at all.  The Court found the testimony by plaintiffs' comic book historian expert, Mark Evanier, as well as the testimony of the head of DC Comics, Paul Levitz, and the head of Warner Bros., Alan Horn, both credible and persuasive.  Considering their demeanor and testimony, the Court observed that each attempted to answer directly and honestly the questions put to them without equivocation or evasion, even when their answers resulted (as was especially the case with Mr. Levitz) in the admission of certain facts that were not altogether beneficial to their companies.  At the same time, certain witnesses were notable for their lack of credibility.  In particular, the Court singles out the film industry expert witness testimony proffered by both parties, Mark Halloran for plaintiffs and John Gumpert for defendants.  It is apparent to the Court that, at various points in their testimony, each film industry expert attempted to couch or shape answers to benefit the party paying their fees.  Their testimony, therefore, is relied upon by the Court only to the extent that it is consistent with (and thus corroborated by) the limited universe of third party film licensing agreements introduced by the parties.  However, even with this understanding, plaintiffs' film industry expert, Mr. Halloran, deserves special mention.

Mr. Halloran unquestionably possesses knowledge of and experience with the customs and practices of the film industry and, as the Court found following voir dire, is technically and professionally qualified to render opinions on the subjects and categories for which he proffered testimony in this case (defendants' protestations notwithstanding), but it is in how he put that

MINUTES FORM 90                                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                                 6