# EXHIBIT H

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

MARVEL WORLDWIDE, INC.,                    )

MARVEL CHARACTERS, INC. and                )

MVL RIGHTS, LLC,                           )

                    PLAINTIFFS, )

                           )

      VS.                        ) NO. 10-141-CMKF

                           )

LISA R. KIRBY, BARBARA J. KIRBY,  )

NEAL L. KIRBY and SUSAN N. KIRBY, )

              DEFENDANTS. )

_____ )

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF STAN LEE

LOS ANGELES, CALIFORNIA

MAY 13, 2010

REPORTED BY:

CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR, CLR

JOB NO.: 30189

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 2

May 13, 2010

9:35 a.m.

        Deposition of Stan Lee, taken on behalf of
Plaintiffs, held at the offices of Paul Hastings,
515 South Flower Street, 25th Floor, Los Angeles,
California, before Christy A. Cannariato,
CSR #7954, RPR, CRR.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 3

A P P E A R A N C E S

REPRESENTING THE PLAINTIFFS:

WEIL, GOTSHAL & MANGES, LLP

BY:   JAMES W. QUINN, ESQ.

RANDI W. SINGER, ESQ.

767 FIFTH AVENUE

NEW YORK, NY   10153

-AND-

HAYNES AND BOONE, LLP

BY:   DAVID FLEISCHER, ESQ.

1221 AVENUE OF THE AMERICAS, 26TH FLOOR

NEW YORK, NY   10020

REPRESENTING THE DEFENDANTS:

TOBEROFF & ASSOCIATES, P.C.

BY:   MARC TOBEROFF, ESQ.

2049 CENTURY PARK EAST, SUITE 2720

LOS ANGELES, CA   90067

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 4

APPEARANCES (Cont'd)

FOR THE WITNESS:

GANFER & SHORE, LLP

BY:   ARTHUR LIEBERMAN, ESQ.

360 LEXINGTON AVENUE, 14TH FLOOR

NEW YORK, NY   10017

REPRESENTING

ALSO PRESENT:

BRENT JORDAN, VIDEOGRAPHER

ELI BARD, MARVEL ENTERTAINMENT

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 5

I N D E X

EXAMINATION BY                                                    PAGE

MR. QUINN...................................................8

---------------------------------------------------------------

EXHIBITS

EXHIBIT DESCRIPTION                                              PAGE

Lee Exhibit 1

Affidavit of Stan Lee...................................23

Lee Exhibit 2

Affidavit of Millicent Shuriff..........................29

Lee Exhibit 3

Article by Nat Freedland, "Super Heroes With Super

Problems," NY Herald Tribune, 1/9/66....................39

Lee Exhibit 4

Reprint "Super-Heroes with Super Problems".............39

Lee Exhibit 5 - Retained by Counsel for Plaintiff

Jack Kirby Collector Fifty-Four........................49

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 6

EXHIBITS

EXHIBIT DESCRIPTION                                      PAGE

Lee Exhibit 6

Color Photocopy of "Fantastic Four"....................53

Lee Exhibit 7 - Retained by Counsel for Plaintiff

Book, Alter Ego.......................................62

Lee Exhibit 8

Deposition transcript of Stan Lee 11/18/03............102

Lee Exhibit 9

DVD titled Stan Lee Deposition Audio and Video Clips..103

Lee Exhibit 10

Collection of Audio CD labels from University of

Wyoming...............................................103

Lee Exhibit 11 - Retained by Counsel for Plaintiff

Book, Stan Lee Conversations, Edited by

Jeff McLaughlin.......................................121

Lee Exhibit 12 - Retained by Counsel for Plaintiff

Book, Origins of Marvel Comics, by Stan Lee...........120

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 39

S. LEE

it based on what Ditko had done?

A.    Oh, it would have had to have been based, I think, on what Ditko did because it would have to look like the Spider-Man.

Q.    The nerdy Spider-Man?

A.    I would think so.  Well, as Spider-Man he didn't look nerdy.  He looked nerdy as Peter Parker, yeah.

Q.    Fair enough.  Now, you mentioned that you would have meetings from time to time, I guess, plotting conferences.  Do you recall -- and let me mark as -- we'll mark actually two documents, although they're related, an article that was written by a man by the name of Nat Freedland in the New York Herald Tribune dated January 9th, 1966.

Do you recall the article?  I'm going to show you copies of it.

Let's mark this as Lee 3.

And Lee 4 --

(Lee Exhibit 3 marked for identification.)

(Lee Exhibit 4 marked for identification.)

A.    I hate that article.

Q.    I'm only going to ask you about one part of it.

In the reprint there's a reference, and I will

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 40

S. LEE

just read it into the record, that says that, "The plotting conference at the end of this article was for FF No. 55," FF would be the Fantastic Four?

A.    Right.

Q.    " -- No. 55 and issued just after the most prolific period of new character creation on the series."

I want you to take a look at the end of this article. Either one. Yeah, that's the one.

And specifically there is a paragraph that begins right here, Mr. Lee (pointing), that starts.

Lee arrives at his plots in sort of ESP sessions with the artists. He inserts the dialogue after the picture layout comes in and then it goes on. Here he is in action at a weekly Friday morning summit meeting with Jack "King" Kirby a veteran comic book artist, a man who created many of the visions of your childhood and mine.

Then it goes on for the next several paragraphs just to describe the plotting conference. And you can just take a quick look at that.

I want to just ask you whether, in fact, this is consistent with your recollection of how typically plotting conferences would be -- would go back in this

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 41

S. LEE

period in the 1960s.

A.    Well, pretty much, except this is written by somebody who I don't know why but he must have taken a very unfair dislike to Jack.  And it is so derogatory.  It's just terrible the way he pictured Jack in this article.  I can't tell you how badly I felt.

At any rate, this is the way the conferences went.  Very often Jack would say more than "mm-hmm."  You know, he might contribute something or he might say, "Stan, let's also do this or do that."  I mean, we had conversations.

But aside from that, yes, we would get together.  I would tell Jack the main idea that I wanted, and then we would talk about it, and we'd come up with something.

Q.    And that was fairly typical of how a plotting conference would go?

A.    Yeah, in that sense.  Yeah.

Q.    Now, during the period of time that you've been testifying about, did Marvel ever buy work that was created by one of the writers or freelancers on spec as opposed to having the material being part of an assignment that you would give him?

A.    Not that I remember.  Excuse me.  You know,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 62

S. LEE

robot or something.  But I felt I'm going to give Johnny Storm that power.  He can fly and burst into flame.

So we had a guy who can stretch, a girl who could be invisible, a man who was an ugly monster.  And again, to go against type, I thought I'd make the ugly monster kind of a funny guy.  He's pathetic, but he's also the comedy relief.  And he was always arguing and fighting with The Human Torch, who was always trying to give him a hot foot.  And he was always trying to grab him and throttle him.

They all loved each other, but they never got along well.  The more they fought amongst themselves, the more the readers loved it.  And that was the way I envisioned them.

(Lee Exhibit 7 marked for identification.)

Q.    Now I'm going to mark as Lee I believe it's 7, the next exhibit.

A.    There's no little blue thing.

Q.    I'll get you there.  It's a document that's actually a magazine entitled "Alter Ego, the Comic Book Artist Collection."

And are you familiar with the Alter Ego?

A.    Oh, yes.  It's a well known fanzine.

Q.    And is a man by the name of Roy Thomas --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 63

S. LEE

A.    Mm-hmm.

Q.    -- that is I guess involved in publishing the Alter Ego?

A.    Right.

Q.    Tell us who Mr. Thomas is.

A.    Well, Roy Thomas is somebody that I met years ago. He came up to the office for a job as a writer. And unlike a lot of comic book writers, he had been an English teacher in school. Even though he was a fan, that sort of set him a little above the others.

And I hired him, and he began to write a lot of our stories. And then when I left to become the publisher, I appointed him as Editor-in-Chief to replace me.

Q.    And that would have been somewhere around 1968?

A.    I guess.

Q.    And let me call your attention to an article that starts on page 32 of Stan Lee 7. And specifically this is an article entitled "A Fantastic First," authored by Roy Thomas.

And are you familiar with this article?

A.    I read it years ago.

Q.    And specifically it's a discussion about the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 64

S. LEE

creation of the Fantastic Four. And do you recall when you read it did you see anything that was wrong or incorrect in the article?

A.    I guess not. No.

Q.    There's a recreation of a note in the article that reads, and it says, "Hi Roy, I found the FF No. 1 synopsis."

A.    Oh, he must have been asking me if I could ever get it for him.

Q.    And then you go on. And that's your handwritten note? That's your signature?

A.    Oh, yes.

Q.    And you recall generally sending him this note?

A.    Yes.

Q.    And it goes on to say, "Will mail it off to you on Monday. It's not clear enough to fax." Then it says, "Sorry to say I have no other synopses on file. Never thought to save any. To this day I will never know what made me save FF No. 1 synopsis. I certainly never thought anyone would care about it later on."

And then across on the other page there is a document, a recreation of a document that says, "Synopsis the Fantastic Four July '61 No. 1."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 65

S. LEE

A.    Right.

Q.    And then it says, Story No. 1, Introduction, "Meet the Fantastic Four."

Is that the synopsis that you wrote back in 1961?

A.    This is the original synopsis that I wrote, and I gave it to Jack.  And of course, after that we discussed it, and we embellished it, and we made little changes.  But this was the beginning of it.  Yeah.

Q.    You mentioned in your note to Mr. Thomas that you hadn't saved others because you didn't think anyone would ever -- did you create other synopses from time to time?

A.    Oh, yeah.

Q.    In the article on the first page, and I will just read it to you, it says, Mr. Thomas writes, "Actually, this wasn't the first early 60s synopsis of Stan's I'd seen."

And it says, "See later part of the article. And when I had gone to work for him in July 1965, I had learned that he was increasingly dispensing with written synopses with Marvel artists, often working merely from brief conversations in person or over the phone."

A.    That's right.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 66

S. LEE

Q.    And is he referring to what you previously testified how the Marvel method came about?

A.    Yes.  And you see also these artists were so good, and I had worked with them for so long, that I knew what I could expect from them.  And I think they knew what I expected, and what I meant when I would give them a few words explaining a story.  It's like two comedians who had been a team on stage for a long time, and they could anticipate what each other was going to say.  That I couldn't have done this with an artist I just met, you know, that I had never worked with.  But I had worked with these people for so long.  We knew each other, and we could work where I'd give them a few words, and they could go ahead and come up with the written drawn story.

Q.    They would know what you wanted?

A.    Right.  And if they did anything a little different, it was usually an improvement, and I would change the dialogue and to suit what they had done.

MR. TOBEROFF:  I'm sorry.  Since I don't have the entire exhibit in front of me, just the article, I'd like to know the date of the magazine this appeared in and the issue number.

MR. QUINN:  Yeah.  Hold on one second.  I can tell you that, I think.  It's --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 67

S. LEE

MR. TOBEROFF:  If I could just look at Stan's.

MR. QUINN:  I will tell you.  It's Volume 2 No. 2, the Summer of 1998.

MR. TOBEROFF:  Thanks.

Q.    BY MR. QUINN:  Now looking at let's turn the page over to page 34.  And I'm going to read a portion of the article that's quoting you.  Mr. Thomas writes, "In answer to my earlier query, Stan sent a few comments along with the synopsis."

And then he quotes you, "Incidentally, I didn't discuss it with Jack first," referring to the synopsis.  "I wrote it first after telling Jack it was for him because I knew he was the best guy to draw it."  And you go on, "PS, as you are probably aware, the biggest change that was made after the synopsis was written was I decided to make the thing more sympathetic than originally intended."

A.    Right.

Q.    After giving -- "After seeing the way Jack drew him, I felt it was too obvious for such a ugly monstrous looking guy to act in a typically monstrous, menacing way."

Do you recall sending that note to Mr. Thomas?

A.    Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 68

S. LEE

Q.    And what were you referring to?

A.    Well, I was referring to what I mentioned before.  I would very often give a writer a synopsis or an oral synopsis what I wanted, and then later when the story was penciled, I would look at it and say, well, maybe we should change this or maybe make this character a little more that way.  And as I mentioned with The Thing, when I saw the way he looked, I thought it would be dull.  We got a guy who looks like a monster.  If he just acts like a monster, a dumb monster, it would be more interesting to give him a real personality.  And actually the guy -- some of you were too young to know him, but I thought of Jimmy Durante, an old comedian.

Q.    Sadly, I'm not too young to know him.

A.    I tried to have the thing talk a little like Jimmy Durante, have that kind of an explosive personality.  So...

Q.    The article on the next page, there's several numbered paragraphs.  And No. 5 talks about, and I will just read it into the record:

          Re the idea of Sue remaining permanently
          invisible and having to wear a humanoid face mask
          to be seen, well, Stan's note at the end of that
          paragraph indicates that he was already

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 69

S. LEE

rethinking that bit.  He asked Jack to talk with him about it because "maybe we'll change this gimmick somewhat."  Since the writer, editor, and artist probably discussed this point before Jack started drawing any number of other changes, including the notion of starting with a multi-page action sequence may have been suggested, then, as well by either man.  In any event, Sue gained control of her invisibility almost at once.

A.    That's right.

Q.    What were you referring to there?

A.    Well, I think either Jack or I or both of us, I don't know, must have thought at some point that she'd always be invisible, and she'd have to wear a mask or something so people would see her.

Q.    Right.

A.    And whether it was my idea or not, as I thought about it, I thought, that's a lousy idea.  So we decided to change it where she could look like a normal person and make herself invisible at will or make herself normal at will.

Q.    And who in this process had the ultimate decision to decide how that was going to come about?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 70

S. LEE

A.    Well, I did.  I was the editor.

Q.    And turning over to the next page of the article, up on the actually the crossover page 37, there's another document that's recreated that says, Synopsis for Fantastic -- Synopsis for Fantastic Four No. 8 "Prisoners of Puppetmaster."

Do you recognize that as another of the synopses you created in connection with Fantastic Four?

A.    I hadn't read that for so many years, but, yeah, that seems to be mine.  I didn't even know this was in here.  Wow.  Yeah.  See, instead of telling him page by page, I would say, Devote five pages to this, five pages to that, and three pages to that.  Yeah.

Q.    That was typical of how you were working utilizing the Marvel method?

A.    Yeah.  Sometimes I wouldn't even be this specific.  And I wouldn't have cared if Jack devoted, let's say, six pages to this and he changed that to three pages.  Just so he got the idea what I had this mind.  But he was good at making his own changes, and very often he'd improve them.  But, yeah, this is mine.

Q.    Let's go to another character, The Silver Surfer.

A.    Oh, yeah.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 103

S. LEE

A.    But we left out Thor for some reason.  I didn't remember Thor.

Q.    Well, you've testified about Thor here. That's probably good enough.

THE VIDEOGRAPHER:  I'm sorry, we're getting some audio interference.  Off video real quick.

MR. QUINN:  Yes.

THE VIDEOGRAPHER:  Off video at 12:14 p.m.

(Recess.)

THE VIDEOGRAPHER:  Back on video at 1:36 p.m.

Q.    BY MR. QUINN:  Good afternoon, Mr. Lee.

A.    Good afternoon.

(Lee Exhibit 9 marked for identification.)

(Lee Exhibit 10 marked for identification.)

Q.    We're going to mark, actually we have marked, a couple more exhibits.

As Lee Exhibit 9 we've marked some excerpts from audio and video clips that you're involved in, and we're going to be going to be listening and watching.

And Lee 10, a compendium of labels from the University of Wyoming American Heritage Center which labels various of these audio and videos indicating their dates and when they were done and with whom.

Now, and I believe did we give copies to Mr.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 104

S. LEE

Toberoff?  That's what those are.

Now, Mr. Lee, you have given a lot of interviews over the years on the subject matter of the comic book industry?

A.    Yes.

Q.    And also many speeches?

A.    Yes.

Q.    And you've been involved in seminars?

A.    Yes.

MR. TOBEROFF:  Excuse me, if I can interrupt. This disk which says Stanley Deposition, is this from the University of Wyoming?

MR. QUINN:  I believe the materials that are on that disk or most of them were from the University of Wyoming.

MR. TOBEROFF:  Okay.  And this is 10?

MR. QUINN:  That's 9.  The labels are 10.

MR. TOBEROFF:  Okay.

Q.    BY MR. QUINN:  And were some or many of those interviews and speeches and seminars recorded visually or sometimes on audio?

A.    Some were.  Yes.

Q.    And did there come a time when you donated copies of these videos and recordings to the University of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 105

S. LEE

Wyoming?

A.    Yes.  I had so much around the house I didn't know what to do with it, and they offered to keep my effects and archive what they have.

Q.    And was there a particular reason why you chose the University of Wyoming?

A.    Silly.  If I had thought about it, I would have gone to a closer college.  But they told me that Jack Benny had his archive there, and they would put mine next to his.  And I was a big fan of Jack Benny's, and I figured if they have him, it must be a good archive.

Q.    Now, what I would like to do is play some audio and video for you and ask you some questions about these particular excerpts.

I believe according to the Wyoming archives in 1966 you were interviewed by a man by the name of Jim Saunders on his Gabfest program on the radio.  And I want to play an excerpt from that audio, and we'll have some questions about that.

(Audio recording playing.)

Q.    Now, was that your voice?

A.    It seems to be.  Yes.

Q.    And was you describing -- what you told us was essentially the Marvel method in that recording?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 106

S. LEE

A.    I have to be honest.  I couldn't hear it very clearly, but I'm always talking about the Marvel method.

Q.    And what you did here, is that consistent with your recollection?

A.    Yeah.  Yes.

MR. TOBEROFF:  Could I just ask you?  Are you going to -- the copies here, Lee 10, you've given me copies of audio disks or video disks with labels, the packaging, packaging for the disk with a label.  This is how it appears at the University of Wyoming?

MR. QUINN:  These labels (indicating)?

MR. TOBEROFF:  Yeah.

MR. QUINN:  Yes.

MR. TOBEROFF:  And are you -- you played an excerpt from the first one in this package you've given me Barry Gray January 31st, 1966.  Is that what you just played?

MR. QUINN:  I think we just played one from 1966, a different one.  It was identified on the record, Gabfest.

MR. TOBEROFF:  So are you going to be producing the whole interview from which you just played this tiny excerpt?

MR. QUINN:  Yes, we would be producing that.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 107

S. LEE

MR. TOBEROFF:  Are you going to supply that to me today?

MR. QUINN:  I don't think we have it all here today, but we will get it to you promptly.

MR. TOBEROFF:  Okay.

MR. LIEBERMAN:  You have to sit where you can hear it.

THE WITNESS:  Yeah, I should.  I will move over there next time.

MR. TOBEROFF:  And Court Reporter, are you taking down the audio?

THE REPORTER:  No.  Mr. Quinn said he didn't need me to.

MR. TOBEROFF:  I think the court reporter should take down the audio because, you know, the disks you're supplying me with on the deposition to make the deposition understandable I think she should take down the audio that he's responding to.

MR. QUINN:  It's not a problem one way or the other, but it is on the disk.  So you can play it, and you will hear it.

MR. FLEISCHER:  It's not customary to have her --

MR. TOBEROFF:  Yes, but to have a --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 108

S. LEE

MR. QUINN:  It's not.  I think Mr. Fleischer is correct; it is not customary to do that.

But if you're able to take it down, do the best you can.  But that disk is the actual record.  It is, in fact, an exhibit to the deposition.  So she may or may not get it correctly given the fact that it's going to be difficult to hear.

MR. TOBEROFF:  I guess my question is the exhibit to the deposition is going to be that short little part of the interview that you just played or is it going to be the entire interview?

MR. QUINN:  To the deposition?  The exhibit is going to be what we have marked as the exhibit, which is the excerpts.

MR. TOBEROFF:  Okay.

Q.    BY MR. QUINN:  Okay.  Now, hopefully we'll have that and you'll hear it a little bit better.  We have another excerpt.  And this one I want to make sure that you can hear.

This is, according to the University of Wyoming archives, an interview you gave to a Mr. Mike O'Dell, WBAI-FM New York radio in March of 1967, you and also Jack Kirby.

Do you recall from time to time that you gave

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 109

S. LEE

interviews with both yourself and on some occasions Mr. Kirby?

A.    Yes.

Q.    Can we play that and let's make sure it's loud enough.

(Audio playing.  Reported as follows:)

UNIDENTIFIED VOICE:  Mr. Lee and Mr. Kirby are going to be asked some questions about their superheroes.  And I guess the first one would be addressed to Stan Lee, and it's the title of this program.  Stan will success spoil Spider-Man? Now that Captain America is back in the fight is there going to be talk about sending --

THE REPORTER:  I'm sorry, I can't take that.

Q.    Did you hear that clearly?

A.    I couldn't make out what the question was.  I could make out --

Q.    Let's play it again.

A.    Maybe if it is a little lower.  See, my problem is I have a hearing problem.  I can hear, but sometimes if the speech isn't clear, I can't make out the words.  It sounds like blah, blah, blah.  You know what I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 110

S. LEE

mean?

Q.    Yep.  I know What you mean exactly.

MR. TOBEROFF:  That sounds that for us also.

MR. QUINN:  Let's play it again.

(Audio playing.  Reported as follows:)

UNIDENTIFIED VOICE:  Mr. Lee and Mr. Kirby are going to be asked some questions about their superheroes.  And I guess the first one would be addressed to Stan Lee, and it's the title of this program.  Stan will success spoil Spider-Man?

THE WITNESS:  That's what I didn't -- Stan what?

MR. QUINN:  "Will success spoil Spider-Man?"

THE WITNESS:  Oh, will success spoil spider-man.

MR. QUINN:  Then there's a question directed to Mr. Kirby.  Play that.

(Audio recording playing.)

THE REPORTER:  I can't report that.

Q.    BY MR. QUINN:  Now, what I want to ask you is: Whose voice was that that we just heard?

A.    That was Jack Kirby's very distinctive voice.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 111

S. LEE

Q.    And when Mr. Kirby said in that interview we just heard that "The editor always has the last word on that," is that -- you agree with that?

A.    Was he referring to the question, Would success spoiled Spider-Man?

Q.    No, he was referring to whether Captain America was going to be sent to Viet Nam.

A.    I didn't hear that.  Well, yes.  I -- if Captain America had been in this country, and one of the writers decided, hey, I think I'd like to send him to Viet Nam and let him be part of the Vietnamese war or whatever, then I would have had to say okay.  Or I might have said to the writer, no, I'd rather keep him here.

Q.    So you agree with Mr. Kirby that the editor always has the last word on that?

A.    Yes.

MR. TOBEROFF:  Counsel, are you going to be providing me at this deposition with a copy of these excerpts?

MR. QUINN:  You have a copy of the excerpts in your hand.

MR. TOBEROFF:  They're all --

MR. QUINN:  We're going to listen to them all together.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 112

S. LEE

MR. TOBEROFF:  No, I'm talking about --

MS. SINGER:  They're all on that disk.

MR. TOBEROFF:  This is the Stanley deposition and the audios on this disk?

MS. SINGER:  It's the clip from the Stanley deposition.  It's all the audio and video.

MR. TOBEROFF:  That was unclear to me.  Thank you.

MR. QUINN:  Okay.  The next excerpt, according to the archives in Wyoming, involves questions that were being posed by an unknown French man to you.  And let's play that.  And I'm going to ask you some questions about that.

UNIDENTIFIED VOICE:  Again on this interview from this guy in France, my method for the construction of the script consists of discussing the story with the artist and having the artist do the penciled artwork on his own, drawing whatever he wants so long as it tells the story we've discussed.

I then would put in the dialogue and the captions and indicate where the dialogue and the captions -- where the dialogue balloons are to be

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 113

S. LEE

placed and where the captions go.  And then the script goes to the inker.  It's lettered, of course.  And I have it proofread and that's it.  I proofread it myself really if it's my own story.

THE WITNESS:  Wow.

Q.    BY MR. QUINN:  Is that consistent -- that's your voice, isn't it?

A.    What I could hear sounded right, the dialogue and the captions.  And it goes to the -- yeah, that was me.

Q.    And that was the method you used?

A.    Yeah.

Q.    Let's go to the next excerpt, this one from the archives is marked as NYU-TV and dated March 16th, 1972.

(Audio recording playing.  Reported as follows:)

UNIDENTIFIED PERSON:  Good morning.  I wonder if you could tell us who you are and what you do, for people that don't know.

STAN LEE:  My name is Stan Lee, and I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 114

S. LEE

produce comic books. There are 50 million reasons why we change artists. Sometimes we do it because the book isn't selling well to hype up sales. Sometimes we do it because an artist is simply tired of the job. He says, if you don't take me off this thing, I will go out of my skull, and I want to do something else.

Sometimes we do it it's like falling dominos. An artist is late or is sick, and his book is late, so we have to take an artist off this strip to do that book quickly to make the printing date. So we have to take another artist off this book to do this book which this artist came off. Now we have to take an artist off this book to do this book, and it goes right down the line.

Q.    BY MR. QUINN: Again, is that your voice we just heard?

A.    Yeah, that was definitely me.

Q.    And is that consistent with your recollection as to how you dealt with artists during that period of time?

A.    Well, I caught the falling dominos part. I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 115

S. LEE

really couldn't understand what came ahead of it, but the falling dominos was correct.

Q.    And what do you recollect about the falling dominos?

A.    Well, it was like if an artist couldn't do one book, you had to take another artist and give him that book, but then that artist had to be replaced on his book by another artist.  And you had to keep shuffling them around.

Q.    And who was in charge of shuffling them around?

A.    Well, I was.

Q.    Now we have a video.  This one is dated --

A.    That might be easier to hear.

Q.    We can hope.  This one is dated from January 12th, 2000.  And according to the archives in Wyoming, University of Wyoming, it is an interview video that was done and distributed by the, I guess, Disney Feature Animation.

Why don't we play this one.

(Video recording playing.  Reported as

follows:)

STAN LEE:  Years later, Jack came back.  I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 116

S. LEE

don't remember, I guess it was in the 50s.  And it was great.  And I would write scripts, and Jack would do the artwork.

But then, we were such a small company.  I was doing most of the writing, most of the books.  And let's say I would be writing a story for Jack and one of the other artists.  Steve Ditko might walk in or John Buscema or Romita or somebody, and they needed a script.  Now, these guys were all freelancers.  And if I didn't have a script for them, they weren't getting paid.  They were standing around with nothing to do.

So I hadn't finished typing the script for Kirby, and here is Romita who needs a script.  So I said, "Look, John.  I can't stop what I'm doing, but here's the story that I would like you to do.  I will tell it to you.  You draw it any way you want.  I will put in the dialogue and the captions later."  And he did.

Then Ditko would walk in, and I would say that to him, and Gil Kane, and whoever they were.

Now, it was done originally in order to save time.  It was sort of an emergency situation, but I found we're getting better stories and artwork

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 117

S. LEE

that way.  Because instead of me writing Panel 1, closeup, blah blah blah; Panel 2 a longshot from up above or whatever, I was leaving it to the artist.

And I was very lucky, because I had the kind of artists who were great visual storytellers, and I'm sure that they dreamed up shots that I never would have even thought of.  So when I got the artwork back from them, it was beautiful, because they had the freedom to tell the story in their own way visually.

Also, it was easier for me then to write the dialogue, because as you can imagine, if you're typing and looking at a blank sheet of paper, you're imagining what the people would say.  And you're imagining how they would look in the drawing.

But when you have the drawing in front of you, and when you see somebody drawn like, aagghh! (indicating), you know, you write "Aagghh!"  It makes it so obvious.

And what started as an emergency situation, it turned out, I thought, to be the best way to do the stories.  And that, after awhile, became

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 118

S. LEE

known as the Marvel Method.

And Jack Kirby and I would, let's say when we did the Fantastic Four, I first wrote a synopsis of what I thought the Fantastic Four should be, who the characters should be, what their personalities were. And I gave it to Jack, and then I told him what I thought the first story should be, how to open it, who the villain should be, and how we would end it. And that was all. Jack went home and drew the whole thing. I put the dialogue in.

And it turned out to be quite successful, and we worked that way for years.

Q.    BY MR. QUINN:  Now, did I correctly recognize that to be a slightly younger version of you?

A.    Yes.  Yes, I do.

Q.    Sorry, I didn't have my microphone on.

That was you up there on the screen we just saw?

A.    Yes, it was.

Q.    Couple years ago?

A.    Mm-hmm.

Q.    You haven't changed much.  And what you were

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 119

S. LEE

describing there was essentially the Marvel method?

A.    Yes.

Q.    And that what was -- and the Jack that was being referred to repeatedly was Jack Kirby?

A.    Jack Kirby.  Always.

Q.    Let me just play two more, couple of more clips or another clip from that same interview.

(Video recording playing.  Reported as follows:)

STAN LEE:  What input did I have in the visual development of the Marvel characters?  Well, I had a lot of input in one sense.  When I created the characters and the idea for the story, I would tell the artist how I wanted him to look.

Q.    BY MR. QUINN:  Now, is that consistent with your recollection of how you operated back in the 50s and 60s?

A.    Yes.

Q.    And one more clip from that same interview.

(Videorecording playing.  Reported as follows:)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 120

S. LEE

STAN LEE:  I never owned these characters.  I did them as a work for hire.  So the company owned the characters.

Q.    BY MR. QUINN:  And that's still consistent with what you believe today?

A.    Yes.

(Lee Exhibit 12 marked for identification.)

Q.    Now, I want to mark, and I think we may have already marked it this one -- I don't think we have a copy of, but I'm only going to ask you a couple of questions -- as Exhibit 12.  It's a book entitled, "Origins of Marvel Comics," by Stan Lee.

And could you tell us what that book is?

A.    At some time in the past Simon & Schuster wanted to do a book about Marvel, and they asked me to write it.  And they wanted to know how I came up with the ideas for the various characters, what the origins were of the characters.  So I turned out this book, and they sold it.

It did very well, actually.  They asked for a sequel.  I did "Son of Origins of Marvel."  Then I did one about the villains called, "Bring on the Bad Guys."  And

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 123

S. LEE

believe, or the excerpts that we're going to refer to, mr. Toberoff.

You can certainly utilize the one that's marked if you would like with regard to "The Origins of Marvel Comics," since I'm not going to ask him any questions about it beyond his identifying it.

Q.    BY MR. QUINN:  Let's take a look, if you would, at page 137.

A.    Which book?

Q.    Of the red book right there, the one that has your picture on the cover.

First of all, tell me what this book is.

A.    Oh, I have a fan whose been writing to me a lot who is a professor at some Canadian college.  And one day he asked if I would mind if he did a book.  He collected a lot of interviews I'd done, and would I mind if he put some of those interviews in book form, because he's expect -- as part of his job at the college, he's supposed to do books every so often.  And he chose this subject.  And I said, Sure, you know, be my guest.  And this is the book he did.

Q.    So this is a compendium of interviews that you gave over the course of I believe about 30 years?  Because it covers --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 124

S. LEE

A.    Yeah.

Q.    -- from 1972 to the late 90s.

A.    I never really looked at the years, but, yes, he took various things that he could find from my interviews and put them in a book.

Q.    Okay.  And let's look at I believe so we have that for the record this was a book that shows it has a copyright of 2007.  Is that about when he --

A.    Yeah, I guess so.

Q.    -- when it was distributed?  Okay.  Could you take a look at page 137 of this book.

A.    Right.

Q.    And this is an interview according to page 134 that you gave to Roy Thomas in 1998.  You've already told us who Mr. Thomas is.

And I want you to refer specifically to towards the bottom of page 137.  I'm just going to read an excerpt from what you are answering.  Mr. Thomas has asked you:

That would have been in very late '40 or early '41 in terms of when the issues left the office.  Less than a year later, you became the temporary Editor.  That lasted for decades.

Now skipping ahead to 1961, the story has

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 125

S. LEE

often been told of this infamous legendary golf game with Martin Goodman and DC President Jack Liebowitz in which Mr. Liebowitz bragged about the sales of Justice League of America. And Goodman came back and told you to start a superhero book.

Was that story really true?

A.   Yes, as far as I know it was. He told me he had been playing golf with -- I think it was Jack Leibowitz. Somebody who was high up at DC. And they told him that the Justice League was a big-selling book. So he came and said, Let's do one like it with a lot of heroes.

Q.   And you answer here:

That's absolutely true. He came in to see me one day and said, "I've been playing golf with Jack Leibowitz." They were pretty friendly. And he said, "Jack was telling me that the Justice League is selling very well and why don't you do a book about a group of superheroes. That's how we happened to do the Fantastic Four.

A.   That's right.

Q.   And that's consistent with your recollection and your prior testimony?

A.   Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 126

S. LEE

Q.    Now, could we now play from the University of Wyoming archives a portion of a talk according to the archives you gave at the Atlanta Fantasy Fair on July 26th, 1984.  I'm going to show you a clip from that.

(Video recording playing.  Reported as
follows:)


STAN LEE:  Martin came to me one day.  He
said, "You know, Stan, I was looking for sales
figures, and DC has a book called" -- I never can
remember is it Justice League or Justice Society,
but whatever it was.  He said, "It's selling
pretty well.  Maybe there's a market for a team
of superheroes.  Why don't you come up with one."
And I said okay.  But I didn't want just
another DC type, you know, of a team of
superheroes.  Not that there's anything wrong
with what they did.  So I had to do a team
because that's what the publisher wanted, but I
had to try to figure out a way to do it
differently.
And I figured, okay, what can we do that's
different.  Let's make a team that doesn't always
get along well together.  They fight amongst

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 127

S. LEE

themselves.  Let's have the girl be the fiancee of the hero, so it's not a case of she doesn't know his identity or anything.  They're about to get married, and in a later issue we'll have them get married and have a kid and all that.  And let's make one of the heroes an ugly guy, and that'd be a good thing.

And then I thought it would be really great to take a character from the 1930s and bring him back again.  That would be Human Torch, whom I had always loved.  But I decided to make him a teenager, which I had always hated, but I figured I'll make him act like a real teenager.  He's rotten and nasty and fights with The Thing.

A.    Boy, I was good.

Q.    That was you up there in that video?

A.    It sure was.

Q.    And who was the other guy?

A.    I don't know.

Q.    Was it Jim Shooter?

A.    Mm?

Q.    Was it Jim Shooter?

A.    It could have been.  I was looking at me.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 128

S. LEE

Q.   Could you identify or tell us who Jim Shooter --

A.   Jim Shooter was -- at some point he became Editor-in-Chief of Marvel, and he was there for a few years.  I forget the exact years.  Way after Roy Thomas.

Q.   Sometime after Roy Thomas?

A.   Right.  He was more recently the Editor-in-Chief.

Q.   And looking at that video excerpt again, that's consistent with your recollection as to how the Fantastic Four was created?

A.   Yes.

Q.   Next we have a video.  I guess, I think it's from the same interview we saw before.  This is the Disney Feature Animation interview, January 12th, 2000.  And this one relates to the Silver Surfer.

Can we play Silver Surfer.

(Video recording playing.  Reported as
follows:)

STAN LEE:  I remember saying to Jack, I want
to get a villain who is more powerful than any
other.  Let's call him Galactus, and let's make
him a demigod.  Because we already had Dr. Doom,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 129

S. LEE

who was the king of his own country.  How can you be bigger than that?  So we came up with Galactus.

Okay.  Now, I gave Jack a rough idea of the story.  He drew it and gave to me.  And when I looked at the artwork, there is some naked nut on a flying surfboard that I didn't (laughter.) I didn't know anything about him.

I said, "Who is this?"  So this is what made the work fun.  I never knew what to expect.

So Jack said, "Well, I figure anybody as powerful as Galactus who wants to destroy planets ought to have a herald who goes ahead of him and finds the planets."  I thought that was a great idea.  So normally Galactus would have just been a herald -- I mean, the Silver Surfer would say, Hey, Galactus, there's a planet.  Go get it, you know.  But there was something about the way that Jack drew the Silver Surfer in the artwork.  He had a certain nobility.  He was so great looking.

And I said you know, Jack, let's really -- because Jack figured we'd only use him once and throw him away.  I said, "I like this guy.  Let's use him."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 130

S. LEE

And little by little we started putting him in the stories.  And the next thing I knew I have him philosophizing and moralizing and all the corny bits of philosophy that I might have liked to find a way to get across started coming out of the Silver Surfer's mouth.

Q.    And once again, that's you up there --

A.    It certainly is.

Q.    -- on the screen?  And that's consistent with your recollection as to how Silver Surfer came about?

A.    Yes.

Q.    Let's go -- let's look back at this book again, the book which is "Stan Lee:  Conversations," and focus on page 96.  Now, this is from an interview that you gave to, according to page 85, an interview with Stan Lee by Leonard Pitts in 1981.

And this was one of the many interviews that you gave during this period of time?

A.    Mm-hmm.

Q.    Let's look at page 96.  And in the middle of the page Pitts is asking you about Spider-Man.  And you say:

I remember when I was a kid 10 years old. There was a pulp magazine called "The Spider,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 131

S. LEE

Master of Men."  And I always thought that title was so dramatic.  He was nothing like Spider-Man.  He was just a detective who wore a mask, and he went around punching people.  He wore a ring with a spider insignia so when he punched somebody it would leave a little mark of a spider on the person.  And I figured, gee, why not call the guy, my guy, Spider-Man.

And Pitts asked you, "Although Spider-Man is arguably the most popular single superhero in comics, legend has it that your publisher, Martin Goodman, took a lot of convincing when you wanted to try the character out."

And you say:  "He said it was the worst idea he ever heard.  He said people hate spiders, and it sounded too much like Superman, the idea of someone sticking to the wall and stuff.  He called it grotesque."

And do you recall that interview, and is that consistent with your recollection of the development of Spider-Man?

A.    Yes, it is.

Q.    We have another track that according to the University of Wyoming archives is a lecture that you gave

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 132

S. LEE

at Virginia Tech.  You'd get around back in those days.

A.    Yeah, I did.

Q.    A lecture that you gave at Virginia Tech on November 15th, 1977.  And I'd like to play that one for you as well.

(Video recording playing.  Reported as follows:)

STAN LEE:  One reason was as a kid I had loved a pulp magazine named The Spider.  I was very young and probably very stupid.  And to me, the most dramatic thing I could think of the cover of this magazine, the series of magazines, was like The Shadow but not as famous.

It said The Spider, and underneath it, Master of Men.  Somehow to me at the age of nine The Spider, Master of Men.  Oh, I would love to be -- who wouldn't want to be a Master of Men? And he had a ring, and he would punch a bad guy in the face.  And it had a little spider thing on the ring, and it would leave a spider mark on the guy's jaw.

I mean, you know, next to Shakespeare...

So when I was looking around for a

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 133

S. LEE

character, I felt, gee, I've always kind of liked The Spider. Why don't I get a guy and call him Spider-Man.

So I presented that to my publisher, who as you may have gathered by now is a model of erudition. And he said, "Nah, nobody likes spiders. That's no good."

So I said, "Well, it's not a case of people liking spiders. Remember there used to be a Green Hornet. I don't think people are turned on to hornets."

"Nah, I don't like it. Forget it."

Anyway, I couldn't get him to advance the funds to put out this book. So finally we introduced Spider-Man in another magazine called Amazing Adult Stories, which we were going to kill. The book was dying. And at the last issue of that book when we were about to kill it off, just to get it out of my system, I threw the Spider-Man story in.

We got our sales figures later, and it was the best-selling book we had ever had. We made it into a series. And a few months later my publisher came to me and he said, "You know,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 134

S. LEE

Stan?  Spider-Man, the best idea I ever had."

That was it.

Q.    BY MR. QUINN:  Again, that was you talking about the origins of Spider-man?

A.    That's right.

Q.    And that's consistent with your recollection as to how Spider-Man came about?

A.    More or less.  Yeah.

Q.    Let's talk about The Hulk.  You have an excerpt, according to the University of Wyoming archives, of a speech that you gave at the L.A. Festival of Books in May of 1998.  And this particular part focuses on creation of The Hulk.

(Video recording playing.  Reported as
follows:)

STAN LEE:  My publisher, at that time I
worked for a publisher, and he said, "Hey, come
up with something else."  So I was trying to
think what could be different than a guy who
bursts into flame and flies, an invisible
woman, an orange skin (unintelligible), and a guy
who stretches.

And I remembered I had always loved the