# EXHIBIT III

## DECLARATION OF STEPHEN GERBER

Stephen Gerber declares and states:

1.   I am the Plaintiff in this action.   This declaration is made for the purpose of opposing Defendants' Motion to Dismiss the Complaint.

2.   I have read the declaration of Donald S. Engel, counsel for Defendants.   In doing so, I discovered a number of inaccuracies.   I also found that the description of events and meaning of documents are inaccurate and taken out of context.   I hereby correct those inaccuracies which might be relevant to the pending motion.

3.   As alleged in my verified complaint, I created a comic book character known as "Howard the Duck" ("Howard").   I created Howard while a free lance writer and independent contractor.   Comic magazine stories featuring Howard were published and sold by the Marvel Comics Group, a division of Defendant Cadence Industries Corporation ("Marvel Comics").   The first issue of the "Howard the Duck" comic magazine series (herein "Howard stories"), is the January, 1976, issue.

Attached hereto and made a part hereof as Exhibit "1," is the cover and first page of that issue.

///

///

-1-

ME00709

4.    The introductory announcement in the left top corner of the cover page, identifies the first issue:

> BECAUSE YOU DEMANDED IT -- THE FABULOUS
> FIRST ISSUE OF MARVEL'S MOST SENSATIONAL
> NEW SUPER-STAR!

5.    As noted on page 1 at the bottom, (in the copyright recital), Marvel Comics correctly identifies itself as only the publisher of the Howard story.  There is no mention by Marvel Comics in the copyright recital, or anywhere else in the maga-zine, that one of its employees was the creator of Howard or that it had rights to exploit Howard or the Howard stories other than through publication of the comic magazine.

6.    Marvel Comics clearly admits on page 1 of the first issue (at the top) that I was the creator of the character Howard and the Howard stories.  There in bold type it states:

> CREATED AND WRITTEN BY STEVE GERBER

6.A.    Marvel Comics also publicly admitted in other comic magazines, that I was the author and creator of Howard. For example, I have attached as Exhibit "2" a true copy of the cover page of the October, 1977, issue of a comic magazine en-titled "Omega, the Unknown" which contains a blurb in the right bottom corner stating:

///

ME00710

"ANOTHER KIND OF HERO FROM STEVE

GERBER, AUTHOR OF HOWARD THE DUCK"


A.   I Was Not Marvel Comics' Employee.


7.   At the time I created Howard, I was not employed
by Marvel Comics or any of its predecessors.  I was a free lance
writer.  I submitted comic magazine stories, as an independent
contractor and free lance writer, to another publisher of comic
magazines besides Marvel Comics.  I was not under written con-
tract to any publisher.  The inference Mr. Engel tries to create
is erroneous.


8.   I was not provided nor did I use in my work any
facilities owned or leased by Marvel.  I wrote and worked at my
own residence.  I used my own materials and had no set work
schedule.  I worked when and as I alone wished.


9.   I had no set income.  I was not paid a salary at
that time by any publisher, including Marvel Comics.  If a
publisher decided to accept and publish my comic magazine stories,
I was paid on the basis of a certain dollar rate per published
page.  I believe that Marvel Comics initially paid me about
$15.00 per page for the Howard stories.  Marvel Comics and the
other publishers, to whom I submitted my comic stories, were free
to accept or reject them.  If my comic stories were rejected, I
was not paid.  I was also free to submit my comic stories, if
rejected, to other publishers.

ME00711

10.    Marvel Comics and the other publishers paid me on a per published page basis for my comic stories, if accepted, in an aggregate sum and without deduction of federal income tax withholding or other taxes.  That fact is corroborated by the check which Defendants have attached as Exhibit "C" to Mr. Engel's declaration.

11.    It was under those circumstances which I created Howard and wrote the Howard stories.

## B.  Howard's Creation.

12.    Mr. Engel's assertions, in paragraph 3 and 4 of his declaration, that Howard first appeared in the December 9, 1973, issue of a comic magazine entitled "Adventure into Fear" (cover and nine pages attached in Exhibit "A" to Mr. Engel's declaration) is inaccurate.  A duck is depicted at pages 18 and 26, and I did write the story, but that duck is unnamed.  That duck was a minor "walk on" character at best.

13.    This duck did appear in another story which I wrote on a free lance basis and at the standard compensation rate per published page.  I also created this duck and gave him the name "Howard" in that story:  This duck was a minor character and a mere proto-type of what ultimately became Howard.  He was killed off in my story, at the request of Marvel Comics, and for all purposes ended as a minor character in that series.

///

ME00712

14.   I do not believe that the $285.00 check, attached
as Exhibit "C" to Mr. Engel's declaration, was payment for any
comic story depicting a duck.   According to my recollection, I
would have written the story for the December, 1973, issue of
"Adventure into Fear" in August or September of that year.
Consequently, I could not have been paid the per published page
rate until after the story was written and accepted.

15.   During 1975 I proposed to Marvel Comics and Marvel
Comics expressed interest in acquiring from me and publishing a
comic magazine story series featuring an expanded and more
developed version of the earlier proto-type duck, the minor walk
on character who was killed off two years earlier.   I already was
aware of the favorable public reaction to the earlier character
and pointed out to Marvel Comics that I already had been consider-
ing creating and writing stories about an expanded and much more
sophisticated duck character.   Marvel Comics requested that I
offer to it, should I undertake such a creation, that development
of the proto-type character and script material for a series
featuring him as the major character.

16.   Later in 1975, in my own home and at my own
schedule, I developed and expanded the proto-type and created the
much more sophisticated character Howard.   I also wrote story
material for a series featuring Howard as the major character.
These stories had a format, setting, characters, themes and plots
unique to my new character, Howard, and entirely different than
that depicted in "Adventure into Fear."

ME00713

## C.  Marvel Was Granted Only A
## Limited License to Publish, Nothing More.

17.   I first offered to Marvel Comics, under the circumstances previously explained, only the right to publish Howard stories in comic magazine form.  Marvel Comics accepted and published my Howard stories, under such circumstances, first as separate stories and then in a comic magazine series, the first issue of which appeared in January, 1976 (cover and first page attached as Exhibit "1").  I solely and only agreed to allow Marvel Comics the limited right to publish the Howard stories in comic magazine form.  I was paid by Marvel Comics for the right to publish the Howard stories, as previously explained, on a per page basis (approximately $15.00).  To the best of my knowledge, the total sum paid by Marvel Comics for such right to publish over 31 Howard stories written by me over a two year period did not exceed $14,000.

18.   I was not asked to nor did I sign a written contract.  Marvel Comics did not ask me, nor did I agree, to assign or transfer rights to use or depict Howard or the Howard stories in any other medium, means, or manner.  All of such rights were reserved by me.  To be sure, I did not receive from Marvel Comics additional compensation for further rights.  I only received the standard industry per page rates paid for publi-cation of comic stories.

///
///

ME00714

19.   I was not told, orally or in writing, that Marvel Comics contended or claimed rights to use or depict Howard in any other media, means or manner.

D.   The Legal Copyright, Said Marvel Comics,
     Was Obtained for My Protection.

20.   To the contrary, I was told in substance on a number of occasions by Defendant Stan Lee, an executive employee of Marvel Comics, and James Galton, president of Marvel Comics, that my rights and interests in Howard and the Howard stories were being protected by Marvel Comics and that no further use would be made of either by anyone without my knowledge and consent and participation.

21.   For example, Defendant Lee often stated to me in essence, when I would ask for assurances, that Howard and the Howard stories were being protected by copyright.  Mr. Lee pro-mised that Marvel Comics would protect the legal copyright and would not sell or use Howard or the stories in any other way without my knowledge and participation and "without taking care of me."  As another example, I asked Mr. Galton on one occasion, out of concern over whether my character Howard and the Howard stories were being adequately protected, to transfer the copy-right to my name.  Mr. Galton stated, in substance, that there was no need to do that because Howard and the Howard stories were being protected for me by Marvel Comics and I would have to
///

ME00715

1    consent to and be paid additional compensation for any other

2    usage or exploitation by anyone.

3

4       22.   The fact that Marvel Comics did not even believe

5    that it had rights to Howard or the Howard stories, other than

6    publication of comic magazines, without my consent and additional

7    compensation is clearly demonstrated by its own Exhibit "D" to

8    Mr. Engel's declaration:  a written agreement between Marvel

9    Comics and myself dated March 18, 1977, over a year after Howard's

10    creation.

11

12       E.  Marvel Comics Sought My Consent and Agreement

13         To Depict Howard in a Newspaper Comic Strip.

14

15       23.   By virtue of Exhibit "D", Marvel Comics sought out

16    and obtained my consent to utilize Howard and my Howard stories

17    in a daily and Sunday syndicated newspaper comic strip.  It was

18    agreed by both parties that my Howard stories (including any

19    further Howard stories which I desired to write) would be adapted,

20    with some minor modifications, for the format of a newspaper

21    comic strip.  Marvel Comics agreed to pay, as consideration for

22    such other use of my Howard stories, one-third of its share of

23    income derived from the newspaper syndication.  In the event that

24    Marvel Comics desired to license or use Howard or the Howard

25    stories in other ways, the agreement required that Marvel Comics

26    pay me one-third of "the net receipts" derived therefrom.

27    ///

28    ///

**ME00716**

24.    Mr. Engel's single quotation of "selected clauses . . . particularly pertinent" from the agreement (Engel, declaration, paragraph 7) omits the most important provisions and obscures the true context thereof.

The agreement, therefore, further provides in pertinent part:

> "In the event that Marvel sells or licenses
> the Material for uses other than the daily
> and Sunday comic strip, then Marvel shall
> pay to you one third of the net receipts
> (less any applicable commissions or expenses)
> it receives from such sale and/or license."
>
> (Balance of paragraph 7 omitted
> by Mr. Engel.)

25.    To confirm my independent contractor relationship with Marvel Comics (as with other publishers), the March, 1977 agreement provided:

> "4.   It is understood that you will supply
> said Material to Marvel at your own cost and
> expense utilizing your own tools, furnishing
> your own place of work and utilizing your
> own assistance."

///
///

ME00717

26.   Marvel Comics never did license or sell Howard or my Howard stories to other markets or for other uses, during the term of the March, 1977 agreement, nor was I paid any compensation therefor.

27.   As reflected in paragraph 10 of the March, 1977 agreement, the agreement was terminable at will by either party by written notice.

28.   It is undisputed, as reflected in Exhibits "G", "H" and "I" to Mr. Engel's declaration, that the March, 1977 agreement was terminated by both parties by written notice.  As a result of that termination, it is undisputed that whatever limited license of rights to market Howard and my Howard stories in other ways which may have been granted thereby was terminated and all of such rights reverted to me.

29.   That such occurred upon termination is clear from the language of the termination notices.  For example, the March 21, 1978, telegram from my then attorney to Marvel Comics (Exh. "G") expressly states:

> ". . . [U]pon the effective date of any such
> termination, all of your rights in and to
> the characters contained in said comic
> strips shall terminate, except for any
> rights under the contract to continue to

///

ME00718

1    exploit the script material provided to

2    you during the term of the agreement."

3

4    As a further example, I wrote to Mr. Galton (president

5    of Marvel Comics) on April 5, 1978:

6

7    "Please be advised that under the terms

8    of our said March 18, 1977 agreement, as

9    of April 27, 1978, Marvel Comics . . .

10   rights to the characters contained in the

11   comic strip "Howard the Duck" shall terminate

12   and Marvel shall have no further rights

13   therein or with respect thereto."

14

15   ". . . Any use after April 27, 1978 by

16   Marvel or under its authority of any of

17   said rights without my written consent

18   first had and obtained shall constitute

19   an intentional infringement of my rights

20   therein and thereto."

21

22   30.   Mr. Galton himself, president of Marvel Comics,

23   attempted to terminate the March 18, 1977 newspaper syndication

24   agreement on March 27, 1978, and before I terminated.   Defendant

25   Stan Lee also had attempted to terminate that agreement by tele-

26   phone on an earlier date.

27   ///

28   ///

ME00719

31.   Shortly after the termination of the newspaper syndication agreement, Marvel Comics discontinued marketing Howard and the Howard stories in syndicated newspaper strips. Marvel Comics did not attempt, to my knowledge, to license or sell or utilize Howard and the Howard stories in any other way under that agreement.  Marvel Comics did not respond to my letter of April 5 (Exh. "H" to Mr. Engel's declaration).

F.   The Other Supposed Agreements Attached to the Moving Papers are Irrelevant and Taken Out of Context.

32.   The other two agreements attached by Mr. Engel to his declaration, as Exhibits "E" and "F", could not have anything whatsoever to do with any supposed transfer of rights to Howard or to the Howard stories.  The agreements relate to entirely different matters.

33.   The October 7, 1977, agreement, (Exh. "E") could be interpreted as an employment agreement.  That agreement, however, was executed over two years after I expanded and created Howard and wrote the initial Howard stories.  That agreement, however, pertained only to whatever new creations which I would write during the term.  The agreement did not relate to characters and stories which I had already created prior to the effective date (October 7, 1977).

34.   The initial term of that agreement, as set forth in paragraph 2 thereof, was for one year "commencing November 1,

ME00720

1977 and ending October 31, 1978."  Marvel Comics moreover admits,
as reflected in Exhibit "I" to Mr. Engel's declaration, that it
unilaterally terminated the agreement before expiration on May 2,
1978.

35.   The selected quotations from that agreement,
recited in paragraph 8 of Mr. Engel's declaration (pp. 23-25),
refer exclusively to any new characters or series which I would
write or create during my employment period and not to Howard or
the Howard stories, with the exception of paragraph 4(c) which
Mr. Engel only quotes in part.

36.   Paragraph 4(c) thereof does not purport to convey
or confer any rights to Howard or the Howard stories.  To the
contrary, it is clear that paragraph 4(c) merely gave me the
choice as to whether I would continue to write or edit stories
featuring Howard and required that I be consulted in the choice
of other writers or editors in the event that I did not wish to
continue.

37.   The segment of paragraph 4(c) which refers to the
licensing of Howard for "film, television or motion picture
adaptation," quoted in part by Mr. Engel, is merely an exception
to my exclusive employment with Marvel Comics.  That segment, the
interlineations to which are in my own hand, simply allowed me to
work directly for and accept payment from a producer of a pro-
duction based on Howard in a visual medium; and requires Marvel
Comics to recommend that such a producer employ me regardless

ME00721

1   of my then exclusive employment relationship with Marvel Comics

2   described in paragraph 4(a) and (d).

3

4       37.A.  The intent and purport of that segment, expressed

5   by its own language, is that Marvel Comics desired to preserve

6   "the integrity of the licensed character" to protect against

7   damage of its limited license to publish Howard stories in comic

8   magazine form; and my desire to write and consult in connection

9   with any production based on Howard in a visual medium to protect

10   "the integrity of the" character Howard which I licensed on a

11   limited basis to Marvel Comics.

12

13       That segment is quoted hereafter in its entirety, with

14   the handwritten portion underlined:

15

16               "In the event of a license for a film,

17               television or motion picture adaptation

18               of HOWARD THE DUCK, Marvel agrees to

19               <u>recommend</u> to such producer that employee

20               and employee only be used by such

21               producer as script and/or story con-

22               sultant to preserve the integrity of

23               the licensed character.  <u>Employee may</u>

24               <u>accept payment for such services from</u>

25               <u>producer</u>."

26   ///

27   ///

28   ///

ME00722

38.   The express terms of that agreement, itself, confirm that it could in no way constitute a grant or conveyance of any rights to Howard or the Howard stories, created and written by me over two years earlier.  Paragraph 17 of the employment agreement expressly states that it does not "alters [sic.] supercedes [sic.], or nullifies [sic.] any . . . previous agreement between Marvel" and me.

39.   The purported Howard button "licensing" agreement between me and Marvel Comics of March 12 of 1976, attached as Exhibit "F" to Mr. Engel's declaration, is irrelevant and was not a grant by me to Marvel Comics of any right to Howard or the Howard stories.  The transaction had nothing to do with that.

40.   Admissible evidence will show that the purported licensing agreement was executed in connection with mail order sales by me of "Howard the Duck for President" buttons with the endorsement and promotion of Marvel Comics.  I desired to sell buttons depicting Howard as a candidate for president and to use the name of Marvel Comics as an endorsement of the button.  I also wanted to use the button design as a thematic and artistic element of other Howard stories.  I felt that lending Marvel Comics' name to the button, using the button design as an element of comic book stories, and obtaining free national advertising from Marvel Comics in its comic magazines would enhance sales of

///

///

///

ME00723

the button.  I therefore went and approached Marvel Comics.  I was informed that I would have to sign an agreement and pay Marvel Comics a modest royalty (5% of gross sales) for use of its name in connection with the button, for advertising and promotion of the button in its comic magazines, and for permission to make artistic use of the button design as a literary and thematic element in other Howard stories.  I was told also by Marvel Comics, in connection with that transaction, that the agreement and use of Marvel Comics' name on the button would avoid legal problems with the copyright and would ensure continued protection of my character under the copyright.  The agreement, for the most part, was represented by Marvel Comics also as legal protection for me and my character.

41.  In connection with that transaction, I was permitted to use the button design as an artistic and literary element on the interior front and back covers and the exterior back cover of the "Marvel Treasury Edition Featuring Howard the Duck" comic magazine, dated 1976.

42.  I was not asked nor did I agree to transfer any rights to Howard or the Howard stories to Marvel Comics in connection with that transaction.  Nowhere is this subject mentioned in the documents attached to Mr. Engel's declaration. I also refused to pay any advance monies to Marvel Comics in

///

///

///

ME00724

connection with that transaction.  I also refused to pay any of
the standard advance monies to Marvel Comics, as advance against
royalty or as a minimum royalty or otherwise, which is demon-
strated by the deletion of the boilerplate form paragraph 2(b) of
Exhibit "F" to Mr. Engel's declaration.

43.   I merely agreed to pay a modest royalty (5% of
gross sales) to Marvel Comics, and agreed to the royalty for the
aforementioned substantive promotional benefits and to ensure
continued copyright protection for Howard and my Howard stories.
I was not financially able to obtain legal counsel at that time
and was motivated to pay a small royalty partially out of concern
over Marvel Comics starting a dispute over use of its corporate
name in connection with the button.

44.   The one agreement which Marvel Comics prepared
which might constitute an attempt to try and convince me to
transfer other rights to Howard and the Howard stories, I never
signed.  Attached hereto and made a part hereof as Exhibit "3" is
a copy of that proposed agreement.

G.   Defendants Have Already Infringed My Copyright.

45.   Mr. Engel states in paragraph five of his declara-
tion that Howard and certain of the Howard stories appeared in
other comic magazines published by Marvel Comics and attaches
///
///

ME00725

representative copyright certificates as Exhibit "B". I am aware
that Howard and the Howard stories did appear in comic magazines
published by Marvel Comics but I am not aware of any use or
publication of Howard and the Howard stories by Marvel Comics
(except for those unlawful uses which are the basis for my claim
against Marvel Comics and the other Defendants for copyright
infringement), which violate the limited license granted to
Marvel Comics to publish Howard and my Howard stories in comic
magazine form. If Marvel Comics published Howard and the Howard
stories unlawfully and in violation of its limited license, it
was done without my knowledge or consent. I have never seen or
heard of the copyright certificates attached as Exhibit "B". I
do not know what "special publications" Mr. Engel is referring
to in paragraph 5.

46. When I first learned that Marvel Comics may be
attempting to license or sell Howard and the Howard stories
without my consent, for productions based on Howard and the
Howard stories in visual and aural media, I contacted and told
Marvel Comics it had no right to do so. I attempted in good
faith to open negotiations with Marvel Comics to try and license
///
///
///
///
///
///
///

ME00726

to it my rights to Howard and the Howard stories.  Marvel Comics
flatly refused to negotiate or agree to anything.  As a result I
then engaged my attorneys, who wrote a cease and desist letter on
June 30, 1980, which is attached as Exhibit "J" to Mr. Engel's
declaration.

47.   I have since learned that Marvel Comics has
already infringed my equitable copyright in and to the character
Howard and the Howard stories and has violated the terms of its
limited license to publish Howard and the Howard stories in comic
magazine form.  Attached hereto, as Exhibit "4", is a tape
recording which I obtained of excerpts of radio programs based on
Howard and the Howard stories produced by Defendants Selluloid
Productions, Inc., and its principals.

48.   I have also learned that Defendant Marvel Pro-
ductions, Inc., has already had written materials and artistic
drawings prepared by various artists for the purpose of unlaw-
///
///
///
///
///
///
///
///
///
///

ME00727

fully producing and selling an animated television episodic

series based on Howard in outright violation of my equitable

copyright. The latter is the subject of deposition testimony

given in this action by writer Gary Greenfield and of various

written materials, which are referred to in the Declaration of

Henry W. Holmes, Jr., filed together with my Declaration in

opposition to the pending motion.


49. I look to this Court for relief.


I DECLARE UNDER PENALTY OF PERJURY THAT THE

FOREGOING IS TRUE AND CORRECT AND THAT

THIS DECLARATION WAS EXECUTED AT LOS ANGELES,

CALIFORNIA, ON DECEMBER 24, 1980.


STEPHEN GERBER

# MARVEL COMICS GROUP

**James Shooter**
Editor-In-Chief

May 10, 1978

Dear Employees,

Recently the copyright laws were changed to provide more protection for artists and writers who are the sole creators of a work. The new law makes a very clear distinction between artists who create and produce a piece of art or writing on their own, and those who do work under supervision, as part of a collective work or series, or as one of many contributors to a work. Creative people who fall in the latter category are considered employees-for-hire. All creative people at Marvel are employed on that basis.

In order to insure our continued ownership of the material we produce and publish, and to clearly define our position under the new law, we have drawn up a work-order agreement (enclosed).

Please write in the date, your name and address at the top in the appropriate blanks, sign at the bottom under "supplier", and return as soon as possible.

This agreement does not change any of Marvel's policies toward freelance creative people. It is only intended to restate the relationship that has always existed between Marvel and its freelance creative staff. Our policies of returning artwork, paying reprint money, and providing insurance are exactly the same as before.

Please feel free to consult a lawyer, and/or call me to discuss this.

Sincerely,

Jim Shooter

EXHIBIT 3

Marvel Comics Group
575 Madison Avenue

CADENCE

ME00753

AGREEMENT made this      day of                , 19   , by and between
residing at
(herein "Supplier") and the Marvel Comics Group, a division of Cadence Industries Corporation, 575 Madison Avenue, New York, New York  10022 (herein "Marvel").

MARVEL  is in the business of publishing comic and other magazines known as the Marvel Comics Group, and  SUPPLIER  wishes to have  MARVEL  order or commission either written material or art work as a contribution to the collective work known as the Marvel Comics Group. MARVEL has informed  SUPPLIER  that  MARVEL  only orders or commissions such written material or art work on an employee-for-hire basis.

THEREFORE,  the parties agree as follows:

In consideration of  MARVEL's  commissioning and ordering from  SUPPLIER  written material or art work and paying therefor, SUPPLIER  acknowledges, agrees and confirms that any and all work, writing, art work material or services (the "Work") which have been or are in the future created, prepared or performed by  SUPPLIER for the Marvel Comics Group have been and will be specially ordered or commissioned for use as a contribution to a collective work and that as such Work was and is expressly agreed to be considered a work made for hire.

SUPPLIER  expressly grants to  MARVEL  forever all rights of any kind and nature in and to the Work, the right to use  SUP-PLIER's  name in connection therewith and agrees that MARVEL  is the sole and exclusive copyright proprietor thereof having all rights of ownership therein.  SUPPLIER  agrees not to contest  MARVEL's  exclusive, complete and unrestricted ownership in and to the Work.

This Agreement shall be binding upon and inure to the benfit of the parties hereto and their respective heirs, successors, administrators and assigns.

IN  WITNESS  WHEREOF,  the parties hereto have executed this Agreement as of the date first above written.


SUPPLIER                          MARVEL  COMICS  GROUP,  a division
                                 of Cadence Industries Corporation



by_____       by_____


**ME00754**