# EXHIBIT J

Confidential Pursuant to Protective Order

Page 150

1                UNITED STATES DISTRICT COURT
2                SOUTHERN DISTRICT OF NEW YORK
3
4    MARVEL WORLDWIDE, INC.,      )
     MARVEL CHARACTERS, INC.,     )
5    and MVL RIGHTS, LLC,         )
                                  )
6           Plaintiffs,           )
                                  )
7     vs.                         )Case No. 10-141-CMKF
                                  )
8    LISA R. KIRBY, BARBARA J.    )
     KIRBY, NEAL L. KIRBY and     )
9    SUSAN N. KIRBY,              )
                                  )
10          Defendants.           )
     _____)
11
12
13
14
15        CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
16                     VOLUME II
17               DEPOSITION OF STAN LEE
18               LOS ANGELES, CALIFORNIA
19            WEDNESDAY, DECEMBER 8, 2010
20
21
22
23
     REPORTED BY:
24   Alejandria E. Kate
     CSR NO. 11897, HI 448, RPR, CLR
25   JOB NO.:  35197

Confidential Pursuant to Protective Order

Page 151

1

2

3

4

5                    DECEMBER 8, 2010

6                      9:11 A.M.

7

8

9        Deposition of STAN LEE, held at the offices

10       of VENABLE LLP, 2049 Century Park East, Suite

11       2100, Los Angeles, California, pursuant to

12       agreement before Alejandria E. Kate, a

13       Registered Professional Reporter and

14       Certified Shorthand Reporter of the State of

15       California.

16

17

18

19

20

21

22

23

24

25

Confidential Pursuant to Protective Order

1    A P P E A R A N C E S:
2
3       ATTORNEY FOR THE PLAINTIFFS:
4           WEIL, GOTSHAL & MANGES
            BY:  JAMES W. QUINN, ESQ.
5                RANDI W. SINGER, ESQ.
            767 Fifth Avenue
6           New York, New York  10153
7           -AND-
8           HAYNES AND BOONE
            BY:  DAVID FLEISCHER, ESQ.
9           1221 Avenue of the Americas
            26th Floor
10          New York, New York  10020
11
12      ATTORNEY FOR THE DEFENDANTS:
13          TOBEROFF & ASSOCIATES
            BY:  MARC TOBEROFF, ESQ.
14               NICHOLAS C. WILLIAMSON, ESQ.
                 JEFFREY R. RHOADS, ESQ. (Page 200)
15          2049 Century Park East
            Suite 2720
16          Los Angeles, California  90067
17
18      FOR THE WITNESS:
19          GANFER & SHORE
            BY:  ARTHUR LIEBERMAN, ESQ.
20               (APPEARANCE VIA VIDEO CONFERENCE)
            360 Lexington Avenue
21          14th Floor
            New York, NY  10017
22
23      ALSO PRESENT:
24          ELI BARD, Marvel Entertainment
25

Confidential Pursuant to Protective Order

Page 194

1          MR. TOBEROFF:  Paragraph 4-G.

2      Q.    So pursuant to this subparagraph, in addition

3  to your stock options and your million-dollar salary,

4  you are to receive 125,000 per year to author the

5  syndicated Spider-Man newspaper strip; is that correct?

6      A.    Well, that's what this says, yeah.

7      Q.    And do you receive money from Marvel to author

8  the Spider-Man newspaper strip?

9      A.    I don't think I'm getting that anymore.

10     Q.    Were you being paid 125,000 a year to author

11  the Spider-Man strip?

12     A.    Well, I must have been if it says it here.

13     Q.    Okay.  It also says, in Paragraph 4-G, that

14  you had been -- you had been receiving, prior to the

15  1998 agreement, 125,000 a year.

16          When did you first start receiving that

17  amount?

18     A.    I don't remember.

19     Q.    Do you know whether it was a few years before

20  or one year before?

21     A.    No.

22     Q.    But you did receive the amount prior to the

23  1998 agreement?

24     A.    Well, I must have if it says it here.

25     Q.    Okay.

Confidential Pursuant to Protective Order

Page 254

1            (Whereupon, Defendants' Exhibit Number

2            LEE 23 was marked for identification.)

3            MR. TOBEROFF:  Exhibit 23 is an amendment

4    dated as of May 2, 2008 to the agreement dated June 11,

5    2007, called a "Cooperation Agreement," between Marvel

6    Entertainment and Stan Lee.  Bates Numbers 16141 to 42.

7        Q.   Can you please turn to Page 2 of this

8    document, Mr. Lee.  Just turn to Page 2.

9        A.   Page 2?

10       Q.   Yes.

11       A.   That's my signature.

12       Q.   That was my -- how did you guess that was my

13   question.  Thank you.  You're a quick study.

14            Now, let's turn back to what was marked as

15   Exhibit 1 in your prior deposition.  It's your

16   June 11th, 2007, affidavit.

17            MR. QUINN:  It's in here somewhere.  I'll find

18   it.

19            THE WITNESS:  Oh.  Thanks, Jim.

20   BY MR. TOBEROFF:

21       Q.   Putting the agreement aside for a second.

22            When did you first start working for Marvel

23   years ago?

24       A.   Before it was Marvel.

25       Q.   Before it was Marvel.

Confidential Pursuant to Protective Order

Page 255

1        I know Marvel has had various names like

2   Timely and other names.

3        A.   Yeah.  When I first really started, I was

4   about 17 or 18 years old.  So -- what's 17 from -- 22

5   and 17 is, what 32?  35?

6        Q.   39.

7        A.   39.  Somewhere around there.  1930s.

8        Q.   Does -- does 1940 ring a bell?

9        A.   Maybe, yeah.

10        Q.   And at the end of 1941, you were promoted to

11   the position of editorial director?

12        A.   Right.

13        Q.   Please turn to Paragraph 8 of the affidavit.

14        MR. QUINN:  On Page 5.

15        THE WITNESS:  Got it.  That's the easiest

16   part, finding the numbers.

17   BY MR. TOBEROFF:

18        Q.   If you go down three-quarters of the way down

19   the page, in that paragraph, you see the sentence that

20   reads, "Although I had no written agreement with

21   Timely, it was our mutual understanding and agreement

22   throughout the 23-year period."

23        Do you see that sentence?

24        A.   Yes.  That my creative contributions were made

25   as a result of my having been commissioned by Timely to

Confidential Pursuant to Protective Order

1  create the works and that Timely would, therefore, own

2  whatever rights existed to any materials I created or

3  co-created for publication by it, including any new

4  characters that I created for publication by Timely and

5  that I had no right to claim" --

6      Q.   You don't have to read the whole sentence.

7          MR. QUINN:  Well, it's good for the record.

8          THE WITNESS:  Yeah.  That was for the record.

9          MR. TOBEROFF:  You keep saying the document

10 speaks for itself.

11     Q.   In any event, what I was getting at here is

12 it's correct that you had no written agreement with

13 Marvel for at least the first 23 years you worked

14 there; is that correct?

15     A.   You mean I had no agreement before this?

16     Q.   You had no written agreement with Marvel for

17 at least the first 23 years that you worked there?

18     A.   I don't know.  How do you know?

19     Q.   Well, we previously looked at an agreement --

20 a '72 agreement with Cadence, and no earlier agreement

21 has been produced.

22          And I asked you whether you had an earlier

23 agreement with Cadence or Marvel.

24     A.   Okay.

25     Q.   So it could have been -- actually, since you

Confidential Pursuant to Protective Order

Page 257

1    started working at Marvel in about 1940, 1972, it could

2    have been longer than 23 years, it could have been 32

3    years that you had no written agreement; is that

4    correct?

5        A.   I'm trying to remember.  I don't know if I had

6    a contract when Cadence took over.  If they gave me a

7    contract.  There was a contract because -- am I allowed

8    to say this?

9        Q.   Yes.

10           MR. QUINN:  Whatever your testimony is.

11           THE WITNESS:  There was a contract because

12   Cadence wouldn't buy the company unless Martin had me

13   under contract.

14           And I remember him saying to me, "Stan, you've

15   got to sign a contract with me or I won't be able to

16   sell the company."

17           And then he sold the company, so I assume I --

18   I know I signed something.  Now, I don't have a copy of

19   it.  I don't know where it is or what it is.  But I

20   know something was signed in order for Cadence to buy

21   the company.

22       Q.   So based on that, is it your belief that the

23   first agreement, written agreement you had with Marvel,

24   was shortly before Cadence bought the company?

25       A.   I would think so, yes.

Confidential Pursuant to Protective Order

Page 275

1    of the work, using a rubber stamp and ink pad."

2       A.    Uh-huh.

3       Q.    Do you believe that Millie prepared the text

4    on these rubber stamps?

5       A.    That she prepared what?

6       Q.    Did Millie prepare the text on the rubber

7    stamps?

8       A.    I have no idea who did what.

9       Q.    Do you believe that Marvel would have a

10   bookkeeper prepare the text on its rubber stamps?

11      A.    I don't know.

12      Q.    You did not prepare --

13      A.    Oh, no.

14      Q.    -- the language on Marvel's rubber stamps, did

15   you?

16      A.    I had nothing to do with it.

17      Q.    Were you involved with -- in the period 1958

18   to 1963, were you in charge of payroll at Marvel?

19      A.    I was never in charge of payroll.  I was just

20   in charge of the artists and the writers, the letters,

21   the inkers and the colorists.  The people who did the

22   work.

23            Somewhere there was a door, and behind that

24   door were a lot of people at desks with adding

25   machines.  And that was the payroll or the bookkeeping

Confidential Pursuant to Protective Order

Page  276

1    department.   And I have no idea what went on there.

2            I know there was a girl named Millie who

3    worked there.   And there was another guy whose name I

4    forget.   And I would call them if a check was late or

5    if an artist called and said, "I didn't get my check."

6    That's all I know about that part of it.

7        Q.   Do you know Dick Ayers?

8        A.   Yes.

9        Q.   And he worked as a freelance comic book artist

10   for Marvel; correct?

11       A.   Right.

12           MR. TOBEROFF:  I'd like to mark the next

13   exhibit as Lee Exhibit 27, comprising -- it's a

14   two-page exhibit, comprising of copies of two checks

15   from Marvel Comics Group to Richard B. Ayers.

16           (Whereupon, Defendants' Exhibit Number

17           LEE 27 was marked for identification.)

18   BY MR. TOBEROFF:

19       Q.   Mr. Lee, these checks, front and back, to

20   Mr. -- to Dick Ayers, aka Richard B. Ayers, were

21   produced by Marvel in this action.

22           I'd like to read to you the legend that

23   appears on the first page, on the back of the first

24   check.

25       A.   Uh-huh.

Confidential Pursuant to Protective Order

Page 284

1   over here.  I get the one thing where they're all out

2   of order.

3           MR. TOBEROFF:  Now, I know why they didn't let

4   you do the payroll.

5           THE WITNESS:  I wish you hadn't made it look

6   so easy.  Thank you.

7           MR. QUINN:  You're very welcome.

8           THE WITNESS:  Okay.

9   BY MR. TOBEROFF:

10      Q.   I'm just drawing your attention to something

11  that I'm going to read.  You can read along with me.

12          On Page 214, the first column, about eight

13  lines down, the interviewer asks, "A little bit of

14  history here."

15          And you reply, "Oh, I'm not good at that.  I

16  have no memory."

17          Do you see that?

18      A.   Yes.

19      Q.   That's it.

20          MR. TOBEROFF:  The next exhibit I'd like to

21  mark as Lee 29 -- for now -- I'd like to mark as Lee

22  Exhibit 29, it is entitled "Excerpts from the 1975

23  Stan Lee Panel."  And it says, "Held at the 1975

24  San Diego Comic-Con."

25          This is a document Bates Number 1298 to 1302

Confidential Pursuant to Protective Order

Page 285

1    that we produced -- that was produced by Marvel in this

2    action.  Excuse me.  It was produced by the defendants

3    in this action, not by Marvel.

4            (Whereupon, Defendants' Exhibit Number

5            LEE 29 was marked for identification.)

6    BY MR. TOBEROFF:

7        Q.   So I'm just going to draw your attention to

8    the first page, the first column near the top.  You see

9    it says, "Stan Lee," and then there are audience

10   questions, and then you respond.  So the second

11   audience question, it says, "How did you get started?"

12           Do you see that?

13       A.   Yes.

14       Q.   And then you respond, and in the third

15   paragraph of your response, it says, "Then I heard

16   there was a job open at Marvel Comics, which was then

17   called Timely Comics, for a reason that nobody has

18   figured out.  Jack Kirby and Joe Simon were practically

19   the whole staff, and they -- I better watch what I say

20   because I never know.  Jack may be here.  I'm not noted

21   for always telling the truth, but at least people don't

22   usually catch me at it.  But Jack may remember this, so

23   I'll be careful."

24           MR. QUINN:  And then there was laughter.

25   ///

Confidential Pursuant to Protective Order

Page 286

1    BY MR. TOBEROFF:

2         Q.   Do you have any reason to believe you were

3    misquoted in this article?

4         A.   I was kidding around with the audience.  This

5    was not a serious lecture.

6         Q.   I'm just asking whether you said that.

7              MR. QUINN:  You heard his testimony.

8              THE WITNESS:  You heard my answer.

9    BY MR. TOBEROFF:

10        Q.   Did you say this?

11        A.   Yes.

12             MR. QUINN:  That will show, you don't kid

13   around.  35 years later, it will come back to haunt

14   you.

15   BY MR. TOBEROFF:

16        Q.   Mr. Lee, by asking that question, I wasn't

17   implying that you weren't kidding around.  I think it

18   stands for -- the interview stands -- Marvel's counsel

19   said it speaks for itself.

20             MR. TOBEROFF:  The next exhibit is Exhibit 30.

21             (Whereupon, Defendants' Exhibit Number

22             LEE 30 was marked for identification.)

23   BY MR. TOBEROFF:

24        Q.   And this is an interview of you entitled

25   "Stan Lee TV Archives, 2004," which was produced by Roy

Confidential Pursuant to Protective Order

Page 287

1    Thomas in this case.  Bates Number 365 to 82.

2           This is an interview that you appeared to have

3    given with the American Archive of American Television

4    on March 22, 2004.

5           Did you give this interview with the American

6    Archive of American Television?

7       A.   Yes.

8       Q.   Please turn to Page 3, second column.

9       A.   I'm sorry.  Did you say Page 3?

10      Q.   Page 3, second column.  All the way down in

11   your response on the second column -- excuse me, all

12   the way down the second column of that page, you see

13   the questioner is Lisa Tarata, and she asked the

14   following question:  "Can you talk a little bit

15   about -- and you mentioned that what the comic book

16   industry was like there.  It didn't have a great

17   reputation at the time.  But can you just talk a little

18   bit of what the industry looked like in the early

19   '40s."

20          And you respond, "Well, in the early '40s --

21   and, again, I'm not really good at this, I have the

22   word's worst memory for detail," and then you continue.

23          Do you see that?

24      A.   Yes.

25          MR. TOBEROFF:  I'd just like to show you one

Confidential Pursuant to Protective Order

Page 316

1  villain.  He's Thor's half brother.  He's jealous of

2  Thor.  He has enchanting powers."

3           I just wanted you to be aware of that

4  deposition testimony.

5           And I want to go back to Exhibit 12, which is

6  "Origins of Marvel Comics," by Stan Lee.

7      A.   It's the big thick one.  Got it.

8      Q.   On Page 185 of that exhibit -- note that

9  Page 184 is blank.  On Page 185 --

10     A.   Okay.  185 is the script.  Right?  It's this

11 (indicating).

12     Q.   Right.

13     A.   No.  That's 186.

14          MR. QUINN:  No.  It's 185.

15          THE WITNESS:  185 is the first page.

16          MR. TOBEROFF:  Actually, I'm going to

17 short-cut this.  We don't have to go over this.

18          MR. QUINN:  Okay.

19          MR. TOBEROFF:  You can put it aside.

20          MR. QUINN:  He's going to move on.

21 BY MR. TOBEROFF:

22     Q.   I'd like to go back to "Son of Origins of

23 Marvel Comics."

24          Chapter 1 of this book is entitled "Make Way

25 for the Mutants."

Confidential Pursuant to Protective Order

Page 317

1    A.    The Memory Mutants.

2    Q.    And that refers to the X-Men characters?

3    A.    Uh-huh.

4    Q.    Is that "yes"?

5    A.    Pardon me?

6    Q.    That refers to the X-Men characters?

7    A.    Oh right.  Yes.

8          MR. QUINN:  What page are we on?

9   BY MR. TOBEROFF:

10   Q.    Turn to Page 14, second full paragraph.  It

11   states, "Why not create a group of characters who are

12   born with their unique abilities.  We would create a

13   team of mutants."

14         And then further down the page, at the fifth

15   full paragraph, you write, "No sooner did I discuss the

16   basis premise with Jack, then we were off and running.

17   We decided to create two groups of mutants, one evil

18   and the other good.  One would be eternally striving to

19   subjugate mankind and the other would be ceaselessly

20   battling to protect the human race."

21         Did you write that?

22   A.    Uh-huh.  Yes.

23   Q.    I'd like to turn to a new exhibit.  This is

24   your fault for being so prolific.

25         MR. TOBEROFF:  I'd like to mark as Exhibit 38

Confidential Pursuant to Protective Order

Page 318

1    excerpts from "Five Fabulous Decades of the World's

2    Greatest Comics."  And then it states, "Marvel, by

3    Les Daniels, with an introduction by Stan Lee."

4           This book was published in 1991 by Marvel

5    Comics Group.

6           (Whereupon, Defendants' Exhibit Number

7           LEE 38 was marked for identification.)

8    BY MR. TOBEROFF:

9       Q.    Are you familiar with this Marvel book?

10      A.    I'm not really familiar with it.  I've gotten

11   it.

12      Q.    Who is Les Daniels?

13      A.    I guess he was a guy we hired to write this.

14   I don't really remember him.

15      Q.    On Page 111 -- turn to Page 111, second column

16   in 111, the last paragraph on the page.

17      A.    Must be here.  Okay.

18      Q.    On that page, it's written, "Once again

19   Jack Kirby joined Lee as co-creator of the comic book.

20           "'Jack was the best guy to work with, you can

21   imagine,' says Lee.  'Any idea I would give him, he

22   could make it better.  When Jack brought in the first

23   story, it opened with all the X-Men fighting in the

24   place they called The Danger Room, where they were

25   trained.  That was Jack's idea.  And it was the most

Confidential Pursuant to Protective Order

1    brilliant opening because it started with action and

2    showed all their abilities immediately.'"

3           Do you have any reason to believe you did not

4    say that?

5       A.   Absolutely true.

6       Q.   Now, switching gears to Spider-Man.

7           In your deposition, you stated that you

8    originally asked Jack Kirby to draw Spider-Man.  This

9    is on Page 75 lines 6 through 9.

10          Do you recall that?

11      A.   Oh, yes.

12      Q.   And that you also stated that his work was not

13   used?

14      A.   Was not what?

15      Q.   That Jack -- the pages Jack Kirby did for

16   Spider-Man were not used in the original issue.

17      A.   That's right.

18      Q.   During this period, you were the editor of

19   Marvel; is that right?

20      A.   Oh, yes.

21      Q.   And who handled -- at that time, do you recall

22   who handled -- strike that.

23          MR. TOBEROFF:  I'd like to mark the next

24   exhibit as Exhibit 39, exhibit --

25          MR. LIEBERMAN:  Did I miss something?  Was

Confidential Pursuant to Protective Order

Page 320

1   there a question?

2           MR. TOBEROFF:  No.  There's no question.  I'll

3   ask the next question when I'm ready.

4           Exhibit 39 is an excerpt from the magazine

5   Comic Scene, which was also retrieved from the Stan Lee

6   Archives of the American Heritage Center of the

7   University of Wyoming.  It is an interview of Stan Lee

8   conducted by Clifford Meth, M-E-T-H, and Daniel -- Dick

9   Holtz, H-O-L-T-Z.

10          (Whereupon, Defendants' Exhibit Number

11          LEE 39 was marked for identification.)

12  BY MR. TOBEROFF:

13      Q.   Now, these documents that we've retrieved from

14  the Stan Lee archives of the University of Wyoming, are

15  these things that you once had and you donated to the

16  university?

17      A.   Yes.

18      Q.   Do you recall giving this interview?

19      A.   Pardon me?

20      Q.   Do you recall giving this interview?  This

21  particular interview.

22      A.   Peter Paul was doing the interview?  I didn't

23  hear what you said.

24      Q.   No, no.  Let me short-circuit.

25          Do you have any reason to believe you didn't

Confidential Pursuant to Protective Order

Page 321

1   give this interview?

2        A.   Well, let me look at it.

3             No, probably -- if you got it from the

4   archive, I must have done it.  Yeah, it looks like an

5   interview I have given.  I've given a million

6   interviews, but this looks like one.

7        Q.   Now, if you go to page -- please go to

8   Page 36.  I'd like to read something from this

9   interview.

10       A.   Got it.

11       Q.   Halfway down, on the right-hand column of the

12  page, it reads as follows:  "To this day, I don't know

13  who made up the Spider-Man costume.  It might have been

14  Kirby who did those first few pages and Ditko might

15  have copied Kirby's costume or Ditko might have just

16  made up the costume and disregarded what Kirby did.  I

17  can't remember."

18            Now, when you refer here to Kirby's costume,

19  you're speaking of Spider-Man's costume in the first

20  Spider-Man pages that Jack Kirby did before you brought

21  in Steve Ditko?

22       A.   Yes.

23            MR. QUINN:  Object to the form.

24            You can answer.

25            THE WITNESS:  Yes, those were the pages I had

Confidential Pursuant to Protective Order

Page 322

1    rejected.

2          MR. TOBEROFF:  I'd like to mark as Exhibit 40

3    an excerpt from David Anthony Kraft's Comic Interview,

4    Number 5, dated July 1983.

5          (Whereupon, Defendants' Exhibit Number

6          LEE 40 was marked for identification.)

7          THE WITNESS:  Well, I'm guessing it's got to

8    be around Page 46.

9          MR. QUINN:  Don't guess.  Let him do it.

10         THE WITNESS:  Well, that's what the contents

11   page said.

12   BY MR. TOBEROFF:

13       Q.   On Page 46, is that a picture of you --

14       A.   As soon as I get to Page 46.

15       Q.   -- on the phone?

16       A.   Oh, it's in the beginning.  Yes.

17       Q.   Okay.  Do you have any reason to believe that

18   you didn't give this interview?

19       A.   No.

20       Q.   On page 49 -- I'd like you to turn to Page 49,

21   in the middle of the right-hand column.

22       A.   Yes.

23       Q.   It says the following:  "I don't know whether

24   this is the case or not, but maybe when Ditko did the

25   story" --

Confidential Pursuant to Protective Order

Page 323

1    A.    The right-hand column?  Oh, there it is.  I

2  see it.

3          MR. TOBEROFF:  Bear with me.

4    Q.    You're being questioned about Spider-Man and

5  Spider-Man's costume in the interview.

6    A.    Right.

7    Q.    And in the -- on the right-hand column,

8  approximately in the middle, you say the following:  "I

9  don't know whether this was the case or not, but maybe

10 when Ditko did the story, he used the costume that Jack

11 created.  I don't remember."

12         Did -- do you believe you made this statement

13 in the interview?

14   A.    Yes.

15   Q.    I'd like to go back to exhibit -- what was

16 marked in your prior deposition as Exhibit 12, "Origins

17 of Marvel Comics."

18   A.    Back to that book?

19   Q.    Yes, please.

20   A.    Got it.

21   Q.    Now, if you turn to Page 139 of the book,

22 there appears to be a reprint of the first Spider-Man

23 story as it originally appeared.

24         Do you see that?

25   A.    Yes.

Confidential Pursuant to Protective Order

Page 324

1     Q.   Do you believe that's the first Spider-Man

2   story?

3     A.   Yes.

4     Q.   Now --

5          MR. QUINN:  Sorry.  What page are we on?

6          THE WITNESS:  Page 139, I believe.

7          MR. QUINN:  Okay.  All right.

8          THE WITNESS:  Yes.

9          MR. QUINN:  Thank you.

10  BY MR. TOBEROFF:

11    Q.   And this story is "Amazing Fantasy,"

12  Number 15.

13         That's when Spider-Man first appeared?

14    A.   That's right.

15    Q.   If you look at the cover of "Amazing Fantasy,"

16  Number 15, there's a blurb that says, "Also in this

17  issue, an important message to you from the editor

18  about the new amazing," exclamation point, end quote.

19         Do you see that?

20    A.   Yes.

21    Q.   Now, turn to the last page of the Spider-Man

22  story on Page 150, please.

23    A.   150.  Okay.

24    Q.   Do you see where it says, "Be sure to see the

25  next issue of Amazing Fantasy for the further amazing

Confidential Pursuant to Protective Order

1    exploits of America's most different new teenage idol,

2    Spider-Man."

3              Do you see that?

4         A.   Yes.

5         Q.   So the next issue would have been Amazing

6    Fantasy, Number 16?

7         A.   Right.

8         Q.   Now, going back to your May 13 deposition --

9    I'm now switching to a new character.  The character of

10   Galactus?

11        A.   Galactus.  Okay.

12        Q.   In your May 13 deposition, on Page 71, at

13   lines 4 through 11, you say the following:  "We had so

14   many villains who were so powerful, I was looking for

15   somebody who would be more powerful than any.  So I

16   figured somebody would be" -- excuse me.  "So I figured

17   somebody who was a demigod, who rides around in space

18   and destroys planets.  I told Jack Kirby about it and

19   told him how I wanted the story to go generally.  And

20   Jack went home and drew it."

21        A.   Right.

22        Q.   Do you recall saying that in your deposition?

23        A.   Yes.

24        Q.   Then later in the deposition, on Page 128,

25   lines 14 through 25, you confirmed as true a statement

Confidential Pursuant to Protective Order

Page 367

1   Martin was in a pretty gloomy mood that day, and he

2   said to me, 'You know, what they don't realize, they

3   don't realize the risk that I'm taking.  Because if the

4   books don't sell, it costs.  I lose a lot of money, and

5   I have no guarantee the books will sell.  And we have

6   periods for months after month after month where I'm

7   losing money, where the books don't sell.  But I don't

8   cut their rate.  I don't fire them.  I try to keep

9   going as much as possible.'  And he gave me this whole

10  thing from the publisher's point of view."

11          This is you speaking.

12          Do you remember saying that at your

13  deposition?

14      A.   Yes.  Now, I do, yes.

15      Q.   I'd like to read you an excerpt from the book

16  "Excelsior:  The Amazing Life of Stan Lee," by Stan Lee

17  and George Mair.  M-A-I-R.

18      A.   Mair, I think.

19      Q.   This book was published in 2002.

20          MR. TOBEROFF:  And please mark it as

21  Exhibit 48.

22          (Whereupon, Defendants' Exhibit Number

23          LEE 48 was marked for identification.)

24          THE WITNESS:  We're only up to 48?  It feels

25  like we've done a thousand.

Confidential Pursuant to Protective Order

Page 368

1    BY MR. TOBEROFF:

2        Q.   Did you write this book, Mr. Lee?

3        A.   I wrote the part that wasn't in italics.

4        Q.   And the part in italics was written by

5    George Mair?

6        A.   Yeah.  George Mair wrote the italics part.

7        Q.   Okay.  So if you could turn to Page 80, I'd

8    just like to read from the last full paragraph on

9    Page 80.

10       A.   Okay.

11       Q.   I'll read.

12            "So when a slump would hit, I kept paying our

13   best people to continue doing strips that we really

14   didn't need at the time, knowing we'd eventually have

15   use for them.  I simply stored the strips in a large

16   office closet after they were done.  To me it was an

17   investment both in people and in inventory.

18            "When Martin one day learned of all the

19   material I had been accumulating for later use, he took

20   an extremely dim view of what I had done.  In fact, a

21   dim view is putting it mildly.  For starters, he told

22   me that he was running a business and not a charitable

23   institution.  Then as he kept warming to the subject, a

24   light suddenly went on inside his head.  Martin

25   realized that he had an expensive bullpen being paid

Confidential Pursuant to Protective Order

Page 369

1   every week and a closet full of complete unpublished

2   strips.

3         "He instantly decided he didn't need both.  I

4   suppose from a business point of view, it was a

5   rational decision.  But I hated it.  The bullpen was

6   immediately disbanded.  Most of the salaried creative

7   people were let go, while I was ordered to use up all

8   the inventory material.

9         "Martin decided that we would only work with

10  artists and writers on a freelance basis from that day

11  forward, not assigning any strips unless they were

12  definitely scheduled to be used."

13        Do you recall writing that?

14   A.   Oh, yes.

15   Q.   Is that accurate?

16   A.   Yes.

17   Q.   And previously you mentioned that in some

18  publicity you would refer to the Marvel bullpen when

19  there wasn't a bullpen.

20        The time when there was not a bullpen refers

21  to the time shortly after all of these Marvel employees

22  were let go; is that right?

23   A.   Say that again.

24   Q.   Previously, you said that in publicity --

25   A.   Yes.

Confidential Pursuant to Protective Order

Page 371

1     Q.    I'm not just speaking in general.

2     A.    Right.

3     Q.    In the passage I just read, you speak about

4  how, because you had stockpiled an inventory of

5  material, Mr. Goodman felt, Why do we have to keep

6  people on salary, and they were fired -- and I'm

7  paraphrasing -- and he said, From now on we're going to

8  work freelance; correct?

9     A.    Well, we had very few artists on salary.  I

10  think what it might have meant was he had given some

11  artists guarantees.  They would get so much work to do

12  each month.  Whether we could -- we always used it, but

13  whether we could use it or not.

14          And I think what he meant when he said to me

15  we're just going to go freelance, we would only buy

16  what we needed, and it wouldn't -- I would never have

17  an opportunity to build up an inventory of unused stuff

18  again.

19     Q.    And -- but you did have certain artists and

20  writers who were on staff at Marvel before you

21  converted to a complete freelance model; correct?

22     A.    Maybe John Romita was on staff, and

23  Marie Severin was on -- I think as a colorist then, or

24  maybe an artist.  But that's about all as far as

25  artists go.

Confidential Pursuant to Protective Order

Page 372

1    Q.   And then they were let go --

2    A.   Yes.

3    Q.   -- after this edict?

4    A.   Yeah.  Well, they were no longer -- well, see,

5    again, I don't remember.  Romita might have been kept

6    on as art director because we needed somebody to do

7    covers and to do whatever had to be done.

8         But we didn't any longer have guarantees to

9    anybody.  And I wasn't just buying things that maybe

10   we'd use and maybe we didn't use.

11        He was just -- he just got very strict with me

12   because I -- I had built up that inventory, which there

13   were strips I liked and I thought we would use them,

14   not realizing the business would be bad and we couldn't

15   publish as many books as we wanted to.

16   Q.   I'd like to go to another, Page 94, which is

17   part of this Exhibit 48.

18   A.   Got it.

19   Q.   You write, "Naturally, as a result of

20   Wertham's War, the market for comic books

21   disintegrated, with artists and writers being fired by

22   the baleful.  I was amazed that Martin kept me on, but

23   then he had to have somebody to fire all those other

24   people for him.

25        "Again, it was indescribably difficult for me.

Confidential Pursuant to Protective Order

Page 376

1                           EXAMINATION

2    BY MR. QUINN:

3         Q.    You recall that Mr. Toberoff asked you some

4    questions in connection with Spider-Man, and there was

5    some testimony that you gave regarding the fact that

6    you -- the original pages that Kirby had drawn --

7    Mr. Kirby had drawn with regard to Spider-Man, that you

8    had rejected them?

9         A.    Right.

10        Q.    And you decided to use Ditko, Steve Ditko,

11   instead?

12        A.    Right.

13        Q.    Did Mr. Kirby get paid for those rejected

14   pages?

15        A.    Sure.

16        Q.    And did you have a practice at that time with

17   regard to paying artists even when the pages were

18   rejected by you or required large changes?

19        A.    Any artists that drew anything that I had

20   asked him or her to draw at my behest, I paid them for

21   it.  If it wasn't good, we wouldn't use it.  But I

22   asked them to draw it, so I did pay them.

23        Q.    I'm going to jump around a little bit.

24        A.    You have some filing system.

25        Q.    I do.

Confidential Pursuant to Protective Order

Page 396

1      Q.   Now, when you -- when you were serving as an
2   editor at Marvel, in the period 1958 to 1963, you were
3   paid a salary as an editor?
4      A.   Yes.
5      Q.   And how were you paid for your work as a
6   writer on the comics?
7      A.   I was paid on a freelance basis, like any
8   freelance writer.
9      Q.   And does that mean you were paid by the page?
10     A.   Yes.
11     Q.   And was it your belief that because Marvel had
12  bought that work from you, that they owned all right,
13  title and interest in the work?
14     A.   Yes, I did believe that.
15          MR. TOBEROFF:  I'm done.
16          MR. QUINN:  Okay.  I have nothing further.
17          MR. LIEBERMAN:  You may leave, Mr. Lee.
18          THE COURT REPORTER:  No stipulation, then?
19  It's Code?
20          MR. TOBEROFF:  In California, we do a
21  stipulation.
22          MR. LIEBERMAN:  Mr. Lee, leave.  We're
23  finished.
24          MR. FLEISHCHER:  Why don't we go off the
25  record, Marc, and tell us what stipulation you want to