# EXHIBIT R



# ARTWORK TRANSFER & OWNERSHIP AGREEMENT

AGREEMENT made this 3rd day of November, 2008, by and between Marvel Characters, Inc., with an office at 9242 Beverly Boulevard, Suite 350, Beverly Hills, California 90210 ("Marvel") and Lisa R. Kirby, an individual having an address at 179 Ottawa Street, Ventura, CA 93001, as administrator of the estate of Jack Kirby ("Administrator").

WHEREAS, Administrator is the current owner of certain artwork previously produced by Jack Kirby, attached hereto as Exhibit A (the "Artist") based upon and utilizing literary and/or artistic properties owned by Marvel (the "Artwork");

WHEREAS, Marvel desires to purchase all rights and interest in the Artwork from Administrator.

NOW THEREFORE, the parties agree as follows:

1.      In consideration of Marvel ordering the Artwork from Administrator and paying Administrator a sum equal to One Thousand Nine Hundred Fifty Dollars ($1,950.00) for six (6) pages of Artwork, Administrator hereby transfers and assigns to Marvel all rights in and to the Artwork. Additionally for each standard twenty (20) - twenty-two (22) page comic book issue plus cover, or the equivalent number of pages thereof (the "Issue", or collectively, each "Issue") featuring the Artwork. Administrator shall also be entitled to participate in Marvel's standard incentive program in effect at the time of publication of such Issues.  A copy of the standard incentive program is attached hereto as Schedule A.

2.      Administrator expressly grants to Marvel in perpetuity all worldwide rights of any kind and nature in and to the Artwork and agrees that as between Administrator and Marvel, Marvel is the sole and exclusive copyright proprietor thereof throughout the world. Marvel shall be free to reproduce, distribute, display, make derivative copies, and otherwise use and exploit, in any and all formats, now known or hereinafter developed, any and all rights, in and to the Artwork, without further compensation or consultation with Administrator. Administrator also hereby waives any and all rights, including any moral rights, in and to the Artwork which Administrator may acquire pursuant to this Agreement or by operation of law.

3.      Administrator perpetually agrees: (i) not to contest Marvel's exclusive, complete and unrestricted ownership in and to the Artwork, (ii) not to claim any ownership in the Artwork, (iii) not to use or exploit or claim the right to use or exploit the Artwork in any manner, and (iv) not to object to any exploitation or use of the Artwork or to any changes, modifications, or revisions to the Artwork made by or on behalf of Marvel. Administrator shall execute and deliver to Marvel, without additional consideration, such documents from time to time as Marvel may request for the purpose of confirming Marvel's rights in and to the Artwork. Marvel may sign these documents in       Administrator's      name      and      make      appropriate      dispositions      of      the      same.

4.      Administrator agrees and acknowledges that Marvel shall have the right and shall use all reasonable commercial efforts to use Artist's name in connection with the Artwork and/or any rights granted hereunder, without compensation to Administrator on behalf of Artist. However, Marvel's failure to use Artist's name shall not be a breach of this Agreement.

5.      Administrator hereby represents and warrants that she is the administrator of the estate of Artist and as such has the right and authority to enter into this Agreement. Administrator represents and warrants that the Artwork will be original and not heretofore published, that the Artwork was produced by Artist, and that the Artwork will not violate any right of privacy or publicity, copyright or trademark or constitute defamatory, obscene or unlawful matter or otherwise violate or infringe any personal or proprietary rights of any person, firm or corporation.

6.      Administrator shall defend, indemnify and hold harmless Marvel and its officers, directors, employees, successors, licensees and assigns from and against any and all liability or loss, including reasonable attorney's

{00061682 DA}

fees, which they or any of them may suffer or incur by reason of the breach of any of Administrator's warranties, representations or covenants hereunder.

7.      No waiver by Marvel of any term, condition or covenant contained in this Agreement or of any breach of this Agreement by Administrator shall be held to be a continuing waiver of the same or any other term, condition or covenant hereof or as a waiver of any subsequent breach by Administrator.

8.      This Agreement cannot be amended or modified except in a writing signed by all parties.

9.      This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.     The execution of this Agreement has not been induced by any representations, statements, warranties or agreements other than those expressed herein.  This Agreement embodies the entire understanding of the parties, with respect to the subject matter herein, and there are no further agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof other than those referenced herein.

11.     This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York applicable to agreements entered into and to be performed wholly in New York, without reference to its choice of law principles.  Administrator hereby consents to the exclusive jurisdiction of any State or Federal court with jurisdiction to enforce this Agreement in New York County and waive any objection thereto on the basis of personal jurisdiction or venue.  Service of any paper or pleading in any such action may be effected by mailing a copy thereof by overnight mail to Administrator's address as stated below.  Any paper or pleading so served shall be deemed served on the recipient with the same legal force and effect as if personally served upon the recipient within New York County, New York.  The parties hereby waive any rights they may have to a trial by jury in respect of any litigation based on or in connection with this Agreement.

12.     This Agreement shall be binding upon and inure to the benefit of the parties hereto and to the benefit of Marvel, and their respective heirs, successors, administrators and assigns.

In WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.


**MARVEL CHARACTERS, INC.**

By: _____
Name: _____
Title: _____
Date: _____


**LISA R. KIRBY,**
As Administrator of the Estate of Jack Kirby

By: _____

Date: ___11-4-08_____


{00061682 DA}

2

K 01486

## SCHEDULE A

| MARVEL COMICS STANDARD TALENT INCENTIVE PLAN - 2003 |
| :--: |
| (Effective for Publications on Sale as of February 1, 2003) |

### SINGLE-ISSUE COMICS

An incentive will be paid for each unit sold over the minimum net unit level based on the cover price of the comic book as follows:

| Cover Price | Incentive per unit |
| :--: | :--: |
| $2.25 | $0.065 |
| $2.50 | $0.070 |
| $2.99 | $0.085 |
| $3.50 | $0.100 |
| $3.99 | $0.115 |
| $4.50 | $0.130 |
| $5.95 | $0.170 |

Minimum net unit level = 50,000

| Example #1: | If net units (with a cover price of $2.25 book) sold were: | 75,000 |
| :-- | --: | --: |
| | Less the minimum net unit level of: | -50,000 |
| | Net units for calculation: | 25,000 |

Incentive calculation:  25,000 units X .065 per unit = $1,625  (incentive payment)

| Example #2: | If net units (with a cover price of $3.99 book) sold were | 75,000 |
| :-- | --: | --: |
| | Less the minimum net unit level of: | -50,000 |
| | Net units for calculation: | 25,000 |

Incentive calculation:  25,000 units X $.115 per unit = $2,875  (incentive payment)

### In general, the incentive payment will be split as follows:

| 18.75% | 18.75% | 12.5% | 25.0% | 15.0% | 10% |
| :--: | :--: | :--: | :--: | :--: | :--: |
| Plot | Script | Layouts | Pencils | Inks | Colorist |

**Example #3:** Under Example #1, Talent would share the incentive payment of $1,625 as follows:
- Writer (for plot & script): 37.5% x $1,625 = $609.38
- Penciler (for pencils & layout): 37.5% x $1,625 = $609.38
- Inks (for inks): 15% x $1,625 = $243.75
- Colorist: 10% x $1,625 = $162.50

### Exceptions to the general split:

There are certain cases where the general split described in Example #3 will be modified based on the actual production of the book.  Here are two examples:

{00061682 DA}

3

K 01487

**Example #4:**   **Digital Painting**, if the book was digitally painted instead of inked, the allotted portion of the incentive for inking will be shared equally by the penciler and the digital painter. Talent would share the incentive payment of $1,625 as follows:

| 18.75% | 18.75% | 18.75% | 26.25% | 0.0% | 17.50% |
|--------|--------|--------|--------|------|--------|
| Plot | Script | Layouts | Pencils | Inks | Colorist |

- Writer (for plot & script): 37.5% x $1,625 = $609.38
- Penciler (for pencils & layout): 45% x $1,625 = $731.25
- Digital Painter (for digital enhancement): 17.5% x $1,625 = $284.38

**Example #5:**   **Rough Pencils and Finished Inks**, if the book had pencil layouts and finishes by an inker, the allotted portion of the incentive for pencils will be shared by the inker and the layout artist. Talent would share the incentive payment of $1,625 as follows:

| 18.75% | 18.75% | 24.4% | 0.0% | 28.1% | 10% |
|--------|--------|-------|------|-------|-----|
| Plot | Script | Layouts | Pencils | Inks | Colorist |

- Writer (for plot & script): 37.5% x $1,625 = $609.38
- Penciler (for layout): 24.4% x $1,625 = 396.50
- Inker (for finished inks): 28.1% x $1,625 = $456.62
- Colorist (for coloring): 10% x $1,625 = $162.50

## Notes

(a)    The number of net units sold is the combined total of units sold in the following distribution channels:
   - **Direct** = domestic & UK distribution to the direct comic book market net of any returns or credits. This would include the initial sales for the month the title goes on sale plus any reorder activity for a period of 60 days after the end of the month on sale.
   - **Newsstand** = estimated net unit sales for newsstand market. This would include gross units distributed less a reserve for returns based on the overall reserve percentage for all titles for each newsstand distributor.
   - **Subscriptions** = subscription units paid in full.

(b)    The incentive will be calculated at the end of the second calendar month following the month the title initially went on sale and payment will be made within 60 days thereafter.

(c)    There will be only one incentive payment made for each month. Payment will be made within sixty (60) days after the date of calculation.

**Example #6:**
   - A title initially is on sale in April 2003;
   - The calculation would include the following unit sales:
      · April initial sales plus May and June reorder sales for the direct market;
      · April estimated sales for all newsstand markets & April paid subscriptions;
   - The incentive payment to be made by August 30, 2003.

## GRAPHIC NOVELS: (A perfect bound collection of either reprinted comic book stories or original content, usually ranging in length from 96 to 200 pages or more.)

The following terms shall be used to calculate graphic novel incentives:
- "**Print Run**" = Quantity of copies printed less 25% (for administrative overhead and account balancing);

Graphic Novel Incentives will be calculated using the following formula:

{00061682 DA}

4

Graphic Novel Incentives = Print Run x Cover Price x 4.5%

**Example #7:**
- Total copies graphic novel copies printed = 5,000 copies
- $14.95 cover price
- 5,000 copies less 25%= Print Run of 3,750 copies
- An incentive payment is then calculated by using the formula: 3750 x $14.95 x 4.5% = $2522.81

The graphic novel incentive payment will be shared by Talent using the split shown above for single-issue comics and will be made for each title within four (4) months after the month the title is initially on sale.

**Example #8:**   Under Example #7, the Talent would share the graphic novel incentive payment of $2,522.81 as follows:

- Writer (for plot & script): 37.5% x $2,522.81 = $946.05
- Penciler (for pencils & layout): 37.5% x $2,522.81 = $946.05
- Inks (for inks): 15% x $2,522.81 = $378.42
- Colorist (for colors): 10% x $2,522.81 = $252.28

**REPRINT MATERIAL:** (Single-issue and/or compilation reprint comics in formats OTHER THAN graphic novels, electronic publications or other non-traditional publications.)

(a)    If a title is reprinted within twelve (12) months from original publication, either as a single-issue comic or a non-graphic novel format compilation or collection, such net units sold are added to the unit volume from the title's original sales and an incentive is paid if the total sales (original and reprint) of such title meets eligibility for incentive. In the case of compilation or collection comics such as "Marvel Must Have", the total number of net units sold will be multiplied by a pro rata share of the number of pages of comic material created by each particular artist or writer and the adjusted sales numbers will be added to the unit volume of the title's original sales for incentive calculation purposes.

**Example #9:** Single-issue Reprint
- Initial publication of a single-issue title sells 47,000 net units; no incentive payment is made because the minimum net unit level was not reached.
- Five months later, 30,000 reprinted copies of the same single-issue title are sold. The additional 30,000 units of reprinted copies sold would be added to the initial number of net units sold for that single-issue title:

| (Initial # net units sold) | + | (Reprinted copies sold) | = | (New net units sold) |
|---|---|---|---|---|
| 47,000 | + | 30,000 | = | 77,000 |

- The new net units for that single-issue title is 77,000.
- The minimum net unit level of 50,000 would then be subtracted from the 77,000 (new net units) leaving 27,000 net units of that title for incentive calculations.
- Talent would be entitled to an incentive on 27,000 units

**Example #10:** Collection Reprint
- Initial publication of a single-issue title sells 47,000 net units; no incentive payment is made because the minimum unit level was not reached
- Five months later, the same single-issue title material is reprinted in a 72 page "Marvel Must Have" collection (title comprises 24 of the 72 pages) and 30,000 copies of such "Marvel Must Have" are sold.

{00061682 DA}

5

K 01489

- In order to calculate incentive payment for the single-issue title contained in that "Marvel Must Have", multiply the number of copies of the "Marvel Must Have" sold times the pro rata share of pages the single-issue material comprises of the overall page count for that particular "Marvel Must Have".
- If the single-issue title comprises 24 pages of the 72 paged "Marvel Must Have" then Talent would be entitled to a 1/3 (33%) of the unit sales of that "Marvel Must Have":

| (# of Marvel Must Have units sold) | x | (% of Pages) | = | (Additional Units Sold) |
|---|---|---|---|---|
| 30,000 | x | 33.3% | = | 9,990 |

- This allocated additional 9,990 units, of Marvel "Must Haves" sold, would then be added to the initial number of net units sold for that single-issue title (47,000 units), so that the new total net unit amount for that single-issue title would be 56,990 units.
- The minimum net unit level of 50,000 would then be subtracted from the 56,990 (new net units) leaving 6,990 net units of that single-issue title for incentive calculations.
- Talent would be entitled to an incentive on 6,990 units.

(b)     If material is reprinted twelve (12) months or more after its original publication, either as a single-issue comic or a non-graphic novel format compilation or collection, a reprint page fee will be paid at the rate of forty-five ($45) dollars per page.

**Example #11:**
If 22 pages are reprinted sixteen (16) months after its original publication, the following reprint fee would be paid:
            22 pages x $45 = $990 (reprint fee)

The reprint fee will be shared by Talent using the pro rata formula shown above for single-issue comic incentive payments. If reprint fees are paid, no other incentives apply.

**Example #12:** Under Example #10, the Talent would share the reprint fee of $990 as follows:
            - Writer (for plot & script): 37.5% x $990 = $371.25
            - Penciler (for pencils & layout): 37.5% x $990 = $371.25
            - Inks (for inks): 15% x $990 = $148.50
            - Colorist (for colors): 10% x $990 = $99.00

## GENERAL:

    * This Plan applies to printed product produced, sold and distributed by Marvel Comics, a division of Marvel Entertainment and does not include any international publishing, licensing agreements or mass market packaged products.

    * No reprint fee or incentive will be paid for use of comic material printed for promotional, advertising or marketing purposes.

    * Regardless of the number of units sold, comic titles must be profitable (as determined by Marvel) to be eligible for incentive payments.

    * Any payments made for coloring under this incentive plan shall only be paid for coloring work completed for single issue comics initially on sale on or after the effective date of this Incentive Plan. Colorists for these single issue comics shall also share in the Graphic Novel incentive plan as outlined in the Graphic Novel incentive above. Marvel shall make the final determination of which Talent, if any, will be paid pursuant to this Incentive Plan.

{00061682.DA}

6

K 01490

* Payments made under this Incentive Plan will be paid to the same party that completed the original work in the publication.

* Effective February 1, 2003, upon the death of talent (defined as either a Writer, Penciler, Inker or Digital Painter), Marvel shall continue to make incentive payments as provided for in this plan for a period of five (5) years following the date of Talent's death to the estate of the deceased talent, contingent that:

  - Talent's estate notifies Marvel of Talent's demise within six months from the date of talent's demise;

  - Talent's estate delivers to Marvel any and all documentation that Marvel may request as proof of such talent's death;

  - Upon delivery of such documentation, talent's estate shall instruct Marvel as to whom such future incentive payments should be paid.

* This incentive plan will be reviewed from time to time at Marvel's sole discretion to determine the appropriateness of incentive plan rates and provisions. Marvel retains the right to amend or cancel any or all parts of this incentive plan at any time at its sole discretion.

{00061682 DA}

7

K 01491

**EXHIBIT A – Artwork**

**(six (6) pages of Artwork featuring the character "Thor")**

K 01492