# EXHIBIT 1

1   Marc Toberoff (CA State Bar No. 188547)
    Nicholas C. Williamson (CA State Bar No. 231124)
2   LAW OFFICES OF MARC TOBEROFF, PLC
    2049 Century Park East, Suite 2720
3   Los Angeles, CA 90067
    Telephone: (310) 246-3333
4   Facsimile: (310) 246-3101

5   Attorneys for Plaintiffs and Counterclaim Defendants
    JOANNE SIEGEL AND LAURA SIEGEL LARSON
6

7                   UNITED STATES DISTRICT COURT

8                   CENTRAL DISTRICT OF CALIFORNIA

9    JOANNE SIEGEL, an individual; and        Case Nos. CV 04-8400 SGL (RZx)
10   LAURA SIEGEL LARSON, an                              04-8776 SGL (RZx)
     individual,
11                                            [Consolidated for Discovery]
                        Plaintiffs,
12          vs.                               Hon. Stephen G. Larson, U.S.D.J.
13   TIME WARNER INC., a corporation;         Hon. Ralph Zarefsky, U.S.M.J.
14   WARNER COMMUNICATIONS                    PLAINTIFFS JOANNE SIEGEL
     INC., a corporation; WARNER              AND LAURA SIEGEL LARSON'S
15   BROS. ENTERTAINMENT INC., a              INITIAL DESIGNATION OF
                                              EXPERT WITNESS JAMES
16   corporation; WARNER BROS.                STERANKO
     TELEVISION PRODUCTION INC.,
17   a corporation; DC COMICS, a general      [F.R.C.P. 26(a)(2) and Court's
     partnership; and DOES 1-10,              Order of November 15, 2006]
18
19                      Defendants.

20
     DC COMICS,
21
                        Counterclaimant,
22          vs.
23
     JOANNE SIEGEL, an individual; and
24   LAURA SIEGEL LARSON, an
     individual,
25
26                      Counterclaim Defendants.
27
28

Pursuant to Rule 26 of the Federal Rules of Civil Procedure and the Court's order of November 15, 2006, Plaintiffs and counterclaim defendants Joanne Siegel and Laura Siegel Larson (collectively "Plaintiffs") hereby designate James Steranko as an expert witness whose testimony Plaintiffs intend to introduce at the trials of these matters. A copy of Mr. Steranko's expert report is attached hereto as Exhibit A.

Plaintiffs' foregoing initial designation does not include any expert whose testimony may be offered solely for purposes of impeachment or rebuttal. Plaintiffs reserve the right to amend and/or modify its expert witness designation in accordance with the Federal Rules of Civil Procedure and the Local Rules of this Court.

DATED: January 12, 2007          LAW OFFICES OF MARC TOBEROFF, PLC

By _____
         Marc Toberoff

Attorneys for Plaintiffs JOANNE SIEGEL
and LAURA SIEGEL LARSON

1

# EXHIBIT A

# EXPERT REPORT OF JAMES STERANKO

## I.  INTRODUCTION

Warner Bros. Entertainment Inc. ("WB") and DC Comics ("DC") (collectively, "Defendants") are alleged to owe Joanne Siegel and Laura Siegel Larson (collectively, "Plaintiffs"), the widow and daughter of Superman co-creator and Superboy creator Jerry Siegel, significant profits from Defendants' ongoing exploitation of the original Superman and Superboy copyrights recaptured by Plaintiffs under the Copyright Act. I have been asked to report on the import and impact of Jerry Siegel's original creations on Defendants' exploitations.

## II.  BACKGROUND QUALIFICATIONS

My involvement in the comic book industry encompasses more than 40 years. In 1965, I entered the comic industry by working for Joe Simon, who assigned me to create a series of superheroic characters for Harvey Comics. Soon afterwards, I was hired by Stan Lee at Marvel Comics and began writing and illustrating the 1960s superspy series NICK FURY, AGENT OF S.H.I.E.L.D. in Marvel's **Strange Tales**. Additionally, I wrote and illustrated many other top Marvel characters, including CAPTAIN AMERICA, THE HULK, THE X-MEN (for which I created the title logo), and, for DC Comics, SUPERMAN. I generated more than 150 original storytelling innovations that changed the direction of the comics medium. **Wizard Magazine**, a comic industry publication, recently credited me as *The 5th Most Influential Comics Artist in the History of the Form.* Michael Chabon cited me as an inspiration for his Pulitzer Prize-winning novel, **The Amazing Adventures of Kavalier & Clay**. I authored the two volume set **The History of Comics**, which have sold more than 100,000 copies each and remains the definitive resource of the four-color chronology in comic books.

In the film industry, I have written animation scripts and developed characters for Paramount, including working with animation giants Shamus

(BUGS BUNNY) Culhane and Ralph (FRITZ THE CAT) Bakshi. I have also worked on feature film projects, including as a film production illustrator with directors such as Tim Burton, Oliver Stone, Francis Ford Coppola (serving as the project conceptualist for BRAM STOKER'S DRACULA, among other projects), George Lucas and Steven Spielberg (creating the initial production paintings visualizing Indiana Jones for RAIDERS OF THE LOST ARK).

I have illustrated numerous science fiction, heroic fantasy, Western, and adventure books written by such authors as Ray Bradbury, Mickey Spillane, Cornell Woolrich, Michael Moorcock, Raymond Chandler, John Jakes, Robert E. Howard, Harlan Ellison, and many others. In this respect, I have visualized a legion of classic fictional heroic characters, including Sherlock Holmes, Luke Skywalker, The X-Men, Mike Hammer, Batman, the Green Hornet, James Bond, Captain America, Han Solo, Sam Spade, Superman, Captain Kirk, Mr. Spock, Conan, Doc Savage, Buck Rogers, and The Shadow, for which I painted 30 book covers—in addition to a multitude of movie posters, record albums, and magazine illustrations.

In 1968, I established Supergraphics, a full-scale publishing organization, for the purpose of producing material related to contemporary culture in every medium. In 1970, I authored and published Volume 1 of **The History of Comics** through Supergraphics, and followed two years later with a companion volume. In 1972, I created and released **PREVUE**, an international newsstand entertainment magazine, which ran for 25 years and was the forerunner of similar titles such as **Premiere, Movieline,** and **Entertainment Weekly**. As its editor-publisher, I explored a multitude of on-set Hollywood productions, conducted hundreds of superstar interviews, and penned numerous articles.

In 1970, I produced a comic book addressing the problems of drug abuse among inner-city children which was distributed free as a teaching tool in schools

2

in major metropolitan cities from New York to Atlanta. The comic met with remarkable success and garnered critical acclaim that ranged from Manhattan Borough President Percy Sutton to **Sesame Street**'s Joan Ganz Cooney.

I continue to work in the comics medium and to lecture on popular culture. Recent works include an essay on narrative concepts in film, animated games, and comics in the Watson-Guptill instructional volume **The Art and Technique of Graphic Storytelling**; scriptwriting for Warner Bros. **Justice League** TV series; and serving as Creative Consultant for the History Channel's two-hour documentary **Comic Book Superheroes—Unmasked**.

From comic art to commercial design, I have won numerous awards in both Europe and America, and have exhibited my work at more than 250 international exhibitions, including in the Louvre in Paris. As the Guest of Honor at Spain's 2002 Semana Negra Cultural Festival, my work was the subject of a large one-man exhibition (160 works, sponsored by the Gijon Museum of Modern Art). I recently received the prestigious Julie Award for Lifetime Contribution to the Fantastic Arts (2003) and the Eisner Hall of Fame Award at the 2006 San Diego Comic Convention.

## III.   SCOPE OF ANALYSIS

I have been asked to analyze with respect to Superman: (a) how Jerry Siegel and Joe Shuster worked in creating the early Superman Comics to aid in a determination as to whether such comics and the elements contained therein were not "works for hire" and thus subject to recapture by the Plaintiffs and (b) the impact and prevalence of such recaptured Superman elements on Defendants' recent exploitations of Superman.

3

I have been asked to analyze with respect to Superboy whether the television series, Smallville, is derived from Jerry Siegel's original Superboy story and the line of Superboy comics to which it gave birth.

## IV.   ANALYSIS

### SUPERMAN

#### A.   Work-for-Hire Issue

In 1933, Jerry Siegel conceived of an original cartoon strip featuring *Superman*, a unique character of superhuman strength and powers who would perform remarkable feats for the public good. Siegel conceived, in essence, the first comic book superhero—an original concept that fused our national ideals with the highest Judeo-Christian ethics—and became an international cultural icon, spawning, what is today, a massive, thriving industry.

In or about 1934, Siegel authored twenty-four days (four weeks) of Superman comic strips intended for newspaper publication, a paragraph previewing future Superman exploits, and a nine-page synopsis covering approximately two months of daily newspaper comic strips (six days per week). The material was subsequently incorporated into the early Superman comic strips, thereafter published from on or about April 18, 1938 to April 13, 1943.

In 1934, Jerry Siegel and artist Joe Shuster ("Siegel and Shuster") co-authored a group of daily Superman comic strips, consisting of one week (six days) of fully-inked daily strips and three additional six-day weeks in penciled form. Those strips were submitted to numerous publishers from 1934-1939.

Although Superman was not published for some time, Siegel and Shuster sold other comic-character features they created to the Nicholson Publishing Company, including Henri Duval and Dr. Occult. In a letter dated October 4,

4

1935, the company's owner, Malcolm Wheeler-Nicholson, expressed his interest in publishing Superman in comic book form, but Siegel and Shuster rejected his offer. Nicholson was, however, involved with a new comic-magazine company, Detective Comics, Inc., which published such Siegel and Shuster features as *Slam Bradley* and *Spy*, which appeared in **Detective Comics** 1 (3/1937).

Siegel and Shuster entered into a free-lance agreement with Detective Comics dated December 4, 1937 (the "1937 Agreement") to continue to produce the comic magazine features, Slam Bradley and Spy, which also provided that any new and additional features which they produced for use in a comic magazine would first be submitted to Detective Comics, which had 60 days to accept or reject it.

One of the entities to whom Siegel had submitted the Superman strip was The McClure Newspaper Syndicate. In early 1938, the head of the syndicate sought Siegel's permission to forward the comic strip material to Detective Comics for potential publication in its contemplated new magazine, **Action Comics.** By this time, Superman and his extraordinary powers had already been completely developed by Siegel and Shuster.

In or about January–February 1938, when Detective Comics expressed interest to Siegel and Shuster in publishing the Superman comic strip in comic magazine format, the writer and artist cut the strip into almost 100 separate panels, and re-pasted it to adapt it into comic book form.

In a grant prepared by Detective Comics, dated March 1, 1938, Siegel and Shuster agreed to the publication of their **Superman** comic strip in consideration for the sum of $130. Superman subsequently appeared as the cover subject on the June, 1938 issue of **Action Comics** 1, issued for sale on April 18, 1938. It became an unprecedented success and provided a powerful, thematic core for

5

the floundering comics form, one that was exploited by most, if not all, comics publishers of the period.

Between March, 1938 and September, 1938, Siegel and Shuster continued to create Superman strips, stories, and continuities. **Action Comics** 1 was followed by further issues published at regular intervals, with each subsequent issue containing Superman material created by Siegel and Shuster.

Detective Comics and Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate dated September 22, 1938 regarding the newspaper syndication of a **Superman** comic strip. Detective Comics and Siegel and Shuster therefore entered into an agreement also dated September 22, 1938 (the "1938 Agreement"), which for the first time provided that Detective Comics would "employ and retain" the writer and artist to produce the artwork and continuity for five comic strips, including **Superman**. Detective Comics and Siegel and Shuster then entered into a supplemental agreement dated December 19, 1939, which raised their page-rate compensation.

The scope of my analysis entails Siegel and Shuster's Superman as published in **Action Comics** 1 and their Superman works thereafter published in **Action Comics** 2-61 (copyright to no. 61 secured on April 13, 1943).

Prior to September 22, 1938, Siegel and Shuster solely produced six comic book issues featuring Superman at their own instance and expense which were published as **Action Comics** 1-6. Of these, **Action Comics** 1 through 5 were published prior to September 22, 1938 and **Action Comics** 6 was published four days later on September 26, 1938.

Although, the 1938 Agreement used for the first time the term "employ and retain" with respect to Siegel and Shuster's subsequent work on Superman, it does not appear that they were traditional employees of Detective Comics or worked in a way that even approximated a hierarchical employment relationship.

6

We know that Siegel and Shuster were not paid a salary, but were paid on a "per page" basis and they were only paid for pages actually delivered by them and eventually published by Detective Comics. In paying them for their pages, Detective Comics did not treat such payments as employee salaries or fees: Detective Comics did not withhold or deduct payroll, nor did Detective Comics withhold or deduct social security and the other taxes normally associated with employee compensation. Detective Comics also did not provide any health benefits or any other employee benefits to Siegel and Shuster. Detective Comics role appears to have been rather limited, paying Siegel and Shuster for finished comic-book product on a per-page basis for the right to publish such works.

Additionally, Siegel and Shuster did not work out of the Detective Comics' offices in New York, instead laboring in Cleveland, Ohio, first out of the respective homes, then from their own art studio. (Conversely, all other "sweat shop" suppliers to the comics medium were in the New York/New Jersey area, relatively close to publishers' offices and their supervision). The writer and artist determined their own hours and days of work. They supplied, used, and paid for their own tools and materials, and hired and paid for their own assistants. As their business expanded, they employed artists who worked under their direction, instance, and expense, not that of Detective Comics. Their payroll records—and subsequent interviews with their assistants—are ample evidence of Siegel and Shuster's independent work and primary guidance of the Superman property.

B.    Allocation Issue

**Action Comics** 1 featured virtually all the signature elements of the Superman mythology which continue to this day, constituting the definitive formula for the subsequent Superman comic books and exploitations in other media. The magazine visualized the origin of the Superman character, in both a literary and pictorial manner, including his personality, habits, superhuman

7

powers, dual appearances, costume, secret identity, and attributes, and the ethical creed to which he aspired and heroically achieved. Specifically, **Action Comics** 1 featured Superman's origin from a distant planet, his back-story, his basic physical and mental traits, and, as a champion of the oppressed, his mission to use his enormous powers to benefit mankind. It also portrays Superman's secret identity as the mild-mannered newspaper reporter, Clark Kent, providing a full literary and pictorial delineation of the character, including his appearance, habits, persona, mannerisms, and clothing.

**Action Comics** 1 also portrays other key characters and their cardinal traits, including newspaperwoman Lois and the publication's editor, from whom Clark gets his assignments. Clark's romantic interest in Lois is immediately established, including her rejection of him as a coward, while leaning passionately towards Superman. The classic image of Lois being swept into the sky held tightly in Superman's embrace is also visualized.

All Superman-related stories, particularly the cinematic adaptations, movie serials, cartoon versions, and TV series —including the recent SUPERMAN RETURNS—draw heavily on the timeless dramatic formula created by Jerry Siegel in **Action Comics** 1. Regardless of a story's content and handling, audiences from comics to the cinema are ultimately attracted to the character for deeply-rooted psychological reasons, all of which were cleverly and succinctly detailed in Jerry Siegel's initial Superman adventure. Without those primary elements, the character, his universal appeal, and countless product incarnations would *never* have existed.

SUPERBOY

    A.    Jerry Siegel's Superboy

8

In or about 1938, Jerry Siegel conceived of a new comic strip series entitled Superboy. On November 30, 1938 he submitted to Detective Comics, a written summary of the character, concept, and plan for his **Superboy** comic strip series (the "Superboy Summary"), which Siegel suggested could run in Detective Comics' magazines **More Fun Comics** or **New Adventure Comics**. His proposal, however, was rejected in a return letter dated December 2, 1938.

Two years later, on his own initiative, he authored a complete original Superboy story (the "Superboy Story"). For clarity, I will subsequently refer to the Superboy Story and Superboy Summary together as the "Superboy Material." In or around December, 1940, Siegel again submitted Superboy to Detective Comics, which again rejected its publication and declined using it.

The Superboy Material contained in detail the unique conception and character of Superboy, the continuity and dialogue for the first presentation of Superboy, and the format for the future publication of a Superboy comic book series.

The Superboy Material firmly establishes the following:

>>Superboy's origins, character, family and social life as a youth growing up in rural America.

>>Although technically an alien, Superboy is raised in a small town environment as a human being by his adoptive parents, the Kents.

>> The Kents realize Superboy must restrain and conceal his extraordinary strength for fear that he will be treated as an outcast.

>> Superboy must also face the emotional challenges and social responsibilities of his extraordinary strength and emerging powers.

>>Superboy's dual dilemma is to conceal his true self, while exploiting his powers to help those in need.

>> Superboy is age eleven or twelve, constantly confronting the trauma of

9

adolescence, school cliques, assorted bullies, and bad guys.

>>Superboy ultimately protects his home town and its inhabitants from accidents and evildoers, the basis of his earliest crime-fighting adventures.

By comparison, the Superman materials which pre-date Siegel's Superboy Story (**Action Comics** 1, 1939 newspaper strips and **Superman** 1) do <u>not</u> contain the same elements or focus. In **Action Comics** 1, where Superman debuted in 1938, we see him as an infant in only one panel on the first page. In the next panel, he is an adult with fully-developed superpowers. Superman was grounded in a very cosmopolitan environment, soon dubbed "Metropolis," and his adventures emanated from that urban setting and Clark Kent's job as a big-city reporter. By contrast, Siegel's Superboy was set in a small town, where the young hero attends school while coming to grips with his emerging superpowers. Siegel's Superboy led to **Superboy** 2, christening his hometown – Smallville.

In July, 1943, Jerry Siegel entered the U.S. Army to fight in World War II. While he was stationed in the Pacific, Detective Comics, without giving notice or getting his consent, used his Superboy Material in the first Superboy story, in **More Fun Comics** 101 (November 18, 1944).

As DC Comics states in its book **DC Comics: A Celebration of the World's Favorite Comic Book Heroes** (Copyright 1995, 2003 DC Comics): "**More Fun Comics** 101...la[id] the groundwork for countless stories and new directions to come. Superboy's learning experiences and the gentle guidance of Ma and Pa Kent become important touchstones in the character's development…"

Jerry Siegel set a startling, new precedent in comics with his Superboy premise, just as he did with Superman. By 1940, comics already embraced kid heroes (young Billy Batson became manly Captain Marvel; Supersnipe stayed a kid, but had no powers; Marvel Boy had plenty; the Young Allies featured a group

10

of kid superheroes; Kid Eternity; Golden Lad; etc) before Superboy debuted. About the closest in concept was Captain Marvel, Jr.; crippled newsie Freddie Freeman, who became a teen costumed tower of power after saying the word "SHAZAM!"

Siegel's concept, however, brilliantly spotlighted and examined an already-established superhero in his childhood, an area previously untapped in comics history. Perhaps it is still unique in that respect. Supergirl *is* Supergirl, with no adult precedent. Superboy, however, highlights an unexploited and highly-marketable area — the evolution of a hero — and might well be a one-of-a-kind phenomenon. There may be stories about Wonder Woman as a girl, for example, but no major series or titles are predicated upon that premise. The point is that with hundred of Golden Age writers and editors developing material for a voracious market, none had the originality or foresight to conceive and express the Superboy concept.

B.    The Derivative Superboy Works

"Superboy's" small town adventures were published in **More Fun Comics** 101-107 (1944-1945), **Adventure Comics** 103-503 (1946-1983), **Superboy** 1-235 (1949-1977), **The New Adventures of Superboy** 1-54 (1979-1984), and another series of comics entitled **Superboy** (aka **The Adventures of Superboy**) 1-100 (1989-2002), which were published at regular intervals, and in numerous other comic book publications (comic books featuring Superboy are sometimes referred to by me as the "Superboy Comic Books"). Superboy has also been exploited in several television series, including the animated **The Adventures of Superboy** (1966), the live action series **The Adventures of Superboy** (1988-1992), and **Smallville** (2001-ongoing).

11

C.     The "Smallville" Series

The **Smallville** television series debuted in October, 2001 and is currently in its sixth season. It is set in Superboy's hometown, from which the series takes its name, and focuses on a youth with extraordinary abilities, who must simultaneously face the challenges of adolescence and the responsibilities of his emerging powers. Like Siegel's Superboy Material, the **Smallville** series mirrors the youthful adventures of its superhero in the town he protects, while examining the character's social and family life.

Each of the following aspects of Siegel's Superboy Material is ubiquitous in **Smallville**:

1.     The character of Superboy– a modest, sensitive young man—at times, a loner—who, while attending school in a small rural town, must confront the complexities of growing up, knowing he is physically and mentally superior to his peers—and all humans—yet forced to keep his powers a vital secret.

While the lead character in Siegel's Superboy Material is originally a few years younger than in **Smallville**, as originally conceived by Siegel, he was naturally mature. The Superboy Summary suggested starting with "characters…of about twelve years, rather than adults," while the story follows the young hero from a toddler through kindergarten to pre-junior high; the majority taking place in the fifth grade (age 11-12). The first appearance of Superboy in **More Fun Comics** 101 follows the same brisk age progression. The ensuing derivative **Superboy** comic books from 1945 to 1984 follow Superboy's adventures as he matures through age eighteen, with the majority depicting him as a teenager.

2.     The characters of Superboy's adoptive parents, the Kents, and their close relationship with Superboy. These characters are fleshed out for the first time in the Superboy Story and in **More Fun Comics** 101. They are earnest

12

and moral people who, above all, love and nurture their adopted son. While simple country folk, they are quite aware and sensitive to Superboy's uniqueness and the challenges posed by his special predicament of growing up with unusual powers. They also know that others will not understand or accept who he really is and that, if the truth be known, he will be treated as an outcast. The Kents gently guide Superboy and counsel him on the need to restrain or conceal his powers. Although he is from another world, the Kents raise him as a human and in every respect, as their *son*. This is a central relationship in Siegel's Superboy Story. Eight of its thirteen pages concern Superboy's relationship with his adoptive parents.

3.      The setting of a small rural town where his social interactions and adventures take place and whose townspeople Superboy protects. The small town environment heightens the young hero's predicament of concealing his true identity and its simplicity provides a strong contrast to his supernatural powers.

4.      The perspective of Superboy going to school and, like any other youth, forming friendships, dealing with school cliques and bullies, while he is completely different from everyone else by virtue of his supernatural powers and origin.

5.      The core themes of Superboy coming to grips with who he really is and his purpose in life, while repressing his true self for fear that he will not be accepted – themes which amplify and reinterpret the dilemma of adolescence in a wish-fulfillment context, relatable themes for the target youth audience.

6.      The evolution and coming-of-age of a young man who destiny is to become a superhero.

In the **Superboy** comic books, the animated and live-action **Superboy** television series, the protagonist's adventures inevitably took place in Smallville. Superboy's fictional town was named in **Superboy** 2, published in 1949, and

13

has, for the following half century, been synonymous with Jerry Siegel's Superboy.

In the **Smallville** television series, the hero's best friend is Pete Ross and his high-school heartthrob is Lana Lang. The former first appeared in 1961 in **Superboy** 86, while the latter first appeared in 1950 in **Superboy**.

It is no surprise that the on-line Internet Movie Database (www.imdb.com), an industry resource regarding credits, lists Jerry Siegel as an author of *Smallville* as follows: "Jerry Siegel (**Superboy** comic book and characters)."

The Superman materials which pre-date the Superboy Material do <u>not</u> contain these elements. A core relationship in **Smallville**, as in the Siegel's Superboy Story, is that between the young hero and his understanding parents, to whom he turns for guidance. The majority of Siegel's Superboy Story concerns Superboy's relationship with his earthly parents. Yet, of the Superman material which pre-dates the Superboy Story – i.e., **Action Comics** 1, 1939 newspaper strips, and **Superman** 1 – only the latter shows his foster parents with him as a boy and then, only in *one* panel.

Comics by definition are representational and will always appear simple in comparison to derivative works of much larger scale and budgets. Nonetheless, **Smallville's** derivation and use of Siegel's Superboy is easily recognizable and qualitatively important.

## V.    CONCLUSIONS

### SUPERMAN

**Action Comics** 1 was clearly not a "work for hire" as it had been completely delineated by Siegel and Shuster prior to Detective Comics expression of interest in Superman. **Action Comics** 2-6, which were thereafter created by Siegel and Shuster prior to their entering into the 1938 Agreement, were also not "works for hire," as no employment relationship existed between

14

Detective Comics and Siegel and Shuster when these works were created. The works were created at Siegel and Shuster's instance and expense and they, not Detective Comics, were the motivating force behind the creation of these works. Finally, the Superman works created by Siegel and Shuster after they entered into the 1938 Agreement with Detective Comics should also not be considered "works for hire."

The 1938 Agreement for the first time used the term "employ and retain" with respect to Siegel and Shuster's subsequent work on Superman. Yet Siegel and Shuster independently created and produced the work and were not traditional employees of Detective Comics, nor did their relationship bear any of the usual indicia of employment. Siegel and Shuster's Superman Comics were not created at Detective Comics' instance and expense and Detective Comics exercised minimal to no control over their creative content.

With respect to all of the Superman comic books in question (**Action Comics** 1-61), Siegel and Shuster were not paid a salary, but were consistently paid on a "per page" basis for a finished product, and only for product actually delivered by them to Detective Comics and published by Detective Comics.  In compensating Siegel and Shuster, Detective Comics did not withhold or deduct payroll tax, social security and other taxes normally deducted from employee salaries; nor provide Siegel and Shuster with any employee benefits; Siegel and Shuster worked from their own premises (not Detective Comics' premises); determined their own hours and days of work; supplied, used and paid for their own tools and materials; and Siegel and Shuster hired and paid for their own employees.  Considering the totality of these circumstances, the Superman material created by Siegel and Shuster and published by Detective Comics in **Action Comics** 1 do not constitute "works made for hire."

15

The distinct foundational imprint created by **Action Comics** 1 is the heart and soul of a derivative motion picture such as **Superman Returns** and dictates that the profits from such classic "Superman" fare should not be minimized by "apportionment." What matters to the public are the core elements comprising the indelible "Superman" character and story, the blueprint for which was delineated in **Action Comics** 1 and survived for seven decades. The rest are really iterations of such elements. The plots though often appealing are transient and essentially fungible. To the unlikely extent that some allocation of Superman profits to elements not recaptured by the Siegels is deemed justified and even calculable, it would seem that the lion's share would have to go to the Siegels as Jerry and Joe's contribution to the success of their iconic character *is* their enduring character itself.

<u>SUPERBOY-SMALLVILLE</u>

It is beyond question that the **Superboy** comic books and television programs were derived from and are substantially similar to Siegel's Superboy Material. In turn, **Smallville** is substantially similar to and derived from Siegel's Superboy, the **Superboy** comic books, and the mythology to which it gave rise. If it were not for Siegel's creation of Superboy, there would be no **Smallville**.

While one might point to many differences in the big-budget, special effects-driven episodes of **Smallville** from a simple, if not primitive, comic book story, **Smallville** exploits the heart of Jerry Siegel's Superboy — a superhero in the making as a powerful metaphor for adolescence. It is this which I believe caused the enduring popularity of Superboy, exclusive and apart from Superman. The similarities are qualitatively important; for instance, the emphasis in both on the nurturing relationship between Superboy and his adoptive parents which shape his destiny and the man he was to become.

16

## VI.    COMPENSATION

I am not being paid for my services as an expert witness.

## VII.   PRIOR CASES

I have not served as an expert witness in any prior case.

## VIII.  PUBLICATIONS

I have authored the following publications:

GENII: THE CONJURERS MAGAZINE 12/1962

GENII: THE CONJURERS MAGAZINE 10/1964

THE STERANKO HISTORY OF COMICS V1 1970 (Supergraphics)

THE STERANKO HISTORY OF COMICS V2 1972 (Supergraphics)

RED TIDE Graphic Novel 1975 (Two Versions) (Pyramid Publications)

GRAPHIC NARRATIVE (Museum Catalog) 1977 Winnipeg Art Gallery

UNSEEN SHADOWS 1978 (Supergraphics)

THE BLOCK (anti-drug comicbook) 1971 (Various)

OUTLAND Graphic Novel 1982 (Coleccion Humanoides)

GRAPHIC PRINCE OF DARKNESS 1998 (Vanguard Publications)

THE ART AND TECHNIQUE OF GRAPHIC STORYTELLING (Essay) 2003
(Watson-Guptill)

NICK FURY: AGENT OF SHIELD (collection) 2000 (Marvel Comics)

NICK FURY: AGENT OF SHIELD (collection) 2002 (Marvel Comics)

MARVEL VISIONARIES: STERANKO 2002 (Marvel Entertainment Group)

VISUAL THEORY V1 2003 (Supergraphics)

100 GREATEST COMIC BOOKS (Two Essays) 2004 (Whitman Publishing)

COMIXSCENE / MEDIASCENE / PREVUE MAG. 1972-1996 (Supergraphics)

Hundreds of interviews and features in magazines internationally.

Jan-13-07  12:15am  From-
Case 1:10-cv-00141-CM-KNF   Document 120-1   Filed 04/29/11   Page 22 of 24

FROM : TYPESOURCE                    FAX NO. :610 3700867              T-193  P.071/073  F-301
                                                                      Jan. 12 2007 05:02PM  P2

     Jan-12-07  12:31pm  From-

                                                                      T-186  P.002/002  F-205

I reserve the right to amend and supplement this initial report.

Respectfully submitted,

James Steranko

18

1            **PROOF OF SERVICE**

2        STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3            I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen
    years and not a party to the within action; my business address is:  2049 Century Park East, Suite 2720,
4    Los Angeles, California 90067.

5            On January 12, 2007, I served the attached documents described as **PLAINTIFFS JOANNE
    SIEGEL AND LAURA SIEGEL LARSON'S INITIAL DESIGNATION OF EXPERT**
6    **WITNESS JAMES STERANKO** as follows:

7    [X]  :BY FACSIMILE:

8            As follows: I caused the transmission of the above named documents to the fax number set
9    forth below, or on the attached service list.

10        James D. Weinberger
          FROSS ZELNICK LEHRMAN & ZISSU, P.C.
11        866 United Nations Plaza
          New York, NY 10017
12        Facsimile No. 212-813-5901

13        Patrick T. Perkins
          PERKINS LAW OFFICE, P.C.
14        1711 Route 9D
          Cold Spring, NY 10516
15        Facsimile No. 845-265-2819

16        Michael Bergman
          WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
17        9665 Wilshire Boulevard, Ninth Floor
          Beverly Hills, CA 90212
18        Facsimile No. 310-550-7191

19    [X]  :BY MAIL:

20            As follows: I am "readily familiar" with the firm's practice of collection and processing
      correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on
21    that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of
      business. I am aware that on motion of the party served, service is presumed invalid if postal
22    cancellation date or postage meter date is more than one day after date of deposit for mailing in
      affidavit. I placed _____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed
23    as follows:

24        James D. Weinberger
          FROSS ZELNICK LEHRMAN & ZISSU, P.C.
25        866 United Nations Plaza
          New York, NY 10017
26
          Michael Bergman
27        WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
          9665 Wilshire Boulevard, Ninth Floor
28        Beverly Hills, CA 90212

1        :(STATE) - I declare under penalty of perjury under the laws of the State of California that the
2    above is true and correct.

3        [X] :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at
     whose direction the service was made.

4        I declare under penalty of perjury that the foregoing is true and correct.

5        EXECUTED on January 12, 2007, in Los Angeles, California.

6

7

8                                                    Alexander M. Merino

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28