UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __7/28/11__
```

                                        :
MARVEL WORLDWIDE, INC.,                 :
MARVEL CHARACTERS, INC. and             :
MVL RIGHTS, LLC,                        :
                                        :
                                        :       10 Civ. 141 (CM) (KNF)
            Plaintiffs,                 :
                                        :
    - against-                          :
                                        :
LISA R. KIRBY, BARBARA J. KIRBY,        :
NEAL L. KIRBY and SUSAN M. KIRBY,       :
                                        :
            Defendants.                 :
_____ x
                                        :
LISA R. KIRBY, BARBARA J. KIRBY,        :
NEAL L. KIRBY and SUSAN M. KIRBY,       :
                                        :
            Counterclaim-Plaintiffs,    :
                                        :
    - against-                          :
                                        :
MARVEL WORLDWIDE, INC.,                 :
MARVEL CHARACTERS, INC.,                :
MVL RIGHTS, LLC,                        :
MARVEL ENTERTAINMENT, Inc.,             :
THE WALT DISNEY COMPANY, and            :
DOES 1 through 10,                      :
                                        :
            Counterclaim-Defendants.    :
_____ x

MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS
MOTION FOR SUMMARY JUDGMENT

McMahon, J.

        Jack Kirby is a legend in the comic book industry. During his long association with

Marvel Comics, Kirby, working as a freelance artist, played a key role in the creation of a

number of iconic characters, including "The Fantastic Four," "The Incredible Hulk," and "The X-Men."

Kirby died in 1994, survived by his wife, Rosalind, and their four children—Defendants Susan M. Kirby, Neal L. Kirby, Barbara J. Kirby, and Lisa R. Kirby (the "Kirby Heirs"). (Pls.' Rule 56.1 Statement of Undisputed Material Facts ("Pls.' 56.1") ¶ 5).

In June 1972, Marvel had Kirby execute an assignment to Marvel Management Company of any and all right, title and interest (including specifically any copyrights, whether statutory and at common law) that Kirby "may have or control" in any of the works Kirby created for Marvel. (2/18/11 Declaration of Randi W. Singer ("Singer Decl.") Ex. 17 at 1.A.(1).) The assignment did not state that Kirby actually owned any copyright in the works; on the contrary, the assignment contained an acknowledgement that Kirby had created the works "as an employee for hire" of the owners of Marvel, the Goodmans. (Singer Decl. Ex. 17 at 5.)

On September 16, 2009, the Kirby Heirs served Plaintiffs with 45 notices purporting to terminate Kirby's assignment of his federally-protected copyrights in a number of Marvel editions that were published between 1958 and 1963: Amazing Adventures, Vol. 1, Nos. 1-6; Amazing Fantasy, Vol. 1, No. 15; The Amazing Spider-Man, Vol. 1, Nos. 1-7; The Avengers, Vol. 1, Nos. 1-2; The Fantastic Four, Vol. 1, Nos. 1-21; The Fantastic Four Annual, No. 1; Journey Into Mystery, Vol. 1, Nos. 51-98; The Incredible Hulk, Vol. 1, Nos. 1-6; The Rawhide Kid, Vol. 1, Nos. 17-35; Sgt. Fury and His Howling Commandos, Vol. 1, Nos. 1-41 Strange Tales, Vol. 1, Nos. 67-115; Tales of Suspense, Vol. 1, Nos. 1, 3-48; Tales to Astonish, Vol. 1, 8 (collectively, the "Kirby Works"). (Pls.' 56.1 ¶ 7; see also Defs.' Rule 56.1 Statement of Disputed Material Facts ("Defs.' 56.1") ¶ 7.) The Termination Notices relied for their force on 17 U.S.C. § 304(c), which provides that

2

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a *work made for hire*, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, . . . is subject to termination under the following conditions: . . . . In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

See 17 U.S.C. § 304(c)(1) (emphasis added). After fruitless negotiations, Plaintiffs Marvel

Worldwide, Inc., Marvel Characters, Inc. and MVL Rights, LLC commenced this action, seeking

a declaration that the Termination Notices were a nullity, since Marvel, not Kirby (or his heirs),

owned the copyrights in the works that were the subject of the Notices. The Kirby Heirs

counterclaimed for a declaration that the Termination Notices were effective and that they now

controlled the copyrights in these iconic works.

Presently before the Court are the parties' cross motions for summary judgment.

Plaintiffs argue that there are no disputed issues of material fact and that the undisputed material

facts establish that the Kirby Works were "works made for hire" within the meaning of the

Copyright Act of 1909, which law conferred all federal copyright in a "work made for hire" in

the employer. Defendants counter that there are disputed issues of material fact that bar

summary judgment in Marvel's favor, but none that would prevent the court from concluding, as

a matter of law, that the Kirby Works are not "works made for hire."

At the outset, it is important to state what this motion is not about. Contrary to recent

press accounts and editorials, see, e.g., Brent Staples, Marvel Superheroes and the Fathers of

Invention, N.Y. Times, June 26, 2011, at SR11; Earl Wells, Letter to the Editor, Giving Credit

for Comics, N.Y. Times, July 3, 2011, at A18, this case is not about whether Jack Kirby or Stan

Lee is the real "creator" of Marvel characters, or whether Kirby (and other freelance artists who

3

created culturally iconic comic book characters for Marvel and other publishers) were treated "fairly" by companies that grew rich off the fruit of their labor. It is about whether Kirby's work qualifies as work-for-hire under the Copyright Act of 1909, as interpreted by the courts, notably the United States Court of Appeals for the Second Circuit. If it does, then Marvel owns the copyright in the Kirby Works, whether that is "fair" or not. If it does not, then the Kirby Heirs have a statutory right to take back those copyrights, no matter the impact on a recent corporate acquisition or on earnings from blockbuster movies made and yet to be made.

I conclude that there are no genuine issues of material fact, and that the Kirby Works were indeed works for hire within the meaning of the Copyright Act of 1909. Therefore, the Section 304(c) Termination Notices did not operate to convey any federally-protected copyrights in the Kirby Works to the Kirby Heirs. Marvel's motion for summary judgment is granted; the Kirby Heirs' cross motion is denied.

## THE MOTIONS TO STRIKE

Before the court can recite the facts, I must consider exactly what should and should not be part of the record on the parties' cross motions for summary judgment. Marvel has made three procedural motions, in an effort to strike certain material from the motion record: to strike the "expert" testimony of Mark Evanier and John Morrow, to strike the declarations of Joe Sinnott and James F. Steranko, and to strike certain documents attached as exhibits to the Declarations of Marc Toberoff and John Morrow. All of these documents were filed in support of the Kirby Heirs' opposition to Marvel's motion for summary judgment.

Marvel's side of the story is told by the most percipient of witnesses: Stan Lee Marvel's editor during the period 1958-1963—when the Kirby Works were created—and a legendary figure in his own right. Although 87 years old, Lee gave a two-day deposition in this matter:

4

Marvel's motion stands or falls on his testimony, although Marvel supplemented Lee's testimony with testimony from Roy Thomas, Lawrence Lieber, and John Romita.

Thomas began as a staff writer at Marvel in July 1965 and continued to work at Marvel until 1980. (10/26/10 Deposition of Roy Thomas ("Thomas Dep.") 8:9-14.)

Lieber was a writer for Marvel beginning in June 1958. (Deposition of Lawrence Lieber ("Lieber Dep.") 9:14-20.)

Romita first worked for Timely Comics in 1949 as a "ghost penciller"—that is, Romita completed pencil artwork for comic book stories Stan Lee assigned to another artist, Lester Zakarin. (Deposition of John Romita ("Romita Dep.") 7:16-8:21.)  Following his one-year stint as a ghost penciller, Romita spent two years in the army.  In 1951, while still in the army, Romita was hired by Lee to work as a freelance artist for Timely Comics.  (Romita Dep. 10:6-12:4.)  In 1953, after leaving the army, Romita continued working for Timely Comics as a freelance artist until 1958.  (Id. 12:5-13.)  In 1965, Romita returned to Marvel, first as a freelance artist and in 1966, as a staff artist.  (Romita Dep. 14:5-11.)  Romita remained at Marvel until 1996.  (Id.)

To counter Lee's first-hand testimony, the Kirby Heirs offer the testimony from three comic book artists who also worked as freelancers for Marvel between the 1950s and 1970s. James F. Steranko is a comic book artist and historian who worked for Marvel as a freelance artist between 1966 and 1973.  (Declaration of James F. Steranko ("Steranko Decl.") ¶¶ 2, 5.) Joe Sinnott is a comic book artist who worked for Marvel as a freelance artist in the 1950s and 1960s.  (Declaration of Joe Sinnott ("Sinnott Decl.") ¶ 3.)  Sinnott also worked as a "freelance inker" and inked many issues of Kirby's "The Mighty Thor" and "The Avengers."  (Sinnott Decl. ¶ 5.)  Richard Ayers is a comic book artist who worked on a freelance basis for Marvel from 1959 until 1975.  (Declaration of Richard Ayers ("Ayers Decl.") ¶¶ 2, 6-8.)  Richard Ayers

5

also inked various newspaper comic strips drawn by Kirby (but not for Marvel) between 1959 and 1961. (Ayers Decl. ¶ 5.)

The Kirby Heirs also offer their own reminiscences about their father and his work, but as they were children during the relevant time period, they do not claim to have first-hand knowledge about their father's business dealings with Marvel.

Finally, in an attempt to cast doubt on Lee's testimony, the Kirby Heirs offer the "expert" testimony of Mark Evanier and John Morrow.

Marvel asks the Court to disregard most of the evidence the Kirby Heirs offer.

The Steranko & Sinnott Declarations:   Marvel asks the court to strike the declarations of Steranko and Sinnott because the Kirby Heirs did not disclose, pursuant to Federal Rule of Civil Procedure 26, their intent to rely on either witness's testimony until two months after discovery was completed and shortly before the parties filed their motions for summary judgment. (See ECF Dkt. No. 111.)  Marvel's motion to strike Steranko's and Sinnott's declarations is denied.

Federal Rule of Civil Procedure 26 requires a party to supplement or correct a disclosure made in an interrogatory, production request, or request for admission, "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Kirby Heirs did not have a duty to supplement their Rule 26 initial disclosures to add Steranko and Sinnott as potential witnesses, because the existence of both witnesses became

known to Marvel during discovery. In his deposition, Mark Evanier told Marvel's counsel that Sinnott was a freelance artist who worked for Marvel during the relevant time period and that he had spoken with Sinnott about "Marvel history." (4/22/11 Declaration of Marc Toberoff ("4/22/11 Toberoff Decl.") Ex. C.) Steranko was disclosed to Marvel during John Morrow's deposition, when Morrow was questioned about an article he wrote that discussed Steranko. (4/22/11 Toberoff Decl. Ex. A.) Marvel's counsel questioned Morrow about Kirby's role in creating a comic book for which Steranko was originally asked to complete the artwork. (Id.)

The duty to supplement a Rule 26 disclosure is "only necessary when the omitted or after-acquired information 'has not otherwise been made known to the other parties during the discovery process.'" See 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2049.1 (3d ed. 2010). The purpose of Rule 37(c) "is to prevent the practice of 'sandbagging' an opposing party with new evidence." Ebewo v. Martinez, 309 F. Supp. 2d 600, 606-07 (S.D.N.Y. 2004). Because Marvel became aware of Steranko and Sinnott at Morrow's and Evanier's depositions, the Kirby Heirs did not have a duty to supplement their Rule 26 initial disclosures. See, e.g., Sealy v. Gruntal & Co., 1998 WL 698257, at *2 (S.D.N.Y. 1998).

Documentary Exhibits: Marvel also moves to strike certain documents attached to declarations filed by the Kirby Heirs in support of their opposition to Marvel's motion for summary judgment. (See ECF Dkt. No. 111.) Specifically, Marvel seeks to strike eight documents they argue were not disclosed by the Kirby Heirs during discovery: (1) the Declaration of Joe Sinnott; (2) the Declaration of James Steranko, and (3) Exhibits Y, GG, JJ, OO, FFF, JJJ, and LLL to the Declaration of Marc Toberoff. That motion is denied as well.

Exhibits Y, GG, JJ, and OO to the Toberoff Declaration are excerpts from "The Collected Jack Kirby Collector" Volumes 5 and 6—a book that was edited and published by Morrow.

7

Marvel's motion to strike these exhibits is denied, as the book was disclosed to Marvel in December 2010. (See 4/22/11 Toberoff Decl. Ex. J.)

Exhibit LLL—a comic book drawn by Kirby entitled "Challengers of the Unknown, No. 1"—was disclosed in the expert reports of Morrow and Evanier, and both were questioned about the comic book during their depositions. (4/22/11 Toberoff Decl. Ex. A at 184:14-186:2, Ex. C at 228:16-231:9.) The Kirby Heirs did not have a duty to supplement their Rule 26 disclosures because the information became known to Marvel during discovery.

Exhibit JJJ is a true and correct copy of excerpts from the 1963 treatise "Nimmer on Copyright." The Kirby Heirs cite to the treatise in their brief. There is no requirement that legal authority be disclosed in a Rule 26 disclosure. Marvel's motion to strike Exhibit JJJ is denied. It is not, however, evidence of anything, and cannot be relied on to raise any genuine issue of fact.

Exhibit FFF is an article entitled "Jack Kirby: A By-the-Month Chronology" for the periods 1950-1959 and 1960-1964. The article simply lists the comic books that Kirby worked on during those years. Even if the article were not disclosed to Marvel, Marvel's motion to strike Exhibit FFF is denied, because Marvel is not prejudiced if the Kirby Heirs are allowed to rely on that chronology now.

The "Expert" Declarations: Marvel also filed two motions, seeking to exclude the expert testimony and reports of John Morrow and Mark Evanier. (See ECF Dkt. No. 67 & 70.) Marvel also filed a motion to strike Exhibit B to John Morrow's Declaration—a comic book entitled "The Fantastic Four: The Lost Adventure." (ECF Dkt. No. 111.) The motions are granted.

John Morrow is a writer, archivist, and publisher in the comic book industry. Morrow states that Kirby's death in 1994 prompted him to produce a newsletter about Kirby's life and

8

achievements.  (Decl. of John Morrow ("Morrow Decl.") ¶ 2.)  He still publishes that newsletter today.

Morrow's "expert" report for the Kirby Heirs relates to three issues: (1) Marvel's history before, during, and after the 1958-1963 time period, (2) the business relationship between Kirby and Marvel during that period, and (3) Kirby's creation or co-creation of certain comic book characters.  (Morrow Decl. at Ex. A (Morrow's Expert Report).)

Mark Evanier is a comic book writer, columnist, and historian.  (Declaration of Mark Evanier ("Evanier Decl.") ¶¶ 1-2.)  In 1969, Kirby hired Evanier as an assistant, to conduct research, co-author "letter pages" in Kirby comic books, and to assist Kirby with creating storylines.  (Evanier Decl. ¶ 2.)  Evanier helped Kirby with new comic book projects that Kirby was producing for DC Comics in 1969—six years after the relevant period.  (Id.)  Like Morrow, Evanier was asked to render an "expert opinion" about the manner in which Kirby created or co-created comic book characters published by Marvel from 1958-1963, and about Kirby's relationship with Marvel during that time period.  (Id. ¶ 14.)  Evanier's report purports to trace the background of the comic book industry, Marvel's origin, and Marvel's relationship with Kirby.  (See Evanier Decl. Ex A. at 4-9.)

The reason for Evanier and Morrow evidence is clear:  to try to rebut Lee's testimony and create issues of fact about the creation of the Kirby Works between 1958 and 1963. Unfortunately for Defendants, Evanier and Morrow lack Lee's "I was there" experience. Evanier admits that he was only six years old in 1958, when the relevant time period began; he did not meet Kirby until over a decade later, when Evanier was 17.  (11/9/10 Deposition of Mark Evanier ("11/9/10 Evanier Dep.") 17:11-13, 19:7-20:10.)  Evanier also concedes that, "There's a limit to how much [he] can know about what two men [i.e., Lee and Kirby] did behind closed

9

doors years ago." (12/6/10 Deposition of Mark Evanier ("12/6/10 Evanier Dep.") 113:14-15.)

Similarly, Morrow has no firsthand knowledge about Marvel's practices during the relevant time

period, or about the actual creation of the Kirby Works. Morrow testified that his accounts of

Marvel's history, its working relationship with Kirby, and the creation of certain characters were

based on "what [he has] read throughout the years" and what others have told him. (See, e.g.,

Declaration of David Fleischer ("Fleischer Decl.") Ex. B. at 53:20-55:10, 74:8-76:20, 91:5-12,

129:10-131:2.) Morrow admits that he learned everything he put in his report from interviews

and other secondary sources, in other words, hearsay. (See, e.g., Fleischer Decl. Ex. B. 37:21-

23, 53:20-55:10, 64:9-17, 91:5-12.) Morrow also admits that his only "connection" to the comic

book industry prior to 1994 was as a "comics fan." (See Fleischer Decl. Ex. B. at 40:7-16.)

A district court can admit expert testimony from a person "qualified as an expert by

knowledge, skill, experience, training, or education," assuming that "scientific, technical, or

other specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue." Fed. R. Evid. 702. Under Daubert v. Merrell Dow Pharm., Inc., 509

U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence, the Court's role is to determine

whether the "expert" is qualified to testify as an expert. The Court conducts a two-part inquiry:

(1) whether the expert used a reliable methodology; and (2) whether the testimony will assist the

trier of fact to understand the evidence or to determine a fact in issue. Daubert, 509 U.S. at 592-

93. The district court should not admit testimony that is "directed solely to lay matters which a

jury is capable of understanding and deciding without the expert's help." United States v.

Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991).

The Kirby Heirs must establish by a preponderance of the evidence that Evanier's and Morrow's expert testimony is admissible. See, e.g., Bourjaily v. United States, 483 U.S. 171, 175 (1987).

The "expert" reports will be stricken for multiple reasons, any one of which is sufficient.

First, Evanier's and Morrow's purported "expert" reports are merely factual narratives based on their review of secondary sources and interviews that attempt to reconstruct events about which neither has first-hand knowledge. Although Rule 703 of the Federal Rules of Evidence permits an expert to rely on hearsay in reaching his own opinion, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 576, 666 (S.D.N.Y. 2007).

Second, "Expert testimony must be helpful to the [trier of fact] in comprehending and deciding issues beyond the understanding of a layperson." DiBella v. Hopkins, 403 F.3d 102, 121 (2d Cir. 2005). Nothing either Evanier or Morrow says concerns technical or scientific matters that lay jurors need help to understand. Their proffered testimony therefore is inadmissible, because Evanier's and Morrow's reports address "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help." Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir. 1989).

Third, Morrow and Evanier also offer their "opinions" about the intent or motivations of Marvel and individuals that worked at Marvel. For example, Morrow opines that he "do[es] not believe that Goodman, Lee, Marvel or the freelance artists, like Jack Kirby . . . thought that the material they created was 'work made for hire.'" (Morrow Decl. Ex. A at 9.) Evanier also opined that "it is extremely doubtful that either Marvel or freelance artists, such as Jack Kirby, . .

11

. had any understanding or intent that their freelance material . . . was somehow work made for hire." (Evanier Decl. Ex. A at 14.)   "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." In re Rezulin Prods. Liab. Litig., 379 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); see also Highland Capital Mgmt. L.P. v. Schneider, 551 F. Supp. 2d 173, 182-83 (S.D.N.Y. 2008).

Evanier also opines on the credibility of Lee's testimony and concludes that it is more logical to believe that certain comic book characters were conceived by Kirby rather than by Lee. Evanier states, "I have great respect and personal affection for Stan Lee, but I disagree with the accounts he has sometimes given of the creation of [T]he Fantastic Four in which he solely created the concept and characters and Kirby's role was limited to simply drawing up Lee's creation." (Evanier Decl. Ex. A at 14.)   Evanier developed this "opinion" even though he was not present during discussions or plotting conferences between Kirby and Lee and has no first-hand knowledge of how the Kirby Works were created.   (12/6/10 Evanier Dep. at 231:10-12; 11/9/10 Evanier Dep. at 17:11-13, 19:7-20:10, 39:11-17, 40:21-25, 41:6-8, 41:24-25, 45:18-21, 46:15-20; Evanier Decl. Ex. A. at 11, 12.)   "An expert's opinions that are without factual basis and are based on speculation or conjecture are . . . inappropriate material for consideration on a motion for summary judgment."   See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

Finally, by purporting to opine on the credibility of Lee's testimony, Evanier has improperly usurped the role of the jury.   Nimely v. City of New York, 414 F.3d 381, 397-98 (2d Cir. 2005).   Testimony that directs the trier of fact to believe one account of events over another "does not 'assist the trier of fact,' Fed. R. Evid. 702, but rather 'undertakes to tell the jury what result to reach,' and 'attempts to substitute the expert's judgment for the jury's.'"   Id. at 398

(quoting <u>United States v. Duncan</u>, 42 F.3d 97, 101 (2d Cir. 1994)). Evanier's "opinion" about Lee's credibility is inadmissible because "it would serve only to usurp the jury in its fact finding role." <u>See</u> <u>Member Servs., Inc. v. Sec. Mut. Life Ins. Co. of N.Y.</u>, 2010 WL 3907489, at *26 (N.D.N.Y. Sept. 30, 2010).

Marvel's motion to exclude the "expert" report of Evanier and Morrow is granted. It's motion to strike Exhibit B to Morrow's declaration—a comic book entitled "The Fantastic Four: The Lost Adventure"—is also granted.

## STATEMENT OF UNDISPUTED FACTS

In opposing a motion for summary judgment, the non-movant may not rely on inadmissible evidence, such as hearsay, to create a disputed issue of fact. <u>See</u> <u>Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.</u>, 769 F.2d 919, 924 (2d Cir. 1985); <u>see also</u> <u>Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.</u>, 241 F. Supp. 2d 246, 270 (S.D.N.Y. 2002). The non-movant must "cite admissible evidence in support of [its] contention that there is admissible evidence creating a genuine issue for trial." <u>Archie Comic Publ'n, Inc. v. DeCarlo</u>, 258 F. Supp. 2d 315, 317-18 (S.D.N.Y. 2003). The Court bears this principle in mind as it considers whether particular assertions of fact are undisputed.

Based on the admissible evidence, the following facts are undisputed:

A. <u>Marvel Comics and the Key Players</u>

The following facts are undisputed.

In 1939 or 1940, Joe Simon and Jack Kirby were producing comics for a man named Martin Goodman at a company called Timely Comics. (Deposition of Stan Lee ("Lee Dep.") 11:3-21, 11:7-21, 14:9-10; <u>see also</u> Pls.' 56.1 ¶ 11.) Lee was hired as an "assistant," tasked with sharpening pencils, erasing pages, and fetching lunch. (Lee Dep. 11:11-17.)

13

At some point in the 1940s, Kirby and Simon left the employ of Timely Comics. Goodman asked Lee to "function as the editor and art director and writer until [Goodman] hired someone, a grown up." (Id. at 14:9-17.) As the whole world knows, Goodman never replaced Lee, who remained the editor at Marvel until the early 1970s. (Pls.' 56.1 ¶ 44.) Lee was thus the Marvel editor between 1958 and 1963, when the Kirby Works were created.

As art director and editor, Lee was responsible for the "creative editorial aspects" of the comic books published by Timely Comics—which eventually became Marvel (the name I will use from this point on). (Lee Dep. at 16:14:19; see also Pls.' 56.1 ¶ 23.) As editor, Lee developed the ideas and stories for all of Marvel's comic books. (Pls.' 56.1 ¶ 22; see also Lieber Dep. 12:19-25, 13:22-14:4.) All of Marvel's artists and writers reported to Lee. (Pls.' 56.1 ¶¶ 23-24.) Lee assigned artists to work on comic books, edited or changed their work, set deadlines for the submission of work, and even gave artists direction and guidance about the stories they were assigned to draw. (Lee Dep. 16:5-17:4; see also Thomas Dep. 59:6-21; Lieber Dep. 14:5-8; Pls.' 56.1 ¶¶ 25-26.)

During the period 1958-1963, when the Kirby Works were created, Lee supervised the creation and publication of Marvel's comic books from beginning to end. (Pls.' 56.1 ¶¶ 27-29.) Nothing was published without his approval. (Id. ¶¶ 30, 32.) Lee reviewed every artist's work before publication. (Lee Dep. 16:20-17:4.) If artwork was "confusing," if more "action" was needed, or if a script had too much or too little dialogue, Lee was responsible for "mak[ing] the stories as good as [they] could [be]." (Id.; see also Lieber Dep. 15:16-25.) It was not uncommon for Lee to make changes to artwork or a script without first consulting the artist or writer. (See Thomas Dep. 63:23-64:19; see also Lieber Dep. 15:16-25.)

14

Lee reported to Goodman. (Lee Dep. 16:17-19.) As the publisher and owner, Goodman "was the ultimate boss," and had the final say over what comics Marvel published. (See 10/21/10 Deposition of John v. Romita ("Romita Dep.") 243:2-4; see also Lee Dep. 19:13-17.) If Goodman did not approve a comic book, it was not published. (Lee Dep. 97:10-11.) Occasionally, Goodman would request changes to artwork or a story (id. at 18:17-19:17); Lee was responsible for ensuring that the artist executed Goodman's changes. (Id.)

B. The Marvel Method

During Lee's early years as art director/editor, either he or another writer prepared detailed "scripts" for new issues of comic books. (Pls.' 56.1 ¶ 36; see also Lieber Dep. 12:19-23, 13:2-5.) These scripts consisted of a panel-by-panel breakdown of the story for each page and explicit instructions about what action should be drawn for each panel and what dialogue would be inserted to accompany the art. Only after a script was prepared was an artist asked to start work on the comic. (Pls.' 56.1 ¶ 36.) During this period, the freelance artists who drew for Marvel had to wait for Lee to write a story before they could draw it. (Lee Dep. 20:7-21:24; see also Pls.' 56.1 ¶ 38.)

Predictably, Lee could not write enough stories to keep up with the artists, who wanted new stories to draw as soon as they finished an assignment. (Lee Dep. 20:7-21:24; see also Pls.' 56.1 ¶ 38.) So to ensure that his artists always had an assignment, Lee invented what became known as the "Marvel Method." (Lee Dep. 20:7-21:24.) He could not place the invention of the Marvel Method at any particular moment in time, other than to say that it evolved during the 1950s. (Lee Dep. 22:2-10.)

Under the Marvel Method, Lee would not write a detailed script for a story before assigning an artist to draw it. Instead, at a "plotting conference," or in a "plot outline," Lee gave

the artist the general contours of the story he had in mind: an outline of the plot, a description of the hero, and suggestions for how the story should look. (Id. at 21:5-22; see also Pls.' 56.1 ¶ 37; Lieber Dep. 19:11-14, 28:3-9, 47:20-48:8.) The artist would draw the story along the lines of Lee's "main theme." (Lee Dep. at 21:5-22.) After an artist completed the pencil drawings, Lee edited his work and added dialogue and captions. (Id.) Use of the Marvel Method allowed Lee to keep multiple artists working on assignments simultaneously. (Id. at 21:23-24; see also Pls.' 56.1 ¶ 37.)

Obviously, the Marvel Method gave an artist greater opportunity for input into the process of creating the characters and the stories. However, even under the Marvel Method, artists did not work "on spec;" they only began to draw "pages" when they received an assignment and plot synopsis from Lee. (Pls.' 56.1 ¶ 39; see also Thomas Dep. 56:12-15, 57:25-58:9; see also N. Kirby Dep. at 127:25-128:5; see, e.g., Lieber Dep. 14:5-8, 23:18-21.) Furthermore, the artists were always constrained by Lee's plot outlines (Pls.' 56.1 ¶¶ 40-41), and Lee retained the right to edit or alter their work, or to reject the pages altogether and not publish them if he did not like them. (Id. ¶ 43.)

Lee used the Marvel Method from the time he created it until he became Marvel's publisher in the early 1970s. (Id. ¶ 44.)

C. How Marvel Paid its Freelance Artists

Between 1958 and 1963, all of Marvel's freelance artists and writers, including Kirby, were paid flat per-page rates for artwork and scripts they produced. (Pls.' 56.1 ¶¶ 45, 61-62; see also Sinnott Decl. ¶ 11 ("I was paid at a page rate multiplied by the number of pages Marvel bought."); Steranko Decl. ¶ 13 ("I was paid by Marvel . . . on a per-page basis for the pages Marvel purchased.").) Kirby never received royalties for his work.

D. The Kirby Works

Between 1958 and 1963, Kirby worked on numerous comic book stories for Marvel. (Pls.' 56.1 ¶ 54.) Kirby received his assignments from Lee. (Id. ¶ 54). Kirby did not draw art for Marvel without first receiving an assignment from Lee. (Id. ¶ 55; see also N. Kirby Dep. at 127:25-128:5).

Like other artists who worked for Marvel at the time, Kirby created his artwork based on plot outlines or scripts provided by Lee. (Pls.' 56.1 ¶ 54.) At plotting conferences, Lee had the final say as to what was included in the comic book. (Id. ¶ 56.) Lee also had to approve Kirby's artwork before publication, and had the authority to require changes or edits to his work. (Id. ¶ 58.) Occasionally, Lee asked Kirby to make changes to his work. (Id. ¶ 59.) According to Lee, Kirby always complied with those requests. (Id.)

Kirby participated in the creation of the following comic book stories that are the subject of Defendants' Termination Notices:

*1. The Fantastic Four*

In 1961, Goodman told Lee to create a new team of superheroes to compete with "The Justice League of America," which was published by National Comics. (Pls.' 56.1 ¶ 80.) Lee and Kirby co-created "The Fantastic Four." (Lee Dep. 340:25-341:1.) At their first plotting conference, Lee and Kirby discussed ideas for the first issue. Kirby then produced the pencil drawings for that issue. (Pls.' 56.1 ¶ 82.) "The Fantastic Four" was originally published in November 1961. (Pls.' 56.1 ¶ 84; Defs.' 56.1 ¶ 84.)

2. *The Incredible Hulk*

"The Incredible Hulk," a sympathetic hero-monster, was co-created by Lee and Kirby in 1962. (Pls.' 56.1 ¶ 85; Defs.' 56.1 ¶ 85, Lee Dep. 340:25-341:1.) Kirby drew the first issue of "The Incredible Hulk," which was published in May 1962. (Id. ¶¶ 85-86.)

In that first issue, The Hulk had gray skin. However, the printer could not produce a consistent shade of gray throughout the book. (Pls.' 56.1 ¶ 87.) By the second issue The Hulk had acquired his now-recognizable green skin. (Lee Dep. 81:20-83:4.) Lee picked the color green because there was no other green hero at the time. (Id.)

3. *The Mighty Thor*

"The Mighty Thor" was first published in August 1962. The hero was based on the Norse god of thunder. (Pls.' 56.1 ¶¶ 88-89.) Lawrence Lieber wrote the script for the first issue, based on a synopsis for the plot created by Lee. (Id.) Kirby drew the art for the series' first issue. (Id.)

4. *Spider-Man*

In 1962, Lee developed the idea for a "nerdy" teenage hero with the power to stick to walls and ceilings like an insect. (Id. ¶ 90.) Lee assigned Kirby to create the artwork for the first Spider-Man story. (Id.) Lee did not like Kirby's initial pencil renderings of Spider-Man— the character was too muscular and heroic-looking—so he reassigned the comic book to artist Steve Ditko. (Id.) After Ditko completed his work on the book, Kirby drew the cover. (Id. ¶ 91.)

Spider Man first appeared in "Amazing Fantasy" in September 1962. (Id. ¶ 92.) Spider-Man was so popular that Goodman gave the character its own comic book. (Id. ¶ 93.) "The Amazing Spider-Man" was first published in March 1963. (Id.)

5. *Iron Man*

Iron Man first appeared in "Tales of Suspense" in March 1963. (Pls.' 56.1 ¶ 96.) The first Iron Man comic book was written by Lawrence Lieber, based on a plot from Lee; Don Heck drew the artwork. (Id. ¶¶ 94-95.) As with Spider Man, Kirby drew the cover for the comic book's first issue. (Id.)

6. *The X-Men*

In 1963, due to the popularity of "The Fantastic Four," Goodman asked Lee to create a new team of superheroes. (Pls.' 56.1 ¶ 97.) Lee conceived of The X-Men as a team of mutants who were born with superpowers, or "extra powers;" he also created the character of Professor Xavier, who opened a "School for Gifted Youngsters" where young mutants could enroll and develop their mutant powers. (Lee Dep. 93:3-94:23.) Lee originally named his heroes "The Mutants," but Goodman did not like the name, so the superheroes acquired their familiar moniker. (Id. at 94:12-20.)

The first issue of "The X-Men" was published in September 1963. (Pls.' 56.1 ¶ 98.) Kirby drew the artwork for that issue. (Id. ¶ 97.)

7. *The Avengers*

Also in 1962, Lee and Kirby developed a new team of superheroes, "The Avengers." (Pls.' 56.1 ¶ 99.) "The Avengers" consisted of several existing Marvel superheroes fighting together as a unit rather than separately. (Id.) Lee conceived the initial plot for "The Avengers," and Kirby drew the first issue, which was published in September 1963. (Id. ¶¶ 99-100.)

### 8. *Ant-Man*

"Ant-Man" was first published in January 1962. Lee had the idea of a miniature hero. (Id. ¶¶ 101-02.) Kirby drew the pencil artwork for the first issue of "Ant-Man," and the panel-by-panel script for the issue was written by Lieber. (Id. ¶ 101.)

### 9. *Nick Fury*

"Nick Fury" was based on a discontinued series from the World War II era entitled "Sgt. Fury and His Howling Commandos." (Id. ¶ 103.) Lee brought fury back to life and oversaw the creation of the comic book using the "Marvel Method." (Id.) Kirby was assigned to draw the artwork for the new series. (Id.) "Nick Fury" was first published in May 1963. (Id. ¶ 104.)

### 10. *The Rawhide Kid*

Lee developed "The Rawhide Kid" because Goodman loved westerns and liked titles that included the word "kid." (Id. ¶ 105.) Lee also wrote the comic book's first issue. (Id.) Kirby drew the pencil artwork. (Id.) Eventually, the writing and artwork for "The Rawhide Kid" was reassigned to Lieber. (Id.) The first issue of the comic book was published in August 1960. (Id. ¶ 106.)

### E. The 1972 Assignment

There is no evidence of any contemporaneous written contract between Marvel and Kirby relating to any of the Kirby Works. From Lee's testimony, it appears that Kirby was a freelancer who was retained to create comic book artwork at Lee's instance and was paid an agreed-upon fee for doing so.

In the spring of 1972—well after the creation of the Kirby Works—Marvel and Kirby executed a written agreement. (Defs.' 56.1 ¶ 147.) The agreement, which Kirby signed on May 30, 1972, assigns to Magazine Management Company (a Marvel predecessor) "any and all right,

20

title and interest [Kirby] *may have or control*" in all the work that Kirby created for Marvel.

(Singer Decl. Ex. 17 at 1.A.(1) (emphasis added).)  Specifically, Kirby assigned to Magazine

Management Company:

> (1) Any and all MATERIALS, including any and all ideas, names, characters, symbols, designs, likenesses, visual representations, stories, episodes, literary property, etc., which have been in whole or in part acquired, published, merchandised, advertised and/or licensed in any form, field, or media by the Goodmans, their affiliates, and/or their predecessors or successors in interest . . . .

> (2) Any and all RIGHTS, including any all copyrights, trademarks, statutory rights, common law rights, goodwill, and any other rights whatsoever relating to the Materials in any and all media and/or fields including any and all rights to renewal or extension of copyright, to recover for past infringement and to make application or institute suit therefor, and including by way of example  and without limitation Kirby's claim to renewal copyright in Volume 2, Nos. 1-10 of the work entitled "Captain America Comics," these being evidenced by Registration Nos. R429502, R446534, R446535, R446536, R446537, R446538, R446539, R446540, R446541, and R448324 in the United States Copyright Office.

(Id. at 1.A.(1) and 1.A.(2).)[1]

As noted, Kirby assigned whatever right, title, and interest (including copyrights) he

"may" have, but the agreement contained no representation that Kirby in fact had any right, title

or interest to convey.  To the contrary: the agreement contained explicit language that was

obviously intended to negate any suggestion that Kirby actually owned any federally-protected

copyright in his artwork:

> Kirby acknowledges and agrees that all his work on the MATERIALS, and all his work which created or related to the RIGHTS, was done as an employee for hire of the Goodmans.

(Id. at 5.)

---

[1] The agreement states that the term "Materials" is defined in "Schedules 1, 2, and 3," which are "attached" to the agreement.  (Singer Decl. Ex. 17 at 1.A.)  However, Schedules 1, 2, and 3 were not included in the declarations submitted to the Court by either party; the parties submitted only a copy of the agreement without any attachments.

It is the assignment of any federal statutory copyright conveyed by this document that the Notices purport to terminate.

F.  Procedural Posture

On September 16, 2009, the Kirby Heirs served Marvel with Termination Notices under 17 U.S.C. § 304(c).  The Termination Notices purport to terminate any and all pre-January 1, 1978 grants of copyrights made by Kirby in the Kirby Works, as well as any implied grant of renewal rights under Federal Copyright law.  (Defs.' Answer ¶ 25.)

On January 8, 2010, Marvel commenced this action.  The Kirby Heirs answered and asserted five counterclaims against the Marvel Plaintiffs.  The Court granted Marvel's motion to dismiss all counterclaims except the counterclaim seeking a declaration that the Termination Notices were valid on November 22, 2010.  Marvel Worldwide, Inc. v. Kirby, 756 F. Supp. 2d 461 (S.D.N.Y. 2010).

On February 25, 2011, following discovery, the parties filed the motions that are the subject of this opinion.

## DISCUSSION

A.  Standard on A Motion for Summary Judgment

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 61 (2d Cir. 2002); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  In addressing a motion for summary judgment, the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in its favor.  L.B. Foster Co. v. Am. Piles, Inc., 138 F.3d 81,

87 (2d Cir. 1998) (citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Whether a disputed issue of fact exists is for the court to determine. Balderman v. United States Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

Not every disputed factual issue is material. A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)). Therefore, although a court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 151 (2000). To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party.

As discussed above, the court can consider only evidence that would be admissible at trial in support of a motion for summary judgment

Finally, "Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact." Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261-62 (2d Cir. 2005) (citing Crawford-El v. Britton, 523 U.S. 574, 600 (1998)).  Defendants challenge the credibility of Stan Lee, who (not surprisingly, given his significant role at Marvel during the relevant time period) is Marvel's main witness. However, general attacks on Lee's honesty or credibility, without more, are insufficient to raise a genuine issue of fact, see, e.g., Crawford-El v. Britton, 523 U.S. at 600; McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 280 (2d Cir. 1999)—especially since many matters about which Lee testified are corroborated by testimony from other freelance artists and writers.

B.  The Cross-Motions for Summary Judgment

The Copyright Act of 1976, effective January 1, 1978 (the "1976 Act"), gives an author or his heirs a nonwaivable right to terminate a prior assignment of copyright at any time during (1) a five-year period that begins on January 1, 1978, or (2) fifty-six years after the date the statutory copyright was originally secured, whichever is later. See 17 U.S.C. § 304(c).  It is this right that the Kirby Heirs have purported to exercise by serving the Termination Notices applicable to the Kirby Works.  The Kirby Heirs take the position that Marvel acquired the federal copyright in the Kirby Works via Kirby's 1972 assignment.  However, the fact of the assignment is not conclusive—especially where, as here, it is couched in language assigning whatever rights (including copyrights) Kirby "may" have, without making any definitive statement about what rights he actually "did" have.  As noted above, the assignment also

24

describes all of Kirby's work for Marvel (which includes the Kirby Works) as work done by Kirby as "an employee for hire of the Goodmans," the owners of Timely/Marvel—which, if that be true, means that Marvel, not Kirby, owned the federal copyright all along. In other words, the assignment speaks out of both sides of its mouth.

The question raised by the cross motions is whether, applying legal tests that have been settled in this Circuit for half a century, the Kirby Works were in fact "works made for hire." If they were, then the Termination Notices were ineffective. The reason is simple:  works made for hire are statutorily exempt from Section 304(c) termination, because the holder of the copyright (the "employer") is the statutory "author" of the work. See 17 U.S.C. § 304(c); Penguin Grp. (USA) Inc. v. Steinbeck, 537 F.3d 193, 203 (2d Cir. 2008).

The applicable rules of proof provide that the burden of raising the presumption that the Kirby Works were in fact "works made for hire" rests on Marvel. If Marvel raises the presumption, it will be deemed the author unless the Kirby Heirs rebut the presumption. They can only do so if they prove, by a preponderance of the evidence, that Kirby and Marvel had a "contrary agreement, either written or oral." Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 554-55 (2d Cir. 1995) (citing Roth v. Pritikin, 710 F.2d 934, 937 n.3 (2d Cir. 1983)). Should they fail to raise a genuine issue of material fact on this score, Marvel is entitled to summary judgment.

C. Works for Hire under the 1909 Copyright Act

The Kirby Works were published between 1958 and 1963. The Copyright Act of 1909 applies to all works published prior to January 1, 1978, Playboy, 53 F.3d at 553, and so constitutes the controlling law for our purposes.[2]

---

[2] This is important, because the 1976 Act, which is far more artist-friendly than the 1909 Act as interpreted by the courts, substantially narrows the scope of works for hire when the work is commissioned from a person who is not an "employee" of the commissioning party. See 17

The key word in that statute, for our purposes, is "author." Under the 1909 Act, the term
"author" includes "an employer in the case of works made for hire." 17 U.S.C. § 26 (1909)
(repealed); Playboy, 53 F.3d at 554. "Under this definition, an 'employer' who hires another to
create a copyrightable work is the 'author' of the work for purposes of the statute, absent an
agreement to the contrary." Id.

The terms "employer" and "works made for hire" are not defined in the 1909 Act—that
task was left to the courts.

By 1955 (which is when Congress began the two-decades-long process of overhauling
the 1909 Act), "the rule that [had] developed was to accord copyright protection to employers for
works made by their employees in the regular course of business." See 1 Melville B. Nimmer &
David Nimmer, Nimmer on Copyright § 5.03(B)(1)(a)(i). "As for commissioned works, the
courts generally presumed that the commissioned party had impliedly agreed to convey the
copyright, along with the work itself, to the hiring party." See Cmty. for Creative Non-Violence
v. Reid, 490 U.S. 730, 744 (1989). The Ninth Circuit, in Lin-Brook Builders Hardware v.
Gertler, 352 F.2d 298, 300 (9th Cir. 1965), was the first court explicitly to extend the work-for-
hire doctrine under the 1909 Act to works commissioned from independent contractors, rather
than created by employees. At about the same time, courts expanded "the definition of
'employer' to include a hiring party who had the right to control or supervise the artist's work."
Nimmer on Copyright § 5.03(B)(1)(a)(i).

In Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565, 567-68 (2d Cir.
1966), the Second Circuit first adopted the "instance and expense" test for deciding whether a
work commissioned from an independent contractor qualified as a work-for-hire under the 1909

U.S.C. § 101 (enumerating the types of commissioned work that qualify as "work made for
hire").

26

Act. That test remains in use today for answering the question posed by the cross motions for summary judgment.

D. Were the Works Made for Hire:  The "Instance and Expense" Test

In this Circuit, courts apply a two-pronged test to determine if a "work is made for hire" under the 1909 Act.  The test is referred to as the "instance and expense" test.

"The copyright belongs to the person at whose 'instance and expense' the work was created." Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 634-35 (2d Cir. 2004).  An independent contractor is treated as an employee under the statute if the work is made at the hiring party's "instance and expense." Playboy, 53 F.3d at 554; see also Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 159-60 (2d Cir. 2003).

"A work is made at the hiring party's 'instance and expense' when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out." Martha Graham, 380 F.3d at 635; see also Playboy, 53 F.3d at 554.  "The right to direct and supervise the manner in which work is created need never be exercised." Martha Graham, 380 F.3d at 635; see also Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir. 1972).  "[T]he hallmark of 'an employment for hire' is whether the employer *could* have exercised the requisite power to control or supervise the creator's work." Playboy, 53 F.3d at 554 (emphasis added).

The Second Circuit's jurisprudence concerning the status of commissioned works under the 1909 Act creates "an almost irrebuttable presumption that any person who paid another to create a copyrightable work was the statutory 'author' under the 'work for hire' doctrine." Estate of Burne Hogarth, 342 F.3d at 158 (citation omitted).

27

On the undisputed facts, the Kirby Works were created at the instance and expense of

Marvel. Therefore, Marvel is presumed to be their "author," and the holder of the statutory

copyright as a matter of law.

   *1.   Instance*

   "When the 'motivating factor in producing the work was the employer who induced the

creation,'" then the work is made at the hiring party's "instance." Playboy, 53 F.3d at 554

(quoting Siegel v. Nat'l Periodical Publ'n, Inc., 508 F.2d 909, 914 (2d Cir. 1974)). "That the

commissioning party be the motivating factor is not a 'but for' test—that is, but for the artist's

employment the work would not have been created—but instead is a more narrow inquiry

focused on the nature and scope of the parties' business relationship." Siegel v. Warner Bros.

Entm't Inc., 658 F. Supp. 2d 1036, 1059 (C.D. Cal. 2009).

   In analyzing that relationship, courts focus on the degree to which the hiring party had the

right to control or supervise the artist's work, since "an essential element of the employer-

employee relationship, is the right of the employer to direct and supervise the manner in which

the [artist] performs his work." Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 2002

WL 398696, at *18 (S.D.N.Y. 2002); see also Siegel, 658 F. Supp. 2d at 1059-60. Whether the

hiring party had the power to accept, reject, modify, or otherwise control the creation of the work

is relevant to whether the work was created at the "instance" of the hiring party. See Picture

Music, 457 F.2d at 1217; see also Playboy, 53 F.3d at 554. Complete control over the creator's

work is not necessary. See, e.g., Picture Music, 457 F.2d at 1217; see also Martha Graham Sch.,

380 F.3d at 635. Instead, "the greater the degree of supervisory power and control a

commissioning party has over an independent contractor, the more likely it is that the work was

created at the commissioning party's instance." <u>Twentieth Century Fox Film Corp v.</u>
<u>Entertainment Distributing</u>, 429 F.3d 869, 880 (9th Cir. 2005).

  The record on the cross motions admits of but one conclusion: Kirby did not create the
artwork that is the subject of the Termination Notices until Lee assigned him to do so. (<u>See</u> Pls.'
56.1 ¶¶ 55, 64.) Lee so testified, of course, but he was not the only one. Kirby's son Neal, a
Plaintiff in this case, testified that his father "didn't do work on spec[ulation], he was getting
paid by the page." (<u>See</u> N. Kirby Dep. at 127:19-128:5.) Although Neal Kirby testified that
there were instances where "his father did pitch ideas on spec to Marvel," he also admitted that
his father did not draw a comic book story until he had received approval for that story or was
assigned to that story by Lee or Goodman. (N. Kirby Dep. 167:21-168:23.)

  Kirby's refusal to work "on spec," as it was called, was consistent with how other Marvel
freelance artists operated at the time. (<u>See</u> Pls.' 56.1 ¶ 39.) Goodman and Lee were responsible
for hiring artists to create work that Marvel could publish. (Thomas Dep. 56:16-18; Romita Dep.
18:15-19; Lieber Dep. 14:5-8.) Thomas testified that artists did not work on comic book "pages"
before discussing the plot with Lee—meaning, before receiving an assignment. (Thomas Dep.
56:12-15.) Lieber also testified that assignments to write scripts came from Lee, and that Lee
was responsible for deciding which writer was assigned to a particular script for a comic book.
(Lieber Dep. 14:5-8, 23:18-21.) Lee also testified that Marvel did not purchase work from artists
that was not part of an assignment from him—that is, it did not purchase work that was created
"on spec." (Lee Dep. 41:20-42:3; <u>see also</u> Thomas Dep. 58:14-23.)

  The Kirby Heirs submitted declarations from three other freelance artists who were
contemporaries of Kirby—James Steranko, Richard Ayers, and Joe Sinnott. But Sinnott's and
Steranko's declarations do not create an issue of fact on the question of instance because all three

stated that payment for their work was contingent on approval of the work by Marvel's editor, (Steranko Decl. ¶ 14; Sinnott Decl. ¶ 11; Ayers Decl. ¶ 11), and neither artist stated that he worked on "spec." Additionally, although all three artists state that they were paid for work that Marvel accepted, none discusses whether their work was revised after submission but prior to publication. As such, their declarations do not create an issue of fact on the question of instance.[3]

In the work-for-hire context, "an essential element of the employer-employee relationship[] is the right of the employer to direct and supervise the manner in which the [artist] performs his work." Id. at 554 (quoting Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1217 (2d Cir. 1972)). If the hiring party "took the initiative in engaging [the artist]" and had "the power to accept, reject, or modify her work," then the work is a work for hire. Picture Music, 457 F.2d at 1217. It is undisputed that at all times between 1958 and 1963 Lee had complete editorial and stylistic control over all work that Marvel published.

In the 1950s and 1960s, Lee supervised the creation of Marvel's comic books from conception to publication. (Pls.' 56.1 ¶¶ 23-27.) Lee assigned writers and artist to work on comic books and reviewed all work before it was published. (Id. ¶¶ 24, 30.) Lee also had the authority to ask artists to revise or edit their work before publication and frequently exercised that authority. (Id. ¶¶ 32, 33, 35.) Freelance artist John Romita, for instance, testified that in the

---

[3] Even if the Court were to consider the "expert" testimony of Evanier and Morrow, the result would remain the same: neither Evanier's nor Morrow's testimony creates an issue of fact as to whether the Kirby Works were created at Marvel's instance and expense. As discussed, the fact that Marvel paid Kirby a fixed per-page rate for those works is by itself sufficient to satisfy the expense prong. Moreover, the testimony of witnesses with first-hand knowledge, such as the testimony of Lee and Lieber, establishes that the Marvel works were created at Marvel's instance. Evanier's and Morrow's testimony, based on hearsay and lacking in personal knowledge, is insufficient to create an issue of fact on the "instance" prong. Because neither "expert" points to "an agreement to the contrary," their testimony is also insufficient to rebut the presumption that the Kirby Works were works made for hire.

1950s, when he submitted artwork to Lee, Lee would note any corrections that needed to be made, and Romita made those corrections. (Romita Dep. 21:12-19, 23:4-13.) If, for instance, Lee wanted a character's frown changed to a smile to suit the story's dialogue, the artist made the change. (Id.) Lee did not always consult with the artist before making a change to their work. (Pls.' 56.1 ¶ 33; see also Thomas Dep. 63:23-64:2.)

If Lee did not approve of the artist's work, it was not published. (Pls.' 56.1 ¶ 30; see also Steranko Decl. ¶ ¶ 11, 13; Sinnott Decl. ¶ 11.) Kirby was no exception. Lee edited Kirby's work and reviewed and approved all of his work prior to publication. (Pls.' 56.1 ¶¶ 58-59.) Lee's testimony is consistent with the recollection of Kirby's daughter, Susan Kirby, who testified that Lee asked her father to "redo pages." (10/25/10 Deposition of Susan Kirby ("S. Kirby Dep.") 37:23-25.) Neal Kirby testified about one instance where Lee rejected a "cover" created by Kirby. (N. Kirby Dep. 58:8-18.)

Additionally, it was Lee who generated the plot or synopsis from which an artist created the pencil drawing for each assignment. (Pls.' 56.1 ¶ 31; see also Lieber Dep. 13:2-5, 13:22-24.) Lee testified that he assigned an artist to draw a comic book after he had either described the premise in a plot outline or plotting conference, or provided the artist with a detailed script. (Pls.' 56.1 ¶¶ 36-37, 39, 54, 82, 85, 88, 94-95, 97, 99, 101.) Lee, who created the plot and dialogue for the characters after the pencil drawing was completed, often times ignored any "margin notes" submitted by the artist with suggestions as to the plot or dialogue in the story. (Romita Dep. 72:21-74:13.)

Lee's testimony is corroborated by both documentary evidence and testimony from other artists and writers who worked for Marvel during the 1950s and 1960s. (See Singer Decl. Ex. 30 (example of Marvel plot outline); see also Pls.' 56.1 ¶¶ 37, 39, 54, 88, 94-95, 101.) For instance,

31

Thomas testified that Lee "would come up with the idea for the plots" and Lee would then give the plots to the artists to draw. (Thomas Dep. 218:14-219:10.) Romita also testified that he and Lee would "get together in a room" to discuss the plot, and then he "would have to do the nuts and bolts" in the pencil drawing. (Romita Dep. 39:18-40:18.) Further, Lieber similarly testified that it was Lee who "came up with the ideas for the characters that would be in the story" and it was Lee who developed the "plot" or "idea" for the comic book. (Lieber Dep. 12:19-23, 13:22-24.) Marvel also produced a plot outline for the first issue of "The Fantastic Four" comic book. (Singer Decl. Ex. 30 (plot outline).) The plot outline gave the artist a detailed narrative of the story to be drawn, including the number of pages the artwork should consume. Kirby produced the pencil drawing for that issue.[4]

Defendants argue that Kirby did not have a contractual relationship with Marvel (by which they mean there was no written contract setting forth the terms of their arrangement), so therefore Marvel lacked the legal right to control Kirby's work. This argument is entirely unpersuasive.

First, the fact that there was no written contract does not, as a matter of law, mean there was no contractual relationship. "We agree that, if you draw a picture, I will pay you" creates a contract, whether the agreement is reduced to writing or not. The issue, however, is of no moment, since no written contract is needed to satisfy the "instance" prong of the instance and expense test.

Second, in deciding whether the "instance" prong is satisfied, courts focus on the "actual relationship between the parties," see, e.g., Aldon Accessories Ltd. v. Spiegel, Inc., 738 F.2d

---

[4] The "expert" declarations of Morrow and Evanier stricken by the Court were submitted to try to raise an issue of fact about "instance." If they were still in the record, they would not raise such an issue, because neither "expert" was at Marvel between 1958 and 1963, and therefore neither has first-hand knowledge of how the Kirby Works were created.

548, 552-53 (2d Cir. 1984), and whether the hiring party *could have* controlled or supervised the creator's work, Playboy, 53 F.3d at 554; see also Martha Graham, 380 F.3d at 635.  A hiring party's ability to supervise and edit an artist's work does not need to be based on terms set out in a written contract.  As the undisputed facts here illustrate, Marvel, through Lee, gave artists assignments, reviewed their work, and made changes when necessary.  Marvel *did* control and supervise all work that it published between 1958 and 1963.

Accordingly, there is no disputed issue of material fact: the undisputed evidence illustrates that the Kirby Works were created at Marvel's "instance."

2.  *Expense*

To qualify as a work for hire under the 1909 Act, the Kirby Works must also have been created at the expense of the hiring party—in this case, Marvel.  Martha Graham, 380 F.3d at 634.

The parties do not dispute that Kirby provided his own tools, worked his own hours, paid his own taxes and benefits, and used his own art supplies.  (Defs.' 56.1 ¶¶ 149-51.)  Indeed, the reason the Kirby Heirs submitted the Sinnott, Steranko, and Ayers declarations—in which all three artists state that as freelance artists they worked from home and paid for their own supplies (Sinnott Decl. ¶ 9; Steranko Decl. ¶ 10; Ayers Decl. ¶ 10)—was to try to raise an issue of fact about whether the Kirby Works were created at Marvel's "expense."  But these factors "have no bearing on whether the work was made at the hiring party's expense;" they are relevant only to the issue of whether an artist worked as an employee and not an independent contractor.  Playboy, 53 F.3d at 555; see also Siegel, 658 F. Supp. 2d at 1058.

In this Circuit, the "expense" requirement is satisfied "where a hiring party simply pays an independent contractor a sum certain for his or her work."  Playboy, 53 F.3d at 555 (citing

33

Second Circuit precedent).  In Playboy, the Second Circuit determined that "the simple fact that Playboy paid [the artist] a fixed sum for each of the works published in *Playboy* magazine is sufficient to meet the requirement that the works be made at Playboy's expense."  Id. (italics in original).  "In contrast, where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship."  Id.  "[T]he focus is on who bore the risk of the work's *profitability*."  Siegel, 658 F. Supp. 2d at 1058 (emphasis added).

It is undisputed that Kirby was paid a fixed per-page fee for all work that Marvel published—including the Kirby Works.  (Pls.' 56.1 ¶¶ 61-62; Defs.' 56.1 ¶¶ 61-62.)  Therefore, there is no genuine issue of material fact: the works were created at Marvel's expense.

The Kirby Heirs argue that Kirby bore the risk of his work's profitability because Marvel was not legally obligated to purchase all the work that Kirby submitted, and on occasion rejected Kirby's work, or asked him to revise it.  They also assert that Kirby was not paid any "turn down fee" or any extra amount if he was required to revise a drawing, and contend that this, too, shows that he bore the risk that his work would not be acceptable to Marvel.

Plaintiffs retort that the relevant question is which party bore the risk of the profitability of entire project—that is, the risk that the published comic book would not sell.  According to Plaintiffs, Marvel bore that risk, because it hired the team of artists who were tasked with creating the comic book (*i.e.*, the writers, pencillers, inkers, letterers, colorists, etc.), bore the cost of printing the comic book, and paid the artists a flat fee, before publication and irrespective of whether the comic book made a profit.

The Kirby Heirs' argument has been made before, and it has been roundly rejected in favor of the position taken here by Marvel.

34

In <u>Playboy</u>, for instance, Playboy paid Patrick Nagel, the artist, "a fixed sum for each of the works published in *Playboy* magazine," —exactly the same arrangement that Kirby had with Marvel. <u>Id.</u>, 53 F.3d at 555. For the Second Circuit this alone was "sufficient to meet the requirement that the works be made at Playboy's expense." <u>Id.</u>

The Kirby Heirs note that, on remand from this decision, the district court focused on Nagels' receipt of a turn-down fee in making the final determination that his paintings were works for hire. They argue that Marvel's failure to pay Kirby a similar fee for unpublished work means that he bore the risk, and so created the work at his own expense. Unfortunately, their argument rests on a misreading of the context in which the district court discussed the turn down fee. On remand, the district court considered the turn-down fee in the context of addressing the instance prong of the instance and expense test—not the expense prong. The Court accepted Playboy's argument that it "at least implicitly requested Nagel to submit at least one painting a month and that it [the turn-down fee] therefore was the motivating factor in the creation of those paintings." <u>Playboy Enterprises, Inc. v. Dumas</u>, 960 F. Supp. 710, 713 (S.D.N.Y. 1997). In this case, the evidence that the works were created at Marvel's instance is so overwhelming that its failure to pay Kirby a turn-down fee is effectively irrelevant.

In <u>Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.</u>, 2002 WL 398696 (S.D.N.Y. Mar. 15, 2002), <u>aff'd</u>, 342 F.3d 149 (2d Cir. 2003), the estate of artist Burne Hogarth claimed ownership of the copyrights in two illustrated Tarzan books. The fictional character, Tarzan, was created by Edgar Rice Burroughs, and the Defendant, Edgar Rice Burroughs, Inc. ("ERB"), was the corporate entity that owned the copyrights in Burroughs' work. The court concluded that the two illustrated Tarzan books created by Hogarth were done at ERB's instance and expense. Discussing the expense prong of the test, the court explained that "ERB's non-

35

refundable advance against royalties to Hogarth of $5,000, the $5,000 cap on its deduction from

royalties for its expenses in addition to the Hogarth advance, the salaried work of its executive . .

. , its obligation to procure domestic and foreign publishers and negotiate the terms of the

publishing contracts (contracts executed by ERB and not Hogarth), and its *full assumption of the

risk of loss on the project*" was evidence that the books were created at ERB's expense. Id. at

\*20 (emphasis added).  Even though Hogarth was eligible to receive royalties if the works sold

well, the court nonetheless concluded that the books were made at ERB's expense because,

"Where, as here, the creator receives both a fixed sum and royalties, the fact that the creator

received a fixed sum is sufficient to meet the requirement that the works be made at the

employer's expense." Id. at \*20.

     In this case, Kirby received only a fixed sum; he was not eligible to collect royalties.  His

heirs' argument that he bore the risk of the project is, therefore, even less persuasive than was

Hogarth's losing argument in Burroughs.

     Finally, in Twentieth Century Fox Film Corp v. Entertainment Distributing, 429 F.3d 869

(9th Cir. 2005), the issue was whether "Crusade in Europe," General Dwight D. Eisenhower's

account of World War II, was a work for hire.  The Ninth Circuit concluded that the book was

created at the instance and expense of the publisher (Doubleday), and so was a work for hire.

Focusing on the issue of expense, the court explained that Doubleday, by agreeing to pay

General Eisenhower a "lump sum for writing the book, instead of negotiating a royalty deal" and

by "shoulder[ing] the expense for the entire staff who assisted General Eisenhower in drafting

the manuscript," had taken "on all the financial risk of the book's success." Id.

     Like Eisenhower, Kirby took on none of the risks of the success of the many comic books

he helped produce.  His contribution to the enterprise was plainly critical, but Marvel, not he,

bore the risk of its failure. Therefore, the expense factor favors Marvel's work-for-hire claim as well.

E.   The Kirby Heirs Fail to Rebut The Work-For-Hire Presumption.

Because the Kirby Works were created at Marvel's instance and expense, there arises a presumption that the Kirby Works were works for hire within the meaning of the 1909 Act. This means that Marvel is presumed to be the "author" of the Kirby Works and the original owner of the copyright in those works. See Playboy, 53 F.3d at 554.

"That presumption can be overcome, however, by evidence of a contrary agreement, either written or oral." Id. The Kirby Heirs bear the burden "to demonstrate by a preponderance of the evidence that such a contrary agreement was reached." Id. at 554-55, 556. Put otherwise, Marvel, having successfully raised the presumption, is entitled to summary judgment unless the Kirby Heirs adduce admissible evidence justifying a finding—or at least raising a genuine issue of fact—that Kirby and Marvel agreed that the Kirby Works would not be "works made for hire."

The Kirby Heirs claim that three documents constitute "evidence to the contrary" sufficient to justify the conclusion that Kirby and Marvel did not intend a work-for-hire relationship: (1) the 1972 assignment agreement between Kirby and Marvel, (2) checks issued between 1973 and 1974 by Marvel to freelance artists other than Kirby, and (3) a 1975 employment agreement between Kirby and Marvel. The Kirby Heirs argue that these documents demonstrate an understanding that Kirby, not Marvel, originally owned the federal statutory copyright in the Kirby Works, and that Marvel acquired those copyrights via the (now revocable) assignment from Kirby.

37

In fact, the first of those documents—the 1972 assignment—is the antithesis of evidence showing the existence of an agreement that contradicts the work-for-hire presumption. The plain language of the 1972 assignment makes it clear that all of Kirby's work for the publications owned by the Goodmans (Timely and Marvel) was work for hire. Other statements made by Kirby himself—including a 1986 affidavit in which Kirby admitted that the practice at the time the Kirby Works were created vested ownership of those works in the commissioning party— corroborate the plain language of the 1972 assignment. (Singer Decl. Ex. 47 at ¶ 1.) So not only are the documents on which the Kirby Heirs rely not "evidence to the contrary" of the presumption; they prove conclusively that the Kirby Works were works for hire.

1. *The 1972 Agreement*

It is undisputed that there was no written contract governing the relationship between Marvel and Kirby during the years 1958-1963, when the Kirby Works were created. (Pls.' 56.1 ¶ 141; Defs.' 56.1 ¶¶ 141, 146.) The first written agreement between Marvel and Kirby was executed on June 5, 1972—nine years after the last artwork at issue was created. (Pls.' 56.1 ¶ 147; Defs.' 56.1 ¶ 147.) This is the agreement discussed above, which contains the language assigning to Magazine Management Company (a predecessor of plaintiffs) "any and all right, title and interest [Kirby] may have or control" in all the work Kirby created for Marvel. (Singer Decl. Ex. 17 at 1.A.(1).) It is also the document in which Kirby agreed that he had created the works as an "employee for hire" of the Goodmans, who owned Marvel. (Id. at 5.)

The Kirby Heirs assert that the 1972 assignment necessarily shows that Marvel knew Kirby owned the copyrights in his works; prior to the document's execution, otherwise, they argue, it would be superfluous. Again, defendants make an argument that has been repeatedly rejected. The fact that the 1972 agreement assigns to Marvel whatever right, title and interest

38

Kirby had at that time in the copyrights to the Kirby Works does not mean that the works were not created as "works for hire" within the meaning of the 1909 Act.

In Twentieth Century Fox Film, the defendant argued that General Eisenhower's memoir was not a work for hire, because Eisenhower and the publisher, Doubleday, signed an agreement assigning all of Eisenhower's rights in the book to Doubleday. 429 F.3d at 881. The defendant argued that if Doubleday held the copyright in the book under the work-for-hire doctrine, the assignment was unnecessary. Id.

The Ninth Circuit disagreed. It explained that the 1948 contract was "insufficient to rebut the presumption" that the book was a work for hire, because it was not "evidence that the parties did not intend to create a work-for-hire"—the only type of evidence that can rebut the presumption. Id. Relying on Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298 (9th Cir. 1965), the court explained that the assignment contract alone did not rebut the work-for-hire presumption, because the contract did not provide "evidence as to the *circumstances or intendment* of its execution." Twentieth Century Fox Film, 429 F.3d at 881 (italics in original). Similarly, there is no evidence as to the circumstances under which the 1972 assignment by Kirby was executed.

This Court in Hogarth also rejected that an agreement conveying rights in the two books Hogarth created, signed after the work was created, meant that the independent contractor had originally reserved the copyright in his work, and so rebutted the presumption of work for hire by the instance and expense test. 2002 WL 398696, at *23. The works were published in 1972 and 1976. In 1970, Hogarth and ERB signed an agreement that conveyed to ERB "whatever rights we need to obtain the copyright in our name and to extend and renew that copyright wherever and whenever we can." Id. The court in Hogarth concluded that the provision in

39

paragraph eight of the agreement neither "'proves [n]or disproves that the parties intended something other than a work-for-hire relationship.'" Id. (quoting Playboy, 53 F.3d at 557). Citing Playboy, the Court noted that "the 1909 Act only governed works after they were published, and left their protection before publication to common law copyright" and therefore the assignment contract could have meant to "protect[ ] the rights of the hiring party before publication." Id. at *23. Moreover, paragraph eight also provided that ERB "shall be the exclusive proprietor[ ]" of the copyrights in the Books. Id. The Court relied on this language to conclude that the "precise import of paragraph 8 to the 1970 Agreement remains unclear, and an explanation for its language consistent with a work for hire arrangement is 'at least plausible.'" Id. (quoting Playboy, 53 F.3d at 557). Further, the language of the agreement conveyed to ERB "whatever rights we need;" it did not constitute an acknowledgement that any rights actually needed to be conveyed.

In this case, as I have already noted, the language of the 1972 Agreement does not support the Kirby Heirs' claim. The agreement only purports to assign whatever right, title and interest Kirby "may have" in the Kirby Works; it does not contain language acknowledging that Kirby actually had retained any federally protected copyright in those works at the time he created them. What the 1972 agreement does contain is Kirby's admission that he created the works as an employee for hire of Marvel's owners—definitive language that completely eviscerates the Kirby Heirs' claim that the agreement constitutes evidence of an understanding that the Kirby Works were not works for hire.

The fact that the assignment was executed when it was—in 1972—actually suggests that the parties intended to memorialize an understanding that the Kirby Works were works for hire, rather than the contrary. 1972 was shortly before the 1909 Act was superseded by the 1976 Act.

40

Drafts of the new copyright law (the first produced in 1963) threatened to alter the court-created

presumption that works commissioned from independent contractors were likely works for hire.

See generally Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 744-45 (1989)

(discussing history of enactment of the 1976 Copyright Act).   The 1965 draft of the statute

limited "works for hire" to "a work prepared by an employee within the scope of his

employment" and four categories of works commissioned from non-employees "if the parties

expressly so agreed in writing: works for use 'as a contribution to a collective work, as a part of a

motion picture, as a translation, or as a supplementary work.'"  Reid, 490 U.S. at 746.  In 1966,

the House Judiciary Committee added four additional categories of commissioned works to the

four mentioned in the 1965 draft: compilations, instructional texts, tests, and atlases.  With one

further addition (answer material for a test), that is the definition of works for hire in the 1976

statute.  Id. at 747.  With a definition of work for hire on the horizon that would severely restrict

the ability of a party in Marvel's position to claim copyright in works created by independent

contractors, it is easy to see why the company and Kirby entered into the 1972 Agreement—even

though the 1976 Act did not apply to works created before January 1, 1978.

The fact that the assignment addressed "all right, title, and interest" evinces a second

purpose for the agreement.  Prior to passage of the 1976 Act, common law copyrights existed in

unpublished works.  See e.g., Playboy, 53 F.3d at 557; Hogarth, 2002 WL 398696, at *23.  To

the extent that Kirby had common law copyrights in any unpublished work covered by the

assignment (such as work rejected by Lee), he conveyed those rights to Marvel in 1972.  The

Termination Notices, which address only statutory copyright, have no effect on any such

assignment.

The <u>Hogarth</u> Court's conclusion that an assignment of rights was not evidence of an agreement contrary to the presumption was bolstered by the "profusion of evidence that Hogarth always considered ERB the sole and exclusive owner of all copyright interest in the Books, including in his original art published in the Books . . . ." 2002 WL 398696, at *23. In this case, as in <u>Hogarth</u>, there is ample additional evidence to corroborate Marvel's contention that Kirby's understanding was no different. For example, on July 12, 1966, Kirby signed an affidavit in which he averred that another character he helped create, Captain America (which is not one of the Kirby Works for which Termination Notices were sent), belonged to the company for which he created it; Kirby "felt that whatever [he] did for Timely belonged to Timely as was the practice in those days." (Singer Decl. Ex. 44 at Marvel0000354.) Kirby also signed a copyright registration application for Captain America in which he acknowledged that Marvel was the "proprietor of a copyright in a work made for hire." (Pls.' 56.1 ¶ 70.)

Finally, in an "Acknowledgement of Copyright Ownership" dated June 16, 1986, Kirby himself stated:

> I have no copyright rights and no claim to copyright, or to the renewal or extension of copyright, or any other rights (except only for my ownership of the original physical artwork being returned to me by Marvel) in any artwork, characters, publications or other material . . . created or prepared by me for or on behalf of, or which was published by or under the authority of, Marvel Comics Group or any predecessor company.

(Singer Decl. Ex. 47 at ¶ 1.) None of these statements suggests that the 1972 agreement conveyed any federal copyright from Kirby to Marvel; all of them support Marvel's contention that no agreement exists that contradicts the work-for-hire presumption.

Thus, the 1972 assignment agreement is the antithesis of evidence of "an agreement to the contrary" and does not rebut the presumption that the Kirby Works are works made for hire.

42

*2. The 1975 Employment Agreement*

The first written employment agreement between Kirby and Marvel is dated March 24,

1975. (See Singer Decl. Ex. 46.) That agreement, which ran for a term of three years

commencing on May 1, 1975, provides the following:

> "Writer/Artist grants to Marvel the sole and exclusive right to all Material
> delivered to Marvel hereunder including, but not limited to, (a) the exclusive right
> to secure copyright(s) in the Material in the United States, Canada, and
> throughout the world, (b) the magazine rights therein of every kind, (c) all film
> and dramatic rights of every kind, (d) all anthology, advertising and promotion
> rights therein, and (e) all reprint rights.

(Id. at ¶ 7.) Based on this language, the Kirby Heirs argue that, as late as 1975, Marvel believed

its relationship with its freelance artists was premised on the purchase of work and the

assignment of copyright, and not on the work-for-hire doctrine. (Defs.' Br. In Opp. To Pls.'

Mot. For Summ. J. at 18-19.)

Again, the argument is unpersuasive. The employment agreement—signed literally on

the eve of passage of the new copyright law, under which Kirby's future work would not have

qualified as work for hire in the absence of such an agreement -- is not evidence that Kirby and

Marvel intended for Kirby to retain any federal copyright in his work at the time he created it.

Furthermore, the 1975 Agreement cannot be an agreement "to the contrary" for our purposes

because it relates to work that was going to be produced between May 1975 and May 1978—not

to the Kirby Works, which were created between 1958 and 1963. It is only the 1972 Agreement

that might have created an agreement "to the contrary" of the work-for-hire presumption—and as

we have seen, it does not.

*3. The 1973 and 1974 Checks*

There is really no need to consider the other evidence presented by the Kirby Heirs,

because the language of the 1972 "assignment" and Kirby's own statements doom their position.

However, the other documents on which the Kirby Heirs rely add nothing of substance to their contention.

Neither Plaintiffs nor Defendants have copies of any checks that Marvel issued to Kirby during the relevant period—nor does Marvel still have copies of checks used to pay other freelance artists who submitted work during those years.   (Pls.' 56.1 ¶ 156; Defs.' 56.1 ¶ 156.) The earliest check uncovered by the Kirby Heirs is from 1973.   It was issued by Marvel to Stephen Gerber, a freelance artist.   (Defs.' 56.1 ¶ 157.)   The check bears the following "legend:"

> By endorsement of this check:  I, the payee, acknowledge full payment for my employment by Magazine Management, Co., and for my assignment to it of any copyright, trademark, and any other rights in or related to the material, and, including my assignment of any rights to renewal copyright.

(Pls.' 56.1 ¶ 158.)   Marvel located a second old check, issued in 1974 to Dick Ayers, another Marvel freelance artist; it bears the same legend.   (Defs.' 56.1 ¶ 158.)

The first check produced by Marvel bearing a legend that explicitly mentions "work for hire" is from 1986—long after passage of the 1976 Act, which, as noted above, substantially narrowed the scope of work for hire from independent contractors from that which pertained under the 1909 Act.   (Defs.' 56.1 ¶ 159.)   The legend on this check (which was made payable to Kirby) states:

> By acceptance and endorsement of this check, payee acknowledges, (a) full payment for payee's employment by Marvel Entertainment Group, Inc., (b) that all payee's work has been within the scope of that employment, and (c) that all payee's works are and shall be considered as works made for hire, the property of Marvel Comics Group, Inc.

(2/25/11 Toberoff Decl. Ex. BB.)

The Kirby Heirs argue that checks issued to Kirby between 1958 and 1963 must have borne a legend similar to the legend that appeared on the 1973 and 1974 checks.   They also argue that placement of the legend suggests that Marvel believed that its artists owned the copyright in

their works, and that Marvel required an assignment from the artists in order to acquire the copyright.

Of course, there is absolutely no evidence that checks issued to Jack Kirby between 1958 and 1963 bore a legend identical or similar to the one that appears on the checks from a decade later; one cannot infer what might have been written on a check issued in 1958 from what was written on an analogous check fifteen years later. For that reason alone, the 1973 and 1974 checks do not raise any genuine issue of fact that tends to contradict the work-for-hire presumption. The legend that appears on the 1986 check can be explained by the radical change in the law on work for hire that was worked by the 1976 Act (see discussion above), and so is evidence of nothing at all.

Further, the language in the legend, which assigns to Marvel the copyright in the work, is not dispositive of whether a work-for-hire relationship exists under the 1909 Act. In Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc., 2010 WL 3564258, at *11 (S.D.N.Y. Sept. 10, 2010), the plaintiff argued that Jamaican reggae artist Bob Marley and Island Records (defendant's predecessor-in-interest) could not have intended that Marley's songs were works for hire because the recording agreements between Marley and Island Records contained language "that either 'assigns' or 'licenses' rights from Marley to Island for the distribution of" Marley's songs, and did not use "the exact phrase 'work made for hire. '" Id. The Court was not persuaded, explaining that "the use of the phrase 'work made for hire' in an agreement is not necessary in order to find the existence of a work-for-hire relationship under the 1909 Act." Id. (citing Martha Graham, 380 F.3d at 639-41; Hogarth, 342 F.3d at 151-53, 163).

In Playboy, the checks Playboy issued to Nagel bore a legend similar to the one found on the 1973 and 1974 checks: "By endorsement of this check, payee acknowledges payment in full

for the assignment to Playboy Enterprises, Inc. of all right, title, and interest in and to the following items . . . ." 53 F.3d at 552. The district court originally concluded that the check legend confirmed that the parties did not intend a work-for-hire relationship. Id. at 556-57. The Second Circuit reversed, stating that it was "impossible to discern the intent of the parties from the language" in the legend. Id. at 557. The Court explained that Playboy's explanation—that the legend is not inconsistent with a work-for-hire agreement because the assignment discussed in the legend governed only common law rights in the work prior to publication—was plausible, so the legend neither "proves or disproves that the parties intended something other than a work-for-hire relationship." Id.

Of course, the language on Marvel's checks (unlike the legend on Nagel's checks) does explicitly state that the assignment is for the copyright in the work. But, as discussed, the checks were not issued to Kirby and are not from the relevant time period, so they are not admissible evidence of anything. The 1972 Assignment (which runs from Kirby to Marvel and relates to, inter alia, the Kirby Works) explicitly assigns whatever copyright Kirby has in the Kirby Works, but, I have already discussed why that does not negate the work-for-hire presumption— especially in view of the other language, in the same document, which states that Kirby's works were "works made for hire." If the 1972 Assignment does not rebut the presumption, or at least raise a genuine issue of fact, then checks issued to some other artist over a decade after the Kirby Works were created certainly does not do so.

One of my colleagues concluded, in a similar case, that legends on checks written during the wrong time period did not raise any issue of fact that would tend to rebut the presumption that a pre-1978 commissioned work was a work hire. In Archie Comic Publication, Inc. v. DeCarlo, 258 F. Supp. 2d 315, 330-31 (S.D.N.Y. 2003), aff'd, 88 F. App'x 468 (2d Cir. 2004),

46

comic book artist Daniel DeCarlo claimed ownership of the copyright in "Sabrina the Teenage

Witch," a well-known story published by Archie Comic Publications, Inc. ("ACP"). After

concluding that the instance and expense test was satisfied, the court presumed that all pre-1978

"Sabrina the Teenage Witch" stories were "works made for hire," in which ACP, not DeCarlo,

owned the copyright. As evidence of an agreement to the contrary, DeCarlo relied on a

handwritten copy of an endorsement on a check ACP issued to him in 1970. The endorsement

stated that "ACP's 'check is accepted as full payment for all the undersigned's right, title and

interest in and to the strip, copy, art, continuity, characters, story or manuscript entitled or used

in' the story identified on the check." Id. at 331. DeCarlo also submitted declarations from other

freelance artists, who had been required by ACP to sign similar check endorsements as early as

1954. Id. at 323-24. DeCarlo himself testified that the handwritten copy of the check

endorsement was "the contract on the back of the old checks" he received, and that the

endorsement was used in 1970. Id. at 324. DeCarlo could not, however, say precisely what

wording appeared on checks issued to him at other times during his relationship with ACP. Id.

The Court concluded that the evidence DeCarlo had submitted, if credited, would not

permit a "trier of fact reasonably to conclude" that DeCarlo owned the copyrights in his pre-1978

contributions to "Sabrina the Teenage Witch," in light of the "'almost irrebuttable' presumption

that these were works for hire." Id. at 330. There "is considerable uncertainty as to the language

of the . . . check endorsements that were used in the 1960's when *Sabrina* was created and at any

other time prior to the effective date of the 1976 Act." Id. at 330 (italics in original). "[A]ny

determination by a trier of fact as to what the text was during the relevant period . . . would be

speculation." Id. at 331.

47

If DeCarlo's evidence was insufficient to rebut the presumption, the two checks on which the Kirby Heirs rely are certainly insufficient to do so. "The presumption may be rebutted only by evidence that the parties did not intend to create a work-for-hire." Twentieth Century Fox Film, 429 F.3d at 881. Checks that were not issued to Kirby, and that postdate the creation of the Kirby Works by a decade and more, prove nothing about what Kirby and Marvel intended; even coupled with testimony from other freelance artists, who claim that their checks bore a similar legend, the trier of fact would have to speculate about what (if anything) appeared on checks issued to pay Kirby for the Kirby Works. See, e.g., Archie Comic, 258 F. Supp. 2d at 330-31.

Finally, even if the legend on the 1973 and 1974 checks had some probative value (which it does not), the language of the legend does not admit of an inference that Marvel and Kirby agreed that Kirby would retain the copyright in the Kirby Works. See, e.g., Archie Comic, 258 F. Supp. 2d at 331. In Archie Comic, the endorsement on DeCarlo's check stated that "ACP's 'check is accepted as full payment for all the undersigned's right, title and interest in and to the strip, copy, art, continuity, characters, story or manuscript entitled or used in' the story identified on the check." Id. The Court held that "the endorsement, far from suggesting that DeCarlo retained copyright in the contribution for which the endorsed check was issued, supports the view that ACP was the sole owner of all rights." Id. Similarly, the 1973 and 1974 legend assigning to Marvel all rights, including the copyright, in the work for which other artists were paid can be read as supporting the view that Marvel did not intend its independent-contractor artists to reserve the copyright in their work.

Thus, none of the evidence submitted by Defendants makes so much as a dent in the "almost irrebutable" presumption that the Kirby Works were works for hire. The Kirby Heirs are not entitled to summary judgment in their favor, and they have not raised any genuine issue of

48

fact necessitating a trial.  The Termination Notices were of no force and effect, because Marvel acquired the federal statutory copyright in the Kirby Works by virtue of its status as their "author" under the work-for-hire doctrine. Plaintiffs are entitled to a declaration to that effect.

## CONCLUSION

For the reasons discussed, the Plaintiffs' motion for summary judgment is granted. The Defendants' cross motion for summary judgment is denied.

The Docket Clerk is instructed to remove docket entries 60 and 73 from the Court's list of pending motions.

Further, the Plaintiffs' motions to strike the expert reports of Mark Evanier and John Morrow are granted. The Docket Clerk is instructed to remove docket entries 67 and 70 from the Court's list of pending motions.

Plaintiffs' motion to strike the declarations of Sinnott and Steranko is denied. The Docket Clerk is instructed to remove docket entry 111 from the Court's list of pending motions.

The court will enter judgment in favor of Plaintiffs and close the case.

Dated:   July 28, 2011

_____
U.S.D.J.

BY EFC TO ALL COUNSEL

50